```
 1                 UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3   UNITED STATES OF AMERICA      :
                                   :
 4   vs.                           : No. SA:17-CR-00347
                                   : San Antonio, Texas
 5   JEFFREY CLINTON MICHALIK(1),  : August 21, 2019
     Defendant.                    :
 6   ********************************************************

 7            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                BEFORE THE HONORABLE DAVID A. EZRA
 8            SENIOR UNITED STATES DISTRICT JUDGE

 9   APPEARANCES:
     FOR THE GOVERNMENT:
10     Tracy Thompson, Esquire
       United States Attorney's Office
11     601 N.W. Loop 410, Suite 600
       San Antonio, Texas  78216
12     (210)384-7150; tracy.thompson@usdoj.gov

13

14   FOR THE DEFENDANT:
       Edward A. Bartolomei, Esquire
15     Richard A. Bartolomei, Esquire
       Jonathan R. Perez, Esquire
16     Law Office of Edward A. Bartolomei, P.L.L.C.
       530 Lexington Avenue
17     San Antonio, Texas  78215
       (210)225-0393; edward@eabartlaw.com
18

19

20   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
21   Official Court Reporter, U.S.D.C.
     655 East Cesar E. Chavez Blvd., Third Floor
22   San Antonio, Texas  78206
     Phone(210)244-5048
23   angela_hailey@txwd.uscourts.gov

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25
```

1                        **I N D E X**

2   **PRELIMINARY JURY INSTRUCTIONS**              **PAGE**

3   By The Court                                  11

4

5   **OPENING STATEMENTS**

6   By Ms. Thompson                               28

7   By Mr. Edward Bartolomei                      36

8

9

10  **GOVERNMENT WITNESSES:**

11  **Special Agent Argelia Juarez**

12  By Ms. Thompson                           52,179

13  By Mr. Richard Bartolomei                104,182

14

15  **Carmella Caravello (AT&T)**

16  By Ms. Thompson                              183

17  By Mr. Richard Bartolomei                    187

18

19  **Adrian Linares (Computer Forensic Analyst)**

20  By Ms. Thompson                              191

21  By Mr. Richard Bartolomei (Voir Dire)        205

22

23

24

25

 1   *(Wednesday, August 21, 2019, 9:16 a.m.)*

 2                         *   *   *

 3            COURT SECURITY OFFICER:  All rise.

 4            COURTROOM DEPUTY CLERK:  SA:17-CR-347, United States

 5   of America versus Jeffrey Michalik.

 6            THE COURT:  Okay.  Why don't you make your quick

 7   appearances -- well, don't make your appearances.  You're going

 8   to have to make them before the jury anyway.  Are we ready to

 9   proceed?

10            MS. THOMPSON:  Government is ready, Your Honor.

11            MR. RICHARD BARTOLOMEI:  Preliminary question that I'd

12   like to ask the Court for clarification on.  We submitted an

13   instruction under the uniform instructions for the Fifth

14   Circuit regarding confession statements voluntariness, single

15   defendant.  And as part of that jury instruction, it says, You

16   may consider and regard such factors as the age, sex, training,

17   education, occupation, physical mental condition of the

18   defendant, his treatment while under interrogation and all

19   other circumstances in evidence surrounding the making of the

20   statement.

21            I know that we've had an entire hearing on the motion.

22   I know that you've entered your ruling, however --

23            THE COURT:  Well, I gave notice of the ruling.

24   Officially, yes, the motion is denied, but the reasoning for

25   the denial will be coming.

1          MR. RICHARD BARTOLOMEI:  But now we're in the trial.

2          THE COURT:  Okay.

3          MR. RICHARD BARTOLOMEI:  So I'm going to have to go

4    over much of that again because that's the circumstances that

5    the jury gets to consider as to whether or not the statements

6    were voluntary because --

7          THE COURT:  So what is it that you want to talk to me

8    about?

9          MR. RICHARD BARTOLOMEI:  I wanted to talk to you about

10   whether there was going to be any limitation in that or if I'm

11   free to examine.

12         THE COURT:  On what?

13         MR. RICHARD BARTOLOMEI:  Voluntariness, all of that.

14         THE COURT:  Of course you can.  There's no limitation

15   on that.  It's no different than if I denied quality immunity

16   on the basis that there were factual disputes, genuine material

17   factual disputes and then we had a trial, you would certainly

18   be able to have -- the government would be able to have the

19   issue of qualified immunity decided again by the jury.  That

20   doesn't change anything.

21         MR. RICHARD BARTOLOMEI:  That's why I asked for

22   clarification.

23         THE COURT:  But I don't want you making statements

24   about the law.  You can't make statements about the law.  You

25   can't instruct the jury on the law.

1              MR. RICHARD BARTOLOMEI:  No.

2              THE COURT:  Well, the reason I mention that is that in

3    some State courts, it is permissible to go much further than

4    you can in Federal Court.  And I don't know what -- you're from

5    Iowa, right?

6              MR. RICHARD BARTOLOMEI:  Yes, sir.

7              THE COURT:  I don't know what Iowa's practice is.

8              MR. RICHARD BARTOLOMEI:  They're more like Federal

9    Court in that regard.

10             THE COURT:  One of my classmates from Saint Mary's Law

11   School ended up as a judge in Iowa, but sadly he died very

12   young from a heart attack.  Strange thing.  He was a great guy

13   too.  Anyway are we ready to proceed?

14             MR. EDWARD BARTOLOMEI:  We are, Your Honor.

15             MR. RICHARD BARTOLOMEI:  Yes.

16             MS. THOMPSON:  Yes, Your Honor.

17             THE COURT:  Bring in the jury.

18             *(9:19 a.m.)*

19                              *   *   *

20             *(9:21 a.m.)*

21             COURT SECURITY OFFICER:  All rise for the jury.

22             THE COURT:  All right, please be seated.  Before we go

23   any further, can we have counsel make their appearances please?

24             MS. THOMPSON:  May it please the Court, good morning,

25   ladies and gentlemen.  My name is Tracy Thompson.  I represent

1    the United States of America.

2         MR. RICHARD BARTOLOMEI:  Good morning, ladies and

3    gentlemen.  My name is Richard Bartolomei.  I represent the

4    defendant, Mr. Michalik.

5         MR. EDWARD BARTOLOMEI:  Good morning, ladies and

6    gentlemen.  My name is Edward Bartolomei and I represent the

7    defendant.  And Mr. Perez is at a court matter, Your Honor, and

8    he'll be here as soon as he resolves that.

9         THE COURT:  I'm sure he was there during jury

10   selection.

11        MR. EDWARD BARTOLOMEI:  He was.  He will be joining us

12   shortly.

13        THE COURT:  Very good.  Has the jury been sworn yet?

14        COURTROOM DEPUTY CLERK:  No, Judge.

15        THE COURT:  Swear the jury please.  Rise and raise

16   your right hand.

17        COURTROOM DEPUTY CLERK:  You and each of you do

18   solemnly swear that in the case styled United States of America

19   versus Jeffrey Michalik, the defendant, now before the Court,

20   you will render a true verdict according to the law and the

21   evidence, so help you God.

22                        *   *   *

23              (Whereupon the jury is sworn.)

24                        *   *   *

25        THE COURT:  Thank you very much.  All right.  Good

1   morning, ladies and gentlemen.  This is the first time that you

2   have met or seen me, I assume.  Judge Bemporad I believe

3   selected the jury.

4         COURTROOM DEPUTY CLERK:  Yes.

5         THE COURT:  And that allowed me to conduct proceedings

6   here on Monday all day.  I was in court all day on Monday doing

7   proceedings.  We were so busy here and we have such a shortage

8   of article three judges.  We're actually in accordance with the

9   numbers we're entitled to five.  And even with the new judge

10  that was just appointed we're still way down.

11        Now, I am actually kind of a hybrid.  I went to law

12  school here in San Antonio.  I met my wife Judy here, but I'm

13  not from here.  When I went to law school here, there was no

14  law school in my home state.  I am from Hawaii and I didn't

15  just fly there and have a vacation and decide to stay.  I grew

16  up there.  I'm really from Hawaii.  And I was a practicing

17  lawyer in the State of Hawaii and mostly in Federal courts, but

18  I actually traveled all over the country because I represented

19  entities, banks, I did a lot of construction litigation,

20  represented Federal insurance for banks and so forth, so I was

21  all over the place.  And then I was appointed in 1988 by

22  President Ronald Reagan to the Federal bench and I'm actually

23  the longest serving Federal judge in this courthouse.  I was

24  the youngest Federal judge in the country when I was appointed.

25  I was appointed at 39.  The average age of appointment is 56.

1    And I'm happy to say I got 100 votes in the United States

2    Senate, bipartisan appointment because my name came up through

3    the Bar Association, but that was a long time ago.  I've been a

4    judge for 31 years.  And Chief Justice Roberts when I took

5    senior status asked me to come here.  And I've known him since

6    actually his law school days at Harvard.  He asked because he

7    was a summer clerk in Hawaii as a young first -- finished his

8    first year of law school.  He asked me to come here and help

9    with the heavy caseload here on a permanent basis.  My wife is

10   from here, as I told you.  I have three daughters, two of whom

11   are lawyers, one works for a major accounting firm.  They're

12   all here in Texas.  And most important for my wife, my seven

13   grandchildren are here.  So I said yes and I am the only

14   permanent serving relocated Federal judge in the United States

15   and I also have the second highest caseload now I am told by

16   the Administrative Office of any judge in the United States, so

17   it's a busy court.  I have a full caseload here in San Antonio.

18   I sit on the United States Court of Appeals for the Ninth

19   Circuit on a regular basis by designation.  And I also have a

20   very heavy docket in Austin, so heavy I actually have my own

21   office and my own courtroom in Austin.  So I mention all of

22   those things not because I'm anything other than an old guy,

23   but because sometimes there will be a few delays in my getting

24   back in here and it's because I'm getting calls from

25   everywhere.  And then people come and see me and the Marshals

1   and I have to do all kinds of stuff, so it isn't because I'm

2   trying or, you know, just sitting back there relaxing.

3            You will also see me frequently drinking something.

4   It will either be a hot beverage or something else.  I had

5   vocal cord cancer about 2003.  I'm actually a four-time cancer

6   survivor.  I had radiation to my vocal cards and it was very

7   successful.  I'm fine, but the problem is that when you have

8   radiation to your vocal cords it damages your vocal cards.

9   It's an okay tradeoff, but I have a hard time if I speak for a

10  long time, I lose my voice.  So I try to keep my vocal cords

11  moist and that way I can continue to talk.  So what I'm going

12  to do now, ladies and gentlemen, is give you what I refer to as

13  the -- and I think most judges do -- the preliminary jury

14  instructions now that you've been sworn and you're a jury in

15  this case.  I also normally when I select the jury and I used

16  to be able to -- one of the reasons Judge Bemporad and the

17  other Magistrates help with selection is because of my voice

18  because it requires a lot of talking, but for 25 years I

19  selected my own juries, so I know what it is to select a jury.

20  I normally thank the jurors and I want to thank you ahead of

21  time for your service.  I also acknowledge because I came from

22  working parents, I worked my way through -- I wasn't some elite

23  guy.  I worked my way through college and law school doing

24  heavy construction.  That's what I did.  I worked for a

25  contractor and I used to work out at Sand Island which is I

 1    think the hottest place on earth because they have these big,

 2    huge, monstrous containers that they put on ships out there and

 3    they're just stacked and it's out there and it's got the sun

 4    beating in and then those mail containers heat up and they act

 5    like ovens and we used to walk around with these wet towels on

 6    our head, moving containers around.  And then I helped build

 7    the gull wings.  Have any of you ever been to Hawaii?  Raise

 8    your hand.  Any of you fly United Airlines?  Yes.  Where you

 9    landed, that's a gull wing.  I helped build that gull wing.

10    And let me tell you, I was a baseball player and I was a pretty

11    big guy and I started out at 215 pounds when I started that

12    job.  And when I ended that job at the end of the summer and

13    went back to school, I weighed 195 and I ate like a horse, but

14    you just work and sweat it off.  So I know what it is to work

15    and to earn a living and to need the money to work, okay, I

16    appreciate that and I understand it.  So I know what kind of a

17    sacrifice you're making being here those of you who hold a job.

18    Fortunately, I worked very hard -- I was President of the

19    District Judges Association and on the Judicial Council and

20    Judicial Conference which is the governing body.  I was elected

21    by all the judges of Ninth Circuit to be the representative.

22    And we worked very hard to get jurors' pay up.  And it's much,

23    much better than it used to be, but I know that it doesn't

24    replace your salary, so I do appreciate that, I understand

25    that.  Believe me.  In this job, and I'm not crying, it's the

1    way it is, I went 12 years without a cost of living increase

2    let alone a pay raise, so Congress isn't very generous with

3    Federal judges, but that's the name of the game, right?  So I

4    understand what we're talking about here and I do appreciate

5    it, okay.  I want you to know that you're making a big

6    sacrifice and I know it and all of the people in our court know

7    it.  And you're making that sacrifice for the parties here,

8    okay, and for your community.  It's important to understand

9    that.  It's not just, gee, I'm here.

10            I mean we can't have justice in this country, we can't

11   have a fair system of justice, we can't have the United States

12   Constitution which is what that stands for without you and

13   without your willingness to serve.  So I really do appreciate

14   it.

15            All right, let me give you your jury instructions,

16   your preliminary jury instructions.  In addition to everything

17   else here, I'm walking a little slowly because when I was on

18   vacation in Europe, I bought a pair of shoes that I had always

19   wanted to buy and the leather in English shoes is like leather

20   on a saddle.  And I'm telling you it is not feeling

21   comfortable.  I'm hobbling around back here.  Ladies, I know

22   what you go through.  Believe me.  I'm suffering over here.

23            Okay.  Now, you are now the jury in this case and I

24   want to take just a few minutes to tell you something about

25   what your duties are as jurors and to give you some

1    instructions.  Now, at the end of the trial, I will give you

2    more detailed instructions and it will be those instructions

3    that will control your deliberations.  Now, this is a criminal

4    case brought by the United States government.  Charges against

5    the defendant are contained in the indictment.  The indictment

6    is simply a description of the charges made by the government

7    against the defendant and it is not evidence of anything.  The

8    defendant has pled not guilty to the indictment and he is

9    presumed innocent unless and until proved guilty beyond a

10   reasonable doubt.  It will be your duty to decide from the

11   evidence to be presented whether the defendant is guilty or not

12   guilty of the crimes charged.  You will decide from the

13   evidence what the facts are and your verdict will be based on

14   those facts.  You and you alone are the sole judges of the

15   facts.  You must apply those facts to the law which I will give

16   you and in that way you reach your verdict.  You must follow

17   the law that I instruct you on whether you agree with it or not

18   and you must not take anything I may say or do during the trial

19   as indicating what I think of the evidence or what your verdict

20   should be.

21           Now, why do we have somebody like me instruct you on

22   the law and say you must follow that law?  Because we can't

23   have 12 jurors back there deliberating everybody thinking the

24   law is something different and we'd never get a verdict in any

25   case.  It would be crazy.  So somebody has to arbitrate the law

1    and the Constitution of the United States says it's me.  But

2    I'll tell you what, your role is actually more important than

3    mine and if we had robes, you'd be wearing one because as

4    jurors, you are the sole judges of the facts.  I have no right

5    at all as a Federal judge to determine the facts in this case.

6    You are the judges of the facts.  That's why when you leave and

7    come in, everyone stands.  Why do they stand?  Because you are

8    a judge in this case.  You are a judge of the facts and you

9    carry the burden of the United States Constitution.  That's why

10   people stand up when a judge walks into the courtroom.  They

11   don't stand up for the individual judge.  Who am I?  They stand

12   up for what I stand for and represent, which is the United

13   States Constitution, your Constitution.  So that's why

14   everybody stands up when you leave and come in.  It's not just

15   a respect for who you are, it certainly is that, but it is

16   because you are cloaked with the United States Constitution

17   when you sit as jurors, okay.

18          Now, the defendant has been charged by the United

19   States government in a one-count indictment with violating 18

20   United States Code, Section 2252(a)5(b), possession of child

21   pornography.  You will decide what the facts are from the

22   evidence which will be presented.  The evidence will consist of

23   the testimony of witnesses, documents and other things received

24   into evidence as exhibits and any facts on which the lawyers

25   agree or which I may instruct you to accept.  The following

1    things are not evidence and you must never consider them as

2    evidence in deciding the facts of this case.  Statements and

3    arguments of the lawyers are not evidence.  Questions and

4    objections of the attorneys are not evidence.  Testimony that I

5    instruct you to disregard is not evidence.  Anything that you

6    may have seen or heard when the court is not in session, even

7    if what you see or hear is done or said by one of the parties

8    or by one of the witnesses, those are not evidence.

9         Now, we all watch TV occasionally I think, most of us

10   do anyway.  And there are lawyer shows on television, right?

11   So in those shows frequently you'll see a lawyer get up, you

12   know, kind of a Perry Mason type and strutting around the

13   courtroom.  There will be none of that in Federal court.  We

14   don't allow that.  There will be no shouting at the witness.  A

15   lawyer that starts shouting at a witness in my court is in big

16   trouble and I don't expect these professionals to engage in

17   that kind of behavior.  But sometimes lawyers will ask a

18   question and that question is a loaded question.  Now, I'm not

19   suggesting that they're intentionally trying to infect the

20   trial, but sometimes it just comes out.  For instance, let's

21   say that before trial -- if this was a murder case and somebody

22   had been previously found guilty of assault, okay, and I had

23   said that's not germane to the case, you can't mention that,

24   but the lawyer gets carried away and he says, now, what did you

25   do the last time after you assaulted someone.  And then the

1   other lawyer jumps up, Objection, I move to strike.  And I

2   grant the objection and I strike the evidence, okay.  That's

3   what we talk about when we say the questions of the attorneys

4   are not evidence, okay.  Because I'll strike that and you have

5   to just forget about it.  All right?  Now, if it's bad enough,

6   I declare a mistrial.  But we won't come to that, I don't think

7   in this case, but I think it's very important that you not

8   allow yourself to take a question by a lawyer as evidence.

9   Now, the answer to the question is evidence, okay.  And of

10  course, you can take into consideration what the question was

11  in your understanding of the answer, all right?

12          Now, there are two kinds of evidence, direct evidence

13  and circumstantial evidence.  Direct evidence is testimony by a

14  witness about what that witness personally saw or heard or did.

15  Circumstantial evidence is indirect evidence, that is it is

16  proof of one or more facts from which you can find another

17  fact.  You may consider both direct evidence and circumstantial

18  evidence in deciding this case.  The law permits you to give

19  equal weight to both, but it is for you to decide how much

20  weight to give to any item of evidence.

21          This is another area where we have a lot of

22  misunderstanding from jurors, direct and circumstantial

23  evidence.  The jurors often think that direct evidence must be

24  better than circumstantial evidence because they see that on

25  TV.  Nothing can be further from the truth.  Circumstantial

1    evidence can be far more compelling than the direct evidence

2    from a witness.  There goes my voice.  That's what I was

3    telling you.  Sometimes I feel like I'm 13 again with my

4    breaking voice.  I'm actually 72, but I'm well preserved, as I

5    like to say, or I like to think anyway.

6           Let me tell you about direct and circumstantial

7    evidence.  And this comes from my 34 years of teaching at the

8    University of Hawaii Law School where I taught second and

9    third-year law students and I'm in my 35th year of teaching law

10   school, first time back and I teach tonight actually.  I teach

11   at Saint Mary's Law School where I graduated.  It's kind of a

12   strange moment coming from me.  I look out at those same seats

13   I sat in and I think, My God, where did all that time go?

14          Okay.  Let's talk about direct and circumstantial

15   evidence.  Let's say that we weren't in a drought and it wasn't

16   a hundred degrees every day.  Let's say that you have a window

17   in your bedroom at home.  And you know what it looks like

18   outside your window because you look out from your window.

19   Now, those of you who don't have a window in your bedroom,

20   let's say you have a window out in the hallway or you have a

21   window somewhere in your house, I hope.  We don't have any

22   windows in the chambers here.  It's the most depressing thing

23   in the world.  Fortunately, we're getting a new courthouse, so

24   before you go to bed, you look out the window, everything is

25   dry, baked out, you know what it looks like, right?  You've

1   seen outside your window, so you know what it looks like.  And
2   you are one of those blessed people that can sleep all night
3   long and never has to get up and use the restroom.  It ain't
4   me, I can tell you, but you're one of those people.  Who knows
5   what happened.  You went to bed, you just slept through the
6   night, you were exhausted, you got up, you looked out the
7   window and you see water dripping off the leaves and the water
8   out in the street and your backyard, it looks like it poured
9   rain at night, okay?  You have -- because you know, you can use
10  your common sense as a juror, you know what it looks like
11  outside your window, right?  And you know what rain looks like,
12  right?  And you know what it looks like outside your window
13  when it rains.  And you look out there and that's what it looks
14  like.  Do you have direct evidence that it rained?  No.
15  Because you didn't see it rain.  It had stopped raining by
16  that.  Had you got up in the middle of the night, looked out
17  your window and seen it rain, then you would have direct
18  evidence that it rained, but you have very strong
19  circumstantial evidence that it rained, right?  And that
20  circumstantial evidence may be just as compelling as the direct
21  evidence.  Now, it's entirely possible, maybe not likely, that
22  a fire truck came along and sprayed everybody's house, but I
23  mean that's pretty remote, right?  So that's what we talk about
24  when we talk about direct versus circumstantial evidence, okay.
25  And one can be much more compelling than the other.  Somebody

1   can get on the stand and tell a fanciful story that you don't

2   believe.  Well, that's direct evidence about what happened

3   because they're talking about what happened, but then the

4   circumstantial evidence may convince you that that fanciful

5   story is just that, fanciful.  On the other hand, it can be the

6   other way, okay.  So as I said, it is for you to decide how

7   much weight to give to any item of evidence, okay.  All right.

8          Now, some evidence may be admitted for a limited

9   purpose only.  When I instruct you that an item of evidence has

10  been admitted for a limited purpose, you must consider it only

11  for that limited purpose and for no other, okay.  Now, there

12  are Rules of Evidence which control what can be received into

13  evidence.

14         Right here.  I've spent 50 years almost as a lawyer

15  learning those Rules of Evidence.  When a lawyer asks a

16  question or offers an exhibit into evidence and a lawyer on the

17  other side believes it is not permitted by the Rules of

18  Evidence, that lawyer may object.  If I overrule the objection,

19  the question may be answered and the exhibit received.  If I

20  sustain the objection, the question cannot be answered and the

21  exhibit will not be received.  When I sustain an objection to a

22  question, you are to ignore the question and not guess what the

23  answer might have been.  Sometimes I may order that evidence be

24  stricken from the record and if that is the case, you must

25  disregard and ignore that proffered evidence, so when you

1    decide the case, you may not consider it at all.  In deciding

2    the facts of this case, you have to decide which witnesses to

3    believe and which witnesses not to believe.  You may believe

4    everything a witness says or only part of it or none of it.  In

5    deciding what to believe, you may consider a number of factors

6    including the following:  The witness's ability to see or hear

7    or know the things the witness has testified to, the quality of

8    the witness's memory, the witness's manner while testifying,

9    whether the witness has an interest in the outcome of the case

10   or any motive, bias or prejudice, whether the witness was

11   contradicted by anything that witness said or wrote before

12   trial or by other evidence and how reasonable was the witness's

13   testimony when considered in the light of other evidence which

14   you are to believe.

15           Of course, you're also entitled to exercise your own

16   common sense and good judgment.  That's what you bring to the

17   table here.  From time to time during the trial, it may become

18   necessary for me to talk to the lawyers out of your hearing.

19   And I'm sure Judge Bemporad must have had some bench

20   conferences during the jury selection, so you saw a little bit

21   of that.  Either by having a conference at the bench when you

22   are in the courtroom or if it's going to be long, I usually

23   call a recess so you don't have to sit there and just wait and

24   wait.  You can go back and use the restroom or relax for a few

25   minutes in the jury room.  Please understand that while you are

1    waiting, we are working.  The purpose of these conferences is

2    not to keep relevant information from you, but to decide how

3    certain evidence is to be treated under the Rules of Evidence

4    and to avoid confusion and error.  We will, of course, do what

5    we can to keep the number and length of these conferences to a

6    minimum.  I may not always grant an attorney's request for a

7    conference.  Do not consider my granting or denying a request

8    for a conference as any indication of my opinion of the case or

9    what your verdict should be and certainly not any indication of

10   what I think of the lawyer.

11           Now, let me talk a little bit again, I'm sure Judge

12   Bemporad talked to you a bit about your conduct as jurors.

13   You're not to talk to each other about this case or about

14   anyone who has anything to do with it until the end of the case

15   when you go to the jury room to decide on your verdict.

16   Second, you're not to talk to any third parties about this case

17   until the trial is over and you have been discharged as jurors.

18   Now, anyone else includes members of your family and your

19   friends.  You may tell them that you're a juror in a criminal

20   case in Federal court, but you must not tell them anything else

21   about it until after you have been discharged by me.  Third,

22   you're not to let anyone approach you and attempt to talk to

23   you about this case.  If anyone does, you're to let me know.

24   Now, that doesn't mean -- you know, when somebody finds out at

25   work, for instance, or somewhere else that you're a Federal

1    juror, they're going to have a natural curiosity.  Geez, what

2    are you doing?  What kind of case is it?  That's a natural

3    question.  I might ask that question if I didn't know better.

4    I mean they will ask.  And you just have to -- that's innocent.

5    And you just tell them, I'm sorry, I can't talk about it.

6           What I'm talking about is if somebody actually that

7    you don't know approaches you and tries to talk to you about

8    the facts of the case and what you should do and what you

9    should do.  And women are particularly good at this.  They have

10   a radar where they can sense somebody is up to no good.  Men

11   aren't so good, but we do an okay job, all right.  So just put

12   your radar out there, all right.  And if it doesn't feel right,

13   you let us know and make the decision, okay.  My wife always

14   tells me that women are better at their radar.  And we've been

15   married now 49 years.

16          As I told you, don't read any news stories or articles

17   or listen to any radio or television reports about this case or

18   about anyone who has anything to do with it.  That's very

19   important.  There's been a lot of publicity about these kind of

20   issues going around and, look, we have jurors who were jurors

21   in felony murder cases.  I had a four-month trial last year

22   with four brutal murders.  And no one on the jury, no lawyer in

23   the courtroom and certainly not any of the spectators involved

24   condoned murder.  The question isn't whether you like murder or

25   you don't like murder.  That's not the issue.  Nobody likes

1    murder.  Everybody thinks it's wrong.  Most people think it's

2    wrong.  If they don't think it's wrong, something is wrong with

3    them.  The question is whether the government has proved beyond

4    a reasonable doubt that the person committed the murder, right?

5    That's the question.  Not whether murder -- and child

6    pornography is no different.  I don't think anybody here thinks

7    that child pornography is a good thing, okay.  The issue isn't

8    whether you think child pornography is good or not good.  I

9    would assume you don't think it's good, okay?  The question is

10   whether the government can prove beyond a reasonable doubt that

11   the defendant had child pornography, okay, knowingly, okay.

12   It's an intent crime.  And I'll give you more instructions

13   about that later.  So just because it's a subject that is very

14   distasteful to you, that doesn't mean anything.  The defendant

15   is innocent as he sits there today.  The question isn't whether

16   you like child pornography or don't like it.  I'm sure you all

17   dislike it.  Fine, I agree, I don't like it either.  I'm sure

18   the lawyers here don't like it.  That's not the question.  The

19   question here is whether the government can sustain its very

20   high burden of proof to show that the defendant committed the

21   crime charged beyond a reasonable doubt.  Okay.  That's the

22   issue.

23           Now, this is very important because we have mistrials

24   over this and it's awful.  Don't do any independent legal

25   research on your own about this case.  And it's really

1    tempting, I'll tell you, it is.  It's even tempting for me.

2    You know, I hear things I don't know about in the trial.  This

3    happens in medical malpractice cases and I'm really tempted to

4    grab an iPad or get on my computer, look at my phone and Google

5    it, you know, but I don't do it and you can't do it either.

6    Because what happens is the lawyers here have a right to know

7    what it is that comes to your attention.  They have an absolute

8    right to know that.  And if you go and go on the Internet and

9    get a bunch of information and they don't know about it, it may

10   be that that information is one hundred percent wrong.  Have

11   any of you ever had a doctor tell you when they're talking to

12   you, For God sakes whatever you do, don't go on the Internet

13   because you're going to get really bad information.

14          I've had four diagnoses of cancer and in every case

15   the doctor said, You're not dying, you're going to be okay.

16   You're going to get treatment, you're going to be fine.  Don't

17   go on the Internet because if you go on the Internet, you're

18   going to jump off the bridge, okay.

19          There's so much bad information floating around out

20   there and they have no way of counteracting it because, what?

21   They don't know you even have it.  And that's particularly true

22   in a case like this because the Internet plays a major role in

23   this case.  So it's really, really important.  You're going to

24   hear about websites and other things and so it's really, really

25   critically important that you stay away from putting yourself

1    in the position of causing us a mistrial, okay.  That would not

2    be good and it would be a terrible thing for all of your fellow

3    jurors too, so just stay away from it.  And there well may be,

4    because this is a subject that has been in the news in other

5    contexts and you know that, a reporter in here.  And there may

6    be news stories about this case, okay, so please be really

7    careful not to come across that.  If you see anything like it

8    in the newspaper, just skip it and tell somebody to save the

9    article for you.  And if it shows up on the news as you watch

10   the news in the evening or in the morning, just mute your TV

11   and just stay away from it, okay.  Because I'll tell you, I had

12   a very long trial in Hawaii once involving a death in a

13   helicopter crash, tourist helicopter crash, very tragic case.

14   And one of the jurors called me later, because I give this

15   instruction in all my trials, and said, Judge, you were right

16   about these stories.  I sit there and listened every day all

17   day long and if I were just to read these newspaper articles,

18   they were just wrong.  They were just flat wrong.

19          I'm not getting into fake news now, but what happens

20   is the reporters can't sit in here all day.  They come in here

21   and sit for ten minutes and then run out.  You're sitting here

22   for eight hours.  Well, not eight hours, but a long time and

23   you're hearing all the evidence, so you know the evidence.

24   They don't know the evidence in ten minutes and they just --

25   right?  So please stay away from it, it isn't good, it isn't

1  fair.  And please don't make up your mind about what your

2  verdict should be in this case.  My voice is particularly bad

3  today and I don't know why.  I think it's the weather.  I get

4  this cedar fever, oh man.  I had forgotten.  Forty years away

5  from San Antonio, except to come back and visit the in-laws, I

6  forgot how bad the allergies are here.  You know, Hawaii you

7  would think would have bad allergies.  It's not good in Hawaii.

8  This is worse, I guarantee you.  You all deserve an allergy

9  medal for living here all these years.

10        Don't make your mind up about what your verdict should

11  be until after you have gone to the jury room to decide this

12  case and you and your fellow jurors have discussed the

13  evidence.  Until then, please keep an open mind.

14        Here is what is going to happen.  Ms. Thompson, how

15  close are you to being ready to make your opening statement?

16        MS. THOMPSON:  I'm ready, Your Honor.

17        THE COURT:  So what is going to happen is as soon as

18  I'm finished, I am going to permit the lawyers --

19  Mr. Bartolomei, are you going to be making your opening

20  statement now or are you going to reserve?

21        MR. EDWARD BARTOLOMEI:  Your Honor, I believe we'll

22  make an opening statement as well.

23        THE COURT:  Now?

24        MR. EDWARD BARTOLOMEI:  Yes, Your Honor.

25        THE COURT:  The defendant has a right to either make

1    their opening statement at the start of the entire trial or

2    they can wait until the government closes and then make their

3    opening statement, so that's what I was inquiring.  So they're

4    going to make their opening statement now.  So what is an

5    opening statement?  All right.  An opening statement is the

6    lawyer's opportunity to tell you what they believe the evidence

7    in the case will show from their perspective, okay.  Now,

8    remember, lawyers -- and you'll hear me say this to you many,

9    many times during this trial.  Lawyers are advocates, okay.  In

10   fact, in England that's what they call lawyers frequently are

11   advocates.  They are advocating a particular point of view.

12   Their job is to try to convince you of their view of the

13   evidence and to try to convince you you should reach a

14   particular verdict that they think you should reach.  So for

15   the government, of course, it's a conviction.  For the

16   defendant, it's an acquittal.

17              I was a trial lawyer and I did the same thing.  That

18   was my job.  In fact, they are ethically required to zealously

19   represent the interest of their client.  It's part of the Codes

20   of Professional Conduct.  Are they going to lie to you?  No,

21   they're not allowed to lie to you.  Are they going to try to

22   trick you?  I don't think so.  I think what they're going to do

23   is put as we all say -- and all lawyers do this and that's

24   their job -- their spin on the evidence, okay.  That's a word

25   you know.  So there's nothing wrong with that because their

1    spin may be the right spin and you may agree with them or it

2    may not.  You should always, however, listen to a lawyer when

3    they talk to you in opening statement or closing argument with

4    the understanding that they are trying to convince you of

5    something, okay.  They're not a neutral arbiter here.  The only

6    neutral arbiter here is me.  They are not neutral.  They better

7    not be neutral, their job is to represent the interest of their

8    client, okay.  If they're neutral, they're not doing their job.

9    All right.  So it's important for you to understand that.

10           Now, I allow jurors to take notes.  A lot of judges

11   don't in Federal Court, but I allow jurors to take notes, but

12   not during opening statement or closing argument.  And why?

13   Because it's not evidence.  And I don't want you to be looking

14   back at this a week from now or whenever we get the case to you

15   and have you think, oh, gee, look at this, and you know, get

16   the recollection that that was somehow evidence, okay.  Because

17   it isn't evidence.  Evidence comes from right here or the

18   documents that will be received into evidence, okay.  Not what

19   the lawyers say, not what I say.  All right.  Okay.  Now,

20   Ms. Thompson, you're ready?

21           MS. THOMPSON:  Yes, Your Honor.

22           THE COURT:  Okay.  You may proceed.  And thank you

23   very much for listening to me, ladies and gentlemen.

24           MS. THOMPSON:  May it please the Court, counsel,

25   members of the jury.  My name is Tracy Thompson and I represent

1    the United States of America in this case.  On October 22nd,

2    2015, agents with Homeland Security Investigations executed a

3    Search Warrant for child pornography at the home of the

4    defendant.  He was living at 9718 Hidden Iron Street in San

5    Antonio, Texas.  Early that morning as he was coming out of his

6    house, he was approached by agents with Homeland Security

7    Investigations.  They identified themselves, they informed him

8    that they had a Search Warrant for his house and wanted to get

9    inside the house, wanted his help to get inside the house to

10   secure the residence and not scare the family members inside.

11        The agents asked the defendant -- once inside and once

12   the house was secure, the agents asked the defendant if he

13   would be willing to speak with them about the facts that led to

14   the Search Warrant and their investigation of child

15   pornography.  They suggested meeting in one of the agent's

16   vehicles just outside the home for the defendant's privacy.

17   It's a sensitive topic and inside the home, in addition to the

18   defendant, were his girlfriend, the girlfriend's mother and the

19   girlfriend's 13-year-old daughter.  So in order to provide the

20   defendant some privacy, they asked him if he'd be willing to

21   speak with them and if he would speak with them somewhere

22   outside the presence of the other people in the house.  The

23   defendant didn't hesitate.  He agreed to speak with them, they

24   all went out to the agent's vehicle which was parked just

25   across the street from the house.  You'll hear from retired

1    Special Agent Donna DePaola who conducted the interview in this

2    case about what happened during the interview and how that

3    conversation took place.  You'll hear from retired Special

4    Agent Argie Juarez who was the case agent of this case and put

5    the matter together and was also present during the interview

6    of the defendant.  Those two agents were in the vehicle with

7    the defendant and spoke with him about the Search Warrant for

8    child pornography for about an hour.  They'll both testify that

9    the conversation was calm, the defendant was cooperative, and

10   it lasted for about an hour.  It was during that conversation

11   that the defendant shared information that in addition to the

12   computers and digital devices that were being seized and

13   searched at his house, he also used a Dell laptop computer at

14   his office.  And he admitted using that Dell laptop computer to

15   search for pornography.  He told agents that he normally kept

16   the Dell laptop computer at the office, but he would bring it

17   home on occasion.  When he was asked about what type of

18   pornography he looked at and whether he ever looked at child

19   pornography, he didn't say no.  He stated he had seen videos of

20   females who were probably of high school age and that he had

21   seen those videos on certain different websites.  You'll learn

22   that the defendant was familiar with some common child

23   pornography terms.  And when asked what search termed he used

24   when he looked for pornography on the Internet, he stated sexy

25   teens, young sexy teens, Lolita, among others.  You'll also

1   learn that the defendant was shown and recognized two images

2   depicting children approximately 12 to 14 or 15 years old,

3   female children who were nude, lying back and had their vaginal

4   area lasciviously displayed.  And that he told the agents he

5   recognized those images and had seen them on a variety of

6   websites, including a website titled Little Puffy Pussies.

7           The agents will explain that the defendant admitted

8   viewing child pornography on the Dell laptop computer just a

9   few days prior to the execution of the Search Warrant.  He

10  stated that he watched a child pornography video titled

11  something like Really Good Blow Job which depicted a child he

12  estimated to be about 14 years old.  He also told agents that

13  on October 19th, just three days before the execution of the

14  Search Warrant, he watched a video titled either Good Lay or

15  Dogie Style and it also involved a child about 14 years old.

16  The agents will testify that the interview was conversational,

17  the defendant was cooperative, he was polite.  But after

18  admitting that he had used that Dell laptop computer to search

19  for and look at child pornography, the agents asked him if he

20  would be willing to sign a consent form to allow them to look

21  at the computer, to take it and look at it and that he agreed.

22  He stated that he didn't think there would be child pornography

23  on the computer now.  The agents will describe how when the

24  interview in the car ended, they went back into the house.  The

25  search of the house is still ongoing, the defendant got his

1   keys and got into his truck by himself and drove the agents to

2   his office.  The agents will testify they didn't know where the

3   office was located, so the defendant had volunteered to take

4   his car and drive them.  He drove first.  In the second vehicle

5   was retired Special Agent Donna DePaola and retired Special

6   Agent Argie Juarez and then in the third vehicle was another

7   special agent with Homeland Security.  They drove about 30 to

8   40 minutes depending on people's recollection from the house to

9   the business, except when one of the special agents had to go

10  to the restroom and they decided to stop at a nearby

11  McDonald's.  In fact, the defendant was told that one of the

12  agents had to use the restroom and suggested stopping at the

13  McDonald's.  So they all stop at the McDonald's, the agent uses

14  the restroom.  He waits for them, afterwards continues driving

15  them to his office.  When he gets to the office, he uses his

16  keys, unlocks the business door, lets the agents in.  He

17  identifies his desk, the laptop computer is right on top of the

18  desk and he provides it to law enforcement.

19          At that time, special agents give him a consent to

20  search form, which you'll see.  And they fill it out with the

21  make of the computer, the address of the business and ask the

22  defendant to look at it and sign it.  He looks at it, he

23  doesn't have any questions, he signs it, he dates it.  The

24  agents thank him again, they take the computer and they leave

25  the business.  The defendant is left at the business.  The

 1   agents at that point have no idea what's on that computer.

 2   They know what the defendant told him he used that computer for

 3   in addition to work.  They didn't know if anything would still

 4   be on that computer.  They also didn't know what would be found

 5   on all the electronic devices seized from the home.

 6           You'll hear from Adrian Linares who is a certified

 7   forensic examiner with Homeland Security Investigations.  He

 8   was asked to assist in this investigation by conducting the

 9   forensic examinations of the computers seized, including the

10   Dell laptop computer that the defendant provided to the agents.

11   None of the computers that were seized from the house or any

12   electronic devices, phones, tablets had any evidence of child

13   pornography, but he will tell you that that Dell laptop

14   computer did contain child pornography.  It contained over 2500

15   image files depicting children engaged in sexual explicit

16   conduct and it contained over a hundred movie files of children

17   engaged in sexual explicit conduct.  And most of those files

18   depicted prepubescent children or children under the age of 12

19   years old.

20           He will also explain how the computer had a program

21   called C Cleaner on it which is used to delete certain files

22   and information on the computer in order to get it to run

23   faster.  It gets rid of all the stuff that's taking up space.

24           Now, the judge will give you additional instructions

25   at the end of all the evidence and he'll instruct you as to the

1    law you need to apply and what the government needs to prove in

2    this case beyond a reasonable doubt in order for you to find

3    the defendant guilty.  The facts that the government will prove

4    known as the essential elements, I'm going to go over them

5    briefly with you at this point because I think they can help

6    serve as a guide as you listen to the evidence and see the

7    exhibits as to how everything in the case comes in to prove

8    what the government needs to prove beyond a reasonable doubt.

9    The government will prove in this case that, number one, the

10   defendant knowingly possessed an item that contains an image of

11   child pornography as alleged in the indictment.  That's the

12   Dell laptop computer that he had on October 22nd of 2015 that

13   he provided to law enforcement.

14            Two, the child pornography involved prepubescent

15   minor, a prepubescent minor or a minor that had not yet

16   attained the age of 12 years.  You'll see a few of the images

17   in this case that were found on the defendant's Dell laptop

18   computer and you can decide for yourselves what the age of

19   those children are.  You will also hear from some law

20   enforcement agents who have identified a few of those children

21   whose images were found on the defendant's computer and they'll

22   tell you about the investigations and that they met those

23   children, talked to those children.  They'll identify the

24   children in the photographs and tell you the ages of the

25   children and that many of them are under the age of 12 or were

1    under the age of 12 at the time that those sexual depictions of

2    them were made.

3           Three, the material was shipped and transported using

4    any means or facility of interstate or foreign commerce.  Again

5    you'll hear from various law enforcement agents who identified

6    just a few of the children depicted in the images.  One will

7    tell you that the child that in the case he investigated was

8    sexually assaulted and the images were made just outside of

9    Cincinnati, Ohio.  Those images were found on the defendant's

10   computer here in San Antonio, Texas.  You'll also hear from an

11   FBI agent who will discuss the three cases he worked on in

12   which the images of those victims were found on the defendant's

13   computer and how those had been traded around the world.

14          Four, when the defendant possessed the material, that

15   is the child pornography, he knew that it contained child

16   pornography.  The defendant says I searched for Lolitas and

17   sexy teens and young sexy teens.  He said just a few days ago I

18   saw -- the last video I recalled seeing was something like

19   Really Good Blow Job and I think it had a girl about the age of

20   14.  He mentions specifically on the 19th watching a video --

21          MR. EDWARD BARTOLOMEI:  Your Honor, I believe this is

22   most appropriate for closing argument.  She's already

23   referenced what she believes the statements were earlier in the

24   case regarding it.  I'd ask that she be instructed to talk

25   about what the evidence rather than editorialize, Your Honor.

 1          THE COURT:  I don't think she's editorializing, I

 2   think she's talking about what she believes the evidence will

 3   show.

 4          MR. EDWARD BARTOLOMEI:  Thank you, Judge.

 5          MS. THOMPSON:  That on the 19th you'll hear testimony

 6   that he described a video he thought was titled Dogie Style

 7   that also involved a 14-year-old child.  Now, the government

 8   anticipates that the defendant in this case is going to claim

 9   that the computer was used by a variety of people at the office

10   and not him.  You'll learn that the computer was not password

11   protected, anybody who had physical access to it could use it.

12   I also anticipate the defendant will claim he didn't make those

13   statements to Special Agent DePaola and Special Agent Juarez.

14   Both of them will testify about their recollection of the

15   interview that they conducted with him.

16          The evidence will also show in this case that at the

17   time that the agents are interviewing the defendant, they have

18   no idea what's on any of the computers.  The Search Warrant is

19   ongoing at the defendant's house and they're taking electronic

20   devices.  Nobody has looked at those yet and when they take the

21   Dell laptop based on what the defendant has told them he's done

22   on that laptop, they don't know whether anything will be found

23   on there or not.

24          At the conclusion of the evidence and after you've

25   seen the exhibits and heard from the witnesses, I'm going to

1   ask that you consider everything in this case and that you

2   return a verdict of guilty and find that the defendant has

3   knowingly possessed child pornography on October 22nd, on or

4   about October 22nd of 2015.  Thank you.

5          THE COURT:  All right.  Mr. Bartolomei.

6          MR. EDWARD BARTOLOMEI:  May it please the Court,

7   government, ladies and gentlemen.  A Search Warrant doesn't

8   start in a vacuum.  There have to be reasons for a Search

9   Warrant.  The key to the front door in this case started

10  somewhere.  You just can't walk up and say I need a warrant,

11  you got to have a reason -- excuse me, you have to have

12  probable cause.  Has to be issued by a Magistrate independently

13  based on information.

14         Now, what the evidence in this case shows is that

15  there was a search of a residence based on a warrant.  We

16  believe the evidence will show that the key to the warrant

17  began at some location in 2014 in Switzerland and information

18  received about a visit of an IP address to a legal website.  In

19  fact, that that particular website over ten thousand images had

20  been sent around or across -- around the world and an IP

21  address attributed to a residence later investigated or to a

22  person later investigated revealed that that web had been

23  visited in 2014.  In order to determine whether or not it was

24  in the United States, they conducted a survey of the evidence

25  that was, quote, unquote, viewed and determined that you needed

1    a certain number of images to even qualify.  Upon qualification

2    to an IP address, they were sent to a central location in

3    Virginia where they were again reviewed, investigated and

4    finally arrived in San Antonio, Texas at some point, almost a

5    year later.  Predicated on that IP address, predicated on an

6    address that didn't show who downloaded it, who actually viewed

7    it, who actually saw it one year earlier, they arrive at the

8    residence of Mr. Michalik shortly after 6:00 in the morning.

9    And they arrive with eight agents, ladies and gentlemen, with

10   black vests on, armed with semi-automatic modified weapons and

11   pistols.  They detain him as he walks out the door of his home,

12   but let me say a little bit more about that first.  They

13   surveilled that residence beginning in I think June, possibly

14   August earlier where they observed the cars, who lived there.

15   And there was no indication at any time that Mr. Michalik was a

16   violent individual, that there were weapons or firearms stored

17   there, that there were drugs being used at that location.  In

18   fact, as we all know and we've all seen -- this is not a

19   aggressive bust with somebody that they believe is going to be

20   a shooter.  This is how they arrive to secure a residence at

21   6:00 in the morning.

22           In the residence at that time, as the State -- excuse

23   me, as the government has stated, the government has stated,

24   are his fiance, his stepdaughter who is 13 and his mother.  And

25   they know the residence is occupied by them, they know who owns

1   the cars, the trucks, they know when he leaves, where he goes,

2   what time he returns because they surveil the home at different

3   hours of the day.  They stop Mr. Michalik, approach him.  Now,

4   they approach in the early morning.  It's dark, they come

5   forward.  The first person that steps out around the vehicle

6   has a vest on that says ICE on it, got a hand on a revolver,

7   clearly displayed, and two other agents come around behind and

8   they come up and say, By the way, we've got a Search Warrant,

9   we need to search your house.  The key to the door.

10          He walks -- is he free to walk away, ladies and

11   gentlemen?  The evidence will show what are you going to do at

12   that time in the morning?  What's going on here?  What have I

13   done?  They walk him to the front door, they say we got a

14   warrant to search, he unlocks the door and in they come, eight

15   agents, chaos.  He flips on the hall light, it's dark in the

16   residence and agents are moving around in the residence with

17   weapons, flashlights, get people downstairs in a commanding and

18   dominant voice.  You'll hear evidence that his fiance thought

19   they were being robbed at that time.  "Get down here."  She had

20   no idea what was going on.  The 13-year-old stepdaughter comes

21   from her room on the first floor in her pajamas and the first

22   thing she sees is an ICE officer with a weapon in this

23   direction pointed at her telling her to come outside with the

24   flashlights buzzing everywhere.  It's pretty chaotic.

25          Now, the next issue is are you free to leave.  We're

1   going to talk about that and consent because the government has

2   raised that issue, a consent to search.  Did he consent to

3   this, did he consent to that.  The warrant, ladies and

4   gentlemen, will show that it was purely and solely confined to

5   the residence and it listed what they wanted to find.  They

6   told him, they corralled him, they were constantly, constantly

7   under the care and custody and control of agents throughout the

8   time that the house was searched.  They had to ask permission

9   to move around in the residence.  The little girl had to go to

10  school.  They had to ask permission if she could go to school,

11  they had to ask permission if she could change her clothes,

12  they had to ask permission if she could have breakfast and

13  there was an agent with her at all times.  Now, you heard the

14  government say, oh, because this is embarrassing and it's so

15  convenient, can we talk to you.  He was escorted constantly by

16  the two female agents, one in the front, one in the back and

17  herded, moved around.  He wasn't free to walk away.  He wasn't

18  free to leave.  "We want to talk to you."  And so they took him

19  outside.  And where did they place him?  They placed him in a

20  motor vehicle, their vehicle, not his vehicle.  They didn't

21  say, By the way, the warrant has been executed, we're going to

22  search your house, you're free to go to work.  We want to talk

23  to you.  We want to record your statement.  And they place him

24  in the vehicle.

25          One, Agent DePaola, and she sits in the driver's seat,

1   he sits in the passenger seat and Agent Juarez sits behind him

2   taking, quote, unquote, notes and recording his statement.

3   Now, what does recording mean to you at 6:00 in the morning,

4   ladies and gentlemen?  Was there a tape recorder present?  No.

5   And they question him and interrogate him for over an hour.  Is

6   he free to leave?  He's in their vehicle.  What's he thinking?

7   They have people in my home, there's people everywhere, we got

8   guns.  I ain't going anywhere because they walked me over here,

9   told me get in that car and sit down, we want to talk to you.

10          After an hour, there's communication you'll find

11  between the agent and the residence and they ask did you find a

12  laptop.  The inventory of the search which the government has

13  and I'm sure will come into evidence at some point indicates

14  there was a laptop in the residence and it was in a box under

15  the bed.  They asked, Where is the laptop?  We got to get the

16  laptop.  He said, well, they claim it's at work.  Ironically

17  the Search Warrant doesn't reference his work address.  Doesn't

18  give them permission signed by a Magistrate to go and retrieve

19  or the key to the office, so to speak.  We continue with that

20  analogy.  So they ask him, Where is the warrant?  They tell

21  him, ladies and gentlemen, we have to get that computer.  Where

22  do they tell him, how do they tell him?  They still tell him at

23  the house where there's agents everywhere with modified

24  firearms and weapons, they're still walking him to and from the

25  car to the house to his car to get the keys and now they follow

 1   him to his office.  Two cars, two agents in one, a male agent
 2   in the other.  What's the weather conditions that morning?
 3   Well, it's raining, it's wet.  They go to a McDonald's.  He
 4   does not get out of his vehicle.  He doesn't talk to any agent.
 5   They pull in, he pulls in and you'll find from the evidence
 6   that he can tell they're following him because they're behind
 7   him.  They pull up to the residence after I believe the male
 8   agent, the evidence will show, used the restroom.  Still
 9   raining, he gets out and he opens the door.
10          Now, they want you to believe that because he opened
11   the door he voluntarily consented to let them in.  They're
12   still at his shoulder, they're still there.  When that door
13   opens, they walk right by him and they walk right into his
14   business.  No Search Warrant, no consent that's been signed yet
15   as the government talks about earlier to let you come on in and
16   do what you're going to do.  He informs them, gee, there's a
17   loaded gun in this place, a shotgun in my closet.  An agent
18   goes, they claim they retrieved it.  That's an interesting
19   point because there's no inventory of a gun ever being seized.
20   And if they cleared the gun for officer's safety, that's fine,
21   but where are the two female agents, they're at his desk.
22   Where is he?  He's away and removed from the desk because he's
23   put his wallet and his keys on the shelf as he normally does in
24   the closet every day.  "is this the computer?"  Agent says.  He
25   says, "Do you need a warrant for this?"  They say, "We have a

 1  warrant."  We can search every electronic device.

 2  Unfortunately, the --

 3          MS. THOMPSON:  Your Honor, I'm going to object to this

 4  as assuming facts not in evidence.

 5          THE COURT:  That is true.  Sustained.

 6          MR. EDWARD BARTOLOMEI:  I'm sorry, Your Honor.  The

 7  issue being does the warrant that they have the key to the

 8  front door of his residence give them permission to search his

 9  office?  I suspect and I respectfully submit that when that

10  warrant is presented and reviewed and discussed in this case,

11  it will not contain permission by warrant for them to enter his

12  place of business.  They pick up his computer and say, here,

13  sign this, a consent.  The question, ladies and gentlemen, is

14  did he voluntarily, freely consent to the retrieving of that

15  particular computer based on, as the judge has spoken,

16  circumstances surrounding the alleged consent?

17          Now, ladies and gentlemen, this is a very, very

18  important case and we're going to hear a lot of terms.  For

19  those of you that are more computer savvy than I, I got news

20  for you, I don't know what any of these mean because I have a

21  secretary and when I ask for something, she prints it for me.

22  My wife prints it for me.  My grandson prints it for me.  But

23  basically, ladies and gentlemen, you got to pay attention to

24  these terms because they're important.  Broadband, modem, disk

25  storage, PDF, RAM, ROM, URL, VPN, ALM, Wifi, routers, cache, on

1   the computer.  Excess storage space in the computer, and a

2   number of applications that are available on computers.  So

3   listen when these are defined, listen when they're applied,

4   listen to how they're used in presenting the evidence in this

5   case as to the knowledge.

6           We respectfully submit that starting in 2014, in

7   Switzerland, a review of this computer will reveal that those

8   images were never found on the computer of Mr. Michalik.  They

9   were not there.  Are they the key to the front door?  Yes.  Do

10  they show that he downloaded them?  Do they show that he ever

11  viewed them?  Do they show that he was even aware what they

12  were?  No.  It shows an IP address.  The evidence will show

13  that there was external opportunity from others because of the

14  various links of people who install computers for him and they

15  had a network right in the business.  That this computer was

16  used in the business, it was available to customers, available

17  to employees, it was not password protected and it was outside

18  where it could be accessed.  Other people, other times.

19          The issues in this case, ladies and gentlemen, as the

20  government has pointed out, those four elements are extremely

21  important, but the most important is did you know.  Knowledge

22  that it's there.  There's no evidence in this case, we believe,

23  that this government can produce that showed that regardless of

24  the images that were recovered, they were ever opened, ever

25  retrieved and ever viewed.  That they arrived not from the

1   Internet, but perhaps from an outside source, a disk or a thumb

2   drive --

3            COURTROOM DEPUTY CLERK:  Ten minutes.

4            MR. EDWARD BARTOLOMEI:  Thank you.  -- on a freely

5   accessible computer at work.  This computer, the evidence will

6   show, belonged to a company called HomeArama.  HomeArama was in

7   the cabinet business.  Mr. Michalik worked for HomeArama.

8   Mr. Michalik was an employee of HomeArama.  And that these

9   computers, and there were a number of different computers in

10  that business, were linked and networked within the business

11  that allowed people, as we said earlier, to access them from

12  any location.  The evidence will show this business operated

13  six days a week.  Mr. Michalik was in sales, out calling on

14  customers.  In fact, we believe the evidence will reflect that

15  on the particular date in question that one of these downloads

16  were dropped, Mr. Michalik was with a customer at the very time

17  that these were being downloaded, viewing a job, bidding a job.

18  Because that's primarily what this computer was about, that's

19  what HomeArama had purchased them for and that's how they were

20  used.

21            You'll hear testimony in this particular case about

22  other computers that were at the business, how they were

23  disseminated as the business wound itself down.  And

24  interestingly enough, Mr. Michalik and his brother inherited

25  that business and built that business back up after the prior

1  owner had experienced some severe financial problems.  The

2  issues in this case again are, one, were the images that were

3  the predicate key to the residence ever found on this computer?

4  No.  Were the images that were the predicate key to the warrant

5  to his front door ever show that he ever accessed them, saw

6  them, downloaded them or actively searched for them?  We

7  believe the evidence will be and will show no.  The other

8  question then is was this an illegal site?  I believe the

9  evidence will show no, it was not an illegal site, it was

10  freely accessible.  The evidence will show that on that

11  particular site for whoever looked at that site from an IP

12  address attributable to Mr. Michalik, that 80 percent of the

13  images that were on that computer were, closed quote, not CAM

14  and 20 percent were.  The evidence in this case will show

15  during the course of their investigation that 18 images were

16  sent from that particular site visited by a particular IP

17  address of which only five were considered CAM.  Six and the

18  balance were either adult or nonevidence issues for purposes of

19  pornography.

20         It's not illegal to view pornography, ladies and

21  gentlemen.  It's not illegal to visit a site.  And this was a

22  legal site.  You could go on it, dial up Amateur Lover and pop

23  up and see whatever you wanted.  Again the evidence will not

24  show that Mr. Michalik, seated right here in front of you, ever

25  was the individual one year earlier who opened that up, who

1   viewed anything that came from that site.  It was the result of

2   an investigation of IP addresses solely, investigation that

3   brought it back.  That's the predicate key to a warrant to his

4   home.  Now, why do they need a warrant to get into his house,

5   if they already have the images in the car that we're talking

6   about?  Why do they need it?  If it's pornography, if they're

7   going to try to attribute it to his IP address and claim that

8   he possessed it and saw it, why do you need to get a Search

9   Warrant to look into his home?  To confirm they're on a

10  computer that they weren't?  Or are we on a fishing expedition

11  to see what else we can find?  Ask yourself that question.

12          COURTROOM DEPUTY CLERK:  Five minutes.

13          MR. EDWARD BARTOLOMEI:  Thank you.  Because that is a

14  very important issue in this case.  Did Mr. Michalik even know

15  that they were on his computer?  Those images.  We respectfully

16  suggest that the images that were recovered were not viewed,

17  downloaded, nor were they presented through the Internet to

18  that computer.

19          Ladies and gentlemen, this is an important day.  This

20  is important evidence, it's their case.  Their duty.  As the

21  judge said, an exceptionally high burden to prove beyond a

22  reasonable doubt that on or about the date in question at the

23  time of the search that Mr. Michalik possessed a computer that

24  he knowingly knew contained pornography, child pornography that

25  he's charged with.  We know and we ask that you pay close

1    attention to the testimony of the witnesses, to facts and

2    circumstances surrounding alleged consents, the situation at

3    the time that the alleged consents are allegedly delivered and

4    signed.  And at the collusion of this case, Your Honor, ladies

5    and gentlemen, I apologize -- and Your Honor, we respectfully

6    suggest that a verdict of not guilty is the only appropriate

7    verdict in this case and we're going to ask you for that.

8    Thank you very much.

9              THE COURT:  All right.  We're going to take a brief

10   recess, let you use the restroom.  When we come back the

11   government will start its case in chief.

12             COURT SECURITY OFFICER:  Rise for the jury.

13             *(10:35 a.m., jury exits.)*

14                           *   *   *

15             MS. THOMPSON:  Your Honor, defense counsel's opening

16   statement brought up an issue and I think opened the door.  His

17   entire opening statement was about the lead information from

18   Switzerland.  And the court ruled I could only show two -- I'm

19   only going to show the two pictures to the jury, but I think

20   that opened the door to asking Special Agent Juarez all about

21   the lead information.

22             THE COURT:  I don't know all about it, but you

23   certainly can get into it, yes, you did open the door.

24             MS. THOMPSON:  Thank you.

25             MR. EDWARD BARTOLOMEI:  That's fine, Judge.

1          THE COURT:  I notice that we have some people out in

2    the audience including the fiance of the defendant.  Are you

3    going to call her as a witness?

4          MS. THOMPSON:  They said in opening they were.

5          MR. EDWARD BARTOLOMEI:  Your Honor, the State listed

6    her as their witness.  I ask she be excused for purposes -- and

7    we'll invoke the rule, Your Honor, at this time.

8          THE COURT:  Is she going to be a witness?  That's the

9    point.

10          MR. EDWARD BARTOLOMEI:  Yes.

11          THE COURT:  Anybody else out there going to be a

12    witness?

13          MR. EDWARD BARTOLOMEI:  No, not to my knowledge, Your

14    Honor, that I recognize and I don't believe so.

15          THE COURT:  Okay.  So she has to stay outside.  That

16    goes for any person the government might have other than the

17    case agent who is going to be a witness.

18          MS. THOMPSON:  The case agent is not going to be a

19    witness.  He took over the case.

20          THE COURT:  Okay.

21          MS. THOMPSON:  So he will not testify.

22          THE COURT:  But the other case agent, the former case

23    agent --

24          MS. THOMPSON:  Correct.

25          THE COURT:  -- will be coming in to testify.  All

 1    right.   That's just fine.   Thank you very much.

 2            MR. EDWARD BARTOLOMEI:   How long is our break?

 3            THE COURT:   About ten minutes.

 4            COURT SECURITY OFFICER:   All rise.

 5            *(10:37 a.m.)*

 6                                *   *   *

 7            *(10:57 a.m.)*

 8            COURT SECURITY OFFICER:   All rise.

 9            MS. THOMPSON:   Your Honor, prior to bringing the jury

10    in, I would like the Court's permission to let Special Agent

11    Steve Nutt who is the government's expert witness remain in the

12    courtroom?

13            THE COURT:   Yes, we let experts -- do you have an

14    expert?

15            MS. THOMPSON:   They have not disclosed an expert.

16            THE COURT:   You don't have an expert.

17            MR. EDWARD BARTOLOMEI:   Not at this time, Your Honor.

18            THE COURT:   What do you mean "at this time"?   It's a

19    little late.

20            MR. EDWARD BARTOLOMEI:   I understand, Your Honor,

21    they're designating Mr. Nutt as their expert.

22            THE COURT:   I think he's been designated previously.

23    Yes, he can stay.

24            COURT SECURITY OFFICER:   All rise for the jury.

25            *(10:58 a.m., jury enters.)*

1                        *   *   *

2          THE COURT:  Please be seated.  The Court would note

3    the presence of the ladies and gentlemen of the jury, all

4    counsel.  You can be seated, counsel.

5          The Court would note the presence of the ladies and

6    gentlemen of the jury all counsel, the defendant and the

7    government's agent.  You want to see me at sidebar?

8          MR. RICHARD BARTOLOMEI:  Yes.

9                        *   *   *

10         *(Sidebar.)*

11         MR. RICHARD BARTOLOMEI:  Your Honor, them designating

12   is a little belated.  If they're going to designate, we can

13   designate our -- we're going to ask --

14         THE COURT:  When did you designate an expert?

15         MS. THOMPSON:  Early on I let them know that he was

16   the expert.  I did not intend to call him in our case in chief,

17   but maybe have him testify on rebuttal.  They have never

18   designated an expert, nor provided any expert material, no

19   discovery, no nothing.

20         MR. RICHARD BARTOLOMEI:  All of our discovery comes

21   from them.  Our guy examines the same stuff that they do, so

22   it's all supplied by them.

23         THE COURT:  If and when you want to try to designate

24   an expert in the middle of the trial, you need to file a motion

25   to do so and I'll look at it.  And you can oppose it and then

1    I'll make a ruling.

2         MR. RICHARD BARTOLOMEI:  The only reason I brought

3    that up is if he would start sitting now, but it's obvious I

4    can't get that done with that approach because I can't file it

5    right at this moment.

6         THE COURT:  You can.  You've got two lawyers, three

7    lawyers.

8         MR. RICHARD BARTOLOMEI:  That's why I wanted to bring

9    it up.

10        THE COURT:  All right.  You can do it.  Just file your

11   motion if you want to do it.

12        MR. EDWARD BARTOLOMEI:  Thank you, Your Honor.

13        *(Sidebar concluded.)*

14                        *   *   *

15        THE COURT:  Ladies and gentlemen, I have in front of

16   me a computer and I have an iPad which belongs to the Court.  I

17   use that to keep in contact with my chambers and also

18   occasionally I do some legal research on it very quickly on

19   some evidence issues.  I have software here that does that.  I

20   am not over here shopping at Target, okay.  Even if I could do

21   it on here, I wouldn't be doing it.  So I want you to know what

22   that is, because you'll see me.  And don't pay any attention to

23   my looking down or typing because I may just be sending

24   Priscilla or Laura a note about something that we have to do at

25   the end of the day or something having to do with the attorneys

1   or maybe they get a call we need to let them know about, or

2   something going on in the courtroom that has nothing to do with

3   the evidence.  I always worry that when I hit the keyboard

4   people are thinking, oh, my goodness, he's taking notes, this

5   must be important.  And it has nothing to do with anything

6   other than maybe ordering you meals for deliberation.  All

7   right.  Counsel, you may begin.

8            MS. THOMPSON:  Thank you, Your Honor.  Government

9   calls retired Special Agent Argie Juarez.

10           *(11:01 a.m.)*

11           COURTROOM DEPUTY CLERK:  Please raise your right hand.

12                        *   *   *

13           *(ARGELIA JUAREZ, Government Witness, Sworn.)*

14                        *   *   *

15           THE WITNESS:  I do.

16           COURTROOM DEPUTY CLERK:  You can have a seat.

17                        DIRECT EXAMINATION

18   BY MS. THOMPSON:

19   Q.  Good morning.

20   A.  Good morning.

21   Q.  Please state your name for the record.

22   A.  Argelia Juarez.

23   Q.  Are you currently employed?

24   A.  Yes.

25   Q.  Where are you employed?

1   A.   I'm employed with MVM, Inc. and I'm also an independent
2   contractor for Shipt.
3   Q.   Have you recently been employed with Homeland Security
4   Investigations?
5   A.   Yes, I retired from Homeland Security Investigations on
6   September 29, 2018.
7   Q.   How long had you worked for Homeland Security?
8   A.   Approximately 20 years.
9   Q.   What was your position in Homeland Security?
10  A.   I was a criminal investigator.
11  Q.   Is that the same as a special agent?
12  A.   Correct.
13  Q.   Prior to your retirement, what was your assignment as a
14  special agent with Homeland Security?
15  A.   I was assigned to the Cyber Group.
16  Q.   What kind of crimes does the Cyber Group investigate?
17  A.   Computer crimes.
18  Q.   Do those include crimes against children?
19  A.   Correct.
20  Q.   How long had you been assigned to that group?
21  A.   I was in that group approximately five years.
22  Q.   Are you familiar with the case against the defendant,
23  Jeffrey Michalik?
24  A.   Yes, I am.
25  Q.   Are you the case agent?

1   A.   I was the case agent.

2   Q.   What does that mean?

3   A.   I'm involved -- I do the preliminary investigation of the

4   case.  I run -- do the reports, do surveillance, anything

5   that -- Search Warrant.  I pretty much control the case file.

6   Q.   How did this case come to your attention?

7   A.   A supervisor provided me with a lead that came from our

8   Cyber Crimes Center in Virginia.  The lead was forwarded to me

9   and then and that's how the case was assigned to me.

10  Q.   Do you remember approximately when you received that lead?

11  A.   That was sometime in April of 2015.

12  Q.   What was the substance of the lead information that you

13  were assigned to investigate?

14  A.   The lead was involved -- it was an IP address that had been

15  involved -- let me go back a bit.  The original investigation

16  prior to the lead coming to me was a case that occurred in

17  Switzerland.  The case up in Switzerland, the police there had

18  seized a server and that server was at a residence.  And when

19  they seized that server they were able to -- he was running the

20  child pornography website, I believe it was called Amateur

21  Lovers.  And from when they seized it and they investigated

22  they pulled out all these IP addresses or Internet protocol

23  addresses that had downloaded images of pornography from that

24  server and from that website.

25  Q.   Did the website contain both child pornography and adult

1  pornography?

2  A.  I know it had child pornography, that's what I was --

3  that's what I remember it having specifically, child

4  pornography.

5  Q.  Is it fair to say you don't investigate adult pornography

6  cases because viewing adult pornography is legal?

7  A.  Adult pornography is legal.

8  Q.  You mentioned an IP address.  What is that?

9  A.  That's -- it's a number that is assigned to a computer by

10  an Internet company.  It's kind of like a telephone number and

11  it's used to communicate from computer to computer.  It's a

12  line like a service line.

13  Q.  You mentioned that when the server in Switzerland was taken

14  down, the IP addresses of individuals who had downloaded

15  material from the Amateur Lovers website was recovered?

16  A.  Correct.

17  Q.  What happened to that material, if you know?

18  A.  If I remember correctly, they collected all the images.

19  And of those images, they focused on whatever Internet address

20  had downloaded five or more images of child pornography, so it

21  kind of reduced -- I think all together it was like 25 or 2600

22  IP addresses and then the number came down a bit.  And then

23  those IP addresses were -- the ones that were assigned to the

24  United States were then provided to our Cyber Crimes Center in

25  Virginia.  At that point, the investigator, it's called C3 for

```
 1   short, those IP addresses were then -- Summonses were created
 2   to find out who those IP addresses were assigned to.  One of
 3   those IP addresses then came back assigned to Mr. Michalik and
 4   then out of the San Antonio area and, therefore, came to our
 5   office.
 6   Q.  That was the substance of the lead that you were provided?
 7   A.  Correct.
 8   Q.  That the defendant's IP address had been used to download
 9   at least five images of child pornography?
10   A.  Correct.
11   Q.  Were those five images sent to you or were you able to
12   access them as part of your investigation?
13   A.  Yes, I was.
14   Q.  Are you familiar with the term CAM or C-A-M?
15   A.  Yes, I believe it stands for child appropriate material.
16   Q.  Child abuse material?
17   A.  Child abuse material.
18          MR. RICHARD BARTOLOMEI:  Excuse me?
19          THE WITNESS:  Child abuse material.
20   BY MS. THOMPSON:
21   Q.  They call it CAM for short?
22   A.  CAM.
23   Q.  After you received -- when you received the images, did you
24   review those?
25   A.  Yes, I did.
```

1   Q.  And did you determine that they depicted child pornography?

2   A.  Yes, I did.

3   Q.  Did you also review the IP information that was sent with

4   the lead?

5   A.  Yes, I did.

6           MS. THOMPSON:  May I approach, Your Honor?

7           THE COURT:  You may.

8   BY MS. THOMPSON:

9   Q.  Special Agent Juarez, I'm going to show you what's been

10  marked for identification as Government Exhibit One which is a

11  three-page document and government 1a and 1b and ask that you

12  take a look at those.

13      (Pause.)

14          MR. RICHARD BARTOLOMEI:  Your Honor, may we have a

15  moment to also get a copy of the exhibit?

16          THE COURT:  Yes.

17          MR. RICHARD BARTOLOMEI:  I wasn't shown it while she

18  walked up.

19          MS. THOMPSON:  You have an entire book of all of our

20  exhibits.

21          MR. RICHARD BARTOLOMEI:  I understand.

22  BY MS. THOMPSON:

23  Q.  Do you recognize that?

24  A.  Yes, these were the forms that were submitted to me by C3.

25  Q.  That's Exhibit 1a?

1   A.   Correct.

2   Q.   And what was the IP address that was associated with

3   downloading child pornography on the lead information that you

4   received?

5   A.   The IP address?

6   Q.   Yes.  What IP address were you investigating at that time?

7   A.   I'm not sure if it shows up here.  I don't have it by

8   memory.

9          MS. THOMPSON:  May I approach, Your Honor?

10          THE COURT:  Are you showing her something to refresh

11   her recollection?

12          THE WITNESS:  Do you mean like to specifically say his

13   IP address?

14          MS. THOMPSON:  Yes.

15          THE WITNESS:  Yeah, I don't have it by memory.  I can

16   look in my case file, if I could.

17   BY MS. THOMPSON:

18   Q.   Is the IP address listed on the --

19   A.   It's right there.

20   Q.   -- on the lead information you received?

21   A.   Yes, it was.

22   Q.   Well, does Exhibit 1a fairly and accurately represent the

23   information you were provided during the investigation of this

24   case?

25          MR. RICHARD BARTOLOMEI:  I'm going to object, Your

1   Honor.  Well, no, I'll withdraw my objection at this point.
2   A.  Yes, it does.
3          MS. THOMPSON:  Government offers Exhibit 1a.
4          MR. RICHARD BARTOLOMEI:  Objection, Your Honor,
5   authentication.  Also it contains information which requires
6   explanation is of a highly technical nature.
7          THE COURT:  What is 1a again?
8          MS. THOMPSON:  The Subpoena results from AT&T that
9   were forwarded to the agent as part of the lead packet
10  information.  It's what she received to start her
11  investigation.
12         THE COURT:  All right.  I assume it contains a variety
13  of -- have you redacted it so it only contains the relevant
14  number, relevant IP address?
15         MS. THOMPSON:  I have not redacted it.  It is exactly
16  what she received at the beginning of the investigation.
17         THE COURT:  Okay.  I'm going to overrule the
18  objection.  I'll receive it, but I want it redacted to remove
19  the extraneous material that's not relevant to this case.
20         MS. THOMPSON:  I don't believe there is any -- I
21  understand what you're saying.  That information is not part of
22  1a.
23         THE COURT:  It isn't?
24         MS. THOMPSON:  It is not.
25         THE COURT:  Then the objection is overruled.  It will

 1   be received.

 2          MR. RICHARD BARTOLOMEI:  Sorry, Your Honor, I'm a

 3   little bit confused.

 4          THE COURT:  I'm not sure why you're confused, but

 5   anyway you tell me.

 6          MR. RICHARD BARTOLOMEI:  I'm looking at 1a, testimony

 7   regarding an IP address which is the only thing that she was

 8   asked about, so the relevancy of the remainder of it in

 9   addition to being not properly authenticated --

10          THE COURT:  I think it's properly authenticated.

11          MR. RICHARD BARTOLOMEI:  Your Honor, this was part of

12   our motion in limine, so I set this out in some length.  If

13   it's coming in as some sort of business record, we object.  And

14   secondly, the testimony was that it was forwarded not from the

15   company that's represented on this document, but from Virginia.

16          MS. THOMPSON:  It is not coming in as a business

17   record at this time.  It is not offered for the truth of the

18   matter at this time.  It's offered to show what information she

19   received and how she acted upon it.

20          THE COURT:  Then you don't need to put it into

21   evidence at this time.  All you need to do is ask her about it.

22          MR. RICHARD BARTOLOMEI:  That was really my point.

23          THE COURT:  Counsel, if you're going to address the

24   Court in this court, you need to stand.

25          MR. RICHARD BARTOLOMEI:  Sorry, Your Honor.  My point

1    was she identified that some information came to her about an

2    IP address.  The rest is surplusage, it's not relevant, its

3    relevancy is conditioned upon facts not yet put in evidence and

4    she has said, the government has said I'm not going to

5    introduce it at this time.  I thought she had offered it and I

6    object to the --

7              THE COURT:  Well, she did offer it.

8              MR. RICHARD BARTOLOMEI:  I object to the remainder of

9    the content and unless and until it is redacted, so it only

10   shows --

11             THE COURT:  I don't know what the remainder of the

12   content is that you're objecting to.

13             MR. RICHARD BARTOLOMEI:  I'm sorry, sir.

14             *(Pause.)*

15             When you're ready, Your Honor.

16             THE COURT:  There isn't anything here that I see

17   that's objectionable or prejudicial.  You're only offering --

18   are you offering both pages, the front and the back?

19             MS. THOMPSON:  I'm offering all three pages of Exhibit

20   1a which is the information the agent stated she received in

21   the lead packet from C3.

22             THE COURT:  The objection is overruled.

23             MR. RICHARD BARTOLOMEI:  Thank you, Your Honor.

24             THE COURT:  It will be received.

25   BY MS. THOMPSON:

1   Q.  Did the information you received that's contained in

2   Exhibit 1a contain the IP address that was used to download

3   child pornography?

4   A.  It did and it also -- it had his physical address which is

5   why it came to the San Antonio area.

6   Q.  Because he resided in San Antonio?

7   A.  Correct, the address came back to San Antonio.

8   Q.  Who was the subscriber for the Internet account?

9   A.  The subscriber was Jeffrey Michalik.

10  Q.  Based on the information you received, what did you do?

11  A.  I opened up a case on this lead and I proceeded to

12  investigate it, conduct my own AT&T Summonses, run CPS, City

13  Public Service, contacted them to see who paid for the

14  utilities at that home.  I believe I also did some driver's

15  license checks to make sure what the persons at the address

16  looked like, possibly who resided at that address.  I also did

17  some open Internet searches of his name to see if there was any

18  kind of Facebook or Instagram.  A lot of people nowadays have

19  social profiles available to the public, so I just kind of

20  wanted to get an idea of who resided at that residence, get

21  more information, develop my case.

22  Q.  Did you determine or were you able to determine who owned

23  the home at 9718 Hidden Iron?

24  A.  Yes, I also ran a Bexar County Appraisal District report on

25  the home to see who it came -- who the owner was at the home

1   and that came back to Jeffrey Michalik.

2   Q.  You mentioned the utilities at the home.  What name were

3   the utilities in, if you recall?

4   A.  They were under Jeffrey Michalik.  I'm not sure if on those

5   the name Crystal Rivas might have also been on there, I can't

6   say for sure, but if I can look in my report.

7   Q.  Did you also find out through your database checks where

8   the defendant may have been employed?

9   A.  When I did the open Internet search of his name, a business

10  populated by the name of MB Cabinetry and that came out with an

11  address that was also listed on the Internet -- on the Summons

12  that was given to me by C3.  It was on Hidden Iron was the

13  address that was associated to that MB Cabinetry business.

14  Q.  So the business he was associated with on the Internet came

15  back to his home address?

16  A.  Correct.

17  Q.  You mentioned you also sent a Summons to AT&T.  What

18  information were you requesting from AT&T?

19  A.  I was requesting to find out if there was still Internet

20  service to that location, the residence.

21  Q.  And did you receive a response from AT&T?

22  A.  I did.

23  Q.  I'm going to have you look at what you have marked for

24  identification as Exhibit 1b.  Is that the response you

25  received from AT&T?

1  A.  Yes.

2  Q.  Is it an exact -- is it a photocopy of the exact response

3  you received?

4  A.  Yes.

5          MS. THOMPSON:  Government offers Exhibit 1b.

6          MR. RICHARD BARTOLOMEI:  Your Honor, I renew my

7  objections.  I renew those that were in the motion in limine

8  regarding the underlying Summons, the fact that the response

9  and the cover sheet on the response set forth all of the

10  objections thereto.  And if they are seeking to introduce it as

11  a business record, I would object that it is not a business

12  record, but is response to a Summons and a specific request.

13  This also violates 902, 1002nd, violates right of confrontation

14  to 6th Amendment and it is hearsay within hearsay.  She is

15  seeking to have testimonial evidence introduced through these

16  documents.

17          THE COURT:  Do you want to say anything for the

18  record?

19          MS. THOMPSON:  It is being offered as the response to

20  the Summons she sent to AT&T and it's offered to show how the

21  investigation continued and how she acted upon receiving that

22  information.

23          THE COURT:  The objection is overruled.  It's offered

24  for a specific purpose only.

25          MR. RICHARD BARTOLOMEI:  Will there be a limiting --

1          THE COURT:  It's offered for the specific purpose as

2    stated by counsel and no other.

3          MR. RICHARD BARTOLOMEI:  Thank you.

4    BY MS. THOMPSON:

5    Q.  In addition to doing the database checks and trying to

6    gather as much information as you could about that residence

7    and who lived there, what else did you do?

8    A.  I also conduct surveillance of the residence.

9    Q.  What does that mean?

10   A.  It means that I go at different times of the day, different

11   dates to try to establish a pattern of ins and outs when people

12   are at the residence, when they leave, how many people live at

13   the residence and trying to establish some form of pattern of

14   the residents that live there.

15   Q.  Who were you able to determine lived at that residence

16   during your surveillance?

17   A.  I was able to determine that Jeffrey Michalik lived at that

18   residence.  I was also able to determine that Crystal Rivas

19   lived at that residence.  I remember seeing a child at the

20   residence and several vehicles that I identified in my reports

21   were also parked at the residence.

22   Q.  Did you ever observe the defendant leaving the residence?

23   A.  Yes.  On occasion I would see him depart his residence at

24   approximately 6:30 in the morning.  I do recall there was one

25   incident that I saw him leave his residence with what looked

1   like a black computer bag, something -- little bit smaller than

2   the one that's right there or like the one that I carried in,

3   place it in his vehicle and proceeded to depart the residence.

4   Q.  Through your investigation, did you ultimately obtain a

5   Federal Search Warrant to search the home at 9718 Hidden Iron

6   Drive?

7   A.  I did.

8   Q.  Was that Search Warrant executed on October 22nd, 2015?

9   A.  Yes, it was.

10          MS. THOMPSON:  If I can get Exhibit Two pulled up

11  please.

12  BY MS. THOMPSON:

13  Q.  I'm going to show you on the monitor what's marked as

14  Government Exhibit Two?

15          MS. THOMPSON:  May I approach, Your Honor?

16          THE COURT:  You may.

17          THE WITNESS:  It's right here.

18          MS. THOMPSON:  Here is also a book of all the exhibits

19  if that's easier.  Pick whichever form is better.

20          THE WITNESS:  I'll look at this one on the screen.

21  BY MS. THOMPSON:

22  Q.  Do you recognize that document?

23  A.  Yes, that's my application for the search and seizure of

24  the Michalik's residence.

25          MR. RICHARD BARTOLOMEI:  If I may, Your Honor.  She

1  was asking about the Search Warrant.  The testimony of this

2  witness goes to application.  I don't see that as a part of

3  Exhibit Two.  The Search Warrant is the result of the

4  application, so I would object to any testimony about the

5  application at this point.

6           MS. THOMPSON:  I am happy to add the application into

7  the exhibit.

8           THE COURT:  That's up to you.

9           MR. RICHARD BARTOLOMEI:  Your Honor, my objection was

10  she's testifying about the wrong --

11           THE COURT:  Does she have any personal knowledge of

12  the application?  Ms. Thompson, does she have any personal

13  knowledge of the application?

14           MS. THOMPSON:  Yes, I think she testified she prepared

15  an application.

16           THE COURT:  And so I'm having a hard time figuring out

17  what your objection is.  If she prepared the application, then

18  she's qualified to testify about it and its authenticity.

19           MR. RICHARD BARTOLOMEI:  My objection was Exhibit Two

20  is not the application.  She was testifying about the

21  application.  That was my objection.

22           THE COURT:  She said she will add the application, so

23  you may proceed.

24  BY MS. THOMPSON:

25  Q.  As the case agent, did you create and write an application

1  for a Search Warrant in this case?

2  A.  Yes.

3  Q.  And was that presented to a United States Magistrate Judge?

4  A.  It was.

5  Q.  Did the Magistrate Judge authorize it, authorize the Search

6  Warrant?

7  A.  Yes, it was authorized.

8  Q.  And the Search Warrant is what is contained as Exhibit Two

9  right now?

10  A.  Correct.

11  Q.  And we will make Exhibit 2a the application to the Search

12  Warrant.

13  A.  Okay.

14  Q.  Was the Search Warrant authorized by the Magistrate Judge

15  in your presence?

16  A.  Yes, it was.

17  Q.  It appears from Exhibit Two the Search Warrant was

18  authorized on October 20th of 2015, is that right?

19  A.  That's correct.

20  Q.  And when did you execute the Search Warrant?

21  A.  On the 22nd.

22  Q.  What time was the Search Warrant executed?

23  A.  It was executed at approximately 6:30.

24  Q.  In the morning or evening?

25  A.  In the morning.

1    Q.   How many --

2            MR. RICHARD BARTOLOMEI:  Your Honor, may we approach?

3            THE COURT:  No.  No need to approach.  If you have an

4    objection, you can state it.

5            MR. RICHARD BARTOLOMEI:  It appears the witness is

6    looking down at something.

7            THE COURT:  Yes.  If she's refreshing her

8    recollection, we need to know that.  She can only testify from

9    her memory.  If she can't testify from her memory, then you can

10   ask her if it refreshes your recollection to assist her, she

11   can look at it.

12           COURTROOM DEPUTY CLERK:  There's a screen laying

13   there.

14           THE COURT:  She was looking at the exhibit?

15           MS. THOMPSON:  Correct.  What's in front of her at the

16   witness stand is a screen showing the exhibit.

17           THE COURT:  She was looking at the screen, counsel, so

18   you can proceed.

19           MS. THOMPSON:  Thank you, Your Honor.

20   BY MS. THOMPSON:

21   Q.   How many agents were present for the execution of the

22   Search Warrant?

23   A.   Approximately eight, eight or nine individuals.  Of those

24   eight or nine individuals, I believe six of us were special

25   agents.

1  Q.  What are the other individuals?

2  A.  They're forensic examiners.  And I believe there was three

3  of those and -- there's three forensic examiners and then the

4  rest of us were agents.

5  Q.  Why are that many people present to execute a Search

6  Warrant?

7  A.  Size of the home, the individuals that we believe might be

8  in there and in my database queries there was two other

9  individuals, three other individuals that had populated in

10  those searches, so I wasn't sure if those people lived in that

11  residence or not because I hadn't seen them coming in and out,

12  but the possibility of them being there -- so that goes into

13  account when I am figuring out how many agents we'll need to

14  execute the Search Warrant.  So being that it was a two-story

15  house, being that there was probably four to five adult

16  individuals in that residence is how I came about the amount of

17  agents required to properly execute the Search Warrant.

18  Q.  What happens when you get to the defendant's house to

19  execute the Search Warrant?

20  A.  That morning Agent DePaola, who is also now retired so I

21  don't know if I call her agent or Ms. DePaola, and myself were

22  in a vehicle.  And in another vehicle was Agent Miller and we

23  set up a little bit closer to the residence to wait and see if

24  there's going to be any movement.  Because of my previous

25  surveillance, we knew that Mr. Michalik would depart the house

1    at around 6:30, so we what they call set up at the residence or

2    close to it while the rest of the agents in their vehicles

3    parked a little bit further, not too far, but just a little bit

4    farther.  So we sit there for a while and surveil and we do see

5    him coming out of the house and walking towards his black

6    truck, I believe.  And at that point, we announce to the team

7    that we have an individual coming out of the house and that

8    we're going to make the approach.  So we drive to his

9    residence, park right by the driveway and then Agent Miller

10   also joins us.  My partner and myself in conjunction we advise

11   Mr. Michalik --

12        MR. RICHARD BARTOLOMEI:  Your Honor, this is going on

13   to a narrative, doesn't --

14        THE COURT:  Sustained.

15   BY MS. THOMPSON:

16   Q.  What happens when you approach Mr. Michalik?

17   A.  We advise him that we have a Search Warrant for his

18   residence.

19   Q.  Did you identify yourselves as agents?

20   A.  Yes, we did.

21   Q.  What was his reaction?

22   A.  He was calm.  I mean he didn't -- he was complacent or

23   compliant, wasn't aggressive.

24   Q.  What else did you tell him at that time?

25   A.  We advise him that we needed to make entry into his home,

1   that we had a Federal Search Warrant.

2   Q.   Did you ask him to help you do that in any way?

3   A.   We asked him for his keys.

4   Q.   Did he provide those?

5   A.   Yes.

6   Q.   Then what happened?

7   A.   By that time, all the other agents had approached the

8   residence and we proceeded to make entry into the home.

9   Q.   Do you remember if he opened the door or if an agent opened

10  the door?

11  A.   That, I don't remember.

12  Q.   Do you remember having a conversation with him about how

13  many people were in the home?

14  A.   We did.  We asked him if he would advise us as to how many

15  people were in the home at that time.

16  Q.   What did he tell you?

17  A.   He advised us that at that time the lady, Crystal, Crystal

18  Rivas, I'm not sure what the relationship is with them, she was

19  there, Crystal's mother was there and that there was a child as

20  well.

21  Q.   At that time, did you ask him to call those people out of

22  wherever they were in the house?

23  A.   Yes.

24  Q.   Why do you do that?

25  A.   We understand that it's something that does not happen

1  normally on everyday basis, you don't have officers coming to
2  your home to do a Search Warrant on an everyday.  So we try to
3  maintain a calm environment so that the people that are still
4  in the home have a familiar voice calling to them as to not to
5  startle them so much.  That's how we usually have and in this
6  case had him call them down to try to alleviate the panic or
7  what they might be feeling.
8  Q.  Did he agree to do that?
9  A.  Yes.
10 Q.  What happened when he did that?
11 A.  He called them and they were brought into the living room
12 area of the home.
13 Q.  What happens at the beginning of the execution of a Search
14 Warrant?
15 A.  At the --
16      MR. RICHARD BARTOLOMEI:  Objection, Your Honor.  Are
17 we asking about specifics or are we asking about what happened
18 this day?
19      THE COURT:  Yeah, that's a fair question.
20 BY MS. THOMPSON:
21 Q.  What happened at the beginning of this Search Warrant?
22 A.  On the beginning of this Search Warrant, we conducted a
23 protective sweep of the home, which means the agents initially
24 do a search for any type of weapons or any other individuals
25 that might be in the home.  That's the initial -- that's what

1  is initially done in this Search Warrant, to search for any

2  other weapons or any other people in the home.  It's called a

3  protective sweep.

4  Q.  And is that to protect the officer's safety or the people

5  in the home or both?

6          MR. RICHARD BARTOLOMEI:  Leading and suggestive.

7          THE COURT:  Sustained.

8  BY MS. THOMPSON:

9  Q.  What's the purpose of a protective sweep?

10 A.  For the safety of our officers and for the safety of the

11 individuals in the home.

12 Q.  How long does that usually take and how long did it take in

13 this case?

14 A.  In this case, it probably took about I would say a good

15 five minutes.  It's a two-story home, so it takes a good while

16 to go through every room, every closet, restroom and such.

17 Q.  Are the agents that are assisting in the execution of the

18 Search Warrant armed?

19 A.  Yes.

20 Q.  Do you recall if anybody was pointing guns at the

21 individuals in the home?

22 A.  That did not happen.

23 Q.  When the occupants of the house are brought into the living

24 area, what happens to them?

25 A.  There's myself, Agent DePaola, I believe one of the other

1  agents are there with them while the other agents go and do the
2  protective sweep.
3  Q.  What do you tell them, if anything?
4  A.  We explain to them that we have a Search Warrant for the
5  home, we tell them that it's for computer crimes, specifically
6  child pornography.  We also advise them that they're free to
7  leave.  We ask, Does anybody need to get to school?  Does
8  anybody need to get to work?  We just tell them that if they
9  need to leave the home, they can, they just cannot interrupt or
10  affect the Search Warrant or get involved in the Search
11  Warrant, but that if they need to leave, they're free to leave,
12  nobody is under arrest.
13  Q.  They can leave the home, but because the Search Warrant is
14  being executed, are they free to walk around the home?
15          MR. RICHARD BARTOLOMEI:  Leading and suggestive.
16          THE COURT:  No, it isn't.  The objection is overruled.
17  A.  The individuals that are residents of the home are asked
18  not to interfere with the Search Warrant.  If they need
19  something, they could ask any of the agents and if that room
20  has been cleared or if it hasn't, we make it available to them
21  if they need to get dressed.  We just have to make sure that
22  it's cleared if they need to leave, but it would be kind of
23  unsafe for them to walk around the house on their own --
24          MR. RICHARD BARTOLOMEI:  Excuse me, Your Honor, I move
25  to strike that as a voluntary statement beyond the scope of the

 1   question.

 2           THE COURT:  Objection is sustained.  Ask her the

 3   question as to why this or that, but you know, we can't have

 4   long, running answers.

 5           MS. THOMPSON:  Yes, Your Honor.

 6   BY MS. THOMPSON:

 7   Q.  Why are occupants of the house not allowed to move freely

 8   about the house during the execution of a Search Warrant?

 9   A.  For their safety and ours.

10   Q.  Do you speak with the defendant directly at this time?

11   A.  I did.

12   Q.  What did you tell him?

13   A.  We advised him if he would be willing to speak to us a

14   little bit further about this investigation.

15   Q.  How did he respond?

16   A.  He said he would.

17   Q.  What else do you tell him?

18   A.  We ask him if he wants to speak to us in the vehicle for

19   some privacy.  At that time -- I'm just going to answer your

20   question.  I think I talk too much.

21   Q.  Did the issue of whether he was under arrest come up?

22   A.  He was told that he was not under arrest and that he -- if

23   he wanted to speak to us, it would be on a voluntary basis.

24   Q.  How did he respond?

25   A.  He said he would be willing to talk to us.

Special Agent Juarez - Examination            77

 1   Q.  Did you discuss where that interview would take place?

 2   A.  We asked him if he would like to have an interview with us

 3   in Agent DePaola's vehicle.

 4   Q.  How did he respond?

 5   A.  He said he didn't mind.

 6   Q.  Where was Agent DePaola's vehicle parked?

 7   A.  It was parked on the street right in front of the

 8   residence.

 9   Q.  So how long was this initial conversation with the

10   defendant inside the living area?

11   A.  Minutes, less than three to five minutes maybe.

12   Q.  After he agreed to speak with you in Agent DePaola's

13   vehicle, what happened?

14   A.  We proceeded to walk towards the vehicle.

15   Q.  Is the defendant handcuffed?

16   A.  No.

17   Q.  Is anyone touching him?

18   A.  No.

19   Q.  Is he walking by himself?

20   A.  Yes.

21   Q.  And what happens when you get near the vehicle?

22   A.  Agent DePaola proceeds to enter the driver's side of the

23   vehicle.  Myself and Michalik walk around the vehicle and I

24   open the passenger door for him.

25   Q.  And where is he seated in the vehicle?

1    A.   In the passenger's seat, front.

2    Q.   What type of vehicle is it?

3    A.   It's a GMC SUV Acadia.

4    Q.   So Agent DePaola is in the front driver's seat?

5    A.   Correct.

6    Q.   Mr. Michalik is in the front passenger seat and where do

7    you sit?

8    A.   I am sitting in the passenger rear seat.

9    Q.   Are all the doors closed?

10   A.   Yes.

11   Q.   Are the doors locked?

12   A.   No.

13   Q.   Is the air conditioning on?

14   A.   Yes.

15   Q.   Why?

16   A.   It's hot.  It's always hot.

17   Q.   What happens after you're all seated in the vehicle?

18   A.   Mr. Michalik is advised again that this is voluntary on his

19   part and if he doesn't -- if he does not wish to speak to us,

20   he doesn't have to.

21   Q.   Did he indicate he understood that information?

22   A.   Yes.

23   Q.   Do you remember how he indicated, whether it was verbally

24   or not?

25   A.   It was kind of like a nod that he understood.

Special Agent Juarez - Examination          79

1    Q.  How did the interview -- the substance of the interview
2    begin?
3    A.  The substance, we initially asked him about the residence
4    of the home, how long he's lived in the home.
5    Q.  What did he tell you?
6    A.  He advised us again about Crystal, Crystal's mom, the
7    daughter.  We asked him how long he had lived in the home.
8    Q.  Do you recall how long that was?
9    A.  Three years.  We asked him if he had Internet access to
10   which he stated he did.  Asked him who was his provider.  AT&T.
11   Asked him if it was secured.
12        MR. RICHARD BARTOLOMEI:  Sorry, ma'am, your voice
13   trailed.
14   A.  We asked him if the Internet was secured.
15   Q.  And how did he respond?
16   A.  And he stated it was.
17   Q.  Did you ask for the password for the Internet access?
18   A.  We asked him for the ID that is assigned to it, like a Two
19   Wire number.
20   Q.  Did he provide that?
21   A.  Yes.
22   Q.  What was his demeanor like during the interview?
23   A.  It was very calm interactions with him, very just like
24   we're talking, like normal conversation.
25   Q.  Did he ever ask to stop the interview?

Special Agent Juarez - Examination                80

1    A.   No.

2    Q.   Did he ever refuse to answer any of your questions?

3    A.   No.

4    Q.   Did he ever hesitate in answering questions?

5    A.   No.

6    Q.   Did you talk about what electronic devices were in the

7    home?

8    A.   We asked him, yes, what electronic devices he owned.  He

9    proceeded to tell us he had a desktop, phones, said he had an

10   iPod in his truck, mentioned several items in the home and

11   proceeded to mention that he had a laptop that he keeps in his

12   place of business.

13   Q.   Did he indicate whether he ever brought the laptop home?

14   A.   Yes, he was asked if he ever brings it home and he stated

15   on occasion.

16   Q.   Did he tell you how long he had had the laptop?

17   A.   Approximately three years.

18   Q.   Did he tell you where he obtained the laptop?

19   A.   It was given to him by a previous boss.

20   Q.   Did he indicate during the conversation whether anybody

21   else used that laptop?

22   A.   He was asked if anybody used that laptop and he stated no.

23   Q.   What did he tell you during the interview that he used the

24   laptop for?

25   A.   He used it for work, he used it to look at pornography.  We

1   asked him music?  Fantasy football?  He used it for work as

2   well.

3   Q.  Did you talk about where he worked?

4   A.  Yes.

5   Q.  What did he tell you?

6   A.  He stated that they had a business over on Mobud was the

7   street address.  I don't remember the number.

8   Q.  Is that the first time you were made aware of the business

9   not being located at his house?

10  A.  Correct.

11  Q.  And you testified that he said he used the computer to look

12  at porn?

13  A.  Correct.

14  Q.  What else did he say about that or how did that come up?

15  A.  We asked him if he ever had used the Internet or the

16  computer to -- I believe we asked him if he had ever accessed a

17  website by the name of Amateur Lovers to which he stated no.

18  We asked him if he had ever viewed child pornography.  He

19  stated he doesn't like to view it because it's small children.

20  We asked him when he looks at his computer when he's searching

21  for pornography, what search terms does he use.

22  Q.  What did he tell you the search terms were?

23  A.  He says he searches Lolitas, he searches yoga pants, he

24  searches I believe it was puffy pussies, teen something or

25  other, just different terms.

Special Agent Juarez - Examination                82

1   Q.  Did the term PTHC get mentioned?

2   A.  Yes, it did.

3   Q.  What is PTHC, what does that mean?

4   A.  PTHC is an acronym for pre-teen hard core.

5   Q.  How did that come up in the conversation?

6   A.  He was -- I believe he was asked or if he had ever used

7   that search term.

8   Q.  And how did he respond?

9   A.  He stated he had used that one before too.

10  Q.  Did he indicate he knew what that meant?

11  A.  Yes.  It's underage young children.

12          MR. RICHARD BARTOLOMEI:  Objection, Your Honor.  Move

13  to strike that as a voluntary statement beyond the scope of the

14  question.  The question was whether or not he knew.

15          THE COURT:  The objection is sustained.  The answer is

16  stricken.

17  BY MS. THOMPSON:

18  Q.  Did the defendant tell you what he thought PTHC meant?

19  A.  Yes.

20  Q.  What did he say?

21  A.  Young children.

22  Q.  Was he asked if he had ever seen child pornography on the

23  computer?

24  A.  Yes.

25  Q.  How did he respond?

1   A.   He stated he's seen it, he doesn't like to view it.

2   Q.   Did he say where he had seen child pornography?

3   A.   On his computer.

4   Q.   Did he indicate --

5   A.   I need some water.

6            MS. THOMPSON:  May she have water, Your Honor?

7            THE WITNESS:  I have it.

8            *(Pause.)*

9            Okay.

10  BY MS. THOMPSON:

11  Q.   Did he indicate where he went to get the child pornography

12  or how the child pornography even found its way to him?

13           MR. RICHARD BARTOLOMEI:  Your Honor, one, it's a

14  compound question, two, it is leading and suggestive.

15           THE COURT:  No, asking him how -- well, you were right

16  on the first, you're wrong on the second, so I'm going to

17  sustain the objection.

18           MR. RICHARD BARTOLOMEI:  Thank you.

19  BY MS. THOMPSON:

20  Q.   Did the defendant indicate how he came to see child

21  pornography?

22  A.   Through searching those -- through those terms as how he

23  would be able to access child pornography.

24  Q.   During the interview, did you show the defendant a series

25  of pictures?

1    A.   Yes.

2    Q.   What are they?  What were they?

3    A.   Those were the five images that I had received from the

4    Switzerland investigation.

5            MS. THOMPSON:  May I approach, Your Honor?

6            THE COURT:  You may.

7    BY MS. THOMPSON:

8    Q.   Special Agent Juarez, I'm going to show you what I've

9    marked for identification as Exhibit Five that contains five

10   separate images and ask that you take a look at those.

11      (Pause.)

12      Do you recognize those?

13   A.   Yes.

14   Q.   What are they?

15   A.   They're images of child pornography that were shown to

16   Mr. Michalik for identification purposes.

17   Q.   How did he respond when they were shown to him?

18   A.   Two of the images he recognized.

19   Q.   Did he say how he recognized them?

20   A.   He stated he had seen them on several of those websites by

21   searching those terms.  I believe he said one of the websites

22   was Little Puffy Pussies he had seen the images and on several

23   other websites, those he did not mention the name of those

24   websites, but that he had seen them on those child pornography

25   websites.

1    Q.  When he indicated that he recognized two of them, what did

2    you ask him to do?

3    A.  We asked him to initial and date them, the ones that he

4    recognized.

5    Q.  And did he do that?

6    A.  For two of the images, yes.

7         MS. THOMPSON:  Your Honor, government offers Exhibits

8    5a and 5b.

9         THE COURT:  Any objection?

10        MR. RICHARD BARTOLOMEI:  Just a moment, Your Honor.

11        *(Pause.)*

12        Can I approach and have the list of the images?  I

13   just want to make sure.

14        *(Pause.)*

15        Thank you, Your Honor.  No objection.

16        THE COURT:  They'll be received.

17        MS. THOMPSON:  Your Honor, at this time I'd like to

18   publish Exhibit 5a and 5b to the jury.

19        THE COURT:  Yes, you may.

20        MS. THOMPSON:  Want to make sure the monitors are

21   turned off first.

22        *(Pause.)*

23   BY MS. THOMPSON:

24   Q.  Is this the first image that was shown to the defendant

25   during the interview?

1   A.   It's one of the images.

2   Q.   And that's one of the images he recognized?

3   A.   Correct.

4   Q.   And the writing on the image, what's that?

5   A.   Those are his initials and the dates.

6   Q.   And was this the actual image that was shown to him?

7   A.   Yes.

8   Q.   What's at the very top of the image?

9   A.   That's the IP address that that image was downloaded from

10  that's got the date, then it's got the website which is the

11  Amateur Lover website from the Switzerland investigation and

12  the file name.

13  Q.   Exhibit 5b contains similar information, but a different

14  picture, is that correct?

15  A.   Correct.

16  Q.   And so the record is clear, can you describe the image

17  that's depicted?

18  A.   It's a child prepubescent lasciviously showing her

19  genitalia.

20  Q.   And those are the defendant's initials and the date also on

21  that image?

22  A.   Yes.

23  Q.   And the defendant indicated he had seen those on a website

24  called Little Puffy Pussies?

25          MR. RICHARD BARTOLOMEI:  Leading, suggestive.

```
 1              THE COURT:  Sustained.
 2    BY MS. THOMPSON:
 3    Q.  Where did the defendant indicate he had seen those images?
 4    A.  On a website entitled Little Puffy Pussies.
 5    Q.  Did the defendant indicate what computer he used to view
 6    those images?
 7    A.  His laptop.
 8    Q.  Did the defendant say what the most recent images or videos
 9    he had seen using the Dell laptop?
10    A.  He was asked when was the last time he had accessed any
11    child pornography websites or of that course and he stated I
12    think it was on the 21st, the day before, he had accessed a
13    couple of websites called -- one of them was Teen Blow Job,
14    Blow Jobs.  Again I think he had also accessed Little Puffy
15    Pussies.  Those are the two I can recollect at this time.
16    Q.  Did he indicate how old the children were that were
17    depicted in the images he had last seen on the computer?
18    A.  He stated they were 14 -- he had seen a 14-year-old girl
19    blow job I believe was what he had seen.
20    Q.  You mentioned the term "dogie style", how did that come up?
21    A.  That was also mentioned then.
22    Q.  Did you ask the defendant at all about the child that was
23    living in his home?
24    A.  Yes.
25    Q.  Was that a female or male child?
```

Special Agent Juarez - Examination          88

1   A.   Female.

2   Q.   What did you ask about her?

3          MR. RICHARD BARTOLOMEI:  Your Honor, I would object.

4   One, it's not relevant to this case.  Two, it's highly

5   prejudicial as to the questioning.  Three, I don't believe

6   they'll have any foundational evidence that there was any such

7   conduct.  Four, it's also --

8          THE COURT:  What is the relevance?  The other

9   objections are overruled, but what's the relevance?

10          MS. THOMPSON:  The relevance is the relationship

11  between the two and the living arrangements within the house.

12  There's no --

13          THE COURT:  The objection is overruled.

14  BY MS. THOMPSON:

15  Q.   What did you ask him about his relationship with the child

16  in the house?

17  A.   Because she's underage we asked if we should be concerned

18  for her safety, if there's been any inappropriate relationship

19  between him and her.

20  Q.   How did he answer that?

21  A.   He stated that his -- that her grandmother, Crystal's

22  mother is overly protective of her and that she watches her

23  like a hawk 24/7.

24  Q.   Did he indicate whether the grandmother lived in the house

25  with them?

1   A.   The grandmother and the child stay in the bedroom

2   downstairs.

3   Q.   They share a bedroom downstairs?

4   A.   Correct.

5   Q.   How many bedrooms are on the second level of the house?

6   A.   There was, if I remember correctly, it was three bedrooms

7   upstairs.

8   Q.   Does the grandmother own a separate house?

9   A.   She does.

10  Q.   What does she do with that house if she lives at the Hidden

11  Iron Street location --

12          MR. RICHARD BARTOLOMEI:  Objection.

13  BY MS. THOMPSON:

14  Q.   -- if you know?

15          MR. RICHARD BARTOLOMEI:  Objection, Your Honor.

16          THE COURT:  I see no relevance in that.  The objection

17  is sustained.

18  BY MS. THOMPSON:

19  Q.   Did you ask the defendant about his honesty?

20  A.   Yes.

21  Q.   What did you ask?

22  A.   We asked him to rate his honesty on a scale of one to ten.

23  Q.   How did he rate himself?

24  A.   He rated himself an eight.

25          MR. RICHARD BARTOLOMEI:  I was going to object, the

 1   relevancy of scale questions regarding honesty.

 2          THE COURT:  Well, it's the defendant's statement.  The

 3   objection is overruled.

 4   BY MS. THOMPSON:

 5   Q.  After you learned the information that the defendant had

 6   used a Dell desktop at work and had viewed child pornography,

 7   does the issue of looking at that computer come up in the

 8   conversation?

 9   A.  Yes.

10   Q.  How does that come up?

11   A.  We ask him if he is willing to provide us with a consent to

12   search the laptop at his place of business.

13   Q.  How does he react to that?

14   A.  He states he's okay with that, that he would sign a

15   consent.

16   Q.  You also mentioned he told you there was an iPod in his

17   truck.  Is the truck covered under the Search Warrant?

18   A.  No.

19   Q.  What do you ask him about the truck, if anything?

20   A.  We ask him if he would be able to provide us with a consent

21   to search the truck as well and he states yes.

22   Q.  And does he execute that document, he signs the consent

23   form?

24   A.  Yes.

25   Q.  How long does the interview last?

1   A.   The interview lasts about an hour.

2   Q.   After the defendant agrees to provide consent for the

3   laptop computer, how does the interview proceed or is that the

4   end?

5   A.   That's pretty much the end.  Like I said, the last part was

6   asking him about when was the last time he had accessed the

7   child pornography and it pretty much comes to an end at that

8   point.  We proceed to go back to the residence.

9   Q.   Do all three of you go back into the house?

10  A.   Yes.

11  Q.   How do you decide how to get the laptop or is that

12  discussed in the interview at all?

13  A.   We discuss after we go into the residence we advise one of

14  the other agents that there's a laptop at his place of business

15  which is away from the residence and ask if he'd be willing to

16  join us.  So as we're walking back outside, we -- that's how we

17  get into our vehicles.  We're discussing there -- we have the

18  address, none of us have really looked it up on our phones and

19  we ask him if he could guide us to the place of business.

20  Q.   How does he respond to being asked that?

21  A.   He's okay with it.

22  Q.   Does he say that or does he do something to indicate that?

23  A.   Well, we allow him to use his vehicle once -- when we were

24  in the residence, he signed the consent to search the vehicle,

25  so that was taken care of.  He had his -- we had given him his

1    keys after the search.  We're standing outside the residence,

2    we're standing outside the residence making arrangements as to

3    how to get to the business.  Our other partner needs to utilize

4    the restroom on our way over there.

5    Q.  And that's the agent that you asked to join you in going to

6    get the laptop?

7    A.  Correct.

8         MR. RICHARD BARTOLOMEI:  Excuse me, Your Honor.  I'd

9    like to hear the rest of her answer.

10        THE COURT:  Well, I think she answered the question.

11        MR. RICHARD BARTOLOMEI:  Thank you, Your Honor.

12   BY MS. THOMPSON:

13   Q.  What happens after you learn that one of the agents has to

14   use the restroom?

15   A.  We ask Mr. Michalik if there's a place where we could stop

16   by in order for the agent to use the restroom.

17   Q.  How does he respond?

18   A.  He states that there's a McDonald's on the way over there.

19   Q.  What happens?

20   A.  So Mr. Michalik gets in his truck, Agent DePaola and myself

21   get in one vehicle and agent Hefner gets in his own vehicle.

22   And I believe it was Mr. Michalik was at the front and then

23   Agent Hefner and then Agent DePaola and myself and that was the

24   vehicle form, we headed out.

25   Q.  Did you stop at the McDonald's?

1   A.   Yes.

2   Q.   How long did that stop take place?

3   A.   That stop probably five, less than five minutes.

4   Q.   What happens while you're stopped at McDonald's?

5   A.   Agent Hefner proceeds to go inside to use the facilities

6   and Agent DePaola and myself just come out and talk to

7   Mr. Michalik.  Agent DePaola tells him that again this is

8   voluntary, you know, it's up to you if you want to continue, if

9   you want to continue.  And we advise him that we appreciate his

10  help.

11  Q.   Did he state anything that you recall at the McDonald's?

12  A.   He stated, "Oh, I didn't think --"

13       Because at one point I think he had gotten a green light

14  and we had gotten stuck on a red or something.  I remember him

15  saying something like, "I didn't want you all to think I was

16  trying to lose you."  And we're like, "Oh, no, why would we

17  think that?"

18       Our conversations, he had been helpful all this time, but

19  like I said, we indicated again that he was free to leave and

20  we thanked him.

21  Q.   And he's in the front of this three-car caravan, correct?

22  A.   Correct.

23  Q.   So he could have driven somewhere else?

24  A.   Correct.

25  Q.   After the agent uses the facilities at the McDonald's, what

1   happens?

2   A.  We proceed to get back into our vehicles and make our way

3   to the place of business.

4   Q.  How long does it take you to get there?

5   A.  I don't remember the time.  I remember the location, but I

6   don't know, a few more minutes, maybe ten, 15 minutes.

7   Q.  What happens when you get there?

8   A.  We all park our vehicles and he unlocks I believe it was a

9   glass door, he unlocks that, we notice there's a long gun rifle

10  of some sort towards the back of the business on the inside.

11          MR. RICHARD BARTOLOMEI:  Your Honor, this is going

12  into a narrative, does not allow me to anticipate the testimony

13  and make appropriate objections.

14          THE COURT:  The objection is sustained.

15  BY MS. THOMPSON:

16  Q.  Once he unlocks the door and let's you in, where do you go?

17  A.  Agent Hefner proceeds to make entry and myself and Agent

18  DePaola kind of stand at the doorway with Mr. Michalik.

19  Q.  Why are you waiting at the door?

20  A.  Because there was some form of a long-arm inside the

21  property.

22  Q.  And what happens to that weapon?

23  A.  Agent Hefner proceeds to make it safe, discharge -- I mean

24  I call it make it safe, but to make sure it's not going to be

25  used against us.  Unload it, unload the rifle or shotgun or

1   long-arm.

2   Q.  After that happens, what do you do?

3   A.  Then we -- once the weapon is made safe, we proceed to walk

4   towards where he tells us is his desk and shows us where the

5   laptop is on his desk.

6   Q.  He points it out?

7   A.  Correct.

8   Q.  What happens next?

9   A.  Then I proceed to say if that's the one, then I provide him

10  with a consent to search.

11  Q.  When you say "that's the one" is that a statement or a

12  question?

13  A.  "Is that your computer?"  Then "Yes."  Then I proceed with

14  the consent to search.

15          MS. THOMPSON:  Your Honor, may I approach?

16          THE COURT:  Yes.

17  BY MS. THOMPSON:

18  Q.  Special Agent Juarez, I'm going to show you what has been

19  marked for identification as Government Exhibit Three.  Do you

20  recognize that?

21  A.  Yes.

22  Q.  What is that?

23  A.  This is a consent to search for the Dell laptop that was

24  located at the business address.

25  Q.  And with the exception of the Exhibit Sticker, is it in the

1  same condition now as when the defendant signed it?

2  A.  Yes.

3         MS. THOMPSON:  Government offers Exhibit Three.

4         MR. RICHARD BARTOLOMEI:  No objection.

5         THE COURT:  It will be received.  How much longer do

6  you have with her?  Because we've got to take lunch break.

7         MS. THOMPSON:  Probably 15, 20 minutes.

8         THE COURT:  We'll go ahead and take our lunch break

9  now.  Ladies and gentlemen, we normally take an hour and a half

10 lunch break and I know that seems excessive, most people get an

11 hour for lunch, but the problem here is that we're kind of

12 stuck in a corner over here of San Antonio that's just now

13 being redeveloped.  There aren't many restaurants around here.

14 There's a somewhat expensive pizza place called Dough, which by

15 the way is excellent, but it's not cheap.  It also gets very

16 crowded at lunch.  And there's Commonwealth which is fairly

17 close, but it also gets pretty crowded, so a lot of our jurors

18 end up having to walk into downtown to eat.  Of course, you can

19 always bring your lunch and eat in the room and then just step

20 outside for a few minutes and walk around.  Once we get the

21 redevelopment done out here, it will be just about time for us

22 to move out of this building and we'll be right back in the

23 same spot we were in before.  But in any event, that's the

24 reason.  And I also have to give the lawyers an opportunity to

25 get something to eat and also prepare for the afternoon.  So

1  it's not because we like to take long luxurious lunch hours.

2  We'd like you back in the jury room about 1:20.  Thank you very

3  much.  Have a good lunch.

4          COURT SECURITY OFFICER:  Rise for the jury.

5          *(12:10 p.m., jury exits.)*

6          THE COURT:  Ma'am, you can step down.  Anything before

7  we take our lunch break?

8          MS. THOMPSON:  No.

9          MR. RICHARD BARTOLOMEI:  No.

10              *  *  (Lunch recess)  *  *

11          *(1:33 p.m.)*

12          COURT SECURITY OFFICER:  All rise.

13          THE COURT:  Please be seated.

14                      *  *  *

15          COURT SECURITY OFFICER:  All rise for the jury.

16          THE COURT:  Please be seated.  The Court would note

17  the presence of the ladies and gentlemen of the jury as well as

18  all counsel, the respective parties.  Okay.  You may continue.

19          MS. THOMPSON:  Thank you, Your Honor.  Will you please

20  pull up Exhibit Three?

21  BY MS. THOMPSON:

22  Q.  Special Agent Juarez, you were describing the consent form

23  when we broke for lunch.  What happened with the consent form

24  at the defendant's office?

25  A.  He signed it.  I mean it was read to him, asked if he

1    understood the consent to search, if he had any questions and

2    if there was no questions and if he was still amenable to us

3    doing the consent to search, then for him to print, sign and

4    date the form.

5    Q.   When you arrived at the office, was the form blank?

6    A.   Yes.

7    Q.   Why is that?

8    A.   I would like to see the laptop and I would need to describe

9    what kind of a laptop it is.  There's an area there for the

10   description of it, plus also if he decides to change his mind.

11   Q.   Okay.  During the interview, he told you it was a Dell

12   laptop, but if you had gotten to the office and it was a

13   different kind of laptop, then that would affect the form?

14   A.   I would inspect the laptop to find out what brand it is.

15   Q.   And then you also put the location of the business where

16   the laptop was in the consent form?

17   A.   Correct.

18   Q.   So as you're filling out this form at the defendant's

19   office, what is he doing?

20   A.   Standing right by us.

21   Q.   He's standing right next to you?

22   A.   Uh-huh.

23   Q.   After you fill out the form, you testified that you asked

24   him -- well, what did you say you asked him?

25   A.   If he understood -- if he had any questions of the form.

1   Q.   Did he indicate he understood what the form said?

2   A.   Yes.

3   Q.   Did he ask you any questions about it?

4   A.   No.

5   Q.   After that --

6              (Interruption.)

7              THE COURT:  It sounds like her computer is exploding.

8              MS. THOMPSON:  Sounds like her computer is about to

9   take off.

10              THE COURT:  That's really your computer?

11              COURTROOM DEPUTY CLERK:  Yes.

12              THE COURT:  It's loading a disk?

13              COURTROOM DEPUTY CLERK:  I think it's fine.  Sorry.

14   BY MS. THOMPSON:

15   Q.   So after you ask him if he has any questions and he doesn't

16   ask you any questions, do you watch him sign it?

17   A.   Yes.

18   Q.   And is that his signature at the bottom of the form?

19   A.   Yes.

20   Q.   He prints his name and then he signs it?

21   A.   Correct.

22   Q.   And he dates it?

23   A.   Correct.

24   Q.   Whose signature is right below that?

25   A.   That's mine.

1   Q.  As a witness to him signing the form?

2   A.  Correct.

3           MS. THOMPSON:  If I haven't already, I will offer

4   Government Exhibit Three.

5           MR. RICHARD BARTOLOMEI:  No objection.

6           THE COURT:  It will be received.

7   BY MS. THOMPSON:

8   Q.  After he signs the form, what happens?

9   A.  We bag the computer in an evidence bag and provide him with

10  a custody receipt, 6051.

11          MR. RICHARD BARTOLOMEI:  Sorry, I could not hear you.

12          THE WITNESS:  It's a custody receipt for his computer.

13  BY MS. THOMPSON:

14  Q.  After that what happens?

15  A.  We proceed to walk outside of the business.

16  Q.  All of you?

17  A.  Correct.

18  Q.  What happens when you get outside?

19  A.  We ask him to wait outside while we depart.

20  Q.  Why is that?

21  A.  Because of the firearm that was in the business.

22  Q.  Did he have any problem --

23  A.  And for our safety also, just to make sure that we can see

24  him and we leave and that's how it ended.

25  Q.  Did he indicate he had any problem doing that?

1   A.   No.

2   Q.   How was the demeanor of the defendant during the whole

3   interaction at his office?

4   A.   It was calm.

5   Q.   Was he cooperative?

6   A.   Yes.

7   Q.   Did he seem to hesitate to participate at all?

8   A.   No.

9   Q.   Do you then get back into Special Agent DePaola's car?

10  A.   Yes.

11  Q.   And you two leave the area?

12  A.   Correct.

13  Q.   What about Special Agent Hefner?

14  A.   He also gets in his vehicle and departs.

15  Q.   Do you know what happens to the defendant, whether he

16  leaves or stays?

17  A.   The last I saw him, he was standing outside of his

18  business.

19  Q.   What do you do with the laptop that you took?

20  A.   We take it to the office for inventory.

21  Q.   Is it put into an evidence room?

22  A.   Correct.

23  Q.   Is that laptop also provided to the forensic examiner to do

24  a forensic exam?

25  A.   Yes.

1          MS. THOMPSON:  Your Honor, may I approach?

2          THE COURT:  You may.

3   BY MS. THOMPSON:

4   Q.  I'm going to show you what I've marked for identification

5   as Government Exhibit Four and ask you to take a look at it.

6   Do you recognize that?

7   A.  Yes.

8   Q.  What is it?

9   A.  It's the Dell laptop.

10  Q.  And other than the internal hard drive being out of it and

11  the battery being gone, is it in the same condition now as when

12  you seized it?

13  A.  Yes.

14          MS. THOMPSON:  Government offers, Exhibit Four.

15          MR. RICHARD BARTOLOMEI:  What's left of it, no

16  objection.

17          THE COURT:  Well, without the editorializing, the

18  Court will receive the computer in evidence.

19  BY MS. THOMPSON:

20  Q.  After you left the defendant's business, did you conduct

21  other interviews in this case?

22  A.  Yes.

23  Q.  On the same day the Search Warrant was executed, did you

24  receive a call from Crystal Rivas?

25  A.  Yes.

1   Q.  Do you recall what time approximately that phone call was

2   made to you?

3   A.  I'm thinking it was after lunch.  Well, no, because there

4   was two calls.  She was probably maybe eleven, maybe 11:30,

5   received a call, she --

6   Q.  How long did the phone call last with her?

7   A.  A few minutes.

8   Q.  And you mentioned there was a second call, was that also

9   from Ms. Rivas to you?

10  A.  Yes.

11  Q.  What time approximately do you think you received that

12  call?

13  A.  That one I believe was the one that was a little bit after

14  lunch, maybe 1:30.

15  Q.  Based on the second phone call, did you meet her at a

16  restaurant?

17  A.  Yes.

18  Q.  Did you have a conversation with her at the restaurant?

19  A.  Yes.

20  Q.  Did she provide you with additional information?

21  A.  Additional information?

22  Q.  Related to the Search Warrant.

23  A.  She had concerns about his -- Michalik's whereabouts.  I'm

24  thinking she might have brought something with her.

25          MR. RICHARD BARTOLOMEI:  Your Honor, I think we're

1   going into hearsay and the government has --

2          THE COURT:  The objection is sustained.

3   BY MS. THOMPSON:

4   Q.  How long did you meet with her at the restaurant?

5   A.  I would say probably 30 to 40 minutes.

6   Q.  After meeting with her, did the focus of your investigation

7   change at all?

8   A.  No.

9   Q.  Did you also meet with the defendant's brother, Eddie

10  Michalik?

11  A.  Yes.

12  Q.  Based on the conversation you had with him, did the focus

13  of your investigation change?

14  A.  No.

15         MS. THOMPSON:  Thank you.  I have nothing further.

16  Oh, if I haven't already offered Exhibits 2 and 2a, the Search

17  Warrant and the application --

18         THE COURT:  They'll be received.

19         MS. THOMPSON:  Thank you.

20                    CROSS-EXAMINATION

21  BY MR. RICHARD BARTOLOMEI:

22  Q.  Good afternoon, Ms. Juarez.

23  A.  Good afternoon.

24  Q.  We've met before, have we not?

25  A.  Yes.

1  Q.  I've had the opportunity to question you under oath just a

2  few days ago, correct?

3  A.  Yes.

4  Q.  I'm going to start with, if I can, the interdiction on

5  October 22nd, take you there, okay.  October 22nd you've

6  testified that there are how many agents, eight agents?

7  A.  Approximately eight to nine agents.

8  Q.  And that includes you and Agent DePaola?

9  A.  Correct.

10  Q.  All of the agents are armed, correct?

11  A.  The special agents, yes.

12  Q.  You were waiting until after 6:00, correct?

13  A.  Correct.

14  Q.  Why do you have to wait until after six?

15  A.  I believe the Search Warrant stipulates a certain time

16  frame.

17  Q.  But you've had an opportunity to surveil how many times,

18  meaning the defendant, how many times?

19  A.  How many times did I surveil his place?

20  Q.  Yes.

21  A.  I don't have the exact count.  I know there was probably

22  three or four times, maybe more.

23  Q.  Now, you knew his business address before the Search

24  Warrant, didn't you?

25  A.  The one at Mobud?

1   Q.   Yes.

2   A.   No.

3   Q.   I thought you testified through your investigation you had

4   an address and it came back to the house, correct?

5   A.   To his residence, not the one on Mobud.

6   Q.   Let me ask you this.  6:00 slightly after, three agents

7   approach the defendant, correct?

8   A.   Correct.

9   Q.   He's getting in his vehicle, correct?

10  A.   He's about to make entry into his vehicle.

11  Q.   You testified about his demeanor, was he not, in fact,

12  startled and surprised?

13  A.   He didn't seem that way.

14  Q.   Was the first agent a male?

15  A.   The first agent --

16  Q.   First agent that approaches him.

17  A.   It was Agent DePaola and myself.

18  Q.   Now, there were only two of you, there wasn't a male agent?

19  A.   The first one was Agent DePaola and myself and Agent

20  Miller.

21  Q.   Agent Miller approaches him first with his hand on his

22  weapon, doesn't he?

23  A.   No, it was Agent DePaola.

24  Q.   Let me ask this.  Does the male agent come down the

25  driver's side of the vehicle first and you and Agent DePaola

1    come from around the back of the pickup bed?

2          MS. THOMPSON:  Objection, Your Honor, asked and

3    answered.

4          THE COURT:  Sustained.

5          MR. RICHARD BARTOLOMEI:  I'll do it differently.

6    Thank you.

7    BY MR. RICHARD BARTOLOMEI:

8    Q.  Ma'am, when you approach the defendant, you come from

9    behind the pickup, don't you?

10   A.  I don't remember.  I just know that we -- it was Agent

11   DePaola and myself that approached him first.  I'm not sure if

12   it was behind the vehicle, in front of the vehicle.

13   Q.  You don't recall the specifics, is that what I'm to

14   understand?

15   A.  Correct.

16   Q.  Now, who is it that speaks and informs the defendant that

17   you have a Search Warrant?

18   A.  Agent DePaola.

19   Q.  At that point, do you tell him, We have a Search Warrant,

20   but you are free to leave?  You don't, do you?  Right at that

21   point.

22   A.  At that point, no, we don't tell him that he's free to

23   leave.

24   Q.  And you have him go to the house to open the door, correct?

25   A.  I believe he provides the keys to one of the agents and

1   then we proceed to the door.

2   Q.  Did you tell him once the door is opened, You're free to

3   leave?

4   A.  Once we were inside.  At the door, no.  I don't remember

5   that.

6   Q.  He goes inside, am I correct one of you directs him to call

7   all of the occupants down or out, correct?

8   A.  Right.

9   Q.  The house is dark, correct?

10  A.  I don't remember if it was completely dark.  There was I

11  think a light that had turned on when we were sitting outside

12  waiting.

13  Q.  Other agents now come in, correct?

14  A.  Correct.

15  Q.  They rapidly deploy, correct?

16  A.  Once he calls his family members down, then they proceed.

17  Q.  In proceeding, these agents are shouting to people

18  forcefully, "Come out, come!"  Are they not?

19  A.  "Police with a Search Warrant.  Police with a Search

20  Warrant" is what we tell them.  I believe I wasn't at the front

21  of the stack, I wasn't at the front, so I'm not sure how that

22  all occurred.

23  Q.  Excuse me?

24  A.  I wasn't at the front of the line or of when the -- when

25  they made that entry and they're announcing "Police with a

1   Search Warrant" I'm not sure if it's the exact words.

2   Q.   Do you remember telling me when we last talked and you were

3   under oath, "I can't remember if he unlocked the door or if he

4   handed the keys to one of the agents to unlock the door", is

5   that your testimony?

6   A.   Yeah.

7   Q.   So you don't have a specific recollection as to whether or

8   not he opened the door or whether another agent did, correct?

9   A.   Correct.

10   Q.   You were aware that there were other occupants, correct?

11   A.   Yes.

12   Q.   I believe your testimony today was that he told you who was

13   in the house, correct?

14   A.   Correct.

15   Q.   Would you agree that you told me when you last testified,

16   "It's kind of somewhat chaotic in the morning, you know, we ask

17   him how many individuals are in the home and is there any

18   weapons."  Do you remember telling me that?

19   A.   Yes.

20   Q.   Now, I asked you about prior surveillance and I believe you

21   testified on direct that you saw a black bag consistent with a

22   laptop bag, correct?

23   A.   Correct.

24   Q.   And you had seen that on prior occasions, correct?

25   A.   On one occasion.

1   Q.  So you knew that he would sometimes have the laptop with
2   him when he left the residence, correct?
3   A.  I'm not sure what was inside the black bag, just that he
4   did take it one time.
5   Q.  Ma'am, I thought you testified and I'll ask you to clarify,
6   did it not look like a laptop bag?
7   A.  Yes, it was a black bag.
8   Q.  The security sweep, they had weapons drawn and they did
9   point them at the occupants, isn't that true?
10  A.  I wasn't at the front of the stack.  I never seen that
11  before if they pointed them at the occupants.
12  Q.  You did not see it that day?
13  A.  I've never seen it where we point at the occupants.
14  Q.  This security sweep that you spoke of takes five to seven
15  minutes, correct?
16  A.  Correct.
17  Q.  And these are all armed agents with weapons and flashlights
18  commanding people to come to them so they can secure the
19  building?
20  A.  Correct.
21  Q.  Are you saying and I will ask this -- nevermind, I'll get
22  to another point on this.
23      Am I correct that in addition to all having weapons,
24  they're wearing vests, are they not?
25  A.  Yes.

1  Q.  Bulletproof vests, correct?
2  A.  Correct.
3  Q.  They have letters across the front, correct?
4  A.  Correct.
5  Q.  They have protective gear, correct?
6  A.  Correct.
7  Q.  They are carrying assault rifles, correct?
8  A.  We have our sidearms.
9  Q.  Are not some of the agents carrying assault rifles?
10  A.  I don't remember if on that occasion there was an assault
11  rifle.
12  Q.  Everybody has sidearms, don't they?
13  A.  Correct.
14  Q.  Are you saying that they're not drawn?
15  A.  Upon entry they're drawn.
16  Q.  Thank you.  Now, and I asked you before, last week, I
17  thought it said ICE across the front of their vest, but
18  actually it says HSI, correct?
19  A.  Perhaps -- it could be either/or, but I think for the most
20  part now we have H -- or we had HSI on them.
21  Q.  All of the people are gathered in the living room, as you
22  testified on direct, correct?
23  A.  Correct.
24  Q.  That you have a grandmother, you have a 13-year-old girl
25  and you have Ms. Rivas, correct?

1    A.   Correct.

2    Q.   They're all directed to sit on the sofa, aren't they?

3    A.   Correct.

4    Q.   And they stay on the sofa, correct?

5    A.   Correct.

6    Q.   And they have armed agents around them, correct?

7    A.   Correct.

8    Q.   I believe you testified on direct that you told people or

9    that Agent DePaola, who is it that told them, You're free to

10   leave?

11   A.   She stated it, I stated it.

12   Q.   Do you have a form like you do for your consents that you

13   read to people, advising them of what their rights are?  You

14   don't, do you?

15   A.   No.

16   Q.   And you don't read them anything, do you?

17   A.   No.

18   Q.   And you don't hand them anything in writing that says

19   you're free to leave, you don't have to talk with us?

20   A.   No, we don't have a form.

21   Q.   With regard to the arms that are involved in this case,

22   where do you take -- excuse me.  Where do you take

23   Mr. Michalik?  You take him to a corner of the living room

24   area, do you not?

25   A.   A corner?  No.  He's been standing with us.  If anything,

1    we might have moved towards the kitchen, but I don't remember

2    moving too far away from that living room area.  It was kind of

3    a small area.

4    Q.  The living room area --

5    A.  The living room area, yeah, I don't remember no corner.

6    Q.  I don't remember a corner of a living room?

7    A.  Taking him to a corner?

8    Q.  I'll let you finish and then I'll start.

9    A.  Go ahead.

10   Q.  Do you remember a television and there's a corner away from

11   the sofas?

12   A.  Specifically, no.  I remember the sofa.  I remember the

13   bedroom downstairs.

14   Q.  You and Agent --

15   A.  DePaola.

16   Q.  You and Agent DePaola stayed with him, meaning

17   Mr. Michalik, the entire time of the interdiction, correct?

18   A.  Correct.

19   Q.  You're never more than two or 3 feet away, correct?

20   A.  Correct.

21   Q.  My understanding is you talked to him, from your direct,

22   about wanting to speak with him, remember?

23   A.  Right.

24   Q.  Did you tell him at that time, You don't have to speak with

25   us?

1   A.  At that time, no.

2   Q.  And you don't tell him, We'd like to speak with you out in

3   the car for your privacy.  You don't tell him that either, do

4   you?

5   A.  We ask him if he'd be more comfortable speaking to us in

6   the vehicle.

7   Q.  Did you tell him, This is for your benefit?  You didn't,

8   did you?

9   A.  No, I don't remember stating that.

10  Q.  And this is approximately, if my math is correct, five to

11  seven minutes for the security sweep with armed agents and then

12  within five minutes you're heading to the vehicle, correct?

13  A.  Correct.

14  Q.  And by that I mean the government vehicle, correct?

15  A.  Correct.

16  Q.  You could have conducted the interview inside the house,

17  couldn't you?

18  A.  We could.

19  Q.  You could have completed the entire Search Warrant and had

20  an interview with him afterward at some other location without

21  any armed agents in the presence of his family or himself,

22  isn't that true?

23  A.  Correct.

24  Q.  That's what you did with Ms. Rivas, didn't you?

25  A.  We met with her after the fact.

Special Agent Juarez - Examination          115

```
1    Q.  Away from the residence, no armed agents, correct?
2    A.  Correct.
3    Q.  When you leave to take him out down the hallway, one of you
4    is in front, one of you is in back, correct?
5    A.  Correct.
6    Q.  And that's how you positioned yourselves, do you not?
7    A.  We do.
8    Q.  Do you remember telling me when we last talked just last
9    week that you positioned yourselves for safety and to control
10   his movements, isn't that true?
11   A.  For safety.
12   Q.  Well, it controls his movements, doesn't it?
13   A.  If he was to approach my partner, yes, I would be able to
14   control him.
15   Q.  That's the purpose of how you position yourselves is
16   controlling his movements, correct?
17          MS. THOMPSON:  Objection, asked and answered.
18          THE COURT:  Sustained.
19   BY MR. RICHARD BARTOLOMEI:
20   Q.  You walk him out one in front, one in back, both armed,
21   correct?
22   A.  Correct.
23   Q.  You walk him to a vehicle, he doesn't know where the
24   vehicle is until you tell him, correct?
25   A.  Correct.
```

1   Q.  One of you has to instruct him as to where to go, correct?

2        MS. THOMPSON:  Objection.  This is assuming facts not

3   in evidence.

4        THE COURT:  That is correct.  The objection is

5   sustained.

6        MR. RICHARD BARTOLOMEI:  I'm trying to put it in

7   evidence, Your Honor.

8        THE COURT:  But your question assumes it already is,

9   so you can ask her questions, but you can't predicate your

10  questions with facts which you assume are correct which are not

11  in evidence.

12  BY MR. RICHARD BARTOLOMEI:

13  Q.  One in front, one in back, one of you leading, I presume?

14       MS. THOMPSON:  Objection, asked and answered.

15       THE COURT:  Yeah.  We're going over the same

16  territory.  We already have I think through the questioning

17  established that there was an agent behind and there was an

18  agent in front and then he was in the middle.  That's already

19  been established.  There's no contention about that.

20  BY MR. RICHARD BARTOLOMEI:

21  Q.  You take him outside and you walk across the front lawn

22  with him to a vehicle that's parked off the premises, correct?

23  A.  Correct.

24  Q.  You don't tell him, If you feel more comfortable or if you

25  feel like you want a family member, you can have them here with

1   you.  You didn't tell him that, did you?

2   A.  No.

3   Q.  You don't ask anything at all about his comfort or security

4   or whether he wants company while you question him, isn't that

5   true?

6   A.  That's true.

7   Q.  And the purpose of taking him to the vehicle is also

8   coincidentally to isolate him one on one, isn't it?

9          MS. THOMPSON:  Objection, Your Honor, again assuming

10  facts not in evidence.

11         THE COURT:  I'm going to overrule that objection.

12  It's a leading question.  He's entitled to ask a leading

13  question.

14  BY MR. RICHARD BARTOLOMEI:

15  Q.  Your purpose is to isolate him and question him one on one,

16  correct?

17  A.  Correct.

18  Q.  And your purpose in questioning him is to get incriminating

19  evidence that you can use against him in this investigation,

20  isn't it?

21  A.  It's to try to find out who used that Internet IP address.

22  Q.  But your questions to him asking if he uses it, if he

23  answers, that would incriminate him, wouldn't it?

24  A.  It could.

25  Q.  That's the whole purpose of your investigative technique is

 1 │ to get people to talk to you and make statements that you can

 2 │ use as evidence in a criminal case, isn't that the point?

 3 │        MS. THOMPSON:  Objection, Your Honor, this is

 4 │ argumentative.

 5 │        THE COURT:  Sustained.

 6 │ BY MR. RICHARD BARTOLOMEI:

 7 │ Q.  The purpose of your questioning was to elicit statements

 8 │ from him, correct?

 9 │ A.  Was to figure out who utilizes that IP address, who uses

10 │ the Internet, it's to further the investigation.  It might not

11 │ be specifically him because I did have another male individual

12 │ that was showing up on my searches, so it was just to try to

13 │ figure out who uses that IP address and continue with the

14 │ investigation.

15 │ Q.  Was the other person a Mr. Smith?

16 │ A.  No.

17 │ Q.  Who was the other person?

18 │ A.  I believe he was Crystal's brother that lived at the

19 │ residence or that showed up on my searches.  I don't recall his

20 │ name, but there was a male and a female that came up to that

21 │ address as well.  So it's just trying to if you say a process

22 │ of elimination trying to figure out who uses this IP address to

23 │ download the images in question.

24 │ Q.  Well, in asking him about the use of computer and sites, if

25 │ he answers and identifies sites regarding pornography, you

1  would agree that would incriminate him, wouldn't you?

2  A.  It could.

3  Q.  And you're controlling the conversation, are you not?

4  A.  Controlling it?

5  Q.  Strike the question.  Actually it's Agent DePaola that was

6  the one who does all of the questioning, isn't it?

7  A.  I do some of the questioning, but she does the majority of

8  them.

9  Q.  And I believe you testified you showed him the five images.

10 Isn't it, in fact, true that Agent DePaola actually showed him

11 the images?

12 A.  I think I had the images in my -- they're kind of shown, I

13 mean, I had the images in my folder.  Yeah, I had the images

14 because I have the case file.

15 Q.  Ma'am, my question is narrower.  Agent DePaola shows him

16 the images while you take notes, isn't that true?

17        MS. THOMPSON:  Objection, Your Honor, asked and

18 answered.

19        THE COURT:  Sustained.

20 BY MR. RICHARD BARTOLOMEI:

21 Q.  So are you now saying you showed him the pictures?

22 A.  Yes.

23 Q.  And there was a specific question about whether he had seen

24 images, correct, those images?

25 A.  We had asked him if he had seen any of the images?  Is that

1    the question?

2    Q.   Yes, ma'am.

3    A.   Yes.

4    Q.   And he tells you that he might have seen two of them on an

5    old business computer, isn't that what he told you?

6    A.   He stated he seen them on some websites is what I remember.

7    Q.   You're the only one taking notes, correct?

8    A.   Correct.

9    Q.   He's not given a pad of paper saying, well, you take notes

10   and we'll compare notes when we're done, right?

11   A.   Correct.

12   Q.   You don't give him the opportunity to look at your notes

13   and make any corrections, isn't that true?

14   A.   Correct.

15   Q.   So all of the recording of the events is by you, not by

16   him, correct?

17   A.   Correct.

18   Q.   And upon walking out, was he not told that the interview

19   would be recorded?

20   A.   No.  Never recorded interviews.

21   Q.   Well, I was going to ask about that.  You never record

22   interviews.  You're a Federal government agency, correct?

23   A.   Correct.

24   Q.   You don't have body cams or tape recorders?

25   A.   No.

1   Q.  Didn't you tell me that we never record interviews?

2   A.  I don't record interviews.

3   Q.  Well, are you aware of any policy or is that just your

4   practice?

5   A.  We don't have a policy.

6   Q.  Well, would you agree, though, that by not recording it

7   with an independent device, only the government got to take

8   notes and record what they claim happened, wouldn't you agree?

9          MS. THOMPSON:  Your Honor, I object to this line of

10  questioning.

11         THE COURT:  That's argumentative again.

12  BY MR. RICHARD BARTOLOMEI:

13  Q.  Nonetheless, ma'am, you're the only one taking notes?

14         MS. THOMPSON:  Objection, asked and answered.

15         THE COURT:  Counsel, you need to move on.

16         MR. RICHARD BARTOLOMEI:  I was trying to get back to

17  it, Judge.

18         THE COURT:  Well, let's not get back to it because

19  you've covered it.

20         MR. RICHARD BARTOLOMEI:  Okay.

21  BY MR. RICHARD BARTOLOMEI:

22  Q.  Now, before we ever get to the vehicle, who guides or is in

23  the lead in directing the defendant to the vehicle?

24         MS. THOMPSON:  Objection, assuming facts not in

25  evidence and it's argumentative.

1          THE COURT:  Sustained.

2          MR. RICHARD BARTOLOMEI:  Excuse me, Your Honor, I'm

3    asking who did it.

4          THE COURT:  Who did what?

5          MR. RICHARD BARTOLOMEI:  Who is it that guides him.

6          THE COURT:  She said nobody guided him.  She didn't

7    testify that anybody guided him, so your question presupposes

8    an answer which wasn't given.

9          MR. RICHARD BARTOLOMEI:  Okay.

10   BY MR. RICHARD BARTOLOMEI:

11   Q.  You opened the door, correct?

12   A.  The passenger side door.

13   Q.  And in doing so --

14         THE COURT:  Are you talking about guiding him into the

15   car or are you talking about --

16         MR. RICHARD BARTOLOMEI:  To the car and then get in

17   the car, yes, just the mechanical process.

18         THE COURT:  All right.

19   BY MR. RICHARD BARTOLOMEI:

20   Q.  You opened the door, right?

21   A.  Yes.

22   Q.  You get in the passenger side in the rear, correct?

23   A.  Correct.

24   Q.  The other agent gets in the front seat, correct?

25   A.  Correct.

1  Q.  Your positioning is that you're kind of leaning between the

2  seats, taking notes, resting on a console, correct?

3  A.  No.  I don't lean forward.

4  Q.  All right.  Is there another agent still out by his

5  vehicle?

6  A.  I'm not aware of it.

7  Q.  When you get in the vehicle, who speaks first?

8  A.  Agent DePaola.

9  Q.  Again you don't have a form advising him that this is all

10  voluntary and he doesn't have to talk with you?

11        MS. THOMPSON:  Objection, Your Honor, this has been

12  asked and answered.  She's testified there's no form.

13        THE COURT:  Sustained.

14  BY MR. RICHARD BARTOLOMEI:

15  Q.  Are you claiming that you tell him then again in the

16  vehicle, and if so, who tells him?

17  A.  Agent DePaola advises Mr. Michalik that the interview is

18  solely voluntary, it's volunteer on his part.  Once again he's

19  free to leave if he wants to.  I reiterate and advise him that

20  once again this is all voluntary.

21  Q.  At that point I believe you testified he didn't even answer

22  verbally.  You said he nodded, correct?

23  A.  Correct.  Do you wish to continue?  And he nodded.

24  Q.  Now, the nature of this question, Agent DePaola, she is

25  asking the questions and he has to respond, correct?

1   A.   She asks the questions -- and what's the second part?

2   Q.   And he responds, correct?

3   A.   Correct.

4   Q.   Are you claiming that he never disagrees with anything that

5   you were asking him?

6   A.   He answered the questions.

7   Q.   Would you agree that they were pointed questions asking the

8   defendant whether he did or did not do something, that's the

9   manner in which he was asked, correct?

10  A.   Certain questions perhaps.

11  Q.   I believe you had told me perhaps in our last conversation,

12  you have Agent DePaola talk to him because she's more forceful,

13  correct?

14  A.   No.  I did not say that.

15  Q.   Well, did you say she's louder?

16  A.   No.  That she's louder?

17  Q.   You don't remember?

18  A.   I remember saying that I'm soft spoken and I have issues

19  like talking on this microphone, but that she's forceful or

20  loud, I don't remember saying that.

21  Q.   All right.  Let me ask you, did she ever call him a liar?

22  A.   No.

23  Q.   You talked about specifically someone asking him about

24  PTHC, correct?

25  A.   Correct.

1   Q.  Isn't it a fact he told you he didn't know what it meant?

2   A.  No.  He stated it was younger females, younger children.

3   Q.  Perhaps my question wasn't clear enough.  You gave him an

4   acronym -- actually Agent DePaola gave him an acronym, PTHC,

5   right?

6   A.  Perhaps.  I know that acronym did come up, yeah.

7   Q.  And didn't he, in fact, tell you he didn't even know what

8   it meant?

9   A.  No, he stated it was for younger children -- what the

10  acronym stood for, probably not, I don't remember specifically.

11  Q.  I'm not sure I understand.  Probably not or didn't he say I

12  don't even know what it means?  Isn't that what he said?

13  A.  I don't remember, quite honestly, if he remembered that

14  part or not.

15  Q.  So he may have said that, you simply have no recollection?

16  A.  Correct.

17  Q.  And he did tell you he doesn't like looking at child porn,

18  didn't he?

19  A.  Correct.

20  Q.  And of course, it's not illegal as you testified to look at

21  adult porn, correct?

22  A.  Correct.

23  Q.  You mentioned something about searching Lolita, do you

24  remember, in your testimony this morning?

25  A.  That he mentioned those names in the search terms.

1  Q.  Isn't it, in fact, true that Agent DePaola asked him if he

2  used that search site?

3  A.  No.  We don't know what search terms he's used to look for

4  stuff in his computer.  We don't know what he's been looking at

5  or how he finds it, so therefore, we need to ask him what is it

6  that -- what terms does he use on his computer because we do

7  not know.

8  Q.  Ma'am, you've been doing this for how many years?

9  A.  About five years with the child porn group.

10  Q.  And you're pretty familiar with all of the sites that

11  people can visit because you have experience with it, correct?

12  A.  Correct.

13  Q.  So Agent DePaola would likewise know the sites, would she

14  not?

15  A.  We know names of sites.

16        THE COURT:  You're asking her to speculate on what the

17  other agent might know or not know.  And that's inappropriate.

18  BY MR. RICHARD BARTOLOMEI:

19  Q.  You would have known the sites because you've done this for

20  five years and had to investigate numerous times persons who

21  search sites, correct?  Isn't it, in fact, true that what was

22  asked was do you know a person or do you know persons named

23  Lolita?

24  A.  No, sir.

25  Q.  Didn't he, in fact, tell you, "I have clients -- customers

1   that are named Lolita"?

2   A.  No.

3   Q.  At some point in the interview, you become aware that the

4   defendant has a laptop at his place of business, correct?

5   A.  Correct.

6   Q.  Am I correct that the decision to go and have him get the

7   laptop for you doesn't actually occur until you're inside the

8   house after the interrogation has ended?

9   A.  No, we spoke about it in the vehicle.

10  Q.  Well, you certainly had a form with you, didn't you, for

11  consent?

12  A.  I could have had one.  Or it might have been in the

13  suitcase in the back.

14  Q.  You remember telling me a few days ago, "We all have the

15  forms"?

16  A.  Uh-huh.

17  Q.  So you could have got the consent right there in the

18  vehicle, correct?

19          MS. THOMPSON:  Objection, Your Honor, this calls for

20  speculation.

21          THE COURT:  Sustained.

22          MR. RICHARD BARTOLOMEI:  Your Honor, I'm asking if it

23  was possible.

24          THE COURT:  Anything is possible, I guess, but that

25  doesn't make it an appropriate question.

1   BY MR. RICHARD BARTOLOMEI:

2   Q.  You could have gotten a Search Warrant at that point,

3   couldn't you?

4           MS. THOMPSON:  Same objection, Your Honor.

5           THE COURT:  No, I'll allow that question.

6   BY MR. RICHARD BARTOLOMEI:

7   Q.  You could have gotten a Search Warrant then, couldn't you?

8   A.  Yes.

9   Q.  You could have gotten an electronic Search Warrant which

10  wouldn't have taken that long, correct?

11          MS. THOMPSON:  Your Honor, I'm going to ask for

12  clarification on what's an electronic Search Warrant or what

13  counsel is referring to.  I don't know that that's --

14          MR. RICHARD BARTOLOMEI:  I'll rephrase my question.

15  BY MR. RICHARD BARTOLOMEI:

16  Q.  You testified last week you could have gotten a Search

17  Warrant, it might have taken a couple hours, correct?

18  A.  Correct.

19  Q.  You knew you didn't have a Search Warrant for his business,

20  correct?

21  A.  Correct.

22  Q.  You knew you didn't have a Search Warrant for the vehicles,

23  correct?

24  A.  Correct.

25  Q.  Did you prepare the consent for the vehicle?

1   A.   That one was created I believe by Agent Miller, I think.

2   Q.   And were you aware as you were walking in, that Agent

3   Miller went up to the defendant and asked him to sign a

4   consent?

5   A.   I remember them discussing by the kitchen table about the

6   consent for the truck, Agent Miller and Mr. Michalik.

7   Q.   And again the vehicles were not part of the Search Warrant,

8   meaning within the scope of it, correct?

9   A.   Correct.

10  Q.   During this interrogation in the vehicle, do you remember

11  either you or Agent DePaola calling inside, meaning

12  communicating with agents inside saying or asking, "Do you have

13  the laptop"?

14  A.   No, sir.

15  Q.   There was a laptop, was there not?

16  A.   In the house?

17  Q.   Yes.

18  A.   Perhaps.  But we didn't call over -- we don't even have

19  radios like that to call in.  I don't remember her telling them

20  about a laptop at the office.

21  Q.   You do not have radios that allow you or communication

22  devices that allow you to communicate with your fellow agents?

23  A.   We use our phones via text.

24  Q.   Last week I asked you, "Let's take those one at a time, do

25  you remember radio contact between you or the other agent about

1    the need to get the laptop, meaning communications with other

2    agents?"  Your answer was, "I don't remember if there was

3    communication or not"?

4    A.  Correct.

5    Q.  When I asked you last week about where the discussion of

6    him consenting to get the laptop occurred, am I correct you

7    answered, "I don't recall if it was in the vehicle or in the

8    house?

9              MS. THOMPSON:  Your Honor, I'm going to object.

10   Counsel is testifying.

11             THE COURT:  Sustained.

12             MR. RICHARD BARTOLOMEI:  Your Honor --

13             THE COURT:  No.

14             MR. RICHARD BARTOLOMEI:  If we approach on the manner

15   in which we are to use the rough transcript.

16             MS. THOMPSON:  The witness hasn't disagreed with

17   anything.

18             THE COURT:  Yeah, she has to disagree and then you can

19   impeach her if you have something and you can do it from the

20   rough transcript, unless there's an objection.  But you

21   first --

22             MR. RICHARD BARTOLOMEI:  May I --

23             THE COURT:  No, you first have to ask her a question

24   that you believe is inconsistent with her prior testimony, then

25   you can impeach her.  You can't just simply ask her a question

1    didn't you say this, this or this.  She's testifying here, not

2    there.

3           MR. RICHARD BARTOLOMEI:  Your Honor, if I may repeat

4    my prior question from a little while back?

5    BY MR. RICHARD BARTOLOMEI:

6    Q.  Was not your testimony that the discussion and agreement to

7    consent occurred during the interview in the car, isn't that

8    what you said on direct today?

9    A.  Yes.

10   Q.  And isn't it true that when I asked you that same question

11   or a similar question last week, you said, "I don't recall if

12   it was in the vehicle or in the house"?

13   A.  Yes, I mean it was in the --

14   Q.  That's all I need, ma'am.  Do you remember going on to tell

15   me that it was done inside the house?

16   A.  The vehicle one was.

17   Q.  That was at the kitchen table you claimed, correct?

18   A.  Correct.

19   Q.  The consent followed the actual search of the vehicle, did

20   it not?

21   A.  The consent of the vehicle?

22   Q.  The consent to search actually followed the agent already

23   having searched the vehicle, isn't that true?

24          MS. THOMPSON:  Your Honor, I'm going to object to

25   relevance.  Nothing was found in the vehicle.

1          MR. RICHARD BARTOLOMEI:  Your Honor --

2          THE COURT:  The objection is overruled.

3    BY MR. RICHARD BARTOLOMEI:

4    Q.  The agent had already searched the vehicle before the

5    consent was even prepared and presented to the defendant, isn't

6    that true?

7    A.  I can't speak to that.  I wasn't the one that did the

8    vehicle search.

9    Q.  That consent was signed at 7:45, correct?

10          MS. THOMPSON:  Objection, irrelevant.

11          THE COURT:  That is sustained.

12          MR. RICHARD BARTOLOMEI:  Just trying to go to the

13   timing of events, Your Honor.

14   BY MR. RICHARD BARTOLOMEI:

15   Q.  At the time that you're back in the house after the

16   interrogation, back in the house, you still have never left the

17   defendant's side, isn't that true?

18   A.  Correct.

19   Q.  Neither has Agent DePaola, correct?

20   A.  Correct.

21   Q.  At that time all of the occupants are still in the house,

22   correct?

23   A.  I remember the little girl having to go to school.  I don't

24   remember if I saw her still sitting there or not.

25   Q.  Well, let me ask this.  If you had told everyone they were

1  free to leave, you would agree --

2          MS. THOMPSON:  Objection, calls for speculation.

3          THE COURT:  Sustained.

4          MR. RICHARD BARTOLOMEI:  Your Honor --

5          THE COURT:  No.

6          MR. RICHARD BARTOLOMEI:  Can I finish the question?

7          THE COURT:  No, because you're already going right

8  there.  It's obvious what you're going to ask.

9  BY MR. RICHARD BARTOLOMEI:

10  Q.  Going to your determination to go and get the laptop, you

11  talked with the defendant first about the Search Warrant

12  results, correct?  The inventory of what was seized?

13  A.  Correct, yes.  He's provided with a form that lists all the

14  items that are going to be seized.

15  Q.  I'm going to jump all the way to the end.  I believe I

16  asked you last week if he was ever given a receipt and my

17  understanding is your testimony was no, he wasn't given a

18  receipt for the laptop?

19  A.  He was asked about the laptop at his office.

20  Q.  Yes.

21  A.  At that one I didn't recall, yeah, but he was.

22  Q.  Do you have a copy of it?

23  A.  It should be in the case file.

24  Q.  But last week you didn't recall if you had?

25  A.  Correct.

1         MS. THOMPSON:  Objection, Your Honor, this is improper

2    impeachment and it's asked and answered.

3         THE COURT:  Sustained.  The objection is sustained.

4    BY MR. RICHARD BARTOLOMEI:

5    Q.  You talked about your reasoning for not getting a consent

6    to go to the business and get the laptop while you were still

7    at the residence, remember your testimony on that this morning?

8    A.  What's the question?

9    Q.  Do you remember your testimony on direct about the reason

10   that you did not get a consent form filled out and signed at

11   the residence?

12   A.  Yes.

13   Q.  And your explanation was, I believe, he could have changed

14   his mind and you didn't have the identification of the laptop

15   to fill out the consent, correct?

16   A.  Correct.

17   Q.  Nonetheless, you could have gotten a consent because he had

18   told you what type of laptop, hadn't he?

19        MS. THOMPSON:  Objection, calls for speculation.

20        THE COURT:  Sustained.

21        MR. RICHARD BARTOLOMEI:  Excuse me, Your Honor?

22        THE COURT:  Sustained.

23   BY MR. RICHARD BARTOLOMEI:

24   Q.  Again continuing, though, you go out of the house, again

25   two agents with the defendant, correct?

1    A.   Correct.

2    Q.   We're now approximately an hour and 15 minutes into the

3    interdiction, correct?

4    A.   The interview is about an hour and then by the time we

5    were -- yeah, about five, ten minutes at the residence before

6    we depart.

7    Q.   You go to your vehicles, correct?

8    A.   Correct.

9    Q.   He goes to his vehicle, correct?

10   A.   Correct.

11   Q.   He is going to guide you to his business location, correct?

12   A.   Correct.

13   Q.   Did you tell him as you leave or remind him, You don't have

14   to do this?

15   A.   At that time, probably not, I don't remember.

16   Q.   And jumping forward to the place of the business, you don't

17   tell him before he enters the building, This is voluntary, you

18   don't have to consent to allow us in and you don't have to

19   consent to give us the laptop.  You didn't do that at the

20   business, did you?

21   A.   Correct.

22   Q.   And you gave some testimony about stopping at McDonald's,

23   correct, this morning?

24   A.   Correct.

25   Q.   And am I correct that your recollection of events was

1  stopping at McDonald's for one of your agents to go to the

2  lavatory occurred at the residence before you left, correct?

3  A.  The discussion?

4  Q.  Yes.

5  A.  As to where we were going to stop, yes, it happened outside

6  of the residence.

7  Q.  There are two agent vehicles following the defendant's

8  vehicle, correct?

9  A.  Correct.

10 Q.  Is it Agent Hefner that's in the other vehicle?

11 A.  Correct.

12 Q.  And you and Agent DePaola go in your vehicle, correct?

13 A.  In her vehicle.

14 Q.  Did you from the time you left the residence to the time

15 you entered the business, did you ever tell him, You don't have

16 to consent to do this during that time period or am I correct

17 you did not?

18 A.  At the McDonald's when we stopped?  At that point, yes, he

19 was reminded that this was voluntary.

20 Q.  Did both of you get out of the vehicle to talk to

21 Mr. Michalik?

22 A.  I believe so.  I know we stepped -- yeah, we stepped out of

23 the vehicle and talked to him.

24 Q.  You weren't parked right next to him, were you?

25 A.  We probably were.  I don't really -- I don't remember

1  specifically.  I do remember having a conversation with him.  I

2  know Hefner went into the McDonald's and we're parked next to

3  him, I think.

4  Q.  You think, is that what you're saying?

5  A.  Yeah, specifically I don't remember parking spots.

6  Q.  He doesn't get out of the vehicle, does he?

7  A.  No.

8  Q.  It is raining, isn't it?

9  A.  I don't remember.

10 Q.  When you get to the business, he unlocks the door and let's

11 you in, correct?

12 A.  Correct.

13 Q.  We've already established that at that juncture you don't

14 tell him anything more about what his rights are, his right to

15 decline and it's all voluntary, not there, correct?

16 A.  Correct.

17 Q.  You go into the building, and I believe you talked about a

18 rifle, seeing a rifle, is that right?

19 A.  Correct.

20 Q.  Isn't it, in fact, the case that the defendant told you

21 that he kept a loaded shotgun in a --

22         MS. THOMPSON:  Objection, Your Honor, counsel is

23 testifying.

24         THE COURT:  Sustained.

25         MR. RICHARD BARTOLOMEI:  I have to ask her if he said

1  it.  It's the defendant's statements and so that's why I'm

2  asking.  There is no other way to ask it.

3          MS. THOMPSON:  That's not a statement that was made by

4  the defendant that has been testified to in this trial.

5          THE COURT:  Well, he does have the right to ask if the

6  defendant said anything to him.  However, the way that you were

7  asking it presumed the fact.  So you can re-ask the question in

8  an appropriate way.

9  BY MR. RICHARD BARTOLOMEI:

10 Q.  What did the defendant tell you about weapons?

11 A.  What I remember -- I don't remember him making the

12 statement.  I do remember seeing a weapon at the back end of

13 the building, behind his desk.  That's what I can remember from

14 that day is that there was a weapon there.

15 Q.  Do you remember that there was a closet or storage area off

16 the side of his office?

17 A.  That, I don't remember.

18 Q.  Do you remember if he went in there before coming back out

19 to talk with you?

20 A.  No, he was standing with Agent DePaola and myself at the

21 entry of the building.

22 Q.  Well, maybe you've already answered this, but do you recall

23 telling me last week, "No, I could still remember seeing it, I

24 don't remember if he made a statement.  I could just see it

25 propped up against the wall, against the desk", right?

```
 1  A.  Yeah, I remember seeing it on the wall, behind the desk.
 2  Q.  And then I asked you, "Does he ever leave the room leaving
 3  you alone in the office?"
 4          MS. THOMPSON:  Your Honor, I object again that he's
 5  testifying and it's improper impeachment because she hasn't
 6  said anything contrary.
 7          THE COURT:  Sustained.
 8  BY MR. RICHARD BARTOLOMEI:
 9  Q.  Did you have a discussion with Agent DePaola about the
10  laptop?
11  A.  No.
12  Q.  And was a statement made by Agent DePaola when he walked
13  out, "I assume that's the laptop"?
14          MS. THOMPSON:  Again objection, he's testifying.
15          THE COURT:  He's entitled to ask leading questions,
16  but leading questions -- this is not a leading question, so you
17  need to rephrase your question, counsel.
18  BY MR. RICHARD BARTOLOMEI:
19  Q.  How did you and which of you identified to the defendant
20  that that was the laptop you wanted him to give you?
21          MS. THOMPSON:  Objection, argumentative, it's not at
22  all what the witness has testified to.  It's misstating the
23  evidence that's already been put in.
24          MR. RICHARD BARTOLOMEI:  With respect, Your Honor, may
25  I respond?
```

 1          THE COURT:  Yes.

 2          MR. RICHARD BARTOLOMEI:  I'm not allowed to ask what

 3  was said.

 4          THE COURT:  No, I didn't say that.  I said you just

 5  needed to rephrase your question properly.

 6  BY MR. RICHARD BARTOLOMEI:

 7  Q.  What was said, then, by either of you to identify that that

 8  was the laptop you wanted to take?

 9          MS. THOMPSON:  Your Honor --

10          MR. RICHARD BARTOLOMEI:  That's a very non-leading

11  question.

12          THE COURT:  That is an appropriate question, the

13  objection is overruled.

14  A.  We asked him to point out to us where his laptop was and

15  where his desk was at, which he pointed to the one on the

16  right-hand side that I remember, the desk.

17  Q.  The defendant asked you words to the effect if not exactly,

18  "Shouldn't you be showing me a warrant for this?"  Isn't that

19  what he said to you?

20  A.  I don't remember that.  I don't recall him telling us that.

21  Q.  Who is it that responds about how you're going to obtain

22  consent, meaning who tells him about the consent form?

23  A.  Once he advises us where his laptop is, then we take a look

24  at it and I'm the one that writes out the consent form and asks

25  him if he has any questions about it.

1   Q.  Did either you or Agent DePaola reiterate to him that you

2   already had a Search Warrant for all of his electronic devices,

3   did that statement get made by one of you at the business?

4   A.  No.

5   Q.  Did you take any pictures inside the business showing the

6   location of the items we've discussed?

7   A.  I don't remember if there was pictures, I didn't take

8   pictures.

9   Q.  Who puts the laptop in the evidence bag?

10  A.  Specifically I don't remember.

11  Q.  Did he hand the laptop to you or did you or Agent DePaola

12  pick it up?

13  A.  I don't specifically remember.

14  Q.  Did you read the consent form aloud to the defendant at the

15  business or am I correct you did not?

16  A.  I don't remember specifically reading it all.  I might have

17  pinpointed where it was, the Dell laptop and the address, but

18  it was there for him to read and if he had any questions.

19  Q.  Well, ma'am, are you saying that you turned it around so

20  that the text would be readable by him, giving him that

21  opportunity or am I correct you did not?

22  A.  I believe he was standing right next to me when I was

23  writing it.  And I just gave him -- showed him the form.  I'm

24  not sure if it was upside down or right-side up.

25  Q.  Well, ma'am, I have only a few more questions about this.

 1  A.  Okay.

 2  Q.  You would agree you did not tell him, Sir, here is the

 3  form, you can read it.  You didn't tell him that, did you?

 4  A.  Yes, he was handed the form so he can read it and if he had

 5  any questions.

 6  Q.  Did you tell him that's what you were doing as you handed

 7  it to him, that's what I'm asking?

 8  A.  Did I tell him?

 9  Q.  Here is the form, you can read it before you sign it.

10  A.  Correct.

11  Q.  Okay.  My question, page 14 of the rough draft, "Slightly

12  different, ma'am.  I have a form in front of me, I have a page,

13  it's upside down to you from where you are.  You don't say,

14  Here, read this.  You didn't do that?"  Your answer was --

15          MS. THOMPSON:  Objection, Your Honor, improper

16  impeachment.

17          MR. RICHARD BARTOLOMEI:  May I approach, Your Honor.

18          THE COURT:  All right.

19          MR. RICHARD BARTOLOMEI:  The witness.

20          THE COURT:  For what?

21          MR. RICHARD BARTOLOMEI:  Well, you can give them their

22  statement under the rule, let them read it and ask them if they

23  acknowledge.

24          THE COURT:  Has she testified differently from the

25  statement?

1      MR. RICHARD BARTOLOMEI:  She said she told him he

2  could read it.  Her prior testimony I believe clearly

3  demonstrates she doesn't remember --

4      THE COURT:  You can go ahead and show it to her.

5      MR. RICHARD BARTOLOMEI:  Let the record reflect page

6  14, line two, please read line two to line seven silently.  Let

7  me know when you have finished.

8      *(Pause.)*

9  A.  Okay.

10  Q.  So am I correct that your sworn testimony in response to my

11  question was, after being asked, "Slightly different, ma'am.  I

12  have a form in front of me, I have a page, it's upside down to

13  you from where you are.  You don't say, Here, read this.  You

14  didn't do that?  And your answer was "I don't remember if I

15  did."  Wasn't that your testimony last week?

16  A.  Correct, that I don't remember giving it to him upside

17  down.

18  Q.  No, ma'am.  You don't read it aloud to him?

19  A.  I don't.

20  Q.  And you said "I don't remember", correct?

21  A.  Yeah, I don't read it aloud to him.

22  Q.  My question was, "You don't say, Here, read this.  You

23  didn't do that?  And your answer was, "I don't remember if I

24  did."  Isn't that true?

25      MS. THOMPSON:  Your Honor, I think it's asked and

1   answered.  And I think the question is taking the testimony --

2   could be taking the testimony, prior testimony out of context.

3           THE COURT:  Well, I'll let the jury make that

4   decision.  They'll have the evidence.

5   BY MR. RICHARD BARTOLOMEI:

6   Q.  And then I went on and asked you, "And you hand it to him

7   or you just slide it to him --"

8           MS. THOMPSON:  Objection, Your Honor, he's testifying.

9           MR. RICHARD BARTOLOMEI:  We'll do it again.  If I may

10  approach?

11          MS. THOMPSON:  I would like a question.

12          THE COURT:  I think you need to ask her a question.

13  She needs to answer the question.  If her answer is -- wait,

14  wait, go back to the podium, counsel.  Ask her a question.  If

15  she answers the question in a way that you believe is different

16  from her prior testimony, then you can show it to her and

17  attempt to impeach her with her prior testimony.  That's the

18  way it's done.

19          (Pause.)

20  BY MR. RICHARD BARTOLOMEI:

21  Q.  Ma'am, when asked, Didn't you tell me you can't say

22  specifically how I did it, I just now remember being by his

23  desk.  Isn't that what you told me?

24  A.  Correct, over by his desk.

25  Q.  Do you know whether the defendant signed the inventory or

1   was it Ms. Rivas back at the house?

2   A.   At the house, I'd have to look at the documents.

3   Q.   I think we may have asked this, but I'll ask you again.

4   When I asked you about whether you gave him or had him sign a

5   receipt, you didn't recall, correct?

6          MS. THOMPSON:  Objection, I'm not sure what time --

7   BY MR. RICHARD BARTOLOMEI:

8   Q.   At the business.  I'll clarify.  At the business, after

9   taking the Dell laptop, was your testimony that you didn't

10  recall whether you had him sign a receipt?

11  A.   Correct.

12  Q.   Now, I want to go back to the application for the Search

13  Warrant.  In the application for the Search Warrant, it's quite

14  lengthy, isn't it?

15  A.   Yes.

16  Q.   You have to provide an Affidavit, do you not, in your

17  application for the Search Warrant?

18  A.   Correct.

19  Q.   You set out your experience, did you not?

20  A.   Correct.

21  Q.   You were a special agent with the Department of Homeland

22  Security, correct?

23  A.   Correct.

24  Q.   And you have been a special agent for approximately 16

25  years, according to your Affidavit?

1    A.  Correct.

2    Q.  You've received training at the Federal Law Enforcement

3    Training Center, correct?

4    A.  Correct.

5    Q.  And you tell the Court in your Affidavit your experience as

6    a special agent includes but is not limited to conducting

7    investigations, executing arrest warrants, executing search

8    warrants, collecting evidence and interviewing witnesses,

9    correct?

10   A.  Correct.

11   Q.  How many witnesses have you questioned about child

12   pornography?

13              MS. THOMPSON:  Objection, irrelevant.

14              THE COURT:  Yeah, I don't see the relevance of that.

15              MR. RICHARD BARTOLOMEI:  Preparatory to my follow-up

16   question.  It's just foundation.

17              THE COURT:  You can ask your next question.

18   BY MR. RICHARD BARTOLOMEI:

19   Q.  In your interviews with subjects that you're interested in,

20   am I correct they're always one on one, aren't they, you don't

21   do it in the presence of their families, right?

22   A.  Their families?  No.

23   Q.  You never Mirandized the defendant at any time, correct?

24   A.  Usually not.

25   Q.  You didn't in this instance, did you?

1    A.  I did not.

2    Q.  And with Miranda warnings, that advises an individual that

3    anything they say can and will be used against them?

4         MS. THOMPSON:  Your Honor, I'm going to object.  A

5    Miranda warning was not necessary in this case.

6         MR. RICHARD BARTOLOMEI:  I'm going to object to that,

7    the necessity of it is a different question.

8         THE COURT:  Well, that will be for the jury to decide,

9    but you've asked your question.  Let's just move on.

10   BY MR. RICHARD BARTOLOMEI:

11   Q.  You have a whole section of your affidavit, do you not,

12   about computer searches, correct?

13   A.  Correct.

14   Q.  And you have section 9.1 about computer storage devices

15   like hard disks, diskettes, tapes, laser disks, CD ROMS and

16   DVDs, you put that in your Affidavit, correct?

17   A.  Correct.

18   Q.  That's different than a computer, correct, those are the

19   storage devices that may contain information that can be put in

20   the computer, correct?

21   A.  Correct.

22   Q.  Is that correct?

23   A.  Correct.

24   Q.  So in your search, you tell the Court before they issued a

25   warrant that you need to also retrieve all of the data from the

1  computer system and all the storage devices, correct?  You tell

2  them that, right?

3  A.  Correct.

4  Q.  You also tell them, do you not, searching the computer

5  systems for criminal evidence is a highly technical process

6  requiring expert skill?

7          MS. THOMPSON:  Your Honor, I'm going to object to

8  this.  The exhibit speaks for itself.

9          THE COURT:  That objection is sustained.

10          MR. RICHARD BARTOLOMEI:  Your Honor, this is

11  preparatory to asking because she puts this all in her

12  Affidavit as to how much she actually knows about a computer

13  because she recites all of these things as the affiant as her

14  personal knowledge to a Magistrate before the issuance of a

15  Warrant.  I think it is highly relevant.

16          THE COURT:  There is a certain amount of questioning

17  you can ask, but then at a point it becomes burdensome and it

18  becomes redundant.  I will let you move forward with some

19  foundational questioning, but let's not overdo it.

20          MR. RICHARD BARTOLOMEI:  Thank you, Your Honor.

21  BY MR. RICHARD BARTOLOMEI:

22  Q.  You talked about an IP address, correct?

23  A.  Correct.

24  Q.  Isn't it, in fact, true that an IP address is not

25  identified to a computer, but to the router that may serve the

1   computer, isn't that true?

2   A.   It's assigned to the -- yeah, it's not assigned to a

3   specific device, it's assigned to access.  You can use your

4   phone through an IP address.  You can use your laptop.  You can

5   use a device.  It's a mode of communication, it's a line.

6   Q.   So there are multiple devices that could use the same IP

7   address, isn't that true?

8   A.   True.

9   Q.   So when you testified on direct that it was identified to a

10  specific computer, that wasn't entirely accurate, correct?

11  A.   I might have said a computer.

12  Q.   Yes, you did.

13  A.   A computer can use the IP address.

14  Q.   But the IP address is not identified to a specific

15  computer, it's identified to the router which the computer or

16  other device may use, correct?

17  A.   Correct.

18  Q.   In the other electronic devices that you seize from the

19  house, you find no pornographic material, isn't that true?

20  A.   That's true.

21  Q.   You don't find any photographs or other images in a paper

22  format like that, there's no photographs, no magazines, nothing

23  like that, correct?

24  A.   Correct.

25  Q.   At 12.1 of your Affidavit, am I correct you inform, "The

 1    Internet is a worldwide network of computer systems operated by
 2    governmental entities, corporations --"
 3              MS. THOMPSON:  Your Honor, I object.  One, I think
 4    he's talking too fast.  And two, I think the witness will
 5    testify that the Affidavit is true and correct such that it
 6    would be her testimony today, so whatever is in the Affidavit
 7    she swore to and she would agree that that is her testimony so
 8    that counsel could move on to other questions about the
 9    significance of what's in there, instead of what is actually in
10    the document.  It speaks for itself.
11              MR. RICHARD BARTOLOMEI:  With respect, Your Honor, I
12    have to apprize the individual fairly under the Rules of
13    Evidence so that she may acknowledge that is her statement.
14              THE COURT:  She's already acknowledged that it's her
15    statement.  I don't think there's any question about that.
16              MR. RICHARD BARTOLOMEI:  I believe I'm entitled to ask
17    her about the specific statements that she makes.
18              THE COURT:  Yes, as long as it's relevant to the
19    matters before this Court.  I'm allowing you to continue, move
20    on.
21    BY MR. RICHARD BARTOLOMEI:
22    Q.  "The Internet is a worldwide network of computer systems
23    operated by governmental entities, corporations and
24    universities in order to access the Internet an individual
25    computer user --"

1          THE COURT:  You're going way too fast for my reporter

2     and she's an excellent reporter.

3          MR. RICHARD BARTOLOMEI:  Let me start over.

4     BY MR. RICHARD BARTOLOMEI:

5     Q.  "In order to access the Internet, an individual computer

6     user must subscribe to an access provider which operates a host

7     computer system which directs access to the Internet."  You

8     write that in your Affidavit, correct?

9     A.  That's correct.

10    Q.  Now, am I correct that the images that were talked about in

11    5a and 5b are never found on the defendant's computer after

12    it's seized and forensically examined, isn't that true?

13    A.  The images on 5a and 5b?

14    Q.  Yes.

15    A.  Can you describe the images?  This was written like four

16    years ago.

17    Q.  Two young women in purportedly sexually explicit positions.

18    Those were the ones that were the CAM that was sent from

19    Switzerland to Virginia and forwarded to you here in San

20    Antonio.  Now, do you remember which ones?

21    A.  Are you talking about the five images that I received from

22    Virginia?

23    Q.  Well, let me make it even simpler.  Yes, I am.  The five

24    images that were supposedly shown to the defendant during the

25    interrogation in the car.

1  A.  Yes, they're described in the affidavit.

2  Q.  And they are never found after the computer is seized in

3  the forensic examination by the government, they are never

4  found in that computer, isn't that true?

5  A.  That's correct.

6  Q.  With regard to the other images that are purportedly found

7  in the computer, after it is seized and forensically searched,

8  am I correct that there is no forensic evidence that these

9  images are put in the computer through the Internet by a direct

10 download, isn't that true?

11      MS. THOMPSON:  Your Honor, I'm going to object.  This

12 goes beyond the scope of this witness.

13      THE COURT:  I agree with that.  The objection is

14 sustained.

15      MR. RICHARD BARTOLOMEI:  If I may, Your Honor, offer,

16 her Affidavit describes how the Internet works, how through her

17 experience and training how sophisticated it is to forensically

18 review all of this, how she says that it has to be under

19 controlled conditions and all the things that she knows from

20 her personal knowledge and she swears to, I believe it is a

21 legitimate question that I should be permitted to ask her about

22 whether or not, based upon her claimed experience and her

23 claimed knowledge, whether in fact there was any evidence

24 whatsoever that the images that are found in the computer were

25 or were not put in the computer through the use of the

1   Internet.

2          MS. THOMPSON:  She testified on direct that she

3   submitted the computer to somebody else for the forensic

4   examination.  She did not conduct the forensic examination in

5   this case.

6          THE COURT:  The objection is sustained.

7          MR. RICHARD BARTOLOMEI:  If I may ask one more thing,

8   Judge.  She's the case agent.  They report the results to her.

9   So can I ask her that?

10          THE COURT:  Yes.

11   BY MR. RICHARD BARTOLOMEI:

12   Q.  Ma'am, you're the case agent, are you not?

13   A.  Correct.

14   Q.  So they report the results of the forensic examination to

15   you, correct?

16   A.  Correct.

17   Q.  Am I correct that the images -- and this would be through

18   the other exhibits beginning I believe with 11 -- there is no

19   forensic evidence that they come into that computer through the

20   Internet, meaning downloaded, using the Internet through the

21   router to the computer and into the computer, isn't that true?

22   A.  That's correct.

23   Q.  And further, there is no evidence after the forensic

24   examination that's reported to you that identifies the

25   defendant ever opened that file, isn't that true?

1          MS. THOMPSON:  Objection, Your Honor, it's beyond her

2    scope of knowledge.

3          THE COURT:  The objection is sustained.  She didn't do

4    the examination.

5          MR. RICHARD BARTOLOMEI:  With respect, Your Honor --

6          THE COURT:  She did not do the examination.

7          MR. RICHARD BARTOLOMEI:  I have to make a brief

8    record, if I could.  We are offering this because they report

9    to her, so the results of the forensic examination would be

10    reported to the case agent before being reported to the

11    government.  I think I can ask her, I think I can ask her if

12    anybody ever told her that.

13          MS. THOMPSON:  That would be hearsay.

14          THE COURT:  It would be.

15          MR. RICHARD BARTOLOMEI:  It comes in, Your Honor,

16    under the exceptions to the hearsay.

17          THE COURT:  No, it doesn't.  I don't know of any

18    exception that would allow that in and I believe that forensic

19    person is going to be testifying so you will have plenty of

20    opportunity to ask those questions of that person.

21          MR. RICHARD BARTOLOMEI:  Well, let me just finish up

22    with a few questions for you, ma'am, and thank you.

23    BY MR. RICHARD BARTOLOMEI:

24    Q.  Going through the process of how just these five images

25    come to you in San Antonio, that's where I'm going, all right.

1  Switzerland police raid and find a website that's being --

2  producing these images, correct?

3  A.  Correct.

4  Q.  When I say producing these images, they're producing images

5  of child porn, correct?

6  A.  The police in Switzerland, I guess, approach the residence

7  and took down a server.  And the server was operating a website

8  called Amateur Lovers and that's how this came to be, they

9  seized the computer, they were able to obtain all the IP

10  addresses that had downloaded images of child pornography from

11  that particular website.

12  Q.  Thank you for saving me five questions.

13  A.  I talk a lot.

14  Q.  Ma'am, no evidence is ever found and nothing is ever

15  reported to you that the computer you seize has ever accessed

16  Amateur Lovers, isn't that true?

17  A.  That is correct.

18  Q.  And obviously there's no evidence since it's never accessed

19  Amateur Lovers, that the defendant --

20         MS. THOMPSON:  Objection.  That's a misstatement of

21  the testimony.

22         THE COURT:  It is.  The objection is sustained.

23  BY MR. RICHARD BARTOLOMEI:

24  Q.  There is no evidence that this computer is ever used to

25  download anything from Amateur Lovers, correct?

1  A.  That's correct.

2  Q.  And the IP address and access logs that are forwarded

3  through I believe what they call a Fed. Pol., is that their

4  acronym?

5  A.  The Federal Police?

6  Q.  Yes.

7  A.  What was the question?

8  Q.  I have only gotten partially through it.  I was asking you

9  to identify what Fed. Pol. is.  My question wasn't great, but I

10 hadn't gotten that far.

11     Now Fed. Pol. is the Swiss, correct?

12 A.  Correct.

13 Q.  They do the screening and they screen for a certain minimum

14 number of images that they believe involve child porn, correct?

15 A.  Correct.

16 Q.  They forward it to Virginia, Virginia parses it out across

17 the country by a geographical location of the IP addresses,

18 correct?

19 A.  Correct.

20 Q.  And then you're supposed to follow up, right?

21 A.  Correct.

22 Q.  Now, they provide just a list of IP addresses that they

23 believe have accessed something, correct, that's what Fed. Pol.

24 does to Virginia to you?

25 A.  What was the question?

Special Agent Juarez - Examination          157

1  Q.  Let me just -- let me strike what I did ask and then we can

2  start from there.  Fed. pol. sends a list of IP addresses,

3  correct?

4  A.  That are assigned to the U.S. to Virginia.

5  Q.  That's what I'm asking.  Now, this accessing that includes

6  the IP address that you focus on, isn't that in 2014?

7  A.  Their operation I believe occurred -- was it October of

8  2014, if I'm not mistaken?  That's when they had their

9  operation.  I don't know how long their investigation occurred.

10  Q.  Your paragraph 16, "The data provided by Fed. Pol. includes

11  the access logs showing the IP address associated to each

12  download, the date and time each download and the downloaded

13  images of CAM."  That's what you wrote in your Affidavit,

14  correct?

15  A.  Correct.

16  Q.  That would have been in 2014 that that data would have been

17  found, correct?

18  A.  That was when they did their operation.

19  Q.  You don't receive a lead until April 27th of 2015, correct?

20  A.  Correct.

21  Q.  And the specific information on the download as reported

22  from Switzerland to Virginia, to you, occurs from August 4th,

23  2014 to August 7th, 2014, correct?

24  A.  I'd have to look at my case notes on that one.

25  Q.  Would it help you to see the affidavit?

1   A.   There was a -- perhaps.  I know there was particular dates.

2   The only one that stands out to me right now is when they did

3   their operation, which is October 2014.  I know there was a few

4   dates of when those downloads took place.

5   Q.   Let me help.

6        MR. RICHARD BARTOLOMEI:  If I may approach, Your

7   Honor?

8        THE COURT:  Yes.

9   BY MR. RICHARD BARTOLOMEI:

10  Q.   Please read your paragraph 17.  Please excuse the marks.

11  Just read paragraph 14 silently to yourself, 17 through the

12  next page.  And go ahead and read 18 as well if you wish.

13  A.   Do you want me to read it out loud?

14  Q.   No.

15  A.   Probably a typo there.  That's probably when I received the

16  lead.

17       (Pause.)

18       Okay.

19  Q.   If you'd like, you can go ahead and read the rest of the

20  page if you want.  Please let me know when you're done.

21       (Pause.)

22  A.   Okay.

23  Q.   Thank you.  Can I have that back?  Now I'm going to read

24  portions of it to you, okay?

25  A.   Okay.

1          THE COURT:  What are you going to read her?

2          MR. RICHARD BARTOLOMEI:  Well, I can ask her, but it's

3   easier if I read it and ask her to acknowledge it.

4          THE COURT:  No.  That's not the way it's done.  You

5   need to ask her a question and then --

6          MR. RICHARD BARTOLOMEI:  I can do it that way, Your

7   Honor.  I'm trying to gracefully take your guidance.

8   BY MR. RICHARD BARTOLOMEI:

9   Q.  In your affidavit, you report that the IP address

10  identified by Fed. Pol., the log file showed that the address

11  was used to access Amateur Lover, the website, download CAM

12  from August 4, 2014 to August 7, 2014, correct?

13  A.  Correct.

14  Q.  And going on to your paragraph 19, you actually set out

15  each date of each download to that IP, correct?

16  A.  Correct.

17  Q.  That they're all between August 4 and August 7, 2014,

18  correct?

19  A.  Correct.

20  Q.  During your interrogation of the defendant in the vehicle,

21  were you not informed that the computer was used by others?

22  A.  I know he stated he had it cleaned up by an individual when

23  it was given to him.

24  Q.  With respect, ma'am --

25  A.  Primarily he stated he was the only user.

1   Q.  You're claiming he said he was the only user?

2   A.  Yeah, if I remember correctly.  We asked him if anybody

3   else had access to the computer.  I remember him telling us

4   that there was an individual that cleaned his computer when he

5   received it.  I don't remember if there was anybody else that

6   used it.

7   Q.  Let me make this as simple as I can.  When you subsequently

8   interviewed Crystal Rivas, she tells you when she last used --

9        MS. THOMPSON:  Objection, calls for hearsay.

10       THE COURT:  Sustained.

11       MR. RICHARD BARTOLOMEI:  She's listed as the

12  government's witness.

13       THE COURT:  It doesn't matter if she's listed as the

14  government's witness, counsel.  It's hearsay.  Now, if you put

15  her on the stand, you can ask her those questions, but she

16  can't testify for Ms. Rivas.

17  BY MR. RICHARD BARTOLOMEI:

18  Q.  You also interviewed Ed Michalik, didn't you?

19  A.  The brother?

20  Q.  Yes.

21  A.  Yes.

22  Q.  I believe your testimony was you had concerns about Ed

23  Michalik, correct?

24  A.  I did not testify about Ed Michalik.  This is the first

25  I've heard of his name since then.

1  Q.  Perhaps I'm mistaken.  There was another individual that I

2  don't believe you ever named.  Who was the other individual you

3  were concerned about using this laptop or this IP?

4  A.  The IP address?

5  Q.  Yes.

6  A.  There was two other individuals that when I researched them

7  they showed up with that Hidden Iron address.  I'm not sure if

8  they used that computer or not.  I just know there was -- that

9  address would come up to those individuals as well.

10  Q.  And was it not reported to you in the forensic -- after the

11  forensic examination by the government that --

12         MS. THOMPSON:  Your Honor, this is going to call for

13  hearsay.

14         THE COURT:  Let him finish the question.

15         MR. RICHARD BARTOLOMEI:  Your Honor, they have been

16  permitted to ask --

17         THE COURT:  Counsel, I can't rule on a question you

18  haven't asked.  So now she has objected in the middle of your

19  question.  I need you to finish your question, then I need to

20  hear from you.

21  BY MR. RICHARD BARTOLOMEI:

22  Q.  The information reported to you was that the file in which

23  images may have been found, not the five, was in fact

24  referenced or identified as Dave Smith, isn't that true?

25         MS. THOMPSON:  Objection.  It calls for hearsay what

1    somebody else told her about what was on the computer.

2          THE COURT:  Well, is this part of her -- the

3    information that she gleaned from the Affidavit?

4          MS. THOMPSON:  No.

5          THE COURT:  The objection is sustained.

6          MR. RICHARD BARTOLOMEI:  If I may have just a moment?

7          *(Pause.)*

8          If we could have just a minute to search for

9    something.  I'm sorry, Your Honor.

10          THE COURT:  Maybe this is a good time for us to take

11    our afternoon recess.  That will give you plenty of time to

12    search.

13          COURT SECURITY OFFICER:  All rise for the jury.

14          *(3:05 p.m., jury exits.)*

15                              *   *   *

16          *(3:31 p.m.)*

17          COURT SECURITY OFFICER:  All rise.

18          THE COURT:  Before we bring the jury in -- you can be

19    seated.  The defendant filed a request to add an expert.  I

20    don't even know who this expert is or what this expert is

21    about.  Who is this expert?

22          MR. EDWARD BARTOLOMEI:  Your Honor, he was retained by

23    former counsel in this case prior to me to review the computer

24    information that was provided by the government.

25          MS. THOMPSON:  I received his name on the witness

1    list.  I have not received any statements from him.  I haven't

2    received a summary of his testimony.  There are no reports

3    provided.  The Court's order of May 23rd of 2017 --

4            THE COURT:  Requires all of that.

5            MS. THOMPSON:  Yeah, and I've gotten nothing.  His

6    name was on there, but not anything else, so I would strongly

7    object to him being called as a witness.  They've provided

8    absolutely -- and if he was retained by prior counsel, he's got

9    to have an opinion -- there has to be a summary of what he's

10   going to testify to.  That has not been provided despite me

11   asking for it numerous times.

12           MR. EDWARD BARTOLOMEI:  First of all, Your Honor, I'm

13   not -- I just want to qualify two things.  Number one, Your

14   Honor, when we were coming into the last week here right before

15   trial, there was a witness expert and she designated an expert

16   she thought may be for rebuttal, but she never designated an

17   expert on the front end.

18           THE COURT:  She doesn't plan on calling him on the

19   front end.  She plans on only calling him in rebuttal.

20           MR. EDWARD BARTOLOMEI:  I understand, Your Honor.  And

21   it was only in response to her calling one that I designated.

22   I can call him as a fact witness, Your Honor, without

23   designating as an expert, but when she said she had one --

24           THE COURT:  You knew she had one.  Didn't you turn

25   over the materials for it?

1          MR. EDWARD BARTOLOMEI:  Yesterday actually, Your

2     Honor, the report.

3          MS. THOMPSON:  No, the forensic report has been turned

4     over years ago.

5          THE COURT:  I think the forensic report, counsel, was

6     turned over a long time ago.

7          MS. THOMPSON:  And even as a fact witness,

8     Mr. Broderhausen, I still have not received even a proffer of

9     what he would say, so I --

10          THE COURT:  How can he be a fact witness?  He didn't

11     participate in any of this.

12          MR. EDWARD BARTOLOMEI:  Well, Your Honor --

13          THE COURT:  He's not a percipient witness.

14          MR. EDWARD BARTOLOMEI:  Judge, at this point in time,

15     I understand their objection, Your Honor.  I only designate it

16     at this late date for the intention and purpose --

17          THE COURT:  Look, counsel, I haven't ruled that you

18     can't have him testify.  I haven't ruled against you, but I

19     have to tell you that it's not a good thing to receive a motion

20     in the middle of a trial to add an expert.  That isn't looked

21     upon very favorably in the Fifth Circuit, either at the trial

22     level or the Court of Appeals level.  I mean the whole reason

23     we have the Federal Rules of Civil Procedure was to get rid of

24     what we used to refer to as trial by ambush where people would

25     pop up witnesses at the last minute and say, okay, here's my

1   expert.  Okay, what?  Does this guy have a report?

2          *(Pause.)*

3          You don't know.  Did you talk to him?

4          MR. EDWARD BARTOLOMEI:  Oh, I've talked to him, Your

5   Honor.

6          THE COURT:  Does he have a report?

7          MR. EDWARD BARTOLOMEI:  I haven't seen a report.

8          THE COURT:  You haven't seen one.

9          MR. EDWARD BARTOLOMEI:  No, Your Honor.

10         MR. RICHARD BARTOLOMEI:  Could I mention one thing,

11  Judge?

12         THE COURT:  Remember what I said about the old tag

13  team match.

14         MR. RICHARD BARTOLOMEI:  I'm not arguing the same

15  thing.

16         THE COURT:  You're not?

17         MR. RICHARD BARTOLOMEI:  No.

18         THE COURT:  What do you want to mention?

19         MR. RICHARD BARTOLOMEI:  Two things.  One, he could be

20  a fact witness simply because he reviews and the government

21  knows that he reviewed all of the data because they had -- he

22  had to go to the government's offices, sign out the disk and

23  review it, so factually that's a factual thing about what you

24  do or do not see, which is if it's not an expert situation,

25  then Mr. Linares doesn't get to testify because that's what he

1    talks about.

2            THE COURT:  The difference between him and Mr. Linares

3    is Mr. Linares was disclosed and his report was disclosed.  So

4    there's a difference there.  If this guy is going to say, well,

5    I went and saw this on a disk, I mean I don't know what that

6    helps.

7            MR. RICHARD BARTOLOMEI:  It's the same forensic

8    analysis that the government did.

9            THE COURT:  That's an expert then.  That's not a fact

10   witness.

11           MR. RICHARD BARTOLOMEI:  But that's not what Mr.

12   Linares is going to be testifying as.  He's testifying as a

13   fact witness and that's why I want to point this out because

14   Ms. Thompson --

15           THE COURT:  Who is Mr. Linares?

16           MS. THOMPSON:  He's the computer forensic examiner

17   from Homeland Security that did the forensic exam on the

18   computer.  His report and his exam has been handed over years

19   ago.

20           THE COURT:  That's an expert.  He's not testifying as

21   a fact witness.

22           MR. RICHARD BARTOLOMEI:  Yes, he is.

23           MS. THOMPSON:  Yes.  He is testifying to what he found

24   on the computer.

25           THE COURT:  What he found on the computer.  All right.

1   Well, if they're going to have somebody testify as to what --

2   you can have somebody testify as to what he found on the

3   computer.  Is he going to disagree with Mr. Linares?

4          MR. RICHARD BARTOLOMEI:  We don't know yet.  The

5   problem we had, we didn't know whether the rebuttal expert was

6   going to be the rebuttal expert or whether he was going to

7   be --

8          THE COURT:  But the expert -- is that Mr. Linares?

9   This isn't Mr. Linares.

10          MS. THOMPSON:  No, that's Special Agent Steve Nutt.

11   The problem with this, Your Honor, is when I received the list

12   of witnesses from the defense on August 12th of 2019, I asked

13   them for an explanation of who these people are and I would

14   object to all of them unless they could establish that they

15   were relevant somehow.  I've never heard of these people.  They

16   provided eventually witness statements for some of them, but

17   not Mr. Broderhausen.  I did not know who Mr. Broderhausen was,

18   so I called the number on the witness list that they provided

19   and somebody answered from Exhibit A.  And when they had

20   Mr. Broderhausen call me back, he explained that he was the

21   computer forensic person hired by defendant's prior counsel and

22   that he had reviewed the evidence.  And I asked him what he was

23   going to testify to and if he would be willing to talk to me.

24   He asked to call me later that day and he never did.  I asked

25   him at some point if he had a report.  He said he did and he

1   provided it to counsel.  I assume that's prior counsel who

2   hired him, but no report has ever been provided to the

3   government.  So I strongly object to him testifying because

4   they've known about him, they've had conversations with him.

5   It would not be difficult for defense counsel to say this is

6   what he's going to testify about or at least give me some

7   indication of what he'll say.

8        THE COURT:  I'm getting the impression that defense

9   counsel doesn't actually know what he's going to testify about.

10       MR. RICHARD BARTOLOMEI:  We have an idea of what he's

11  going to testify about, doing the very same thing that Linares

12  does.  But the problem that we have, and incidentally, today

13  Ms. Thompson handed me a brand new document, multi-page I

14  think, it's 96 different subjects which is brand new which is

15  the summary of all of the things that they checked that we

16  haven't been told about in great specificity.  I got it this

17  morning.  And they ran this yesterday.

18       THE COURT:  What is that?

19       MS. THOMPSON:  There is a supplemental forensic

20  examination report that was run yesterday about files that were

21  viewed on the computer.

22       THE COURT:  By who?

23       MS. THOMPSON:  Anybody using the computer.

24       THE COURT:  That computer.  We don't know who saw it.

25       MS. THOMPSON:  We don't know who viewed them.

Special Agent Juarez - Examination          169

1          MR. RICHARD BARTOLOMEI:  We just got it literally

2    today.

3          THE COURT:  Are they child porn files?

4          MS. THOMPSON:  Some of them are, yes.

5          THE COURT:  Some of them are child porn files.

6          MS. THOMPSON:  Yes.

7          THE COURT:  Are you trying to get that in evidence?

8          MS. THOMPSON:  Based on the argument of counsel and

9    the line of questioning at the suppression hearing, yes, we

10   will be asking -- I plan to ask about that exhibit.

11         MR. RICHARD BARTOLOMEI:  If I may?

12         THE COURT:  If his client takes the stand, I presume.

13         MS. THOMPSON:  Right.

14         THE COURT:  You're going to cross-examine him with it.

15         MS. THOMPSON:  And then use it on rebuttal.

16         THE COURT:  All right.

17         MR. RICHARD BARTOLOMEI:  Well, Your Honor, if I may

18   respond once more.  If that's what she plans to do, I've looked

19   at this file, I did run it by our witness over lunch hour while

20   I was scrambling to get this part done and he said it will take

21   me an hour to check each one of these forensically.  The point

22   is, questioning -- and I can tell you from looking at the

23   document and having him explain the hieroglyphics -- and I use

24   that euphemistically -- the hieroglyphics of what this report

25   says, you and I and I would imagine anybody else couldn't read

```
 1    it, so it is all expert and it's just put on us today.  And
 2    it's going to be rebutting something that they anticipate.  I
 3    asked him, what is it?  He said, Each one of these little
 4    rectangles would take me an hour to verify or refute in looking
 5    at the government's CD which was the sole source of what we
 6    know about what's on the computer since they've had the
 7    computer since it was seized.  That's all I could tell you.
 8         MS. THOMPSON:  The law mandates that the child
 9    pornography not leave the custody of the government, so we
10    cannot disclose a copy of the hard drive to the defense in
11    these cases.  We make it available for them to review.  And
12    someone hired by Mr. --
13         THE COURT:  You made a misstatement.  You can disclose
14    it.  You can't give them a copy of it.
15         MS. THOMPSON:  Correct, correct.  And they had an
16    individual come over to the Homeland Security Investigations
17    office on multiple days and review the information.  Part of
18    the reason this report was run is because of a statement by
19    defense counsel that none of those files had ever been viewed.
20    And that's not true.  So part of the reason in disclosing it is
21    so that they know those are the 90 files that we can show were
22    viewed.
23         MR. RICHARD BARTOLOMEI:  That's a complete surprise to
24    us.  Complete.
25         THE COURT:  Well, it is what it is.
```

1          MR. RICHARD BARTOLOMEI:  It was a surprise, but it

2     also doesn't reference who did it.

3          THE COURT:  But you made -- either I think it was you

4     did make the statement that none of those files were viewed, so

5     if she now has evidence that they were, of course that was in a

6     suppression hearing.  That wasn't in the trial.

7          MS. THOMPSON:  Correct, but when the forensic examiner

8     gets on the stand, if he's cross-examined about, hey, none of

9     these files were viewed, he's going to say, yes, they were.

10         THE COURT:  You can use it for that.

11         MS. THOMPSON:  Everything the government has has been

12    disclosed as soon as we get it.  I guess that's my argument is

13    they still have information from Mr. Broderhausen or

14    Mr. Broderhausen wrote a report and gave it to somebody, but

15    the government doesn't have it.

16         THE COURT:  If you want to use Mr. Broderhausen as a

17    fact witness as you've suggested, you need to get

18    Mr. Broderhausen's report to Ms. Thompson this evening.  Better

19    get a hold of him, find him and get the report because

20    apparently he told her that he wrote one and he gave it to the

21    prior counsel.

22         MR. RICHARD BARTOLOMEI:  Well, the only thing I want

23    to alert the Court is we now have this multi-page document

24    generated yesterday and he has said, Rich, it will take me an

25    hour to look at each one of these rectangles.

1          THE COURT:  Then you are not in the position to say to

2   the jury that these files have never been opened because then

3   what you're doing is you're making a statement that is

4   absolutely unfounded.  Do you understand?

5          MR. RICHARD BARTOLOMEI:  No.  I've asked and that's

6   the basis --

7          THE COURT:  You've asked who?

8          MR. RICHARD BARTOLOMEI:  Our witness, fact witness, I

9   asked very specific questions.  I know my duty, I'm not going

10  to jeopardize my career.  There's nothing false about what he

11  told me.

12         THE COURT:  He told you that none of the files have

13  been opened?

14         MR. RICHARD BARTOLOMEI:  Well, of the particular

15  files --

16         THE COURT:  If he says none of the files have been

17  opened and she has something that shows otherwise, she is

18  absolutely entitled to cross-examine him on it.

19         MR. RICHARD BARTOLOMEI:  Let me bring these two poles

20  together.  The only images that we're aware of are five images

21  now down to two and these other images that are loaded in a

22  compressed file over two days.  Those are the only ones we know

23  about.  And it's my understanding --

24         THE COURT:  I don't remember -- I don't think that's

25  the case.

1         MR. RICHARD BARTOLOMEI:  2557 downloaded from 750

2    imaged units and 112 videos, some of which are selected.  The

3    point is they're done in two days over two hours, literally the

4    day before and two days before the Warrant.  And those are the

5    only images we know that the government is trying to use.  And

6    from those, they're trying to use ten or eleven.  And the other

7    one we know about the five CAM.  And so very specifically --

8         THE COURT:  They'd like to use more, but I'm not

9    letting them use more.

10        MR. RICHARD BARTOLOMEI:  I understand, but unless they

11   can show that those files were the ones that were accessed out

12   of this IP or this computer, then they're irrelevant.  And

13   today we get 95 pages or 95 hits and we have no time to do that

14   because we can give you a report based on what we know which is

15   just exactly what was argued in opening statements because we

16   were very careful not to run afoul of an argument that we were

17   saying something would be shown that we didn't have a factual

18   belief would be shown.  It's that simple.

19        MS. THOMPSON:  Your Honor, Exhibit Six is the forensic

20   report done by CFA Linares that has the child pornography files

21   taken out, extracted so that I could give that to them.  Almost

22   all of that is child pornography.  The disk that goes along

23   with that, Exhibit 6a, is the entire forensic exam with the

24   child pornography.  The government is intending to put all of

25   that into evidence and only show a very small portion that

 1   we've discussed with counsel and with the Court, but all of the

 2   images are going into -- will be offered by the government.

 3            THE COURT:  Right.

 4            MR. RICHARD BARTOLOMEI:  Your Honor, looking even at

 5   the exhibit which I think is an improper summary under the

 6   rule, but also in every one of these -- and that's why we

 7   talked about David Smith.

 8            THE COURT:  I don't know who David Smith is.

 9            MR. RICHARD BARTOLOMEI:  David Smith is the person

10   that -- and I was just going to examine Ms. Juarez about

11   that -- who ran the business, HomeArama, gives the defendant

12   access to a computer and eventually when he goes out of

13   business, gives him the computer.

14            THE COURT:  But then he says he gets the computer

15   cleaned.

16            MR. RICHARD BARTOLOMEI:  No, they say he said that.

17            THE COURT:  All right.

18            MR. RICHARD BARTOLOMEI:  They say he said that and one

19   of their witnesses, I believe, will testify who was the person

20   who purportedly did it.

21            THE COURT:  But the timestamp on these downloads is

22   long after he had any contact with the computer, isn't it?

23            MS. THOMPSON:  Correct.  And David Smith, David/S is

24   listed in the file path because the computer originally

25   belonged to David Smith and so that is the only user account on

1   the computer.  The computer forensic examiner will testify to

2   that, so they're on every file.  It's automatically generated

3   on every file because that's the only user account.

4          THE COURT:  It's kind of the meta-data on the file.

5          MR. RICHARD BARTOLOMEI:  With respect, Your Honor, the

6   timing of this is kind of important, but the long and the short

7   of it is dumping this on us today is a little late for us to be

8   able to recreate whatever caused that -- they could have given

9   us that a year ago or two years ago and we probably would be

10  further along in this regard, but the long and the short of it

11  is you can't give it to us today, we can only give you the

12  report of what he has seen based off the CD they give him.

13  They control all of the data.

14         THE COURT:  I'm not telling you that he has to create

15  a new report.  I'm telling you that you need to give her the

16  report that he's got.  That's number one.

17         MR. RICHARD BARTOLOMEI:  Yes, sir.

18         THE COURT:  Number two, if he gets up there and

19  testifies that none of these files were opened and she has

20  definitive evidence that they were, she can cross-examine him

21  with it.

22         MR. RICHARD BARTOLOMEI:  One more thing, if I may, the

23  problem that we have is when you look at the list, it doesn't

24  identify the file except in digital language, so we don't know

25  if it --

1          THE COURT:  But he understands digital language.

2          MR. RICHARD BARTOLOMEI:  You'd have to go in, use the

3     digital search and type each one of these in to get to that.

4     That's what the forensic search is.

5          THE COURT:  They're going to have their expert

6     testify.  You're going to have your expert testify, I guess

7     he's an expert.  I don't know whether he's an expert or he

8     isn't an expert.  Sounds like he's an expert to me.  And I'm

9     going to let him testify, all right.

10          MR. RICHARD BARTOLOMEI:  Thank you.

11          THE COURT:  But I'm not going to prohibit her from

12     cross-examining him on material that was on the computer that

13     they discovered which would refute that testimony.  So that's

14     where we are.

15          MR. RICHARD BARTOLOMEI:  Could he then sit in like

16     their expert?

17          THE COURT:  Of course, if he's an expert.

18          MS. THOMPSON:  And he gets -- can I clarify?  He gets

19     to testify if I get some information from him tonight.

20          THE COURT:  That's exactly right.  Ms. Thompson, you

21     need to get that before 7:00 p.m. tonight, you need to have a

22     copy of his report.  Period.  If it isn't there by 7:00, it's

23     over.  He's not testifying.

24          MR. RICHARD BARTOLOMEI:  Can we send one of our

25     lawyers out?

1          THE COURT:  You can send the lawyer out, anybody out.

2          *(Pause.)*

3          MR. RICHARD BARTOLOMEI:  Just to try to save time, I

4    gave Ms. Juarez a document, Ms. Thompson didn't disagree, so

5    she could read it.

6          THE COURT:  That's fine.  Thank you.

7                          *   *   *

8          *(3:52 p.m.)*

9          COURT SECURITY OFFICER:  All rise for the jury.

10          THE COURT:  All right.  Please be seated.  The Court

11   would note the presence of the ladies and gentlemen of the jury

12   as well as counsel and the parties.

13          Sorry it was a little delayed you had to stand out

14   there.  We were in the process of dealing with some legal

15   issues and we got that, I think we got it resolved.  I don't

16   know, I'm hopeful.  You can continue, counsel.

17          MR. RICHARD BARTOLOMEI:  Thank you.

18   BY MR. RICHARD BARTOLOMEI:

19   Q.  Ms. Juarez, while the jury was out, I had you read a

20   document silently to yourself which I believe is a report

21   authored by you referencing details of the investigation that

22   you participated in, did I not?

23   A.  Correct.

24   Q.  This regards an interview of a Dave Smith, does it not?

25   A.  Correct.

1    Q.  And my client, according to your report, had stated that

2    his previous employer --

3              MS. THOMPSON:  Objection, Your Honor, this is hearsay.

4              THE COURT:  Let him finish his question.

5              MR. RICHARD BARTOLOMEI:  It's the defendant's

6    statement.

7              THE COURT:  What?

8              MR. RICHARD BARTOLOMEI:  It's the defendant's

9    statement.

10             THE COURT:  You can't elicit the defendant's

11   statement.  You can't elicit it, so she's right.  The objection

12   is sustained.

13   BY MR. RICHARD BARTOLOMEI:

14   Q.  Why did you go investigate Mr. Smith?

15   A.  David Smith was Michalik's previous employer, I believe,

16   and he had given laptop in question to Michalik.

17   Q.  Thank you.

18             MR. RICHARD BARTOLOMEI:  May I approach, Your Honor?

19             THE COURT:  Sure.

20   BY MR. RICHARD BARTOLOMEI:

21   Q.  I'm going to hand you paragraph 15 from your Affidavit.

22   Would you just read that and let me know when you're finished?

23   Just 15.

24     (Pause.)

25     Are you ready, ma'am?

1    A.  Yes.

2    Q.  Thank you.  On your direct I believe that you thought that

3    the material that was sent over from Switzerland regarding the

4    site Amateur Lovers, you had said was primarily child porn?

5            MS. THOMPSON:  Objection.  Misstatement of the

6    testimony.

7            THE COURT:  Sustained.

8    BY MR. RICHARD BARTOLOMEI:

9    Q.  I'll ask it differently.  According to your Affidavit,

10   80 percent of that site --

11           MS. THOMPSON:  Objection, Your Honor, counsel is

12   testifying.

13           THE COURT:  Well, he's entitled to ask leading

14   questions.  You can proceed.

15   BY MR. RICHARD BARTOLOMEI:

16   Q.  80 percent of it is pornography, meaning adult pornography

17   and approximately 20 percent is child pornography under the age

18   of 18, correct?

19   A.  From their investigation?

20   Q.  That's what you wrote in your Affidavit, correct?

21   A.  Correct.

22   Q.  Ms. Juarez, thank you very much.

23                        REDIRECT EXAMINATION

24   BY MS. THOMPSON:

25   Q.  Special Agent Juarez, you testified that during the

1   execution of the Search Warrant, every agent had a weapon, they

2   were wearing bulletproof vests, is that standard or was that

3   done just for this investigation?

4   A.   That's for every Search Warrant that we conduct.

5   Q.   You also mentioned that weapons were drawn upon entry, is

6   that correct?

7   A.   That is also what we do upon every entry.

8   Q.   After the entry is complete and the protective sweep is

9   done, what happens to the weapons?

10  A.   The weapons are placed back in our holsters.

11  Q.   Is it standard policy for special agents always to be

12  armed?

13  A.   That is correct.

14  Q.   So special agents didn't just bring firearms for the Search

15  Warrant.  When you were a special agent, did you have one on

16  you all the time?

17  A.   All the time.

18  Q.   On October 22nd, 2015, was the defendant ever arrested?

19  A.   No.

20  Q.   Was he ever handcuffed?

21  A.   No.

22  Q.   Was his --

23        MR. RICHARD BARTOLOMEI:  Your Honor, I'm going to

24  object.  These questions were not part of my cross-examination.

25  They were asked and answered on her direct, it's repetitive and

1   cumulative.

2            THE COURT:  Well, actually it encompasses the general

3   tone of your examination and I'm going to overrule the

4   objection.

5   BY MS. THOMPSON:

6   Q.  Was he physically restrained in any way?

7   A.  No.

8   Q.  Did you make the defendant go anywhere?

9   A.  No.

10  Q.  Was he ordered around?

11  A.  No.

12  Q.  Was he ordered to sign the consent form?

13  A.  No.

14  Q.  You testified on cross-examination that you were very

15  familiar with child pornography websites, is that correct?

16  A.  With the names?

17  Q.  Yes.  With the names of various websites.

18  A.  Correct.

19  Q.  How many child pornography websites are there?

20  A.  I wouldn't be able to tell you an exact number.  I'm sure

21  there's lots.

22  Q.  Are you familiar with all of the names of them?

23  A.  No.

24            MS. THOMPSON:  Thank you.  I have nothing further.

25            THE COURT:  Anything else, counsel?

1        MR. RICHARD BARTOLOMEI:  One minute, please.

2        *(Pause.)*

3                        RECROSS-EXAMINATION

4   BY MR. RICHARD BARTOLOMEI:

5   Q.  You testified on redirect regarding how things were

6   conducted.  Am I correct that your testimony was you and Agent

7   DePaola were always close, went everywhere with him and never

8   left him alone throughout the entire interdiction but for

9   driving to the business, am I correct?

10  A.  Correct.

11  Q.  And the other agents were still armed, still in the house,

12  still conducting the search with a young girl, his fiance and

13  his mother, correct?

14  A.  Correct.

15        MR. RICHARD BARTOLOMEI:  Thank you.  No further

16  questions.

17        THE COURT:  Anything else, Ms. Thompson?

18        MS. THOMPSON:  No, Your Honor.

19        THE COURT:  You can step down.

20        THE WITNESS:  Thank you.

21        MS. THOMPSON:  Your Honor, may the witness by excused?

22        THE COURT:  Yes.

23        MR. RICHARD BARTOLOMEI:  Your Honor, we have no --

24  we're not going to recall her.

25        THE COURT:  She lives here in San Antonio, doesn't

1  she?

2          MS. THOMPSON:  She does, but she has travel plans.

3          THE COURT:  She can be excused.

4          MS. THOMPSON:  Thank you, Your Honor.

5          THE COURT:  Next witness.

6          MS. THOMPSON:  Government calls Carmella Caravello.

7          COURTROOM DEPUTY CLERK:  Please raise your right hand.

8                          *   *   *

9          *(CARMELLA CARAVELLO, Government Witness, Sworn.)*

10                         *   *   *

11         THE WITNESS:  Yes, I do.

12         COURTROOM DEPUTY CLERK:  You can have a seat.

13                      DIRECT EXAMINATION

14  BY MS. THOMPSON:

15  Q.  Please state your name for the record.

16  A.  Carmella Caravello.

17  Q.  Where are you employed?

18  A.  AT&T in North Palm Beach, Florida.

19  Q.  How long have you been employed with AT&T?

20  A.  Close to 22 years.

21  Q.  What type of business is AT&T?

22  A.  Communications company.

23  Q.  Does it provide Internet service?

24  A.  It does.

25  Q.  What is your position with AT&T?

1  A.  I'm service custodian of records for the Global Legal

2  Demand Center for AT&T.

3  Q.  What are your duties and responsibilities?

4  A.  My duties are to review court records that have been

5  provided through legal process and to testify in court to those

6  records and for authentication.

7          MS. THOMPSON:  Your Honor, may I approach?

8          THE COURT:  You may.

9          MS. THOMPSON:  Actually can we pull up Exhibit 1a?

10 BY MS. THOMPSON:

11 Q.  I'm going to show you what's been marked for identification

12 as Exhibits 1a which is three pages and 1b.  Do you recognize

13 those?

14 A.  I do.

15 Q.  What are they?

16 A.  The one I hold in my hand and I believe it's up on the

17 screen right now is U-verse customer account detail, it's a

18 subscriber record for a U-verse account.

19 Q.  Are all of those records kept in the normal and ordinary

20 course of business at AT&T?

21 A.  Yes, they are.

22 Q.  Exhibit 1a, who is the subscriber of that account?

23          MR. RICHARD BARTOLOMEI:  Your Honor, may I inquire?  I

24 thought you had already permitted the introduction of 1a.

25          MS. THOMPSON:  I believe the Court did admit it on a

Carmella Caravello - Examination          185

1   limited basis with Special Agent Juarez.  I'm now putting it in

2   for all purposes.

3          MR. RICHARD BARTOLOMEI:  Okay.  Thank you.

4   A.  May I answer?

5   Q.  Yes.

6   A.  Jeff Michalik.

7   Q.  And did he have Internet service through AT&T?

8   A.  Yes.

9   Q.  What was the IP address that was assigned to him by AT&T?

10  A.  75.1.83.139.

11  Q.  And that Internet service was assigned to what location?

12  A.  Service address is 9718 Hidden Iron Street in San Antonio.

13  Q.  Can you tell from the records what date his Internet

14  service began with AT&T and with that IP address?

15  A.  Yes, June 10th of 2013.

16  Q.  Drawing your attention to Government Exhibit 1b, do you

17  recognize that?

18  A.  Yes.

19  Q.  What is it?

20  A.  It's an AT&T response cover sheet.

21  Q.  And was it responding -- was it sent in response to a

22  Summons inquiring whether Jeff Michalik still had Internet

23  service at that location?

24  A.  Yes.

25  Q.  And he did until the date of that response at least,

1  correct?

2  A.  That's correct.

3  Q.  And what's the date on the response?

4  A.  10/20/2015.

5  Q.  So the IP address shown in the records, 75.1.83.139, was

6  assigned to the house at 9718 Hidden Iron Street from

7  June 13 --

8          MR. RICHARD BARTOLOMEI:  I'm going to object to the

9  form of the question as leading, suggestive and I believe

10  assumes a fact not in evidence.

11          THE COURT:  Why don't you just ask her.

12  BY MS. THOMPSON:

13  Q.  How long was that IP address assigned to Jeff Michalik at

14  9718 Hidden Iron Street?

15  A.  For a minimum time of the date that I provided as an

16  account having been established on 6/10/2013 to at least the

17  time of this response on 10/20/2015.

18  Q.  If that IP address was assigned to the physical location of

19  9718 Hidden Iron, could anybody else also be assigned that

20  specific IP address?

21  A.  No.

22          MR. RICHARD BARTOLOMEI:  Objection.

23          THE COURT:  Objection is overruled.

24          MS. THOMPSON:  Thank you.  Nothing further.

25  Government admits Exhibits 1a and 1b for all purposes.

1          MR. RICHARD BARTOLOMEI:  I object and I would ask that

2    in the nature of voir dire my cross-examination precede my

3    objection.

4          THE COURT:  All right.

5          MR. RICHARD BARTOLOMEI:  It will be quick.

6          THE COURT:  That's a new one on me, but go ahead.

7          MR. RICHARD BARTOLOMEI:  Otherwise I would have asked

8    for voir dire, made my objection, but I thought I'd expedite

9    matters.

10                     CROSS-EXAMINATION

11   BY MR. RICHARD BARTOLOMEI:

12   Q.  Ma'am, as I understand it, your job within AT&T is to be a,

13   quote, legal custodian of files, correct?

14   A.  That's correct.

15   Q.  And this may seem tedious, but I have to ask.  Could we

16   have 1a up please?

17        Looking at 1a, is this a business record in the manner that

18   AT&T keeps its business records or is it a generated document

19   specifically for the purpose of permitting you to respond to

20   governmental Subpoenas and civil Subpoenas?  Do you understand

21   the question?

22   A.  No.

23   Q.  Business records are usually for a business purpose.  It's

24   not the purpose of AT&T to respond to government Subpoenas, you

25   would agree?

1    A.  I would agree.

2    Q.  And when you have accounting systems, the purpose of

3    generating reports, be they summaries or analyses, is for a

4    business purpose, not to respond to government Subpoenas or

5    civil Subpoenas or a Summons, correct?

6    A.  I would say so, yes.

7    Q.  Am I correct that 1a is a record that is generated to meet

8    government or civil Subpoenas rather than something that is

9    maintained for use within the business of AT&T in this format?

10   A.  Yes.

11   Q.  And the response is a letter -- what's called a response

12   coversheet, right?

13   A.  That's correct.

14   Q.  And it simply responds a single piece of information.  It

15   too is simply to respond to civil Subpoenas, governmental

16   Subpoenas or Summons, correct?

17   A.  That's correct.

18           MR. RICHARD BARTOLOMEI:  Your Honor, at this time I'd

19   move to and I object to 1a and 1b that the record reflects by

20   the acknowledgment of the witness these are not business

21   records.  They are prepared solely for the purpose of

22   responding to a government Subpoena and they are testimonial in

23   nature in their content they contain hearsay, hearsay within

24   hearsay and are a violation of the Sixth Amendment right to

25   confrontation.  They do not come in as self-authenticating as

1  business records because they are not for business purposes.

2  Thank you.

3          MS. THOMPSON:  Your Honor, I believe it has been

4  properly authenticated as a business record.  The information

5  is kept in the ordinary and normal course of business and it

6  should be admitted.  It's also admitted based on defense

7  counsel's questioning under Rule 902, Subdivision 13, records

8  generated by electronic processor system that are

9  self-authenticating.

10          MR. RICHARD BARTOLOMEI:  If I may --

11          THE COURT:  No, I'm ready to rule.  The part of AT&T's

12  business as is the case for any large corporation that is

13  supplying Internet or data services and, in fact, virtually any

14  corporation in the United States today is to respond as they

15  must legally do to appropriate governmental or private

16  Subpoenas.  That's part of their business.  And documents which

17  are generated by AT&T for the purpose of responding to

18  governmental Subpoenas are part of their business records.  If

19  they didn't generate this, they would be out of business

20  because they couldn't continue to operate, they would be in

21  violation of Court order and would face severe sanctions.  So

22  the information was drawn, she testified the information is

23  drawn from AT&T records and files kept in the ordinary course

24  of business.  This document was generated in the ordinary

25  course of business.  Her whole job is to do exactly that and

1    she is an employee of AT&T.  So this is, in fact, a business

2    record and it's also generated, as counsel has stated, it's

3    also admissible under the other rule as counsel indicated.  So

4    the objection is overruled.  It will be received.

5             MS. THOMPSON:  Thank you, Your Honor.  Nothing further

6    from this witness.

7             MR. RICHARD BARTOLOMEI:  I too have nothing further.

8    Thank you.

9             THE COURT:  Okay, ma'am, you may step down.  And where

10   are you from?

11            THE WITNESS:  I'm from Florida, South Florida.

12            THE COURT:  I don't know whether it's any cooler there

13   than it is here.

14            THE WITNESS:  It isn't.  Thank you, Your Honor.

15            MS. THOMPSON:  Your Honor, may this witness be

16   excused?

17            THE COURT:  She may be.  Go back to South Florida.

18            MS. THOMPSON:  Your Honor, government calls Adrian

19   Linares.

20            COURTROOM DEPUTY CLERK:  Please raise your right hand.

21                            *   *   *

22         (ADRIAN LINARES, Government Witness, Sworn.)

23                            *   *   *

24            THE WITNESS:  Yes, ma'am.

25            COURTROOM DEPUTY CLERK:  You can have a seat.

```
1                        DIRECT EXAMINATION
2   BY MS. THOMPSON:
3   Q.  Please state your full name for the record.
4   A.  My name is Adrian Angelo Linares.
5   Q.  I'm going to ask you to slow down when you testify because
6   the court reporter has to take down everything you say?
7   A.  Yes, ma'am.
8   Q.  Where are you employed?
9   A.  Homeland Security Investigations.
10  Q.  What is your position within Homeland Security?
11  A.  I'm a computer forensic analyst.
12  Q.  How long have you been a computer forensic analysis?
13  A.  Four years, ma'am.
14  Q.  What did you do prior to your work with Homeland Security?
15  A.  I was in the United States Army.
16  Q.  For how long?
17  A.  Twenty years.
18  Q.  What was your assignment or what were your assignments in
19  the Army?
20  A.  I was an infantryman.
21  Q.  What's your educational background?
22  A.  I will complete my Bachelor's degree this December.
23  Q.  Do you currently have an Associate's degree?
24  A.  Yes.
25  Q.  How did you go from the Army to computer forensic analyst?
```

1    A.   I was connected to the Wounded Warrior Project which

2    connected me to the HERO Program, which through the HERO

3    Program I had the opportunity to join the Homeland Security

4    Investigations.

5    Q.   What is the HERO Program?

6    A.   The HERO Program is -- it stands for human exploitation

7    recovery operative.

8    Q.   And through the HERO Program were you provided training?

9    A.   Yes, ma'am.

10   Q.   What kind of training?

11   A.   Forensics training, ma'am.

12   Q.   Describe the training that you received prior to your

13   employment with Homeland Security?

14   A.   The training we received, training on the software used,

15   hands-on training on extraction of data on devices.  We did the

16   basic course, the basic computer evidence recovery training and

17   I also did the advanced computer evidence recovery training.

18   Q.   And was that training done through the HERO Program?

19   A.   Yes, with the systems from Homeland Security

20   Investigations.

21   Q.   Okay.  Did your training start with the Wounded Warrior

22   Program?

23   A.   Yes.

24   Q.   And then you applied to be specifically part of the HERO

25   Program?

1   A.   Yes.

2   Q.   And so your computer forensic training just kept going?

3   A.   Yes, ma'am.

4   Q.   Okay.  Do you have any certifications in computer

5   forensics?

6   A.   Just the two certifications I mentioned, the basic and

7   advanced computer evidence recovery training.

8   Q.   Are you familiar with A Plus, is that what you're talking

9   about?

10   A.   Yes, A Plus as well.

11   Q.   Okay.  Is that in addition to the training you've already

12   mentioned?

13   A.   Yes.

14   Q.   A Plus is a specific computer forensic certification?

15   A.   Yes.

16   Q.   How long does it take to obtain that certification?

17   A.   I started the training with the Wounded Warrior Project and

18   continued the training with the HERO Program in HSI, so it took

19   about three weeks.

20   Q.   The basic computer evidence training that you mentioned, is

21   that a six-week class?

22   A.   Yes.

23   Q.   What does a computer forensic analyst with Homeland

24   Security do?

25   A.   We access -- we conduct digital forensics.

1  Q.  Did you assist in the investigation of the case against the

2  defendant, Jeffrey Michalik?

3  A.  Yes, ma'am.

4  Q.  When did you first become involved in this case?

5  A.  On the day of the operations brief.

6  Q.  Explain to the jury what an operations brief is?

7  A.  Operations brief is just pretty much the plan, how we're

8  going to conduct the Search Warrant and the duties of each

9  personnel and all the safety requirements and stuff of that

10 nature.

11 Q.  What was your assignment?

12 A.  I was part of the search team.

13 Q.  What are your duties on the search team?

14 A.  Look for any digital evidence and collect.

15 Q.  Were you also asked to conduct forensic examinations of any

16 evidence seized?

17 A.  Yes.

18 Q.  The Search Warrant in this case was executed on

19 October 22nd, 2015, so you were present during the Search

20 Warrant?

21 A.  Yes.

22 Q.  Did you review the Search Warrant that was issued in this

23 case prior to the execution of the Search Warrant?

24 A.  Yes.

25 Q.  Why do you do that?

1   A.  To better familiarize yourself with the operation, pretty

2   much what's going on, who is doing what and --

3   Q.  Sorry, I couldn't tell if you were done.

4   A.  No.

5   Q.  Sorry.  Were you present when the agents -- when the

6   defendant took some of the agents to the business to recover a

7   laptop computer?

8   A.  No, ma'am.

9   Q.  Were you asked to forensically review all of the digital

10  evidence seized in this case?

11  A.  Yes.

12  Q.  Do you recall generally what items were seized from the

13  house?

14  A.  I have it on the report.

15  Q.  Were there a number of different computers?

16  A.  Yes.

17  Q.  A variety of phones?

18  A.  Yes.

19  Q.  Two tablets?

20  A.  Yes.

21  Q.  Did you forensically examine all of those?

22  A.  Yes.

23  Q.  Did any of them contain any evidence of child pornography?

24  A.  One laptop.

25          MR. RICHARD BARTOLOMEI:  Sorry, sir, I didn't hear

1    you.  Did you say the laptop?

2            MS. THOMPSON:  I think he said one laptop.

3            MR. RICHARD BARTOLOMEI:  I didn't hear you, sir,

4    sorry.  That's my problem.

5    BY MS. THOMPSON:

6    Q.  The laptop that contained evidence of child pornography,

7    was that seized from the house or provided on consent from the

8    defendant?

9    A.  On consent from the defendant.

10   Q.  So that laptop wasn't at the house when you executed the

11   Search Warrant?

12   A.  No, ma'am.

13   Q.  Are you familiar with the process of previewing items?

14   A.  Yes, ma'am.

15   Q.  Forensically previewing, what does that mean?

16   A.  What we do is we preview an item to see if it contains any

17   contraband.  In this case, child pornography.  If we preview

18   that item and it seems that there is no contraband, then we

19   will clear it, put it to the side, give it back to the case

20   agent.  If it contains contraband, then we will put it to the

21   side and continue our analyzation.

22   Q.  Do you preview all items before you conduct a full forensic

23   exam or how do you decide which items are previewed and which

24   go through the full forensic exam?

25   A.  We preview everything.  Everything gets previewed.

1   Q.  And then what makes it move to step two?

2   A.  If there's contraband found.

3   Q.  Did you preview items in this case and return some of them

4   to the family?

5   A.  Yes, I previewed and returned to the case agent.

6   Q.  Do you remember what was returned?

7   A.  Everything was returned minus the laptop.

8   Q.  I'm going to show you --

9          MS. THOMPSON:  May I approach, Your Honor?

10         THE COURT:  Yes.

11  BY MS. THOMPSON:

12  Q.  Government Exhibit Four and ask that you take a look at

13  that.

14  A.  Yes, ma'am.

15  Q.  Do you recognize that?

16  A.  Yes, ma'am.

17  Q.  What is it?

18  A.  It is a laptop.

19  Q.  Is that a laptop that you forensically examined?

20  A.  Yes.

21  Q.  I'm going to also show you Exhibit 4a and 4b.  Do you

22  recognize those?

23         MR. RICHARD BARTOLOMEI:  Your Honor, if Ms. Thompson

24  could turn them --

25         MS. THOMPSON:  They're in your book.

1          MR. RICHARD BARTOLOMEI:  I understand, but I didn't

2   have time to open the book.  Thank you.

3   BY MS. THOMPSON:

4   Q.  Are these photographs of the top and the bottom of the

5   laptop?

6   A.  Yes, ma'am.

7   Q.  Do they fairly and accurately reflect the laptop?

8   A.  Yes.

9   Q.  What is Exhibit 4c?

10  A.  This is the hard drive to the laptop.

11  Q.  Was that contained within the laptop when you got it?

12  A.  Yes, ma'am.

13  Q.  Who removed it?

14  A.  Another CFA removed it.

15  Q.  And is it in the same condition now substantially, except

16  for the exhibit sticker, that it was when it was removed?

17  A.  Yes, ma'am.

18          MS. THOMPSON:  Government offers Exhibits 4a, 4b and

19  4c.

20          MR. RICHARD BARTOLOMEI:  No objection to 4a, no

21  objection to 4b.

22          *(Pause.)*

23          Do you have those exhibits still up there?

24          *(Pause.)*

25          No objection, Your Honor.

1          THE COURT:  All right.  They'll be received.

2     BY MS. THOMPSON:

3     Q.  With regard to Exhibit Four, where was that manufactured?

4     A.  This was made in China.

5     Q.  And 4c, the internal hard drive, where was that

6     manufactured?

7     A.  This was --

8          MR. RICHARD BARTOLOMEI:  Your Honor, could I interpose

9     an objection.  It's irrelevant where the computer --

10          THE COURT:  What's the relevance of where the hard

11     drive was made?

12          MS. THOMPSON:  The prior objections and the prior

13     arguments regarding whether the material was child pornography

14     or the computer that traveled in interstate and foreign

15     commerce.

16          MR. RICHARD BARTOLOMEI:  I thought we had clarified

17     that.  We'll stipulate that they're made in China.

18          MS. THOMPSON:  Actually 4c is made in Malaysia.

19          MR. RICHARD BARTOLOMEI:  Yes.

20     BY MS. THOMPSON:

21     Q.  Describe the process of conducting a forensic exam on a

22     computer specifically?

23     A.  On a computer?

24     Q.  Yes.

25     A.  We receive the evidence with the documentation, we document

Adrian Linares - Examination                     200

```
 1   everything, serial numbers.  Once we're done documenting it, we
 2   remove the hard drives from that computer.
 3   Q.   And is the hard drive 4c?
 4   A.   Yes.
 5   Q.   What does that do?
 6   A.   The hard drive, it stores the data for that device.
 7   Q.   Then what do you do after the hard drive is removed?
 8   A.   Once we remove the hard drive, what we do is we connect
 9   what is called a write blocker to that device.
10   Q.   What's a write blocker?
11   A.   Write blocker is a device that will -- that protects the
12   original device from being altered in any way.
13   Q.   Then what happens?
14   A.   Then once we have the write blocker connected, we will then
15   connect it to the computer and make an image of that hard
16   drive.
17   Q.   And what do you mean by an image of the hard drive?
18   A.   Pretty much sector by sector copy of that device to work
19   on.  We make it -- it helps so that the original evidence is
20   preserved.
21   Q.   So you make an exact copy of the hard drive?
22   A.   Yes, ma'am.
23   Q.   What happens to the original hard drive?
24   A.   We put it back into storage.
25   Q.   In evidence?
```

1   A.   In evidence, yes.

2   Q.   And then the imaged copy that you've made is an exact copy

3   of the original?

4   A.   Yes.

5   Q.   And what do you do with that?

6   A.   That is my working copy and that's where I conduct all my

7   analysis from.

8   Q.   What type of forensic tools are used to analyze a computer

9   hard drive?

10  A.   Software such as EnCase, Internet Evidence Finder,

11  Griffeye, Cellebrite Technologies.

12        MR. RICHARD BARTOLOMEI:  Sorry, sir.  I have a little

13  difficulty hearing you.  If you could get a little closer to

14  the mike.  Could you repeat what those three were?

15  A.   EnCase, Griffeye, Cellebrite, Internet Evidence Finder,

16  softwares of that nature.

17  Q.   Are those tools used commonly in the law enforcement

18  forensic community?

19  A.   Yes.

20  Q.   Describe how you extract the data from the imaged copy?

21  A.   Once we hook it up to the software, for instance EnCase, we

22  go ahead and process that image into -- we bring in that image

23  into the software which allows us to view the contents of that

24  hard drive or the image.

25  Q.   Does EnCase allow you to copy and access the information

1   without making any changes to the information?

2   A.   Yes.

3   Q.   Once the information is inputted into your forensic

4   software, what happens?

5   A.   We begin to analyze -- we begin to analyze the image.

6   Q.   And do you review all the evidence that's in the forensic

7   software?

8   A.   Yes.

9   Q.   In this case, what were you asked to do?

10  A.   This was a child pornography case in this instance.  I was

11  to analyze that laptop and look for child pornography.

12  Q.   Do you isolate an image or video files in order to do that

13  Or does the software -- does the software do that

14  automatically?

15  A.   Isolate?

16  Q.   Yes.  Do you go through and look at all the images?

17  A.   I go through and look at every image.

18  Q.   Manually yourself?

19  A.   Yes.

20  Q.   Do you keep track of the image and video files that appear

21  to depict children engaged in sexual activity?

22  A.   Yes.

23  Q.   What software tools did you use in this particular case?

24  A.   I used EnCase and Internet Evidence Finder.

25  Q.   You mentioned EnCase.  What is Internet Evidence Finder?

1    A.   It's just another software that helps us and it pretty much

2    gives more the Internet information.

3    Q.   When you analyze the information on the hard drive, do you

4    create any reports documenting your finding?

5    A.   Yes.  Once I'm complete with the device, I then make a

6    report.

7             MS. THOMPSON:  May I approach, Your Honor?

8             THE COURT:  You may.

9    BY MS. THOMPSON:

10   Q.   I'm going to show you what's been marked for identification

11   as Government Exhibit Six and ask that you take a look at it.

12   Do you recognize that?

13   A.   Yes, ma'am.

14            MR. RICHARD BARTOLOMEI:  May I have a moment?

15            (Pause.)

16            Thank you.

17   BY MS. THOMPSON:

18   Q.   What is Government Exhibit Six?

19   A.   This is the report from EnCase.

20   Q.   Is that the report that you created based on your forensic

21   examination?

22   A.   Yes.

23   Q.   Were the child pornography files specifically taken out of

24   that report?

25   A.   Yes.

1   Q.   I'm going to show you what's been marked for identification

2   as Government Exhibit 6a, do you recognize that?

3   A.   Yes.

4   Q.   What is it?

5   A.   It is a copy of the disk containing the report.

6   Q.   Does that disk contain your forensic report with all the

7   child pornography files included in the report as you made it?

8   A.   Yes, ma'am.

9   Q.   I show you what I marked for identification as Government

10  Exhibit Seven.  Do you recognize that?

11  A.   Yes, ma'am.

12  Q.   What is it?

13  A.   This is a report created from Internet Evidence Finder.

14          MS. THOMPSON:  Government offers Exhibits Six, 6a and

15  Seven.

16          MR. RICHARD BARTOLOMEI:  Your Honor, permission to

17  voir dire outside the presence of the jury?

18          THE COURT:  Well, all right.  I'm not going to make

19  you sit back there and try to come back here.  It's going to

20  take us too long, so I'm going to excuse you for the day,

21  ladies and gentlemen.  Please remember my admonitions.  You can

22  just leave your notebooks in the jury room.  They'll give them

23  back to you in the morning.  And what time do we want them

24  here?

25          COURTROOM DEPUTY CLERK:  No later than 8:30.

1        THE COURT:  About 8:30.  Thank you.  Have a good

2  evening.

3        COURT SECURITY OFFICER:  All rise for the jury.

4        *(4:32 p.m., jury exits.)*

5                        *   *   *

6        THE COURT:  All right.

7        MR. RICHARD BARTOLOMEI:  May I question him since the

8  jury is out?

9        THE COURT:  Yes.

10                 VOIR DIRE EXAMINATION

11  BY MR. RICHARD BARTOLOMEI:

12  Q.  And thank you for your service.  Exhibit Six, is before

13  you, but I don't know if they have it, they don't have it in

14  front of you this way.  Is it easier for you to view if we put

15  it up on the screen?

16  A.  What are we viewing?

17  Q.  Exhibit Six.

18        THE COURT:  He has a screen right in front of him,

19  doesn't he?

20  BY MR. RICHARD BARTOLOMEI:

21  Q.  Going to the second page, and I'll go through this quickly.

22  The examination report that is generated by what, the computer

23  software?

24  A.  Yes.

25  Q.  Okay.  Entirely by the computer software, correct, not

1   something you have to put in the data for?

2   A.   The only data were the names.

3   Q.   Okay.  You put in the name and that titles the page?

4   A.   Yes.

5   Q.   Thank you.  Looks like page three, again the computer

6   software does all of this sorting and display?

7   A.   Yes.

8   Q.   That's just how the formatting of the computer program

9   produces the summary, correct?

10  A.   Yes.

11  Q.   That's not something you have to input or analyze?

12  A.   I did not input that.

13  Q.   The software -- which software was it?

14  A.   This was EnCase.

15  Q.   EnCase.  The next page which I believe is the fourth page

16  of the exhibit, three pages in past the cover, that too is

17  generated entirely by the software known as EnCase, correct?

18  A.   Yes.

19  Q.   Now, very quickly, there's a column at the very top of the

20  third page that just says Registered Owner and it says Jeff.

21  Do you have to put that in?

22  A.   No.

23  Q.   With regard to -- I believe it's the fourth page, yes,

24  there's a column that says User, correct?

25  A.   Yes.

1    Q.   Does the computer auto-populate the name?

2    A.   Yes, according what we're looking for, yes.

3    Q.   So that's auto-populated, meaning it's not a situation

4    where the software can actually establish that Jeff or

5    Mr. Michalik was the user on that particular date, correct?

6    A.   Can you repeat that question?

7    Q.   I'll try.  You see the column that says Friendly Name

8    that's on the left, correct?

9    A.   Uh-huh.

10   Q.   Yes?

11   A.   Friendly Name, yes.

12   Q.   She has to take down yes and no.  Then it says User.  Am I

13   correct that the software assumes by some reference to an IP

14   number that that's the user, am I correct?

15   A.   I don't know about the IP number.

16   Q.   You don't know how it identifies it as --

17   A.   What I know is --

18   Q.   Let me just ask, sir.  We'll get to it.  I want to be fair.

19   The computer software identifies the user and auto-populates in

20   the column.  We've already established that, correct?

21   A.   Yes.

22   Q.   The software is not capable of determining who made the

23   inquiry or who made the search, it just assumes based on

24   something, right?

25   A.   When we -- when I ask the software to let me know how many

1   USB devices are run, this was logged in, according to what was

2   plugged in those devices.

3   Q.  What I'm asking and you're going to guide me because I'm an

4   old man.  Are you saying the software -- well, let me just ask

5   it simply.  Does the software have any capability of

6   determining who actually touched the keyboard, made the inquiry

7   or am I correct the software cannot do that?  It can't tell

8   who, it just picks a name by some reference to either an IP

9   number or something.  Do you understand what I'm saying?

10  A.  Yes.

11  Q.  So the computer can't actually tell who did it.  Somebody

12  could have been doing it remotely, correct, using an IP number

13  that comes back to Mr. Michalik, correct?

14  A.  Is that a general question?

15  Q.  That's a general question.

16  A.  Are you asking about the remote access on this?

17  Q.  That's a general question.  And let me make it -- you have

18  to answer though.

19  A.  Okay.

20  Q.  Can it do that?

21  A.  Okay.

22  Q.  It can't identify who actually sought access or went

23  through the Internet, it can't do that?

24  A.  No, it's not going to tell me who plugged in at that time,

25  that USB drive.

1   Q.  And let me make a simple example.  I walk in, my sister's

2   computer, and if I access something, go out on the Internet,

3   search for it, download it, it's going to come back as my

4   sister doing it, not me, right?

5   A.  Say again?

6   Q.  Just trying to give an example.  My sister's computer is

7   sitting on the table, it's open, it's not password protected

8   and it's running.  Can you assume that for me?

9   A.  Okay.

10  Q.  If I go in and use my sister's computer to search the

11  Internet, find a website, download something, your software is

12  going to print that my sister did it, not me, right?

13  A.  Correct.

14  Q.  Correct?  Is that correct?

15  A.  Yes.

16  Q.  And that's true for all the pages of the exhibit.  It can't

17  identify who actually did whatever triggered that in the

18  computer, it just comes back to either the IP address, is that

19  what you believe it identifies?

20          MS. THOMPSON:  Your Honor, I'm going to object.  This

21  line of questioning is confusing and I don't believe it's

22  proper voir dire of the witness.

23          THE COURT:  I think that you left voir dire and are

24  engaging in cross-examination of the witness, to be honest with

25  you.

1          MR. RICHARD BARTOLOMEI:  Well, Your Honor, if you

2     believe I've gotten far enough, then I'll step back.

3          THE COURT:  I don't know what far enough is.  I don't

4     know where you're going.  I mean if the idea is to show that

5     the software can't identify who was using the computer at the

6     time, I don't think counsel is introducing the evidence for

7     that purpose.  I think she has other evidence that she believes

8     at least will show that beyond a reasonable doubt, but it isn't

9     this gentleman.  It is I think being offered for the purpose of

10    showing that the computer accessed the information, not any

11    particular individual.

12         MR. RICHARD BARTOLOMEI:  Your Honor, that's why I

13    asked and if I may just continue.

14         THE COURT:  Now, the computer is his computer and the

15    computer is one that he, according to the government at least,

16    acknowledged that he uses.  So it is not irrelevant and quite

17    to the contrary, it's relevant testimony.  Now, if she was

18    trying to introduce it for the purpose of showing that he was

19    the one through this witness who was the one who was using the

20    computer and downloaded the child pornography files, then I

21    would agree with you, but that's not why she's offering it.

22         MR. RICHARD BARTOLOMEI:  My question then is and

23    that's why I asked these questions, if it's the software that

24    identifies, what I'm trying to get at is -- and I'm still

25    close, but not there -- is how does this software automatically

1   identify to something referencing Mr. Michalik?  Is it the IP

2   number, is it something else and if --

3              THE COURT:  Why don't you just ask him the question.

4              MR. RICHARD BARTOLOMEI:  I thought I had.  That's what

5   I'm saying.

6              THE COURT:  I don't think you had.

7              MR. RICHARD BARTOLOMEI:  I'll make it clear, if I may

8   step back up.

9              THE COURT:  I don't know that it identifies

10  Mr. Michalik.  I think what it does identify is the computer.

11             MR. RICHARD BARTOLOMEI:  Let me if I can.

12             THE COURT:  Or at least the IP address is what it

13  identifies.

14             MR. RICHARD BARTOLOMEI:  That's what I'm trying to get

15  at.

16  BY MR. RICHARD BARTOLOMEI:

17  Q.  What is it in the software that the software searches for

18  that results in that name?  Is it an IP address, is it the

19  computer itself?

20  A.  That software is going to give me the data from that

21  computer and it's going to give me the users, the user account

22  to that computer.

23  Q.  That's what I'm asking.  It's the account that it

24  auto-populates?

25  A.  It's going to give me the information from that computer,

 1   from that laptop.

 2   Q.  Do you understand I asked a little more than that.  It

 3   auto-populates from the something about the computer, it does

 4   not tell you who the actual user is.  It automatically

 5   identifies Mr. Michalik as the user, correct?

 6           MS. THOMPSON:  Your Honor, I'll object again.  I

 7   believe this witness will testify that he doesn't know who was

 8   sitting at the computer.  His examination was limited to what

 9   was on the computer.

10           THE COURT:  That's right.  I think we've already

11   passed that bridge.  That's a bridge too far, as they used to

12   say.

13           MR. RICHARD BARTOLOMEI:  Vermogen.

14           THE COURT:  My father was Vermogen, so I know all

15   about Vermogen.  So where are we here?

16           MR. RICHARD BARTOLOMEI:  Well, I'm going to object

17   because I don't think that it's relevant and I don't think that

18   it's a proper summary where the gentleman has acknowledged

19   searching the computer just auto-populates his name, the

20   prejudicial effect far outweighs the probative value because he

21   acknowledged I can't tell you who the user really was and,

22   therefore, it has no relevance in the case.

23           THE COURT:  Well, I might agree with you if this was a

24   public computer, but it isn't.  It's a private computer owned

25   by your client and he's acknowledged that it's his computer.

1  He's acknowledged that he's the one that uses the computer.

2  Now, there may be others that have access to it, I don't know.

3  The government doesn't have that information.  And if that's

4  your evidence, then you'll present that evidence and the jury

5  will hear it.

6         There is also in this case the government has

7  presented or will present actually, through the next I think

8  whatever the other agent, retired agent testifies, his

9  confession and the jury will have an opportunity to hear that

10 and that ties his use of the computer to the files that they're

11 talking about.  So it is not irrelevant, it is highly relevant

12 and it is not more prejudicial than it is probative.  It would

13 be if he were attempting to himself draw the distinction

14 between -- not the distinction, the connection between your

15 client and the computer.  All he's trying to do, and I think

16 that was the testimony, is to say that these files came off of

17 this computer or were on this computer, I should say.  These

18 files were on this computer.  That's all.

19         MR. RICHARD BARTOLOMEI:  If it's that limited --

20         THE COURT:  Well, that's what it is.  That's all she's

21 trying to do with it.

22         MR. RICHARD BARTOLOMEI:  I made my objection.  Thank

23 you very much.

24         THE COURT:  All right.  The objection is overruled for

25 the reasons I've stated.  All right.  We'll stand in recess

1    until tomorrow morning, 9:00.

2                MS. THOMPSON:   Thank you, Your Honor.

3                COURT SECURITY OFFICER:   All rise.

4            (4:47 p.m.)

5                             *   *   *

1                        *   *   *   *   *

2   UNITED STATES DISTRICT COURT

3   WESTERN DISTRICT OF TEXAS

4

5        I certify that the foregoing is a correct transcript from

6   the record of proceedings in the above-entitled matter.   I

7   further certify that the transcript fees and format comply with

8   those prescribed by the Court and the Judicial Conference of

9   the United States.

10

11  Date signed:  September 25, 2019

12

13  /s/ Angela M. Hailey

14  Angela M. Hailey, CSR, CRR, RPR, RMR
    Official Court Reporter
15  655 East Cesar E. Chavez Blvd., Third Floor
    San Antonio, Texas  78206
16  (210)244-5048

17

18

19

20

21

22

23

24

25