| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | WESTERN DISTRICT OF TEXAS |
| 2 | SAN ANTONIO DIVISION |

```
 3   UNITED STATES OF AMERICA      :
                                   :
 4   vs.                           :  No. SA:17-CR-00347
                                   :  San Antonio, Texas
 5   JEFFREY CLINTON MICHALIK(1),  :  August 26, 2019
     Defendant.                    :
 6   *******************************************************
```

```
 7            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
            BEFORE THE HONORABLE DAVID A. EZRA
 8          SENIOR UNITED STATES DISTRICT JUDGE
```

```
 9   APPEARANCES:
     FOR THE GOVERNMENT:
10     Tracy Thompson, Esquire
       United States Attorney's Office
11     601 N.W. Loop 410, Suite 600
       San Antonio, Texas  78216
12     (210)384-7150; tracy.thompson@usdoj.gov
```

```
13
```

```
14   FOR THE DEFENDANT:
       Edward A. Bartolomei, Esquire
15     Richard A. Bartolomei, Esquire
       Jonathan R. Perez, Esquire
16     Law Office of Edward A. Bartolomei, P.L.L.C.
       530 Lexington Avenue
17     San Antonio, Texas  78215
       (210)225-0393; edward@eabartlaw.com
18
```

```
19
```

```
20   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
21   Official Court Reporter, U.S.D.C.
     655 East Cesar E. Chavez Blvd., Third Floor
22   San Antonio, Texas  78206
     Phone(210)244-5048
23   angela_hailey@txwd.uscourts.gov
```

```
24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25
```

# I N D E X

**GOVERNMENT WITNESSES:**                                **PAGE**

**Adrian Linares  (Computer Forensic Analyst)**
By Ms. Thompson                                      25,96
By Mr. Richard Bartolomei                            52,103


**Special Agent Sean Mullen**
By Ms. Thompson                                      107,136
By Mr. Edward Bartolomei                             135,137


**Special Agent Donna DePaola**
By Ms. Thompson                                       140

1   *(Monday, August 26, 2019, 9:11 a.m.)*

2                              *   *   *

3            COURT SECURITY OFFICER:  All rise.

4            THE COURT:  Please be seated.

5            COURTROOM DEPUTY CLERK:  SA:17-CR-00347, United States

6   of America versus Jeffrey Michalik.

7            THE COURT:  Can we have appearances please.

8            MS. THOMPSON:  Good morning, Your Honor.  Tracy

9   Thompson appearing on behalf of United States.

10           THE COURT:  All right.

11           MR. RICHARD BARTOLOMEI:  Richard Bartolomei on behalf

12   of the defendant.

13           MR. EDWARD BARTOLOMEI:  Edward Bartolomei on behalf of

14   the defendant.  Mr. Perez is in route, Your Honor.  He had to

15   make some copies at the office.

16           THE COURT:  We have a matter we have to take up this

17   morning.  Unfortunately one of our jurors is ill.  What is his

18   name, 69-year-old gentleman?

19           COURTROOM DEPUTY CLERK:  Flournoy Schmidt.

20           THE COURT:  What is his juror number?

21           COURTROOM DEPUTY CLERK:  One.

22           THE COURT:  Juror number one.  Floyd Schmidt who is a

23   69-year-old gentleman was admitted to the hospital on Saturday

24   with pancreatitis and he's been in the hospital all weekend.  I

25   spoke with the medical personnel at the hospital or a medical

1   person treating him and the doctor hasn't been around this

2   morning so that they can't say definitively whether he'll be

3   discharged this morning, but if he is discharged, he's going to

4   be discharged home on bed rest.  Pancreatitis, I don't know if

5   any of you know about pancreatitis, it is and can be an

6   extremely debilitating and dangerous disease, illness.  And

7   there's no hope of him coming back any time soon, at all.  I

8   had Laura on the phone call with me.  She'll verify that when I

9   asked whether -- I said I knew about pancreatitis and whether

10  there was any -- he was going to be home in bed rest, the

11  answer is yes.  So my inclination is to excuse him as a juror.

12  Is there any objection?

13          MS. THOMPSON:  None from the government, Your Honor.

14          MR. EDWARD BARTOLOMEI:  No, Your Honor.  In light of

15  his medical condition, Your Honor, I believe that he won't be

16  back.

17          THE COURT:  All right.  We did some Fifth Circuit

18  research on the law.  The big gold standard Fifth Circuit case

19  upheld a District Judge in actually less serious circumstances

20  than this excusing -- then there's two lead cases excusing a

21  juror without even consulting with counsel, but I felt it

22  better to consult with you first and see if there was any

23  objection, then I would take it up.  I mean we're not going to

24  see this fellow, he's gone, so he will be excused without

25  objection.  And who is alternate number one?

1          MR. RICHARD BARTOLOMEI:  Your Honor, there's a matter

2    I'd like to take up with the Court.

3          THE COURT:  No, we're not going to hear any more

4    argument, counsel.  If you're going to try to argue with me

5    about this business of getting more time --

6          MR. RICHARD BARTOLOMEI:  No.

7          THE COURT:  I hope not because that's been resolved.

8    I've filed an order.  The defense has had multiple

9    opportunities to review that material.  You may not have

10   because you only recently got on the case.

11         MR. RICHARD BARTOLOMEI:  That's not what I'm talking

12   about.

13         THE COURT:  What are you going to talk to me about?

14         MR. RICHARD BARTOLOMEI:  There's a little confusion.

15   One, you were talking about conditional admission and then all

16   of a sudden you admit things.

17         THE COURT:  Wait a minute, wait a minute.  I don't

18   normally do conditional -- and just admit things.  Talk to me

19   about a specific item.

20         MR. RICHARD BARTOLOMEI:  There are reports and there's

21   been discussion about how many images and how many things would

22   be introduced.  The point is that six -- and I may have been

23   confused because now I believe 6a is actually the CD.  Six is

24   the first report, 6b was the second report that you gave us

25   time to look at.  The point is when you look at the face of

1    these, they have all of the titles of all of the purported

2    pornography.  They are clearly -- and I leaned back in just

3    before we left and I said, Oh, and they're cumulative and their

4    prejudice outweighs their probative value.

5         That was something the Court told us and told both

6    sides they were going to address.  And the point is when you

7    look at Six, it has the titles of all of these purported sites

8    whether or not there will be any evidence that they were ever

9    accessed or opened by the defendant.  The same thing is true of

10   6b in all of the pathways, but in 6b those titles roll to the

11   top.  So you have 94 statements of pornography which I think is

12   highly prejudicial.  And to make this as simple as I can, where

13   in the 12 exemplar images or the eleven exemplar images, how

14   are they identified to the report so that we have a fighting

15   chance of knowing what we're defending?

16        Now, the Court has made it very clear at several

17   stages of this trial.  I will look at that whether it's

18   cumulative.  I don't believe -- I believe there's a quote in

19   the transcript.  I don't believe you should have thousands of

20   images.  Why should they have thousands of files titled with

21   pornographic images?

22        THE COURT:  Well, one of the problems we have here,

23   and this is generally the -- not a defense.  Most of these

24   cases you don't ever go to trial, but the ones that do go to

25   trial the defense is often very different than this.  Now, I

1    don't know whether your client is going to testify in this
2    case.  If he does, I assume that it would be consistent with
3    his testimony here during the suppression hearing.  And during
4    the suppression hearing he basically said that he didn't know
5    about any files.  I mean I didn't -- unless I'm mistaken, his
6    testimony was that he looked at adult pornography, he didn't
7    look at child pornography.  That was his testimony.  And the
8    statement that he made to the officer, was it before he got the
9    computer, he had the computer completely cleaned or cleared,
10   okay.  And so this argument that he's making that this is
11   somehow from the previous owner, he can make that argument, I'm
12   not suggesting he can't, but the government has substantial
13   evidence that when from the time he got the computer and it was
14   conclusively his, these files were downloaded.  Now, if his
15   position is he didn't do it, they're entitled to put in
16   evidence that he did.
17          Now, when I was talking about in terms of cumulative
18   is showing one salacious nude picture of little children after
19   another.  That, I don't allow.  Because I'm concerned that it
20   will be so overwhelming to the jury that the jury will lose
21   sight of the defendant's defense in the case or any opportunity
22   for a defense and they'll just -- all they'll remember is
23   seeing 300 or 200 or 100.  Heck, I had a case once in Hawaii, I
24   was told at the time by the FBI that it was the largest child
25   pornography case they ever came after because this guy had

1   successfully alluded law enforcement for decades and downloaded

2   child porn and it was over a million images, if you can imagine

3   such a thing.  Now, many of the -- he would download blocks of

4   files that would contain 20 and 30 images at a time.  And I

5   don't know how he did it under the old computers, it was just

6   over the -- what was that when you'd hear that -- you know,

7   over the phone line.  This guy must have just left his computer

8   on downloading and went to work, I guess.  But he had movies

9   and hundreds of thousands of images.  It was just unbelievable.

10  Now, when he went to trial, I didn't let in hundreds of

11  thousands of images.  I let in about 30 images.  They were

12  enough, you know.  And he was ultimately convicted and I think

13  he's in jail basically pretty much for the rest of his life

14  given his age.

15          MR. RICHARD BARTOLOMEI:  Well, if I may just revisit

16  one thing.  And I've looked at the roughs and I've tried to

17  follow the thread.  When I say that it was suddenly admitted.

18  First it was conditionally admitted and then with no change

19  with regard to 6b, no testimony from Mr. Linares, suddenly they

20  become admitted.

21          THE COURT:  There's something had changed.  There was

22  an argument that had been made that made me realize that I was

23  wrong.  You know, I told counsel from the very beginning of

24  this trial that any of my in limine motion rulings are subject

25  to revision if counsel can show me that I was -- this wasn't in

1    limine, but it was during the trial, in any event, if counsel

2    can show me that I was mistaken or wrong.  I am not one of

3    those judges and have never been that don't look carefully at

4    and occasionally grant motions for reconsideration.  I once had

5    a Federal judge tell me that he was very proud of the fact that

6    he never granted a motion for reconsideration.  I don't think

7    that's something you can be proud of.  I think that -- I mean

8    his point was that he's always right.  Well, I'm not always

9    right, okay, and I know that.  I know that I'm not always

10   right.  That's why we have -- and I don't think any trial judge

11   is always right.  And I think most Circuit judges would tell

12   you that -- I've talked to dozens of them over the years

13   because I've got hundreds of Circuit judges that I know and I

14   would say at least a hundred who are close friends of mine over

15   the 30 years, served on committees with and sat with when I sat

16   by designation with the Ninth Circuit.  I mean very good

17   judges, fine judges.  And I've even talked to several Fifth

18   Circuit judges who I know very well and have become quite

19   friendly with who have told me that, yes, there are decisions

20   that they made in light of other things that's happened where

21   they regret -- they would have gone another way if they looked

22   at it today and/or they've been reversed by the Supreme Court

23   and looked at the Supreme Court's opinion and said, gee, wiz,

24   maybe there's something there that I missed.

25           I certainly have been reversed where I looked back at

1    it and said, you know, the Circuit Court is right, I was wrong

2    on this one.  I've also had cases where I didn't think I was

3    wrong, but you know, that's the way it is.  You make the best

4    call that you can make and anything that I've ruled on is --

5    now, if you don't make a further objection, you've waived it,

6    you know.  That's the way it is.

7         MR. RICHARD BARTOLOMEI:  That's what I'm trying to do.

8         THE COURT:  So I am more than happy to reconsider

9    anything that I've ruled on.

10        MR. RICHARD BARTOLOMEI:  The thing that I was trying

11   to get at, Judge, is -- and obviously I am analogizing one to

12   the other -- if I can put in 100 lurid titles, how is that

13   functionally different than putting in images?

14        THE COURT:  Well, it depends upon what the title is

15   and it depends upon -- I would agree with you.  I mean if your

16   client took the position that he downloaded these files, but

17   he's taken the opposite position, that he didn't download them.

18   But if he takes the position that he downloaded the files --

19   and the fact that he never looked at them, I don't know that

20   that makes a difference if you download pornography knowingly,

21   know it's pornography.  But if he takes the position that he

22   downloaded and didn't realize it's pornography, then the titles

23   make a heck of a lot of difference.

24        MR. RICHARD BARTOLOMEI:  If I may go a little farther.

25   We believe from the forensic examination these are not

1    downloaded.  That comes through the Internet.  It's very clear

2    from 6a -- actually it's Six, they aren't downloaded.

3              THE COURT:  He just opened them up -- didn't open them

4    up.  He just went to the site and looked at them?

5              MR. RICHARD BARTOLOMEI:  No.  They appear to go

6    directly in by a CD ROM or a thumb drive.  There is no Internet

7    involvement.  That's what 6a -- that's what it appears to show.

8    The point that I am trying to make is the relevance is

9    conditioned upon and one of the elements of is interstate

10   commerce, but one of the other things is if it does not show

11   that he puts it in the computer, that is extremely relevant.

12   What I'm saying -- if I could finish my sentence.  It's a

13   two-prong analysis and the point is why should -- and I advised

14   the Court early on in these proceedings.  I said you have

15   inherent power to determine the order of proof, so until and

16   unless they show that there is anything that makes him as the

17   user or anything else to these files, they're not relevant.

18             THE COURT:  Okay.  Well, just a minute now.  This is a

19   new defense that I've never heard of before, but okay.  Is it

20   my understanding that the defense is yes, these were on his

21   computer, no question about it, but somebody else snuck in

22   there and put a thumb drive in his computer or put a CD ROM in

23   his computer with all this child pornography?

24             MR. RICHARD BARTOLOMEI:  They didn't sneak.  The point

25   is when you look at these two files and that's the second part

1    of my --

2           THE COURT:  They got on the computer somehow.  How did

3    they get on the computer?

4           MR. RICHARD BARTOLOMEI:  They don't come through the

5    Internet.

6           MS. THOMPSON:  We don't know that.

7           THE COURT:  I understand that's your defense.  Are you

8    saying that what he did is he bought these CDs?

9           MR. RICHARD BARTOLOMEI:  No, no.  This defense is

10   really much simpler than that.

11          THE COURT:  What is it?

12          MR. RICHARD BARTOLOMEI:  He didn't put them on the

13   computer and he never opened them.

14          THE COURT:  That's what I asked you before.

15          MR. RICHARD BARTOLOMEI:  That's what I said.

16          THE COURT:  No, you didn't.  I asked you.  I said, Is

17   it your defense that somebody else snuck in, got a hold of his

18   computer, put the CD ROM in or put the thumb drive in and

19   uploaded these files?  That's your defense.

20          MR. RICHARD BARTOLOMEI:  Absent the snuck part, that's

21   correct because there --

22          THE COURT:  Well, who put them in there?

23          MR. RICHARD BARTOLOMEI:  If we knew that, don't you

24   think, as they say, we would have had them here.  The computer

25   doesn't show that.  The computer doesn't show that he ever does

 1   this.

 2          THE COURT:  So somebody was out to get him and put

 3   these files on his computer?

 4          MR. RICHARD BARTOLOMEI:  Your Honor, a friend could

 5   walk in, put in a thumb drive while you're sitting there making

 6   barbecue and they could do all the maneuvers on this, the file

 7   would never even show that it was opened.

 8          THE COURT:  Okay.  Well, then all of these files are

 9   not prejudicial because you're claiming that somebody else did

10   it and he didn't do it, so if that's the case, then they're

11   not -- from your perspective whatever is on there is not

12   prejudicial because he didn't do it.

13          MR. RICHARD BARTOLOMEI:  Respectfully, Your Honor, the

14   very thing that was the premise to your statement, and I

15   followed it very closely, was that people lose sight of

16   something.  It's like the famous line from the restaurant, one

17   from column A, two from column B, so if I'm really, really

18   strong on column A --

19          THE COURT:  The difference is on that case there was

20   no allegation by the defendant that someone else unknown to him

21   or anybody else had put those files on his computer.  His point

22   was that he didn't know they were all child pornography and

23   that was one -- they were adults who were posing at children.

24   He didn't have any infant stuff.  His stuff, he was into the

25   12-year-old, 13-year-old, 15-year-old thing.  And there is a

1    lot of that kind of porn going around that even by -- I hate to

2    say it -- legitimate pornography companies that operate within

3    the law, where they dress these young women as girls and they

4    find very young looking girls.  Look, they're around.  My

5    oldest daughter, we used to call her baby face because she has

6    such a baby face.  And she was in college and people were

7    asking her if she was a freshman in high school, okay.  And

8    they still -- she is 38 now, I think, 39, Amanda, and they

9    still, they still ask her when she graduated from college

10   because they think she's like brand new to the company where

11   she's working -- this is a girl that's got a Master's degree,

12   three children, happily married to a combat veteran, but she

13   just has a baby face.  Well, there are these girls that are

14   born -- girls I say, not women.  Well, they become women, okay,

15   but they look like girls.  And, you know, there was a time when

16   there was an attempt to prosecute that and the Supreme Court

17   said no dice, you have to show that they really are younger and

18   they also tried to prosecute anime where they would draw these

19   young girls, you can't do that either, I don't think.

20           MS. THOMPSON:  Under the obscenity statute, you can if

21   it definitely represents a child.

22           THE COURT:  Okay.  But you can't get it as downloading

23   child porn, right?

24           MS. THOMPSON:  Correct.

25           MR. RICHARD BARTOLOMEI:  The only thing I wanted to

 1   say, though, because I have listened very carefully --

 2          THE COURT:  Counsel, you don't have to keep telling me

 3   that.  I assume that you're listening carefully to me.  Believe

 4   me, you're a good lawyer.  I've said that many times.  Your

 5   brother is an excellent lawyer.  I'm sure that the gentleman in

 6   the middle is a good lawyer.  I don't know him.  I've never

 7   seen him practice, so I can't make that statement, but your

 8   brother is in my court all the time and he is an excellent

 9   lawyer and he and I have always gotten along very well.

10          MR. RICHARD BARTOLOMEI:  I mentioned the analogy to

11   the prejudicial effect of all these salacious listings, it

12   becomes prejudicial because it overwhelms the jury just the way

13   the images do.  And I also mention that this is only relevant

14   if their forensics show the defendant somewhere in the user

15   path actually did anything.

16          THE COURT:  No, there's something called

17   circumstantial evidence and if they have strong circumstantial

18   evidence -- now, in accordance with -- they have a confession,

19   okay, I understand you're challenging the confession.  I

20   already ruled on that motion, so the confession comes in

21   through the agent.  That's evidence, that's actually direct

22   evidence, not circumstantial.  But he said that's his computer,

23   he said that he got it from somebody else, but he had it

24   cleaned before he used it and I'm sure that the government's --

25   somebody is going to explain what clean means at some point.

1   That completely erases any -- that's different from just going

2   delete on your computer.  If you go delete on your computer,

3   you're not cleaning your computer.  All you're doing is taking

4   it off the immediate drive, but it's still there.  I mean I

5   can't tell you how many FBI experts and computer experts I've

6   listened to over the years.  I could get up there as an expert

7   I think on this, but they actually go through the hard drive

8   and they wipe it multiple times and overwrite it, overwrite it.

9   And I've had agents tell me that when that's done and it's done

10  the right way you cannot recover images.

11          MR. RICHARD BARTOLOMEI:  A small point I would make is

12  the representation is that my client said he had it cleaned,

13  the forensic evidence is quite obvious that it was never

14  cleaned, so if that changes --

15          THE COURT:  No, no, no.  It was cleaned when he got

16  it, then the government contends it was after that point that

17  he put these images on there, that those images got on there.

18  Now, his contention is apparently now -- well, I know his

19  contention is that he didn't do it, that he acknowledged that

20  he viewed adult pornography.  You're entitled to a theory of

21  defense instruction in my court.  It isn't a Fifth Circuit

22  requirement that you get a theory of defense instruction, but

23  it is a requirement in my court.  I come from the Ninth Circuit

24  where it is a requirement.  There is nothing in the Fifth

25  Circuit that says a judge can't allow a theory of defense

1  instruction, so you're going to get one in my court, okay.

2  Until the Fifth Circuit tells me that a defendant doesn't get

3  one, you will get one.  Ms. Thompson knows that, although she

4  hasn't tried a case in front of me before, many in her office

5  have and they know that I give a theory of defense instruction.

6  So you're going to get a theory of defense instruction in which

7  I am sure that you are going to want the jury instructed that

8  viewing adult pornography is legal under both the Constitution

9  and the law.  And you're going to get that as part of your

10 theory of defense instruction because he's acknowledged that.

11 And I don't know if he's going to testify, but if he does

12 testify, I am quite sure he's not going to deny that he viewed

13 adult pornography because he said so, I think during the

14 suppression motion, so he's going to say that.  Fine.  And

15 adult pornography I think was found on the computer, I believe.

16 Wasn't it?  No?

17          MS. THOMPSON:  Not that I'm aware of.

18          THE COURT:  All right.

19          MR. RICHARD BARTOLOMEI:  My final question is if it is

20 established that this computer was never wiped, does that

21 change the Court's analysis?

22          THE COURT:  Well, it's a little too late for trying to

23 get in expert opinion on that.  You can cross-examine the

24 government's witness.

25          MR. RICHARD BARTOLOMEI:  That's what I'm saying.  When

1   it's established that it obviously wasn't wiped because the

2   nature of the data and times and dates, does that change the

3   Court's analysis?

4           THE COURT:  I don't think there was any specific date

5   given by him as to when he got the computer from the previous

6   owner.  He just gave a general date.

7           MS. THOMPSON:  Right.  He told the agents he's had it

8   for three years.

9           THE COURT:  What does that mean?

10          MS. THOMPSON:  Right.

11          THE COURT:  I know he says he didn't tell them that.

12          MR. RICHARD BARTOLOMEI:  This is not the time for him

13  to testify.

14          THE COURT:  No, no.  You've got good lawyers.  The

15  worst thing that you can do is start to chime in.

16          THE DEFENDANT:  Sorry.

17          THE COURT:  Listen to me.

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  You've got good lawyers, if you start

20  chiming in yourself and you do that in front of the jury,

21  you're cooked.  Do you understand me?

22          THE DEFENDANT:  Yes, sir, Your Honor.

23          THE COURT:  If the jury sees you misbehave in front of

24  them, it's all over.

25          THE DEFENDANT:  Yes, sir, Your Honor.

1          THE COURT:  Got it?

2          THE DEFENDANT:  Yes, sir, Your Honor.

3          THE COURT:  Listen to your lawyers.  You've got good

4    ones.

5          MR. RICHARD BARTOLOMEI:  So we're not going to redact

6    anything out of --

7          THE COURT:  I didn't say that.  I'm going to take

8    another hard look at it.  There's a lot of files there.

9          MR. RICHARD BARTOLOMEI:  I'm just talking about the

10   two reports.

11         THE COURT:  I know, but there's a lot of files.  You

12   would agree, that's your whole argument.

13         MR. RICHARD BARTOLOMEI:  There's 400 pages of one and

14   there's 94 files in the other.  I just wanted to say that's all

15   I had to say.  Thank you very much for considering my objection

16   and I assume if you're going to look at them, you'll make your

17   decision and let us know before we start.

18         THE COURT:  I want to hear from counsel.

19         MS. THOMPSON:  Your Honor, the files in Exhibit 6b,

20   there are 94 of them, not all of them are child pornography.

21   The purpose of Exhibit 6b is to show that the files contained

22   in that exhibit were all from the music folder and they were

23   opened, that somebody was going into the music folder and

24   viewing files.  The music folder was specifically targeted

25   because that's where all the -- that's where most of the child

1   pornography was found.  And some of the files in Exhibit 6b are

2   child pornography.  The defense computer analyst spent -- was

3   at HSI Friday and then spent eight hours on Saturday.  We don't

4   know what he looked at.  He's able to look at the material all

5   by himself, but could verify that not all of that is child

6   pornography, but it simply shows that those files were viewed

7   by somebody.

8          With regard to Exhibit Six, which is the written

9   forensic report without the images, if the defense is I didn't

10  do it, I didn't put them there and I didn't look at them --

11         THE COURT:  The only other person that could

12  reasonably have had access -- well, maybe his what he refers to

13  as his common law wife.  I doubt she had access to it.  And

14  then his brother.

15         MS. THOMPSON:  And if other people --

16         THE COURT:  Is his brother around?

17         MS. THOMPSON:  Yes.

18         THE COURT:  If he makes that argument, I would expect

19  to hear from the brother one way or the other.  Either the

20  government is going to call the brother or I am going to order

21  the government to call the brother, one of the two.  Something

22  is going to happen because we need to hear.  If the brother

23  gets up there and says, No, I didn't do it -- okay.  If the

24  brother says, Yup, I put child pornography on there to sink my

25  brother, then there we go.

1          MS. THOMPSON:  He is on the defense witness list, Your

2    Honor.

3          THE COURT:  All right.  Well, we'll find out whether

4    he put child pornography on that computer then.

5          MS. THOMPSON:  But the images are as they're found.

6    We take the computer as we found it.  The fact that there's

7    2600 child pornography files is relevant if he's saying I

8    didn't even know they were there.  That makes it more relevant

9    and, as the Court pointed out, less prejudicial if he says I

10   didn't do it.  If he's saying I put them there, but I thought

11   it was adult porn, that may be a different argument.  The

12   exhibit is what it is.  We found the computer the way it was

13   with all of those titles on there.  Not all of them indicate

14   from the file name that they're child pornography, but many of

15   them do.

16          The government feels strongly that it is what it is,

17   that's what was found on the computer and so to redact part of

18   that, the government believes would be inappropriate because it

19   is relevant.  The fact that there's all those files on the

20   computer is relevant, more so the original report that they've

21   had for years shows that items 1174 to 1219 weren't in the

22   music folder.  You'll hear analyst Linares testify that those

23   came right from the Internet.  Those were viewed on Mozilla

24   Firefox.  That's been available to them since day one.  That's

25   in the report that they've had for years, so at least 46 of

1    those files did come straight from the Internet.  They keep

2    arguing they didn't.

3         THE COURT:  The one thing that I agree with counsel

4    on -- now, first of all, let me say that given what I now

5    understand to be the defendant's defense is that he didn't put

6    those on there, that significantly lessens any potential for

7    prejudice because he's saying, look, I don't know what's on

8    there.  Now I know, but I didn't do it.  Okay.

9         So the fact that there are a lot of files with child

10   porn on them or potentially child porn, we'll see, certainly

11   would not inure to his detriment given the fact -- other than

12   what the government can prove by circumstantial evidence, given

13   the fact that he said I didn't do it.  That's number one.

14        Number two, I do agree with him that having you read

15   off to the jury hundreds of titles of files -- give me some

16   sample names.

17        MS. THOMPSON:  Seven-year-old girl, four-year-old

18   dogie anal.  I'm going to put that into evidence, but I'm not

19   going to read all --

20        THE COURT:  I don't have any problem with you reading

21   a small sample of the file names.  And then if counsel believes

22   that those are cherrypicked to make them look the worst,

23   counsel can read in other names if he wishes to, defense

24   counsel.  But I'm only going to let you do that with maybe five

25   or six, okay.  I don't want to have hundreds and hundreds and

 1    hundreds of those kinds of names just read off in seriatim.

 2          MS. THOMPSON:  Your Honor, what I was planning on

 3    doing is Exhibits 11, 12 and 13 that were submitted have the

 4    file names on them.  I'm going to have the forensic analyst

 5    identify those as being found on the computer only because then

 6    the FBI witness has identified these children and will testify

 7    they were real children and that they're prepubescent, so in

 8    order to connect that, but these are the only names I'm going

 9    to read.

10          THE COURT:  That's fine.  So I noted your objection

11    and your objection is on the record.

12          MR. RICHARD BARTOLOMEI:  Thank you.  I add only one

13    sentence, if I could.  And that is it's not just two or three

14    people that have access to this computer.  There are nine

15    listed in the report that the users.

16          THE COURT:  Counsel says that's wrong.

17          MS. THOMPSON:  We'll go over that.  In their motion or

18    in the reply to the government's response, they list that there

19    are seven computer user accounts on the computer.  That's the

20    desktop computer, not the laptop.  The desktop didn't have any

21    child pornography.  The laptop has one computer user.  That's

22    it.  What counsel was referring to in his reply is the desktop

23    computer which did not have any child pornography.

24          THE COURT:  Okay.  There we are.  I've made my ruling.

25    By the way, the alternate's name is Bret Alexander Wiseman

1    Guadalupe.

2            COURTROOM DEPUTY CLERK:  No, he's from Guadalupe.

3            THE COURT:  Bret Alexander Wiseman, so he is now juror

4    number one.  Well, now that it's quarter to 10:00, you can

5    bring the jury in.

6                            *   *   *

7            COURT SECURITY OFFICER:  All rise.

8            (9:48 a.m., jury enters.)

9            THE COURT:  Please be seated.  Would counsel like to

10   make their presence known here please?

11           MS. THOMPSON:  Good morning, Your Honor.  Tracy

12   Thompson appearing on behalf of the United States.

13           MR. EDWARD BARTOLOMEI:  Richard Bartolomei stepped

14   out, Your Honor, for a minute, will be returning on behalf of

15   Mr. Michalik.  Edward Bartolomei on behalf of Mr. Michalik and

16   Jonathan Perez.

17           THE COURT:  The defendant is present.  Good morning,

18   ladies and gentlemen.  Unfortunately one of our jurors became

19   quite ill over the weekend and ended up in the hospital all

20   weekend, but we understand he's on the mend, but he's on bed

21   rest for the rest of the week and the lawyers have agreed with

22   me that it would be unfair to have to recess this trial and

23   continue it for -- and wait for him to get better because we

24   don't know whether he'll ever be able to come back to sit as a

25   juror in a reasonable amount of time.  He may be on bed rest

 1   for a month for all we know.  So we've replaced -- which is why

 2   we have alternates.  We replaced him with our first alternate

 3   and so you are a regular juror now.  All right.  Are we ready

 4   to proceed?

 5              MS. THOMPSON:  Yes, Your Honor.  Your Honor, Adrian

 6   Linares was on the stand.

 7              THE COURT:  Yes.

 8              *(9:50 a.m.)*

 9              You may proceed.  You remain under oath, sir.

10              THE WITNESS:  Yes, sir.

11                          DIRECT EXAMINATION

12   BY MS. THOMPSON:

13   Q.  CFA Linares, I'm going to draw your attention to Exhibit

14   Six, which is the forensic report that you completed in this

15   case, specifically page two.  At the top of that report, it

16   lists evidence and then has the name Michalik C1D1.  What is

17   that?

18   A.  Ma'am, that is a desktop computer that I labeled.

19   Q.  And what does C1D1 refer to?

20   A.  Stands for computer one, drive one, ma'am.

21   Q.  And then farther down in the middle of that page is also

22   the listing for Michalik C1D2.  What's that?

23   A.  That is computer one, drive number two.

24   Q.  So the desktop computer that was taken from Mr. Michalik's

25   house had two internal hard drives?

1    A.  Yes, ma'am.

2    Q.  And the first one is listed first, second one is listed

3    second?

4    A.  Yes, ma'am.

5    Q.  Then near the bottom there's another hard drive named J.

6    Michalik.  What does that refer to?

7    A.  The second computer.

8    Q.  Which is Exhibit Four, the Dell laptop?

9    A.  Yes, ma'am.

10            MR. RICHARD BARTOLOMEI:  Leading, suggesting.

11            THE COURT:  Sustained.

12   BY MS. THOMPSON:

13   Q.  What computer is J. Michalik?

14   A.  That is the laptop.

15   Q.  The Dell laptop?

16   A.  The Dell laptop.

17   Q.  Turning to page three of your report, on the top of page

18   three it lists operating system information.  Items one and two

19   are the operating system and account users for which computer?

20   A.  The C1D1, the desktop.

21   Q.  The Dell desktop.  So the Dell desktop had Windows 7

22   Professional installed?

23   A.  Yes.

24   Q.  And the registered owner was Jeff?

25   A.  Yes.

Adrian Linares - Examination                 27

1    Q.   And it had eight account users, eight different accounts?

2    A.   Yes.

3    Q.   Then number three at the bottom of page three shows system

4    info L1D1 Jeff Michalik.  What computer is that?

5    A.   That is the laptop, ma'am.

6    Q.   That's laptop one, drive one?

7    A.   Yes, ma'am.

8    Q.   How many drives did the laptop have in it?

9    A.   One.

10   Q.   And the laptop was using Windows 10 Home, is that correct?

11   A.   That is correct.

12   Q.   And the registered owner is listed as David/S?

13   A.   Yes.

14   Q.   The install date is listed as August 27th of 2015.  What

15   does that refer to?

16   A.   That refers to the last major update that was made on that

17   computer, on that laptop.

18   Q.   The last major Windows update or what update?

19   A.   Windows update.

20   Q.   And then number four at the bottom of that page is also

21   referring to the laptop, is that correct?

22   A.   That is correct.

23   Q.   How many user accounts were on the laptop?

24   A.   There's only one usable user account.

25   Q.   And that is?

1    A.   David S.

2    Q.   David S.  If you turn to page four of your report, you

3    record USB devices.  What's a USB device?

4    A.   USB device is kind of also known as a thumb stick that you

5    can plug into the computer that holds data.

6    Q.   Do computers also consider ports for camera cards and

7    things like that as USB devices?

8    A.   Yes.

9    Q.   Now, number five, does that list the USB devices only for

10   the desktop computer?

11   A.   Yes.

12   Q.   And what about item number six?

13   A.   Item number six refers to the laptop.

14   Q.   And on the Dell desktop computer, did you find any child

15   pornography?

16   A.   No, ma'am.

17   Q.   Was all the child pornography you found on the laptop

18   computer?

19   A.   Yes, ma'am.

20   Q.   Given that the laptop computer only has one usable user

21   account, if multiple people use that computer, will it all be

22   listed under David S?

23   A.   Yes.

24   Q.   Who inputs the name of a registered owner on a computer,

25   how does that name get there?

1          MR. RICHARD BARTOLOMEI:  Objection, Your Honor.  Calls

2    for speculation and it's also leading.

3          THE COURT:  No, it's not leading.  And based on his

4    knowledge and experience, he's not talking about this

5    particular -- she's not asking about this particular case.

6    She's asking about generally how does it get in there from a

7    mechanical standpoint, I believe.  Is that right?

8          MS. THOMPSON:  Correct.

9          THE COURT:  The objection is overruled.

10   BY MS. THOMPSON:

11   Q.  The registered owner of a computer that's shown on page

12   three in item three of David S, is that automatically created

13   by the computer or is that created by the user?  How does a

14   piece of information like that get on the computer?

15   A.  That is created by the user.

16   Q.  And so going back to page four with regard to item six, the

17   USB devices, number three on there is a USB device.  And can

18   you tell from your report when that USB device was last

19   connected to the computer?

20   A.  Yes, ma'am, 10/21/15.

21   Q.  The last connected items relate to the list directly above

22   it, correct?

23   A.  Yes.

24   Q.  So for instance, on number five, the HTC Android phone

25   would have been connected when?

Adrian Linares - Examination                    30

1   A.   09/18/15, ma'am.

2   Q.   Thank you.  As part of your forensic exam, do you check for

3   malware on the computer?

4   A.   Yes, ma'am.

5   Q.   What is malware?

6   A.   Malware is a software written to pretty much damaged

7   devices or stolen information.

8   Q.   Did the defendant's computer have anti-virus software on

9   it?

10  A.   Yes, it did.

11  Q.   Do you recall what type it had on it?

12  A.   What type of software?

13  Q.   Anti-virus software.

14  A.   I think it was PC Doctor, malwarebytes and anti-spyware.

15  Q.   So it had a few different types of anti-virus software on

16  it?

17  A.   Yes, ma'am.

18  Q.   Did it have a firewall?

19  A.   Yes, ma'am.

20  Q.   What is a firewall?

21  A.   A firewall is a wall that controls the in and out

22  connection to the device.

23  Q.   And the Dell laptop had a firewall on it?

24  A.   Yes, ma'am.

25  Q.   What is a remote desktop up in -- what's a remote desktop?

Adrian Linares - Examination                    31

1   A.   A remote desktop is pretty much giving an outside user

2   access to your computer.

3   Q.   Does it automatically come with Windows or is it software

4   you have to download from the Internet?

5   A.   It automatically comes with windows.

6   Q.   In order to give somebody access to your computer, what

7   steps are necessary for the computer user to take?

8   A.   The user has to give permission for the outside access.

9   Q.   I would have to give you permission to access my computer?

10  A.   Yes.

11  Q.   Did you check to see if the remote desktop was functional

12  on the Dell laptop computer?

13  A.   Yes.

14  Q.   What did you find out?

15  A.   It was disabled.

16  Q.   So someone could not have used the remote desktop feature?

17  A.   Correct, correct.

18  Q.   Did you find any malware on the Dell desktop that would

19  allow any type of remote access into the computer?

20  A.   No.

21  Q.   Did you find any type of malware on the computer that would

22  unintentionally download files?

23  A.   No.

24  Q.   Did you find any indication through your forensic

25  examination that someone other than the person actually sitting

1    and typing at the keyboard had access to that computer?

2    A.   No.

3    Q.   Did you find any adult pornography on the computer?

4    A.   No, ma'am.

5    Q.   Did you find cabinet making software on the computer?

6    A.   Yes, ma'am.

7    Q.   Did you find C Cleaner on the computer?

8    A.   Yes, ma'am.

9    Q.   What is that?

10   A.   It's a disk cleaner, it scans for useless files and deletes

11   them to free up space on your computer.  It's also used to

12   clear up browser history, Internet history and any other

13   private data.

14   Q.   Does C Cleaner do that automatically or can the computer

15   user specifically tell it what to clean?

16   A.   The computer user can tell it what to clean.

17   Q.   The computer or the user?

18   A.   The user, excuse me.

19   Q.   When was C Cleaner last run on the Dell laptop computer?

20   A.   10/21/15.

21   Q.   The day before the Search Warrant?

22   A.   Yes, ma'am.

23   Q.   Did you find any child pornography files on the hard drive

24   of the Dell laptop computer?

25   A.   Yes.

1   Q.   Approximately how many did you find?

2   A.   Approximately 2500 images.

3   Q.   How many video files or movie files did you find depicting

4   child pornography?

5   A.   Approximately 100.

6   Q.   Were all of those files saved onto the computer?

7   A.   Yes, ma'am.

8   Q.   Where were the child pornography files found?

9   A.   They were found in the music folder, under the music

10  folder.

11  Q.   Were all of them found there or were some found somewhere

12  else?

13  A.   A majority were found on the music folder and approximately

14  46 were saved on the -- were found in the Mozilla Firefox

15  folder.

16  Q.   Explain to the jury what Mozilla Firefox is?

17  A.   Mozilla Firefox is an Internet browser like Google Chrome

18  or Internet Explorer.

19  Q.   Does it have a cache folder?

20  A.   Yes.

21  Q.   What is a cache folder?

22  A.   A cache folder is where the Internet history is

23  automatically saved by the computer.

24  Q.   If the files are in the cache folder, are they still

25  accessible to the user?

1    A.   Yes.

2    Q.   Similar to when I delete a document on my computer, if it's

3    in the recycle bin, I can still get it back?

4    A.   Yes.

5    Q.   So if a file is in the Mozilla Firefox cache folder, I can

6    go look at it again?

7    A.   Yes.

8    Q.   How many child pornography files were found in the Mozilla

9    Firefox cache folder?

10   A.   Approximately 46.

11   Q.   With regard to Exhibit Six, there are specific items in

12   there, I think items 1174 to 1219 all relate to the Mozilla

13   Firefox cache.  If you'll go to page 1187?

14          MR. RICHARD BARTOLOMEI:  Excuse me.  Leading and

15   suggesting.

16          MS. THOMPSON:  He's testified that there are 46 files

17   in that folder.

18          THE COURT:  He's already done that, so I'm going to

19   overrule the objection.

20   BY MS. THOMPSON:

21   Q.   Are those located at items 1174 to 1219 in your report?

22   A.   Yes.

23   Q.   Specifically with regard to page 187 --

24          MR. RICHARD BARTOLOMEI:  May I have a moment?

25          THE COURT:  Sure.

1          *(Pause.)*

2               MR. RICHARD BARTOLOMEI:  I've got it, thank you.

3    BY MS. THOMPSON:

4    Q.  -- which will show item 1193.  As an example item number

5    1193, take us through the file path and tell us what that tells

6    you.

7    A.  This tells me that it came from Mozilla Firefox profiles on

8    the date 11/13/14.

9    Q.  At the very beginning of the item path, it says J.

10   Michalik.  Does that tell you what computer it was on?

11   A.  Yes, that is from the laptop.

12   Q.  And then as you go through the file path, you see the

13   Mozilla Firefox profiles, correct?

14   A.  Yes, ma'am.

15   Q.  Have you viewed that file?

16   A.  No, ma'am.

17   Q.  When was that -- can you tell from that information when

18   that file was viewed by somebody sitting at the laptop?

19   A.  On 11/13/14, ma'am.

20   Q.  That's the file creation date listed below?

21   A.  Yes, ma'am, the file created date.

22   Q.  Through your examination you reviewed all of these files,

23   is that correct?

24   A.  That is correct.

25   Q.  Does this one depict child pornography?

1    A.   Yes.

2    Q.   Do you remember specifically what this one shows?

3    A.   This one shows a -- this one shows a prepubescent female.

4    Q.   Pubescent or prepubescent?

5    A.   Excuse me, prepubescent.

6    Q.   What does prepubescent mean?

7    A.   Prepubescent means that they have not yet gone through

8    puberty, there's no pubic hair and not sexually developed yet.

9    Q.   Do you recall what else this image depicted?

10   A.   Yes, ma'am, a prepubescent female, no clothes from the

11   waist down with legs spread in the air being penetrated by a

12   male.  She was being penetrated in her anus by a male with his

13   penis.

14   Q.   An adult male penis was penetrating her anus?

15   A.   Yes.

16   Q.   Were all the files that are listed in the Mozilla Firefox

17   cache folder viewed on the Internet?

18   A.   Yes.

19   Q.   What are the dates associated with those files that were

20   viewed on the Internet?

21   A.   11/13/14, the file created date.

22   Q.   November 13th of 2014?

23   A.   Correct.  Yes, ma'am.

24   Q.   Was there another date that they were viewed?

25   A.   For Mozilla?

 1  Q.  I'll take you to --

 2        MR. RICHARD BARTOLOMEI:  Your Honor, I think she's

 3  about to lead him.  I'm going to object.

 4        THE COURT:  I don't know.  Let's wait until she asks

 5  the question before we jump in.

 6  BY MS. THOMPSON:

 7  Q.  Let's look at page 189 of the report, specifically item

 8  1203 which is in the middle of that report.  Can you tell from

 9  the data on your forensic report what date that image was

10  viewed using Mozilla Firefox to connect to the Internet?

11  A.  It was the file created date November 14, 2014.

12  Q.  Thank you.  Now, the Mozilla Firefox cache folder that the

13  46 files are in, are those automatically saved by the computer

14  user?

15  A.  By the computer.

16  Q.  By the computer itself?

17  A.  Yes.

18  Q.  When I as the computer user go to the Internet and look at

19  that picture, my computer stores that in that folder?

20  A.  Correct.

21        MR. RICHARD BARTOLOMEI:  Leading, suggestive.

22        THE COURT:  Sustained.  You have to re-ask the

23  question.

24  BY MS. THOMPSON:

25  Q.  If the computer user is on the Internet viewing that image

1   of child pornography, what does the computer do?

2   A.   The computer is automatically going to save it into that

3   Mozilla Firefox cache folder.

4   Q.   Until when?

5   A.   Until it's deleted.

6   Q.   The fact that 46 child pornography files were found in that

7   Mozilla Firefox cache folder tells you -- does that tell you

8   they weren't deleted?

9   A.   Correct.

10  Q.   And if the user -- if there's C Cleaner on the computer,

11  why wouldn't those have been eliminated?

12  A.   Maybe he didn't -- maybe someone didn't want them deleted,

13  didn't select that specific folder to be deleted.

14  Q.   Is that something through C Cleaner that would have to be

15  specifically checked by the user?

16  A.   Yes.

17  Q.   Now, you also mentioned child pornography files were found

18  in the music folder on the computer, is that right?

19  A.   That is correct.

20  Q.   Is that where the rest of them were found?

21  A.   Yes, ma'am.

22  Q.   Is the music folder automatically created on a new

23  computer?

24  A.   It is operator system installed, yes, just like the video

25  pictures, the video folder, the documents folder, the downloads

1    folder, so forth.

2    Q.  On a new computer with Windows operating system, there are

3    certain folders that automatically come on the computer?

4    A.  Yes.

5    Q.  The music folder is one of them?

6    A.  Yes.

7    Q.  And you mentioned movies, pictures, documents and

8    downloads?

9    A.  Yes.

10   Q.  Those are all automatically put on the computer when the

11   computer is new?

12   A.  Correct.

13   Q.  Or it comes from the factory?

14   A.  Correct.

15   Q.  Are the child pornography files that were found in the

16   music folder automatically put there by the computer?

17   A.  No.

18   Q.  How do they get there?

19   A.  Someone had to put them there.

20   Q.  In your report, you start with item number seven on page

21   five of the report.

22          MR. RICHARD BARTOLOMEI:  Let me turn to it please.

23          (Pause.)

24   BY MS. THOMPSON:

25   Q.  The movie files or video files that you found on the Dell

1    laptop, those are listed in section -- well, in the video

2    section of your report starting on page five, is that right?

3    A.  Yes, ma'am.

4    Q.  And that goes through page 22?

5            MR. RICHARD BARTOLOMEI:  May I have a moment?

6            *(Pause.)*

7            Got it.

8    BY MS. THOMPSON:

9    Q.  And so those are the 112 movie files depicting child

10   pornography that were found on the Dell laptop?

11   A.  Yes.

12   Q.  Specifically with regard to page 21 of the report, number

13   110 at the top is listed Katrin 7-year-old - 1.avi.  What does

14   .avi mean?

15   A.  The AVI is showing that it is a video.

16   Q.  Can you tell when that movie file was put onto the Dell

17   laptop computer?

18   A.  Yes, through the file created date of October 19, 2015.

19   Q.  Can you tell how it got put on the computer?

20   A.  No.

21   Q.  Could it have come from the Internet?

22   A.  Could have.

23   Q.  Could it have come from a USB drive?

24   A.  Could have.

25   Q.  Could it have come from a CD?

 1   A.  Yes.

 2   Q.  The information listed in the report doesn't tell you how

 3   it got there, just that it was put there on the 19th, is that

 4   right?

 5   A.  That is correct.

 6   Q.  Now, later on in item number 113, that file is listed as

 7   .mp4.  What does that mean?

 8   A.  It's just another video, states it's a video.

 9   Q.  That signifies it's a movie file or video file?

10   A.  Yes.

11   Q.  And then finally, number 115 at the bottom, Baby Lover 2.

12   That ends in .wmv.  What kind of file is that?

13   A.  Movie video file.

14   Q.  Page 23 of your report, does that page begin listing the

15   child pornography images that were found on the computer?

16   A.  Yes, ma'am.

17   Q.  Specifically with regard to number 119, that file ends in

18   .jpg.  What does that mean?

19   A.  That is an image.

20   Q.  When was that image file put onto the Dell laptop computer?

21   A.  On October 18, 2015, ma'am.

22   Q.  Through your forensic examination, were you able to

23   determine that other than the Mozilla Firefox files that were

24   viewed on the Internet, that the other child pornography files

25   were put there on only two dates?

1    A.  Yes.

2    Q.  And what were those dates?

3    A.  The 18th and the 19th of October, 2015.

4              MS. THOMPSON:  May I approach the witness, Your Honor?

5              THE COURT:  You may.

6    BY MS. THOMPSON:

7    Q.  CFA Linares, I'm going to show you what's been marked for

8    identification as Government's Exhibit 11, 12 and 13 and have

9    you take a look at those.

10             MR. RICHARD BARTOLOMEI:  Your Honor, with your

11   permission, could I --

12             THE COURT:  Sure.

13             (Pause.)

14   BY MS. THOMPSON:

15   Q.  Do you recognize those?

16   A.  Yes, ma'am.

17   Q.  Are those all child pornography files that you found on the

18   Dell laptop computer?

19   A.  Yes, ma'am.

20   Q.  And those files are listed in Exhibit Six, correct?

21   A.  Correct.

22   Q.  If you can turn to page 385 of the report.  And CFA

23   Linares, if you'll look at Exhibit 11, specifically 11n.

24             MR. RICHARD BARTOLOMEI:  Can we have one second?

25             THE COURT:  Of course.

1          *(Pause.)*

2     BY MS. THOMPSON:

3     Q.  Specifically on page 385 of the report, item 2470 is an

4     image called Kitty five-year-old C baby seven.  Is that

5     correct?

6     A.  That is correct.

7     Q.  Is that also the file reflected in Exhibit 11n?

8     A.  Yes, it is.

9     Q.  What does that depict?

10          MR. RICHARD BARTOLOMEI:  Your Honor.

11          THE COURT:  Yes, sir.

12          MR. RICHARD BARTOLOMEI:  If the exhibit is going to be

13    introduced, the best evidence of what it depicts does not

14    require interpretation.

15          THE COURT:  I can't remember whether I received it

16    yet.

17          MS. THOMPSON:  No.  There's additional foundation

18    that's going to be laid by the FBI agent.

19          THE COURT:  Okay.  Well, then he can't testify -- if

20    it's not in, he can't testify as to what it includes.

21          MS. THOMPSON:  Okay.  Let's go to page 78 of the

22    forensic report.

23    BY MS. THOMPSON:

24    Q.  On page 78 of Exhibit Six, item 478 is another image file

25    depicting child pornography, is that correct?

1    A.  Yes, ma'am.

2    Q.  What is that one called?

3    A.  That one is called MC Girl Common Vibe.

4    Q.  And is that image also part of the Exhibit 12a?

5    A.  Yes, it is.

6    Q.  And with regard to Exhibit 13, specifically Exhibit 13a,

7    does that include two images, both titled Girl In Tent

8    11-year-old Tatiana Part One and Part Two?

9    A.  Yes, ma'am.

10   Q.  And those were also found on the defendant's Dell laptop

11   computer and are contained in your report in items 1149 and

12   1150?

13   A.  Yes, ma'am.

14         MR. RICHARD BARTOLOMEI:  Your Honor, leading,

15   suggestive, move to strike and ask for admonition.

16         THE COURT:  Can you read back the question?  I want to

17   take it in context of counsel's objection.

18                    *   *   *

19         *(Whereupon the court reporter read back the record.)*

20                    *   *   *

21         THE COURT:  The objection is overruled.

22   BY MS. THOMPSON:

23   Q.  CFA Linares, with regard to item number 1149, Girl In Tent

24   11-year-old Part One, when was that image of child pornography

25   put on the defendant's laptop computer?

1    A.   On October 19, 2015, ma'am.

2    Q.   You also wrote a supplemental forensic report, Exhibit 6b,

3    correct?

4    A.   That is correct.

5    Q.   You testified earlier that that is an Axiom report.  What

6    is Axiom?

7    A.   Axiom is another software that we use and what it does is

8    it searches for a variety of -- searches for a variety of

9    artifacts to include Internet history.

10   Q.   What type of files are contained in Exhibit 6b?

11   A.   Those are what's called link files.

12   Q.   What's a link file?

13   A.   A link file is a shortcut that is created once a folder or

14   file has been accessed.

15   Q.   Did you specifically look for link files in this case?

16   A.   Yes.

17   Q.   In what folder or all over the computer?

18   A.   All over the computer.

19   Q.   Are the link files in Exhibit 6b from the music folder?

20   A.   Yes, they point to the music folder.

21   Q.   Why did you look in the music folder?

22   A.   Because that's where I found all the child pornography.

23   Q.   Did you find that many of the child pornography files that

24   were saved in the music folder had been viewed on the laptop

25   computer?

Adrian Linares - Examination                    46

1    A.   Yes.

2    Q.   Now, Exhibit 6b contains 94 separate entries, are all of

3    those child pornography?

4    A.   No, ma'am.

5    Q.   Some of them are?

6    A.   Correct.

7    Q.   Specifically with regard to page 41 of that exhibit, record

8    92, page 41 of the exhibit, it's record number 92.

9         What does record number 92 show you?

10   A.   The music folder.

11   Q.   And it shows what about the music folder?

12   A.   It shows that it was opened, that it was accessed.

13   Q.   Accessed.

14   A.   Accessed.

15   Q.   Somebody went onto the computer and opened the music

16   folder?

17   A.   Yes.

18   Q.   Can you tell when it was opened?

19   A.   No.

20   Q.   What about on the same page, record number 93, what does

21   that tell you?

22   A.   That that particular file, that image has been -- was

23   accessed on that in that folder.

24   Q.   What's the name of the file that was accessed?

25   A.   The name of the file is Collection Videos OpenF20.jpg.

1    Q.  So the file listed as open/F20.jpg was the file that was

2    opened?

3    A.  Yes.

4    Q.  And that was stored in the music folder?

5    A.  Yes.

6    Q.  Can you tell that from the file path of the file?

7    A.  Yes.

8    Q.  And that somebody opened that?

9    A.  Yes.

10   Q.  Is that an image that depicts child pornography?

11   A.  Yes.

12   Q.  Let's look at record number 50.  It should be on page 24 of

13   the exhibit.  Is record 50 another file that you can show was

14   opened using the Dell laptop computer?

15   A.  Correct.

16           MR. RICHARD BARTOLOMEI:  Leading, suggestive.

17   BY MS. THOMPSON:

18   Q.  What does record number 50 show you?

19           MR. RICHARD BARTOLOMEI:  Did the Court rule?

20           THE COURT:  She withdrew the question.

21           MS. THOMPSON:  Thank you, Your Honor.

22   A.  That the image Tropical Cuties was accessed.

23   Q.  And does it tell you what type of file it was?

24   A.  The jpeg image.

25   Q.  What about record number 51 right below it?

1   A.  That Tropical Cuties Two/Delay 10-year-old Hard Core Full

2   jpeg image was accessed.

3   Q.  By accessed you mean opened or viewed?

4   A.  Yes.

5           MR. RICHARD BARTOLOMEI:  Objection, Your Honor.

6   Leading, suggestive and asking --

7           THE COURT:  Sustained.

8   BY MS. THOMPSON:

9   Q.  What does hard core mean?

10  A.  Hard core means sexual activity.

11  Q.  There are dates associated in the bookmarked file, like for

12  record 51 there's dates.  What do those relate to?

13  A.  Those dates are associated with the actual image, the

14  actual file.

15  Q.  Does it tell you anything about when the file was accessed?

16  A.  No.

17  Q.  Thank you.  Do they get transferred along with the file?

18  A.  Yes, ma'am, that's correct.

19  Q.  Exhibit Seven is another report that you wrote.

20          MS. THOMPSON:  May I approach, Your Honor?

21          THE COURT:  You may.

22          MS. THOMPSON:  Seven has already been admitted.

23  That's a better copy for you.

24  BY MS. THOMPSON:

25  Q.  As part of your forensic examination of the Dell laptop

Adrian Linares - Examination                    49

1  computer, do you look to see what, if anything, the computer

2  user is searching for?

3  A.   That is correct.

4  Q.   What did you find in this case?

5  A.   What I found in this case was that VK PTHC was input into

6  the computer using the Bing search engine.

7  Q.   So let's break that up a little bit.  Somebody is using

8  Bing?

9  A.   Correct.

10 Q.   What is that?

11 A.   Search engine like Google, type in and look for stuff.

12 Q.   What did they type in that they wanted to find?

13 A.   VK PTHC was typed in.

14 Q.   Are you familiar with PTHC?

15 A.   Yes.

16 Q.   What does that mean.

17 A.   PTHC stands for pre-teen hard core.

18 Q.   Would somebody actually sitting at the computer have to

19 type those specific letters in and hit search?

20 A.   That is correct.

21 Q.   Can you tell from your forensic exam what type of material

22 they were trying to find, like what type of files?

23 A.   Pre-teen hard core.

24 Q.   Can you tell if they were trying to find video files or

25 image files?

Adrian Linares - Examination                    50

1   A.  On this one it's video, it was a video file.

2   Q.  Does that mean the user had to specify that they just

3   wanted video files?

4   A.  That's correct.

5   Q.  When did somebody search for VK PTHC on that computer?

6   A.  On November 14, 2014.

7   Q.  Did you find the term PTHC in any of the file titles that

8   were found on the computer that depicted child pornography?

9   A.  Yes.

10  Q.  Do you remember approximately how many?

11  A.  Approximately 20.

12  Q.  The next page of Exhibit Seven references web pages.  What

13  is that?

14  A.  These are page titles that were -- that I put into this

15  report with the names Little Pre-teens and Youngs List.

16  Q.  Is this information you found on the Dell laptop computer?

17  A.  That is correct.

18  Q.  Does it indicate whether or not somebody went to that

19  website?

20  A.  Yes.

21  Q.  Can you tell when somebody using that computer went to that

22  website or each of the websites?

23  A.  On both of these it's 08/28/2015.

24  Q.  So August 28th of 2015?

25  A.  That is correct.

1   Q.  Now, the first one under the page titled Little Pre-teens,

2   right next to that it lists a URL.  What does URL stand for?

3   A.  A URL is basically just a web address.

4   Q.  And that address is pixienet.tor.kr.  What is TOR?

5   A.  Stands for the onion router and it's pretty much -- it is a

6   worldwide network traffic used by anonymous Internet traffic

7   including the dark web.

8   Q.  And through that website someone visited the page Little

9   Pre-teens?

10  A.  That is correct.

11  Q.  And the one listed right below it, what can you tell from

12  that?

13  A.  Well, the title is Youngs List.

14  Q.  Was this all of the browser history that you found on the

15  computer?

16  A.  No.

17  Q.  Why signify just these two?

18  A.  For the titles.

19  Q.  Why were the titles significant?

20  A.  For the CP that was found on the music folder.

21  Q.  And CP, you mean child pornography?

22  A.  Yes, child pornography.

23         MS. THOMPSON:  I have nothing further.

24         THE COURT:  Is this a good time for our morning

25  recess?

1          MR. RICHARD BARTOLOMEI:  Yes.

2          THE COURT:  We'll take our morning recess, ladies and

3     gentlemen.

4          COURT SECURITY OFFICER:  All rise.

5          *(10:35 a.m., jury exits.)*

6                          *   *   *

7          THE COURT:  You can be excused.  Thank you.

8                          *   *   *

9          *(11:20 a.m.)*

10         COURT SECURITY OFFICER:  All rise.

11         THE COURT:  Please be seated.

12                         *   *   *

13         COURT SECURITY OFFICER:  All rise.

14         *(Jury enters.)*

15         THE COURT:  Please be seated.  All right, the Court

16    would note the presence of the ladies and gentlemen of the

17    jury, also of course all counsel and the parties.  All right,

18    counsel, you may begin your cross-examination.

19         MR. RICHARD BARTOLOMEI:  Thank you very much, Your

20    Honor.

21                        CROSS-EXAMINATION

22    BY MR. RICHARD BARTOLOMEI:

23    Q.  Mr. Linares, Rich Bartolomei.  Good morning.

24    A.  Good morning, sir.

25    Q.  I would like to go to what I believe is Exhibit Six, past

1    the cover page.

2        I would draw your attention to under evidence it has

3    Michalik C1D1, correct?

4    A.   That is correct.

5    Q.   That's the name you give it for your report, correct?  Take

6    a moment to turn to it.

7            (Pause.)

8        Are you ready?

9    A.   Yes.

10   Q.   At the top it says Michalik C1D1, that's the name you give

11   that file, correct?

12   A.   That is correct.

13   Q.   And then you come down says Michalik C1D2, does it not,

14   about the middle of the page?

15   A.   That is correct.

16   Q.   Again the name you give it, correct?

17   A.   That is correct.

18   Q.   That's for your identification, you put that in as the

19   forensic investigator, correct?

20   A.   That is correct.

21   Q.   Coming down to -- and it looks like because I don't see it,

22   so I'll ask you, where does it break into what you claim

23   references the laptop?

24   A.   Right where it says name J Michalik.

25   Q.   But it does not say laptop there, correct?

1  A.  That is correct.

2  Q.  Does not identify it as L1D1, correct?

3  A.  That is correct, it does not.

4  Q.  And if I look throughout this entire report, I'm going to

5  go through it.  I want to go down before we leave that so let

6  me be fair to you.  What does write blocked mean?

7  A.  Write block is a device that we use to attach to the actual

8  device and it keeps it from being altered in any way.

9  Q.  That's the process you described whereby you try to

10  segregate a clean copy of something rather than using the hard

11  drive itself, correct?

12  A.  Correct.

13  Q.  I want to be fair to you.  Now I show a model, 00BEVT-7.

14  What does that reference?  If I may help you I think six up

15  from the bottom.

16      *(Pause.)*

17      Have you had an opportunity, Mr. Linares, to look at that?

18  A.  Yes, sir.

19  Q.  What does that refer to?

20  A.  I don't remember at this time.

21  Q.  I have an exhibit up on the screen that appears to be a

22  picture of a hard drive that was removed, did you remove a hard

23  drive?

24  A.  I personally did not remove that hard drive.

25  Q.  However, that's the hard drive that purportedly comes from

1   the --

2   A.  This is not working, so I can't clearly see.

3         MR. RICHARD BARTOLOMEI:  Let me walk up and show you.

4   BY MR. RICHARD BARTOLOMEI:

5   Q.  I believe you were previously shown that?

6   A.  Yes.

7   Q.  May I have it back please?

8         MR. RICHARD BARTOLOMEI:  May I stand next to him,

9   Judge?

10        THE COURT:  Yes.

11        MR. RICHARD BARTOLOMEI:  Thank you.

12  BY MR. RICHARD BARTOLOMEI:

13  Q.  Would I be correct that what you reference and I ask you

14  about which is I believe 00BEVT doesn't appear on this hard

15  drive, correct?

16  A.  I don't see it.

17  Q.  Does that hard drive have what appears to be an

18  identification number for the hard drive?

19  A.  Serial number?

20  Q.  Yes.  Does it have one?

21  A.  Yes, it has a serial number.

22  Q.  Where is the serial number in your report or am I

23  correct --

24  A.  It is right here.

25  Q.  Thank you.  Anyway the Tableau is a machine that creates an

Adrian Linares - Examination                    56

1   image of the entire hard drive, correct?

2   A.   Say again?

3   Q.   Tableau that is listed, that's a machine that creates the

4   image of the entire hard drive?

5   A.   The Tableau is the write blocker that is attached to the

6   device.

7   Q.   And that's how --

8   A.   That just keeps it from being altered.

9   Q.   Okay.  Then there's another method that you used to

10  reproduce all of the data on the DVD -- excuse me, on the

11  computer and that's what you use for your forensic exam?

12  A.   Yes.

13  Q.   Turning if you would to page three of the exhibit, I am

14  correct, am I not, that under subparagraph one, subparagraph

15  two, there is no identification that any of that information is

16  not referring to the L1D1 laptop, isn't that true?

17  A.   Can you rephrase your question?

18  Q.   Sure.  You were asked about the sources of particular

19  information, one was about a desktop, correct?

20  A.   Correct.

21  Q.   One was about a laptop, correct?

22  A.   Correct.

23  Q.   All of the information, though, that you chose to put in

24  your report under operating information, OS artifact, account

25  users, it doesn't show that it doesn't come from L1D1, does it?

1    A.   One and two come from the desktop.

2    Q.   Not my question, sir.  The report does not inform those who

3    are reviewing it or having to use it that it does not come from

4    the laptop, isn't that true?

5    A.   It does as the laptop is labeled L1D1.

6    Q.   Sir, OS info isn't labeled, C1D1 or C2, correct?

7    A.   That is correct.

8    Q.   That's what I'm asking.

9    A.   Okay.

10   Q.   Account users isn't listed C1D1 to differentiate it from

11   L1D1, correct?

12   A.   That is correct.

13   Q.   And you talked about Windows having a remote user program,

14   correct?

15   A.   Correct.

16   Q.   And you said that it was disabled, correct?

17   A.   Correct.

18   Q.   But Log Me In is a different program, correct?

19   A.   Log Me In?

20   Q.   Log Me In.

21   A.   I've never heard of that.

22   Q.   So if the computer had Log Me In and that allowed remote

23   use, you simply are not aware of that program's existence or

24   whether it was on this computer, correct?

25   A.   Say that again?

1  Q.  You're not aware what Log Me In is, correct?

2  A.  That is correct.

3  Q.  So your forensic investigation did not disclose to you or

4  reveal to you whether it had Log Me In in the computer, that's

5  a program, you just don't know, correct?

6  A.  Correct.

7  Q.  Would you agree that if there were an alternative remote

8  user program, you didn't detect it?

9  A.  I did not detect another program.

10  Q.  You didn't look for it, though, right?

11  A.  For another program?

12  Q.  Yeah.

13  A.  No.

14  Q.  If there was such a program, a person could remotely use

15  the computer from a different location, correct?  That's what

16  the purpose of those programs is.

17          MS. THOMPSON:  Objection, calls for speculation.

18          THE COURT:  Sustained -- wait a minute.  Overruled.

19  He can answer that question.  He's supposed to know this stuff.

20  BY MR. RICHARD BARTOLOMEI:

21  Q.  The purpose of a program that allows a remote user to

22  access a computer, that's the very purpose of it is to allow

23  you to use it so that you don't have to physically be with the

24  computer with your hands on the keyboard, you can use it from a

25  remote location, correct?

1   A.   Correct.

2   Q.   In this particular instance, I want to go to your system

3   info on the L1D1, right?  Third paragraph down.  The registered

4   owner is David S, correct?

5   A.   That is correct.

6   Q.   Not Jeff Michalik, correct?

7   A.   Correct.

8   Q.   And you would agree that that identifies the registered

9   owner of the Windows 10 installation that you testified about,

10  correct?

11  A.   It is a registered owner.

12  Q.   It's the only registered owner you report?

13  A.   Yes.

14  Q.   And the install date is clear back on 8/27/15 and the

15  shutdown date is 10/21/15, correct?

16  A.   That is correct.

17  Q.   Now, with regard to the user registry, that's your

18  paragraph four, you were the one who puts in at the top in

19  boldface User Registry, and it's misspelled, but it was

20  intended to be Michalik, correct?

21  A.   Correct.

22  Q.   Again L1D1, you now tell us is the laptop, correct?

23  A.   That is correct.

24  Q.   An administrator, the administrator of that laptop,

25  according to your last log on has a security ID, does it not,

1    you have a line there of data?

2    A.   Yes.

3    Q.   Last log on is 11/20/10, correct?

4    A.   That is correct.

5    Q.   If a computer were completely wiped meaning all of the data

6    was removed, you would agree that it would wipe out the

7    operating system, correct, a complete wipe?

8    A.   If it was completely wiped.

9    Q.   Yeah.  If it's completely wiped, it has no operating system

10   and no files, correct?

11   A.   Correct.

12   Q.   No temporary files, correct?

13   A.   If it's completely wiped, yes.

14   Q.   No cache, correct?

15   A.   Correct.

16   Q.   It has no data on it at all, correct?

17   A.   Correct.

18   Q.   Yet when you looked at this computer forensically, your

19   examination showed that you had an administrator from clear

20   back on 11/20 of '10, correct?

21   A.   Yes.

22   Q.   So obviously the computer was not completely wiped,

23   correct?

24   A.   Correct.

25   Q.   It also shows the other administrator as David S, does it

1  not?

2  A.  Yes, it does.

3  Q.  And it shows their last log on is 10/21/15, correct?

4  A.  That is correct.

5  Q.  Now, when you look at a profile path, a profile path you

6  see to the far right-hand side, same boxes?

7  A.  Okay, right.

8  Q.  It shows C, users backslash David S.  That would be the

9  profile path of the administrator, correct?

10  A.  That is correct.

11  Q.  Turn with me, if you will, to page four, subparagraph five,

12  correct, are you there?

13  A.  I'm good.

14  Q.  You show a number of different USB devices, do you not?

15  A.  Yes.

16  Q.  You show several users, correct?

17  A.  That is correct.

18  Q.  Now, are you claiming that's not on L1D1 or is it?

19  A.  No, that is not L1D1.

20  Q.  But of course your report does not say it, does it?

21  A.  No, it doesn't.

22  Q.  And again you have last connected for each of these USB

23  devices and you have dates on the right-hand side, correct?

24  A.  That is correct.

25  Q.  All of those predate the installation of Windows 10,

1   correct?

2   A.   Are we talking about number five?

3   Q.   Number five, last connected.

4   A.   Okay.

5        MS. THOMPSON:  Your Honor, I going to object.  Windows

6   10 isn't on that computer.  That's confusing --

7        MR. RICHARD BARTOLOMEI:  I can clarify the question.

8   I'll withdraw it.

9        THE COURT:  All right.

10  BY MR. RICHARD BARTOLOMEI:

11  Q.   Windows 10 from the prior page, you have an installation

12  date?

13  A.   Windows 10 on L1D1 has an installation date of 08/27/15.

14  Q.   Looking down the right-hand column of last connected, all

15  of the dates listed there with the exception of Dell USB mass

16  storage all predate the installation of Windows 10 on the

17  laptop, correct?

18       MS. THOMPSON:  Your Honor, I'm going to object again.

19  One is referring -- item four is referring to the laptop, item

20  five is referring to the desktop.

21       THE COURT:  The objection is sustained.

22       MR. RICHARD BARTOLOMEI:  With respect, Your Honor --

23       THE COURT:  We need to keep them separate.  There's

24  going to be too much confusion.

25  BY MR. RICHARD BARTOLOMEI:

1   Q.  Well, the point is you were able to retrieve that data, so

2   once again this computer was not completely wiped, correct?

3          THE COURT:  Which computer?

4          MR. RICHARD BARTOLOMEI:  The L1D1.

5          THE COURT:  Which one is that?

6          MR. RICHARD BARTOLOMEI:  That's the laptop.

7          MS. THOMPSON:  The question, though, referred to

8   information on the desktop.

9          THE COURT:  Let's start -- why don't you just flat out

10  re-ask him the questions because that's what you're interested

11  in, the laptop, right, counsel?

12         MR. RICHARD BARTOLOMEI:  Actually I'm interested in

13  the confusion in the report, but I'll go back and do this a

14  little more simpler.

15         THE COURT:  The confusion is in the question

16  because -- there may be confusion in the report, that's for the

17  jury to decide, but right now I'm confused by the question

18  because I'm not sure whether you're asking him about the laptop

19  or you're asking him about the other one.

20         MR. RICHARD BARTOLOMEI:  We share the confusion of the

21  Court, but I'm trying to clean that up.

22         THE COURT:  We may be confused about different things.

23  Why don't you go ahead.

24  BY MR. RICHARD BARTOLOMEI:

25  Q.  Paragraph five, I believe your testimony was refers to a

1  desktop, correct?

2  A.  Paragraph five, yes.

3  Q.  Okay.  So you're saying I didn't retrieve that data from

4  L1D1, correct?

5  A.  Paragraph five belongs to the desktop.

6  Q.  Thank you.  Now, going to six, six does refer to L1D1, does

7  it not?

8  A.  That is correct.

9  Q.  That's the laptop, correct?

10  A.  That is correct.

11  Q.  The only user that is shown for any of the USB devices is

12  David S, correct?

13  A.  That is correct.

14  Q.  Do you know from any source whether David S was the prior

15  owner of this laptop?

16  A.  I don't know who David S is.

17  Q.  And let me ask, you have never been asked to forensically

18  examine any computer owned by a person David S, correct?

19  A.  I don't know who David S is.

20  Q.  You have not examined any laptops belonging to any other

21  person purportedly other than Mr. Michalik, correct?

22  A.  All the devices I examined belong to Mr. Michalik or came

23  out of his house.

24  Q.  And that's fair.  Last connected, third line down, generic

25  multi-card USB device David S, then it has last mapped drive,

1    it's an H drive, correct?

2    A.  Yes, that is an H drive.

3    Q.  Is that something you assign to it as the forensic

4    investigator or the computer assigns it?

5    A.  I don't, no.

6    Q.  Now, it shows that as 10/21/15 at 9:05 p.m., correct?

7    A.  That is correct.

8    Q.  And item number four, David S, 8/31/15, correct?

9    A.  That is correct.

10   Q.  9/18/15 goes with item number five, correct?

11   A.  That is correct.

12   Q.  And it's on a G drive, correct?

13   A.  That is correct.

14   Q.  And finally, number seven an Android phone is 9/18/15,

15   David S, correct?

16   A.  That is correct.

17   Q.  If a person has remote access to a computer, they can

18   operate the computer completely from another computer, can't

19   they?

20   A.  That is correct.

21   Q.  They can move any file they wish, correct?

22   A.  Yes.

23   Q.  They can download information, correct?

24            *(Pause.)*

25       I note your pause.

1   A.   Yes.

2   Q.   They can basically use the host computer like it was their

3   server and operate it in all facets even though they're not

4   there with their hands on the computer and they can do it from

5   a remote access, correct?

6   A.   That is correct.

7   Q.   Now, let's turn to your examination report and we're going

8   to go to page five, if you would.  Let's look at the item path,

9   all right.  See J Michalik is the first thing with backslash?

10  A.   That, I do.

11  Q.   That's put into this line of data by you, correct?

12  A.   The name.

13  Q.   Yes, the name.  Then it has D drive.  And a D drive, would

14  you agree, indicates some form of external storage device, not

15  the computer's C drive, correct?

16  A.   Negative.

17  Q.   Negative?

18  A.   That is the drive that the software gave it.

19  Q.   That's what I'm saying.  It's not from the computer, the

20  software gave it that, correct?

21  A.   Correct.

22  Q.   Okay.  And the user comes back as David S, correct?

23  A.   That is correct.

24  Q.   If I look through all of these hundreds and I believe there

25  are hundreds, that will be the same pathway for each one

1   opening, correct?

2   A.  Correct.

3   Q.  Not one single one of these entries will show Jeff Michalik

4   as the user in that chain of data, correct?

5   A.  These file paths do not contain the name Jeff Michalik.

6   Q.  That's what I'm asking.  So not one single indication in

7   this report or from your forensic examination that's in this

8   report establishes that Jeffrey Michalik ever created a file,

9   correct?

10  A.  Correct.

11  Q.  That he ever wrote on the file, last written, correct?

12  A.  Correct.

13  Q.  Or that he ever accessed the file, correct?

14  A.  Yes, it does not state that Jeff Michalik accessed these

15  files.

16  Q.  Well, the software does the search, correct?

17  A.  The search for?

18  Q.  The search that generates this report.

19  A.  I look at all these images and select these images for this

20  report.

21  Q.  Okay.  Then again, even you selecting these images, no

22  forensic evidence is revealed to you through the use of your

23  search and your forensic software that establishes that Jeff

24  Michalik accessed, say, item seven?

25  A.  No.

1    Q.   Correct?

2    A.   Correct.

3    Q.   All right.  And if I go through each and every one of them,

4    your response will be the same, correct?

5    A.   Right.

6    Q.   Now, going to the right of David S and then it says music,

7    just using number seven which is at the top, is that a date,

8    SO70809?

9    A.   I don't know what that is.

10   Q.   It's all right.  Do you know what Post 07 is?

11   A.   I do not know what that means.

12   Q.   And obviously the title, that's assigned not by your

13   forensic software, correct?

14   A.   No.

15   Q.   It's not assigned even by the computer, correct?

16   A.   No.

17   Q.   So this would seem to indicate, if I'm not mistaken --

18   well, let me just ask this question.  Nothing in this entire

19   report shows that there was ever anything downloaded using the

20   Internet so that this data, this information was introduced

21   into the computer using the Internet, isn't that true?

22   A.   On this report?

23   Q.   On this report.

24   A.   Well, minus the Mozilla, the Mozilla Firefox images that

25   are on here.

1    Q.  Sir, the Mozilla Firefox that you refer to, that doesn't

2    show that the defendant used Mozilla Firefox --

3              MS. THOMPSON:  Objection, Your Honor, argumentative.

4              THE COURT:  Sustained.

5              MR. RICHARD BARTOLOMEI:  Your Honor --

6              THE COURT:  No.

7              MR. RICHARD BARTOLOMEI:  Can I ask whether his report

8    shows --

9              THE COURT:  Yes.  If you want to rephrase your

10   question, you can ask that question.

11   BY MR. RICHARD BARTOLOMEI:

12   Q.  Here is my question.  Same as with the earlier one, nothing

13   on the Mozilla Firefox shows Jeff Michalik as the user who

14   downloads anything?

15   A.  No.

16   Q.  Thank you.

17      And again a remote user who doesn't have to identify

18   themselves could use the computer by accessing the computer and

19   using it just as if they were there at the computer and they

20   could make those searches, couldn't they?

21             MS. THOMPSON:  Objection, Your Honor, asked and

22   answered, it's cumulative.

23             THE COURT:  Sustained.  You're re-asking -- you've

24   already asked that question.

25             MR. RICHARD BARTOLOMEI:  This is with regard to the

 1   Mozilla Firefox.

 2           THE COURT:  I think you asked it with respect to the

 3   computer and the computer has the Firefox on it.

 4           MR. RICHARD BARTOLOMEI:  As long as we established

 5   that, I'm fine.

 6   BY MR. RICHARD BARTOLOMEI:

 7   Q.  Let me ask it a different way.  Going through all of these

 8   pathways for each, the only named user is David S, correct, all

 9   of them?

10   A.  In all these file paths David S is the name.

11   Q.  Now, I'm going to turn to 6b.  Do you have a copy, sir?  I

12   didn't know if you had it in the book.

13       (Pause.)

14   A.  It only goes to seven.

15           MR. RICHARD BARTOLOMEI:  May I approach, Your Honor?

16           THE COURT:  You may.

17   BY MR. RICHARD BARTOLOMEI:

18   Q.  Do you have that manual in front of you now?

19   A.  No, 6b is not in here.

20           MS. THOMPSON:  Your Honor, I have an extra copy.

21   BY MR. RICHARD BARTOLOMEI:

22   Q.  There you go.  Take a moment and look at that.  And let me

23   know when you're ready.

24   A.  Okay.

25   Q.  I want to turn to what would be page two because the page

1  one says Forensic Examination Report, is that what it says?

2  A.  Okay.

3  Q.  And that was generated just August 20th of 2019, correct?

4  A.  That is correct.

5  Q.  Long after the report contained in Six was generated,

6  correct?

7          MS. THOMPSON:  Objection, irrelevant.

8          THE COURT:  Sustained.

9  BY MR. RICHARD BARTOLOMEI:

10  Q.  Do you know when you generated Six?

11          MS. THOMPSON:  Objection, asked and answered.

12          MR. RICHARD BARTOLOMEI:  I don't believe I ever asked

13  that.

14          THE COURT:  Overruled.

15  BY MR. RICHARD BARTOLOMEI:

16  Q.  Do you know when you generated Six?

17  A.  I believe it was December of 2015 when I finished.

18  Q.  Thank you.  Now, turning to 6b again, you have the gray

19  rectangle to the left of each and then the data or information

20  to the right, correct?

21  A.  Okay.

22  Q.  Looking at linked path, computer, that's what the C stands

23  for, correct?

24  A.  Yes.

25  Q.  Users, correct?

1  A.  Yes.

2  Q.  Once again it's David S, correct?

3  A.  That is correct.

4  Q.  I will not find if I look through this entire file, this

5  entire report anything that shows Jeff Michalik as the user,

6  correct?

7  A.  Correct.

8  Q.  Correct?

9  A.  Correct.

10  Q.  Again if someone doesn't have to log in under a particular

11  name using a remote access, it wouldn't show up in your data or

12  your report, correct?

13  A.  If somebody logged in?

14  Q.  But didn't have to identify themselves because they have

15  the Log Me In or the Windows program operating, they can

16  operate that computer without any footprint that they had ever

17  been there, correct?

18          MS. THOMPSON:  Your Honor, I object.  He already said

19  there was none of that on this computer.

20          THE COURT:  Sustained.

21          MR. RICHARD BARTOLOMEI:  I'm not sure what he said

22  there wasn't any of.  That's why I asked.

23          THE COURT:  You can ask him that question.  That's a

24  different question than you previously asked.

25  BY MR. RICHARD BARTOLOMEI:

```
 1   Q.  A remote user that doesn't have to identify themselves
 2   would likewise not appear as a user in any one of these files,
 3   correct?
 4           MS. THOMPSON:  Same objection and it calls for
 5   speculation.
 6           THE COURT:  Yes, without the foundation it would call
 7   for speculation.  The objection is sustained.
 8   BY MR. RICHARD BARTOLOMEI:
 9   Q.  Your software is supposed to tell you who the users are
10   that seek to either input access or use the computer, that's
11   what the software does, right?
12   A.  Yes.
13   Q.  So if the software cannot find a user because the computer
14   doesn't have data that shows who the user was, there's no way
15   for you to know as a forensic investigator and no way for the
16   software to report it, correct?
17   A.  Correct.
18   Q.  A remote user could, in essence, be invisible to the
19   computer, correct?
20           MS. THOMPSON:  Objection, Your Honor.
21           THE COURT:  "Could" is just calling for speculation.
22   Depends upon a whole series of factors that aren't factored
23   into your question.
24   BY MR. RICHARD BARTOLOMEI:
25   Q.  Well, let's make this even simpler.  Your forensic report
```

1   in 6b does not identify any specific user, correct?

2   A.  My forensic report --

3   Q.  Excuse me, other than David S?

4   A.  Correct.

5   Q.  Now, let's go back to Six, if we could, which is the prior

6   report.  Take a look at number seven or eight, whichever one

7   you choose.  It shows, does it not, file created?

8   A.  Yes.

9   Q.  That is the date that it comes into the computer, correct?

10  A.  That is correct.

11  Q.  Last accessed is also the time that the computer shows

12  something came into it, correct?

13  A.  Correct.

14  Q.  So if the times are always the same, there's nothing that

15  indicates, using the example, say, eight, 11:05:35 a.m., file

16  created, right?

17  A.  Well, the file created date is the date that it was

18  created, that it was brought into that computer.

19  Q.  Yes.  Last accessed is the exact same instance, correct?

20  A.  The last access --

21  Q.  Let me ask my question.  Last accessed is the time any

22  action was taken with regard to this file in the computer,

23  correct?

24  A.  The last access date is -- the file created date is what is

25  true.

1    Q.  The last access date is false?

2    A.  The last access date, I mean --

3         *(Pause.)*

4         The last access date is really not -- it's not a true time.

5    Q.  Excuse me.  Not true time?

6    A.  Right.

7    Q.  Yet your software file after file after file after file

8    reports file created last accessed at the identical time,

9    doesn't it?

10   A.  Right.

11   Q.  And if somebody else opened that file, moved that file,

12   saved that file, you would have a different access time as last

13   accessed, isn't that true?

14   A.  The file created date is the most important date here and

15   that's what I focus on is the file created date.

16            MR. RICHARD BARTOLOMEI:  Your Honor.

17            THE COURT:  No, he's answered the question.

18   BY MR. RICHARD BARTOLOMEI:

19   Q.  My question was different.  If someone takes another action

20   using that computer, the last access date would no longer match

21   the file created date, isn't that true?

22   A.  Say again?

23   Q.  If someone else -- let's lay it out very slowly and

24   clearly.  File created is when it comes into the computer,

25   correct?

1  A.  Yes.

2  Q.  Last access date for all these files you've acknowledged is

3  identical to the time it comes into the computer, correct?

4  That's all these files, correct?

5  A.  Say again?

6  Q.  Sir, look at eight please.  I don't want to be accused of

7  asking and answering, but I thought we went through and said in

8  every one of these files, all several hundred, you're going to

9  find files that show created and last accessed at the exact

10  same moment to the second, correct?

11  A.  Yes, I see that.

12  Q.  Okay.  If somebody did anything with regard to that

13  particular file, then the last access date would have to be

14  later and different than the date and time it comes into the

15  computer, isn't that true?

16  A.  I don't know the answer to that.  All I know is the file

17  created date is the important date for me.

18  Q.  So you don't know what last accessed means?

19  A.  I know what last accessed means, but that's not the date --

20  I don't worry about the last access date.  I worry about the

21  date that it was on the computer.

22  Q.  Sir, if you know what last accessed means, then you should

23  be able to tell us --

24          MS. THOMPSON:  Objection, Your Honor, argumentative.

25          THE COURT:  That is an argumentative question.

1  BY MR. RICHARD BARTOLOMEI:

2  Q.  Last accessed, what's it mean?

3  A.  Last accessed is -- if you're asking what it means, last

4  access is the last time I do something or I see something or I

5  use something.

6  Q.  With the computer, correct?

7  A.  True.

8  Q.  So the entry time, file created matches the last access

9  time, that's the act you're talking about, correct?

10  A.  It does match, yes.

11  Q.  So if anybody does anything after it literally physically

12  comes into the computer, you would agree it will change the

13  last access date and time, correct?

14  A.  I don't think so.

15  Q.  But you don't actually know, correct?

16  A.  I don't know.

17  Q.  Now, turning to 6b, I believe you were asked about item 43.

18  Do you remember?  Do you see it?

19  A.  Yes.

20  Q.  On your 6b.  And I show that as the gray rectangle with the

21  number 43 above it.  Going down the list, once again the linked

22  path, C: backslash users is David S, correct?

23  A.  That is correct.

24  Q.  Am I correct that if I look through every single one of

25  these 94 files, the linked path will not show Jeff Michalik as

1    the user?

2            MS. THOMPSON:  Your Honor, I'm going to object to this

3    line of questioning.  The witness has already testified that's

4    the only user account.

5            THE COURT:  Sustained.

6            MR. RICHARD BARTOLOMEI:  If they're willing to

7    stipulate to that, okay.

8    BY MR. RICHARD BARTOLOMEI:

9    Q.  Let me ask it a different way.  Nothing in this report

10   shows that Jeff Michalik was the user, correct?

11           MS. THOMPSON:  Objection, asked and answered.

12           THE COURT:  Sustained.

13   BY MR. RICHARD BARTOLOMEI:

14   Q.  Now, with regard to the information that comes in in 6a --

15   excuse me, the report which is Six, you would agree that in

16   looking at it, it appears to be the majority of it two large

17   inputs of information in a compressed file, correct?

18   A.  Say again?

19   Q.  Archive file, do you know what an archive file is?

20   A.  I know what an archive is.

21   Q.  I'm asking you because I've got to make a record.  What's

22   an archive file?

23   A.  Folders that are saved for later, archived.

24   Q.  There are two large, for lack of a more articulate term,

25   dumps of information on this computer, one is on the 18th and

Adrian Linares - Examination                79

1  one is on the 19th, correct?

2  A.  That is correct.

3  Q.  One is approximately 30 minutes long and one is over an

4  hour long, correct?

5  A.  That is correct.

6  Q.  Neither one of those inputs of data into the computer come

7  through the Internet, isn't that true?

8  A.  Minus the Mozilla, the Firefox.

9  Q.  So the answer is the data that comes in on those dates,

10  18th, 19th, do not come through the Internet, correct?

11  A.  Correct.

12  Q.  Nobody logged on, pressed a button and had it downloaded

13  into the computer, correct?

14  A.  It was downloaded into the computer.

15  Q.  Term of art.  Downloading, when I use it means comes

16  through the Internet as opposed to some external storage.

17  That's how I use it, okay.  Do you understand what I'm saying?

18  A.  Right.

19  Q.  It's apparent that the data that is put into the computer

20  on the 18th and the 19th does not come from the Internet to the

21  computer, correct?

22  A.  Well, yes, because we showed some of them on the link

23  files.

24  Q.  Sir, I'm talking about putting the data into the computer.

25  Do you understand?

1    A.   Right.

2    Q.   There is not on the 18th and the 19th all these files that

3    are in Six, they all show sequential dates and times within

4    seconds of each other, correct?

5    A.   That is correct.

6    Q.   That data goes into the computer not through the Internet,

7    but through an external storage device, what you referred to I

8    believe before as a USB device, is that correct?

9    A.   Yes.

10   Q.   That's what I was trying to get.  Somebody plugs something

11   into the computer and transmitted the data to the computer,

12   correct?

13   A.   There was multiple USB devices plugged in.

14   Q.   On the 18th and 19th you have no forensic evidence that the

15   manner in which the computer received this information came

16   through the Internet, correct?

17           MS. THOMPSON:  Your Honor, I'm going to object.  The

18   witness has already testified he doesn't know how the files got

19   there.

20           THE COURT:  Sustained.

21   BY MR. RICHARD BARTOLOMEI:

22   Q.   Your report, and I'm going to turn to 1174 - 1219, which I

23   believe -- strike that.  Go a different place.

24       6b, let's turn to 43, which should be page 23.  And let me

25   know, sir, when you've had a chance to get there.  It seems to

1   be record of 43.

2       You see the gray rectangle?

3   A.  What number?

4   Q.  Forty-three.

5   A.  Okay.

6   Q.  Tags says bookmark.  What puts the words "bookmark" in, the

7   software?

8   A.  Yes.

9   Q.  We've already gone through the link path, every one of the

10  link paths shows David S as the user, correct?

11  A.  Correct.

12  Q.  You show a target file creation date, correct?

13  A.  Yes.

14  Q.  This one is 10/9/2015, correct?

15  A.  Okay.

16  Q.  Now, you show a target file last accessed, 10/9/2015,

17  correct?

18  A.  Correct.

19  Q.  The target file itself was last modified 7/21 of 2013,

20  correct?

21  A.  Yes.

22  Q.  So you would agree that the file itself, whatever the

23  images are, whatever they are, predates entry into this

24  computer, correct?

25  A.  Say again?

1  Q.  Predates entry into this computer by a couple years,

2  correct?

3          MS. THOMPSON:  Your Honor, objection.  That's a

4  misstatement of his testimony.

5          MR. RICHARD BARTOLOMEI:  I didn't ask him -- it's not

6  a misstatement of his testimony.  I'm asking him a direct

7  question.

8          MS. THOMPSON:  Well, there isn't any evidence as to

9  when that file was put on the computer.

10          MR. RICHARD BARTOLOMEI:  If they will stipulate that

11  there's no evidence when it was put on the computer --

12          MS. THOMPSON:  Not that particular file.  That exhibit

13  shows that file was accessed and viewed on the computer, but

14  there's --

15          THE COURT:  The objection is sustained.  She's

16  correct.

17  BY MR. RICHARD BARTOLOMEI:

18  Q.  Target file last accessed would be the last time any action

19  was taken with the computer involving this file, wouldn't you

20  agree?

21          MS. THOMPSON:  Your Honor, I'll object to this too.

22  The witness has already testified he doesn't know that last

23  accessed would change anything.

24          THE COURT:  Sustained.  We're going around in circles,

25  counsel.  You've already covered all of this area.

1    BY MR. RICHARD BARTOLOMEI:

2    Q.  You talked about data that's in the cache, remember on

3    direct?

4    A.  Yes.

5    Q.  And I believe you testified that if it was on the cache, a

6    user could retrieve it, correct?

7    A.  Yes.

8    Q.  But if it's in the cache, it's not in a named identified

9    file, isn't that true?

10   A.  Say again?

11   Q.  It's not in a named identified file that I could hit the

12   button and open the file, it's in the cache, correct?

13   A.  Correct.

14   Q.  So a person may not even know that the data is in the

15   cache, correct?

16   A.  Yeah, I mean he may not know, yes.

17   Q.  And without forensic software, he can't as a user retrieve

18   it from the cache, isn't that true?

19   A.  Say again?

20   Q.  He can't retrieve it from the cache without the forensic

21   software, correct?

22   A.  I don't --

23   Q.  You don't know?

24   A.  I don't agree.

25   Q.  You don't agree?

Adrian Linares - Examination                84

1   A.  Right.

2   Q.  If it doesn't have an identifiable file name to a person

3   sitting there at a computer, they may not even know it's in the

4   cache, you've already acknowledged that, correct?

5   A.  Correct.  If he --

6   Q.  Excuse me.  So if it's in the cache --

7   A.  If he doesn't know it's in the cache or what the cache is,

8   then no, he won't.

9   Q.  That's what I was getting at.  Thank you.  So obviously you

10  can't retrieve what you don't know about, right, correct?

11  A.  Right.

12  Q.  Let me go back to page one of Six, if I could.  Actually

13  it's page two, I believe it's past the cover sheet.

14  A.  Say again?

15  Q.  It's page two actually, the cover sheet is page one of Six.

16  In blue at the top it says Evidence, correct?

17  A.  Yes.

18  Q.  I want you to go all the way down third to the bottom, File

19  Integrity, correct?

20  A.  That's correct.

21  Q.  It shows that your software found five errors, correct?

22  A.  That is correct.

23  Q.  We don't know which errors those are, correct, your report

24  doesn't tell us, correct?

25  A.  Correct.

1   Q.  We don't know what type of error, correct?

2   A.  Correct.

3           MR. RICHARD BARTOLOMEI:  Your Honor, did you plan to

4   go through lunch?

5           THE COURT:  No, I don't know how much further you

6   have.

7           MR. RICHARD BARTOLOMEI:  I do have a bit more.  This

8   might be a time to break.

9           THE COURT:  We'll take our lunch recess.

10          COURT CRIER:  All rise.

11          *(11:57 a.m.)*

12                          *   *   *

13          *(1:37 p.m.)*

14          COURT SECURITY OFFICER:  All rise.

15          THE COURT:  Please be seated.

16                          *   *   *

17          COURT SECURITY OFFICER:  All rise for the jury.

18          *(1:38 p.m.)*

19          THE COURT:  Please be seated.  The Court would note

20  the presence of the ladies and gentlemen of the jury as well as

21  counsel and the parties.  All right, sir, you may continue your

22  examination.

23          MR. RICHARD BARTOLOMEI:  Thank you very much, Your

24  Honor.

25          THE COURT:  I should really say cross-examination.

1   BY MR. RICHARD BARTOLOMEI:

2   Q.   Exhibit Six, it should be five.  Mr. Linares, good

3   afternoon.

4   A.   Good afternoon.

5   Q.   Looking at page five of Exhibit Six, you were asked about

6   the last three letters of an item path and it showed AVI,

7   looking at number seven.  Yes, you see it?

8   A.   I see it.

9   Q.   That's a video, correct?

10   A.   Yes.

11   Q.   You would agree that if the file is created and last

12   accessed with no elapsed time, a person couldn't view the

13   video, correct?

14   A.   They both have the same time, yes.

15   Q.   Well, you couldn't view it in zero seconds, correct?

16   A.   Correct.

17   Q.   In contrast, starting at page 23, I believe you had a

18   different division and those all end in JPG, those are images,

19   correct?

20   A.   Correct.

21   Q.   But likewise, they don't show any elapsed time between file

22   created and last accessed, correct?

23   A.   It's the same time.

24   Q.   So there's no elapsed time, it's the same time, correct?

25   A.   It's the same time, but the last access -- what happens

1    with the last access, Windows doesn't update the last access

2    date and time.

3    Q.  Sir --

4          MR. RICHARD BARTOLOMEI:  I'm going to move to strike

5    that as a voluntary statement beyond the scope of the question

6    I asked and move to strike it.

7          THE COURT:  Well --

8          MR. RICHARD BARTOLOMEI:  I did not ask it.

9          THE COURT:  I'll strike, I agree.

10   BY MR. RICHARD BARTOLOMEI:

11   Q.  Now, I want to turn to if we could Exhibit Seven.  That

12   will be page one of one, parsed search queries.  Do you see

13   that, sir?

14   A.  I do.

15   Q.  What does parsed mean?

16   A.  Looked into.

17   Q.  Now, you've had looks like a number 43 to the left,

18   correct?

19   A.  To the left?

20   Q.  Record, straight down.

21   A.  I don't see it.

22   Q.  Do you see it, sir?

23   A.  No, I don't.

24          MR. RICHARD BARTOLOMEI:  May I approach?

25   BY MR. RICHARD BARTOLOMEI:

```
 1   Q.  No wonder you couldn't see it.  It's not there.  I'll skip
 2   the front page.  Take a look at it now, sir.  Do you see 43?
 3   A.  Yes.
 4   Q.  Then you see "search term", correct?
 5   A.  Yes.
 6   Q.  Am I correct that all this shows is that someone made a
 7   search, correct?
 8   A.  Someone searched that, someone put those search terms in
 9   there and searched, yes.
10   Q.  Nothing shows that Jeff Michalik made that search, correct?
11   A.  No.
12   Q.  Meaning yes, it does not?
13   A.  There is no Jeff Michalik name on here.
14   Q.  And below the first line that begins HTTP, do you know what
15   HTTP means?
16   A.  I forgot.
17   Q.  Hyper text markup language, does that sound right?
18   A.  Okay.
19   Q.  It's just an acronym, right?
20   A.  Okay.
21   Q.  All of the information below that starting with Q, ending
22   with RESTAB, that is all supplied by Bing, correct?
23   A.  Where?
24   Q.  All of the information starting with Q under the URL
25   column, starts with Q equals and then it ends with RESTAB.  Do
```

1  you see where I'm talking about?

2  A.  Yeah, I see.

3  Q.  That's all labeled or put into the data, let me make that a

4  little clearer.  Bing is the one who puts down all that data,

5  not the individual user?

6  A.  According to the search term, yes.

7  Q.  That's what I'm saying, according to the search term.

8      Now, rebuilt web pages, that would be I believe page one of

9  one.  What's a rebuilt web page?

10  A.  Well, all it means is it has a data containing to rebuild

11  the web pages, according to the software.

12  Q.  So an individual looking at their own computer without

13  forensic software wouldn't be able to rebuild the web page,

14  correct?

15  A.  Correct.

16  Q.  That requires specialized software, correct?

17  A.  Correct.

18  Q.  And incidentally just out of curiosity, a number of your

19  reports, well, two of them exact, show two different search

20  devices.  I believe one of them is EnCase and there's another

21  one mentioned.  Do you know what that is?

22  A.  Are you talking about the Axiom report.

23  Q.  Well, there are actually three reports, but let's go to

24  Six.  How many different software devices did you use?

25  A.  I used EnCase, Internet Evidence Finder and Axiom.

1   Q.  Where would that be listed on your evidence opening page

2   describing your activities, or am I correct it does not?

3   A.  My opening page?

4   Q.  Did you mean first page?

5   A.  I don't understand your question.

6   Q.  You don't understand my question?

7   A.  No, I don't.

8   Q.  Where in Exhibit Six does it show or reveal the software

9   you used to make the forensic examination?

10          MS. THOMPSON:  Objection, relevance.

11          THE COURT:  Sustained.

12          MR. RICHARD BARTOLOMEI:  Can we reserve offer after?

13          THE COURT:  Yes.

14          MR. RICHARD BARTOLOMEI:  Thank you.

15  BY MR. RICHARD BARTOLOMEI:

16  Q.  Now, turning back to Seven, rebuilt web pages.  And let me

17  just ask so I have my train of thought and perhaps bring us

18  back.  I think you answered that an individual user that

19  doesn't have the forensic software couldn't rebuild the web

20  page from the data that's in the computer, correct, that

21  requires specialized software, correct?

22  A.  Correct.

23  Q.  Now, with regard to the UHL, what does UHL stand for?

24  A.  URL.

25  Q.  Is it UH or UR?

1   A.  I see URL.

2   Q.  What does it stand for?

3   A.  Don't remember, slipped my mind.

4   Q.  Now, then it has a column entitled Created Date/Time, does

5   it not?

6   A.  Yes, it does.

7   Q.  And as I look through this, it does not ever tell you who

8   was involved -- excuse me, let me strike that.

9       Are you claiming that somehow this shows some kind of a

10  search?

11  A.  Yes.

12  Q.  Doesn't show who made the search, correct?

13  A.  No.

14  Q.  Is this search, does that mean somebody downloaded anything

15  or am I correct it does not?

16  A.  That is a time and that is the date that that URL was

17  searched.

18  Q.  My question was different.  It doesn't show that anybody

19  searched, saw some images, downloaded them into the computer,

20  correct?

21  A.  That is a date that that web address was searched.

22  Q.  Same question, please listen.  It does not show that anyone

23  ever downloaded anything as the product of that search?

24  A.  Not on this one, no.

25  Q.  That's what I was asking.  All right.  Now, so it doesn't

1   identify I think we've already established who the user might

2   have been that made the search contact, correct?

3   A.   Correct.

4   Q.   And it doesn't provide any explanation through the profile

5   or data list as to what if any action was taken beyond making

6   the initial search, correct?

7   A.   Say again?

8   Q.   It doesn't provide any information from which you as a

9   forensic investigator can determine that any other action was

10  taken beyond simply making a search inquiry?

11  A.   This is the information right here on the search.

12  Q.   I know the information is right there.

13  A.   Right, that's all it tells me is what's on here.

14  Q.   So your answer is no it does not tell me that any other

15  action was taken, correct?

16          MS. THOMPSON:  Your Honor, objection, asked and

17  answered.

18          THE COURT:  That is sustained.  We're going around in

19  circles here.

20          MR. RICHARD BARTOLOMEI:  Your Honor, with respect --

21          THE COURT:  Counsel, just ask the next question

22  please.

23          MR. RICHARD BARTOLOMEI:  I'll preserve that for offer.

24  Thank you.

25  BY MR. RICHARD BARTOLOMEI:

1  Q.  So from the data you have there, it may have been viewed,

2  but not downloaded any information from it, correct?

3          MS. THOMPSON:  Objection, asked and answered.

4          THE COURT:  Sustained.

5          MR. RICHARD BARTOLOMEI:  Reserve for offer.

6  BY MR. RICHARD BARTOLOMEI:

7  Q.  There were a number of items that we've already discussed

8  that were I refer to as the big dump, the big data, the 18th

9  and the 19th, obviously these dates predate that, correct, 8/25

10  and 8/28, correct?

11  A.  8/28, right.

12  Q.  My question was, and people may be able to deduce this, if

13  the large computer input was October 18 and October 19, my

14  question was obviously these predate that, correct?

15  A.  This is date is before October, yes.

16  Q.  Thank you.  Turning to 6b, a link file, which you described

17  as a shortcut file, correct?

18  A.  Yes.

19  Q.  That can actually be created automatically by the Windows

20  operating system, can't it?

21  A.  Say again?

22  Q.  The link file can be created automatically by the Windows

23  operating system, isn't that correct?

24  A.  The link file is created once a file or folder is accessed.

25  Q.  Are you claiming that Windows operating system cannot

1   automatically create the link file?

2           MS. THOMPSON:  Objection, argumentative.

3           MR. RICHARD BARTOLOMEI:  No, it's not.

4           THE COURT:  Sustained.  That is argumentative,

5   sustained.

6           MR. RICHARD BARTOLOMEI:  Your Honor, with respect, I

7   don't think -- I got it.  Mark it for offer.

8   BY MR. RICHARD BARTOLOMEI:

9   Q.  When you go into the computer, are the references to link

10  files -- is it possible that the image, in fact, no longer

11  exists, only the link?

12  A.  Say again?

13  Q.  Is it possible when you search link files that the image

14  itself or the video doesn't actually exist, all you have is the

15  link, isn't that possible?

16  A.  Sure, it could be deleted, yes.

17  Q.  Could be that it simply goes into a temporary file and

18  doesn't appear, correct?

19  A.  I'm not aware of that.

20  Q.  You're not saying it doesn't happen?

21  A.  It can be deleted, yes.

22  Q.  Well, let me ask it a different way.  If something is

23  wiped, deleted, stored onto a USB, the link file information

24  could still be in the computer, the original file may not

25  exist?

1   A.  If the device is wiped where it's completely wiped, then

2   nothing is going to exist.

3   Q.  If someone were to transfer the data to a temporary storage

4   device like a thumb drive or a CD ROM, is it possible that the

5   file, the image to which the link references may no longer be

6   in the computer and may no longer be able to be viewed in the

7   computer, is that possible?

8           MS. THOMPSON:  Objection, cumulative.

9           THE COURT:  Sustained.

10  BY MR. RICHARD BARTOLOMEI:

11  Q.  Are you aware whether or not this laptop was part of a

12  network?

13  A.  Say again?

14  Q.  Are you aware of whether or not this laptop was part of a

15  network?

16  A.  A network group?

17  Q.  Network.  Local network, larger network, any kind of

18  network linking it to other computers.

19  A.  No.

20  Q.  Did you search for that?

21  A.  No.

22  Q.  So you don't know whether it was linked to a larger

23  network, correct?

24  A.  I said no.

25  Q.  Are you aware that link files can contain references to

```
 1   network details if the file was stored on a network or a remote
 2   computer, are you aware of it?
 3   A.  I don't know.
 4           MR. RICHARD BARTOLOMEI:  Excuse me.
 5           (Pause.)
 6   BY MR. RICHARD BARTOLOMEI:
 7   Q.  Just a few more questions.  What is unallocated space in a
 8   computer?
 9   A.  Unallocated space, free space where you can recover deleted
10   files.
11           MR. RICHARD BARTOLOMEI:  Thank you.  No further
12   questions, sir.
13           MS. THOMPSON:  May I approach, Your Honor?
14           THE COURT:  You may.
15                       REDIRECT EXAMINATION
16   BY MS. THOMPSON:
17   Q.  CFA Linares, I'm going to show you Government Exhibit 4c
18   and ask you to take a look at that.  Do you recognize that?
19   A.  Yes, ma'am.
20   Q.  Is that the hard drive that was taken out of the Dell
21   laptop computer?
22   A.  Yes, ma'am.
23   Q.  You were asked about the serial number of the hard drive?
24   A.  Yes, ma'am.
25   Q.  Do you see the serial number WD-WX21A50Y9805 on Exhibit 4c?
```

1   A.  Yes, ma'am.

2   Q.  You were also asked about the model number.  Do you see the

3   model number 00BEVT-7 on that hard drive?

4   A.  Yes, I do.

5   Q.  And is that information automatically taken from the hard

6   drive and put into the report?

7   A.  Yes.

8         MR. RICHARD BARTOLOMEI:  Objection, Your Honor.

9   Perhaps I should move to strike the prior two leading

10  questions.  Sorry.

11        THE COURT:  What was your objection, sir?

12        MR. RICHARD BARTOLOMEI:  I'm going to withdraw my

13  objection.

14        THE COURT:  All right.

15  BY MS. THOMPSON:

16  Q.  On Exhibit Six, page three, under number two, account

17  users, are those the account users for the Dell desktop

18  computer that did not contain child pornography?

19  A.  Yes, ma'am.

20        MR. RICHARD BARTOLOMEI:  Objection, Your Honor, beyond

21  the scope of my cross.  It's also asked and answered in direct.

22        THE COURT:  Counsel.

23        MS. THOMPSON:  Your Honor, it goes directly to a lot

24  of the questions he asked about the Log Me In remote user and

25  the confusion between computer one and the laptop.

1          THE COURT:  The objection is overruled.  It does.

2    BY MS. THOMPSON:

3    Q.  Do you see that entry number eight?

4    A.  Yes, ma'am.

5    Q.  Is that a user account on the desktop computer?

6    A.  Yes.

7    Q.  Now, with regard to the laptop computer which is item

8    number four, there are two entries listed under user account

9    for the laptop, is that correct?

10   A.  Yes, ma'am.

11   Q.  If the Log Me In remote software was on the laptop

12   computer, would it have generated a separate user account in

13   number four?

14         MR. RICHARD BARTOLOMEI:  Objection, Your Honor.  I was

15   not permitted to examine about Log Me In or to go past the

16   initial question.  He did not know what Log Me In was, so I

17   question how he would now become competent to answer that

18   question and it's certainly beyond the scope of what I was

19   permitted to do on cross.

20         MS. THOMPSON:  He testified that it wasn't listed on

21   L1D1, I'm establishing why it wasn't listed.

22         THE COURT:  The objection is overruled.

23   BY MS. THOMPSON:

24   Q.  Now with regard to item four, the first entry says

25   administrator?

1    A.   Yes.

2    Q.   Where does that come from?

3    A.   That's from the operating system, it's an unusable account.

4    Q.   So once I set up my computer, can I go in as the

5    administrator and write documents and work on the computer?

6    A.   No, ma'am.

7    Q.   The user number two, David S, how is that name derived?

8    A.   It's user inputted.

9    Q.   Does the user of the computer pick what to name the user

10   account?

11   A.   Yes, he could name it anything he wants, the user wants.

12        MR. RICHARD BARTOLOMEI:  This is her direct

13   examination again and is not part of my cross-examination

14   whatsoever and I was not permitted to inquire further about

15   that.

16        THE COURT:  First of all, I think that's wrong, but

17   anyway.

18        MS. THOMPSON:  Most of his cross-examination pointed

19   out that all this activity happened under David S.  I'm merely

20   establishing --

21        THE COURT:  The objection is overruled.

22   BY MS. THOMPSON:

23   Q.   -- it's the only account on the computer, correct?

24   A.   Yes.

25   Q.   Also number three, the system info, you mentioned that

1    Windows 10 was installed on August 27th of 2015.  Was that a

2    total installation of a new operating system or something else?

3    A.   Just an update.

4    Q.   And does your forensic examination tell you who ran the

5    update?

6    A.   I don't know who ran the update.

7    Q.   In fact, is there any part of your forensic examination

8    that shows you who is actually sitting at the computer when any

9    of this is done?

10   A.   No, ma'am.

11   Q.   Let's go to Exhibit Six, page five.  You were asked about

12   the file creation date.  And Exhibit Six for each file there's

13   a file creation date listed?

14   A.   Yes.

15   Q.   Is that significant in your forensic examination?

16   A.   Yes.

17   Q.   Why?

18   A.   Because that tells me when that image was entered into the

19   computer.

20   Q.   Entered into the laptop computer?

21   A.   Yes, into the laptop.

22   Q.   Also listed is a last written date.  Is that significant to

23   your forensic examination?

24   A.   No, it's not.

25   Q.   The last accessed date is also listed for each file.  Is

1   that significant to your forensic investigation?

2   A.  No, it's not.

3          MR. RICHARD BARTOLOMEI:  Your Honor, objection.  I'll

4   withdraw it.  I'll take it on recross.

5          THE COURT:  Okay.

6   BY MS. THOMPSON:

7   Q.  Why is the last access date not important forensically?

8   A.  Because Windows doesn't update that date.

9   Q.  So forensically can you say whether the last access date is

10  accurate?

11  A.  No.

12  Q.  Does the last access date give you any information on

13  whether the file was opened or saved or moved?

14  A.  No.

15  Q.  You were also asked about the fact that most of the child

16  pornography, except for the Mozilla Firefox stuff, was put onto

17  the computer on two dates, October 18th and October 19th, is

18  that correct?

19  A.  Yes.

20  Q.  Do you know from your forensic exam how those images and

21  movie files were put onto the computer?

22  A.  I don't know how they got there.

23  Q.  Do you know whether they came from a USB drive?

24  A.  No.

25  Q.  Do you know whether they came from the Internet?

1    A.   No, I don't.

2    Q.   Could they have come from either?

3    A.   It could have possibly, yes.

4    Q.   You were also asked about the Mozilla Firefox cache folder

5    where there's 46 images of child pornography.  If I know that

6    that folder is on my computer, can I access it and review those

7    files?

8    A.   Yes.

9    Q.   Do you need any type of forensic software to do that?

10   A.   No.

11   Q.   Is it true that the user just has to know they're there?

12   A.   Yes.

13   Q.   You were also asked on Exhibit Six, page two, about the

14   five errors that are at the bottom of that exhibit.  What are

15   those?

16   A.   They're just errors, unreadable sectors that just didn't

17   transfer over to the image.

18   Q.   Does that affect any of the material that was on the imaged

19   copy?

20   A.   No.

21   Q.   During your forensic examination in this case, did you

22   rerun the MD5 cache values?

23   A.   Yes, I did.

24   Q.   How many errors did you get when you reran it?

25   A.   Zero.

1             MR. RICHARD BARTOLOMEI:  Excuse me.

2             THE COURT:  Yes.

3             MR. RICHARD BARTOLOMEI:  May my objection precede?  We

4    have no documentary evidence of this, no notice of it, it

5    arises during trial and we object to its introduction through

6    his testimony where there is no documentary evidence and we

7    have no opportunity to voir dire or question regarding it on

8    cross-examination.

9             MS. THOMPSON:  Your Honor, it's contained in Exhibit

10   6b which was provided --

11            THE COURT:  The objection is overruled.  This is

12   something that you brought up, she is redirecting him on

13   material which was raised by defense, so there doesn't need to

14   be some sort of pre-notice of particular questions.  This is

15   not new material.

16            MS. THOMPSON:  Thank you.  Nothing further.

17                        RECROSS-EXAMINATION

18   BY MR. RICHARD BARTOLOMEI:

19   Q.  Do you recall your prior cross-examination just today?  You

20   recall it, don't you?

21   A.  Do I recall it?

22   Q.  Yes.  When I asked you about the five errors before we

23   broke for lunch, you didn't know what they were, correct?

24            MS. THOMPSON:  Objection.  That's a misstatement of

25   the testimony.

```
 1            THE COURT:  The objection is sustained.
 2            MR. RICHARD BARTOLOMEI:  May I have a moment, Your
 3    Honor?
 4            THE COURT:  Sure.
 5            (Pause.)
 6            MR. RICHARD BARTOLOMEI:  Can we have a sidebar
 7    briefly?
 8            THE COURT:  Not right now.
 9    BY MR. RICHARD BARTOLOMEI:
10    Q.  Your testimony was that on Exhibit Six you couldn't tell
11    whether that information came into the computer through the
12    Internet or through a USB, that was your testimony on your
13    redirect, correct?
14    A.  Right, I don't know where or how it got there.
15    Q.  So if you don't know where or how it got there, you cannot
16    say affirmatively it ever came through the Internet, isn't that
17    true?
18    A.  I just know that it's there.
19            MS. THOMPSON:  Objection, asked and answered.
20            THE COURT:  Sustained.
21    BY MR. RICHARD BARTOLOMEI:
22    Q.  You don't know, do you?
23            THE COURT:  I just sustained an objection and now
24    you've asked a question based on an objection I've sustained.
25    I think you need to move on.
```

1          *(Pause.)*

2     BY MR. RICHARD BARTOLOMEI:

3     Q.  With regard to the searches involving the Mozilla Fox,

4     that's not a folder, that's a search, correct?

5     A.  Mozilla Fox is an Internet browser.

6     Q.  Yes, it does not -- the evidence that you have from your

7     forensic examination does not show that it resulted in the

8     downloading of a folder?

9     A.  That search term was inputted.

10    Q.  The search was inputted, yes?

11    A.  Can you rephrase your question?

12    Q.  I'll try, sir.  You made reference in redirect to Mozilla

13    Fox being a folder.  That's not accurate, is it?

14          MS. THOMPSON:  Objection.  That's a misstatement of

15    the testimony.  He talked about the cache folder.

16          THE COURT:  Sustained.

17          MR. RICHARD BARTOLOMEI:  Note that for offer.

18          MS. THOMPSON:  Your Honor, I'm going to move to strike

19    all these extraneous comments, the "note that for offer".  I

20    don't know what that means.

21          THE COURT:  I don't either, but that's okay.

22          MR. RICHARD BARTOLOMEI:  I'm directing to my own

23    people so that they remind me because you've allowed me an

24    offer of proof.  So that's why I'm doing it.  It's not meant as

25    anything else.

Adrian Linares - Examination                    106

1          THE COURT:  All right.  Let's just go on.

2          MR. RICHARD BARTOLOMEI:  One moment.

3          *(Pause.)*

4    BY MR. RICHARD BARTOLOMEI:

5    Q.  Turning you to Six please, page five is an example.  You've

6    testified that certain aspects of your report don't mean

7    anything to you forensically, have you not?

8    A.  Yes, the last written and last accessed.

9    Q.  Yet the software provides it, correct?

10   A.  If asked, yes.

11   Q.  And you must have asked because that's how it printed,

12   correct?

13   A.  Yes, I did that.

14   Q.  Yet it's your position that last accessed doesn't mean

15   anything?

16          MS. THOMPSON:  Objection, asked and answered.

17          THE COURT:  Sustained.

18   BY MR. RICHARD BARTOLOMEI:

19   Q.  And the last written date, what is that there for?

20          MS. THOMPSON:  Objection, asked and answered.

21          MR. RICHARD BARTOLOMEI:  I did not ask it.

22          THE COURT:  Go ahead and ask your question.

23          MR. RICHARD BARTOLOMEI:  Thank you.

24   BY MR. RICHARD BARTOLOMEI:

25   Q.  Sir, what is last written date?

1    A.  The last written date is just -- that comes with the image.

2    Q.  Thank you.

3    A.  It comes from -- it can be from multiple devices, you never

4    know.

5    Q.  Thank you.  You never know.

6            MR. RICHARD BARTOLOMEI:  No further questions.

7            MS. THOMPSON:  Nothing further.

8            THE COURT:  All right, sir.  You can step down.

9            MS. THOMPSON:  Government calls Special Agent Sean

10   Mullen.

11                          *   *   *

12            COURTROOM DEPUTY CLERK:  Please raise your right hand.

13                          *   *   *

14        (SEAN MULLEN, Government Witness, Sworn.)

15                          *   *   *

16            THE WITNESS:  Yes, I do.

17            COURTROOM DEPUTY CLERK:  You can have a seat.

18                    DIRECT EXAMINATION

19   BY MS. THOMPSON:

20   Q.  Please state your name for the record.

21   A.  Sean Mullen.

22   Q.  Where are you employed?

23   A.  At the Federal Bureau of Investigation in Austin, Texas.

24   Q.  How long have you been employed with the FBI?

25   A.  Since November of 2003.

1    Q.  What is your current assignment within the FBI?

2    A.  Currently assigned to the Violent Crimes Against Children

3    Squad in Austin.

4    Q.  What does that squad handle?

5    A.  We handle all federal crimes where children are victims,

6    that can range from child abductions to human trafficking to

7    child sexual exploitation.

8    Q.  How long have you been assigned to the Violent Crimes

9    Against Children Unit?

10   A.  I've been working these crimes since 2007.

11   Q.  All in Austin, Texas?

12   A.  Yes, ma'am.  Well, I spent a year and a half in Washington

13   as a supervisor.

14   Q.  And when you spent the year and a half in Washington, what

15   did you supervise?

16   A.  I was a program manager for what we call the Innocent

17   Images National Initiative which is the FBI's program to combat

18   online child exploitation problem.

19   Q.  And what years did you serve as program manager for the

20   Innocent Images Project?

21   A.  March of 2011 to September of 2012.

22   Q.  What were your duties and responsibilities as the program

23   manager for that program?

24   A.  Primarily supervised the program, I would provide resources

25   and guidance to the 13 field offices in the Southeast United

1    States including Puerto Rico.  I also had some responsibility

2    for some of our overseas legal attache offices.

3    Q.  Do you have training and specialized experience related

4    just to child exploitation investigations?

5    A.  Yes, I do.

6    Q.  Can you describe that briefly?

7    A.  Sure.  I've received, gosh, can't tell you, probably couple

8    hundred hours of training in the online child exploitation and

9    undercover operations, how to -- obviously in the law, we also

10   receive training into some forensics and then the general

11   investigative resources that we have at our disposal from the

12   FBI and our State and local partners.

13   Q.  Are you familiar with the child pornography series named

14   Tent?

15   A.  Yes, I am.

16   Q.  What is a child pornography series?

17   A.  What is a child pornography series?

18   Q.  Yes.

19   A.  A child pornography series is a group of visual depictions,

20   it can be images or videos.  They particularly depict -- each

21   series is given a name and a series is of one victim.  It used

22   to be a group of victims at times, but they've now been

23   separated out to each victim has a series name.  So it can be

24   any number of videos and images of a particular victim and

25   they're given a series name.

1  Q.  Who manages or has that program to name these series?

2  A.  The National Center For Missing and Exploited Children in

3  Washington -- actually Alexandria.

4  Q.  Can you explain briefly for the jury how they work with law

5  enforcement to do that?

6  A.  Sure.  They run a program called the Child Victim

7  Identification Program.  Most Federal agencies have people

8  assigned there to work there.  I know Homeland Security

9  Investigations does, the FBI does, Secret Service and the

10  Military Investigative Arms do.  So what they do is they're

11  like the clearinghouse for all child pornography that's found

12  throughout the country in investigations.  So the State and

13  locals, us, Homeland Security, we will submit videos and images

14  we find during our investigations to them and they maintain a

15  database of what they call known victims or known series and

16  unidentified series and unidentified victims.  They manage that

17  for the United States, so once those are submitted, then the

18  investigator comes back and finds all the images and videos

19  that are known throughout law enforcement as identified

20  victims.

21  Q.  And are you familiar with the specific series named Tent?

22  A.  I am, yes.

23  Q.  How are you familiar with that?

24  A.  I was the case agent that investigated and identified the

25  offender and the victims or the victim in that case.

1   Q.  Were you the lead case agent?

2   A.  Yes, I was.

3   Q.  How did that investigation arise?

4   A.  In August of 2009, we received a call from the Maine State

5   Police where they felt like they had identified the location of

6   the filming of one of the particular videos in that series and

7   from there that led us out to the Star Ranch Colony out in

8   Bastrop.

9   Q.  Is that where the child pornography was produced?

10  A.  Yes, it was.

11  Q.  How old was the child at the time this pornography series

12  was produced?

13  A.  For the Tent series, she was ten years old.

14  Q.  Were there image and videos produced of this young child?

15  A.  I'm aware of only videos, but I know that throughout

16  time --

17          MR. EDWARD BARTOLOMEI:  Objection, Your Honor.

18  Speculation.  He was only aware of videos.

19          THE COURT:  Sustained.

20          MR. EDWARD BARTOLOMEI:  Thank you.

21  BY MS. THOMPSON:

22  Q.  As the lead case agent, have you been called to testify

23  about the Tent series and identify that victim in other

24  jurisdictions?

25  A.  Yes, I have.

1          MR. EDWARD BARTOLOMEI:  Your Honor, as to the

2    relevancy whether he's had to testify or not.  It's what he

3    knows of this particular case, not what he's done in the past.

4          THE COURT:  Sustained.

5          MS. THOMPSON:  Your Honor, the information also goes

6    to the interstate commerce nexus of the images moving.

7          THE COURT:  Then you need to lay some more foundation.

8    BY MS. THOMPSON:

9    Q.  Where were these, the images of the Tent series first seen?

10   A.  They were identified -- we were notified of them by the

11   Maine State Police Department, but I believe based on my

12   investigation we had been told by National Center --

13         MR. EDWARD BARTOLOMEI:  Objection as to hearsay, Your

14   Honor, where they were found.  He doesn't know of his own

15   personal knowledge.

16         THE COURT:  Can you establish whether he has any

17   knowledge of this other than hearsay?

18         MS. THOMPSON:  Yes, Your Honor.

19   BY MS. THOMPSON:

20   Q.  Special Agent Mullen, have you personally met the victim

21   depicted in the Tent series?

22   A.  Yes, I have.

23         MS. THOMPSON:  May I approach, Your Honor?

24         THE COURT:  Yes.

25   BY MS. THOMPSON:

1  Q.  I'm going to show you what's been marked for identification
2  as Government Exhibit 13 which includes 13a and 13b.  Will you
3  take a look at those?
4          MR. EDWARD BARTOLOMEI:  Before he goes any further, we
5  renew our objection to any discussion or admission of 13a as
6  previously objected to, Your Honor, for purposes of record for
7  all testimony relating to that particular issue.
8          THE COURT:  The objection is overruled.
9          MR. EDWARD BARTOLOMEI:  Renew or request for 403, 404,
10 Your Honor.
11         THE COURT:  The objection is overruled.
12 BY MS. THOMPSON:
13 Q.  Do you recognize those?
14 A.  Yes, I do.
15 Q.  What are they?
16 A.  Those are what are called contact sheets.  They are
17 individual stills that come from the videos that I know as the
18 Tent series videos.
19 Q.  And is that the child that you identified in that series?
20 A.  Yes, it is.
21 Q.  And how old was she when those were produced?
22 A.  She was ten years old.
23 Q.  Have you been called as a witness to identify that series
24 in other jurisdictions?
25         MR. EDWARD BARTOLOMEI:  Again, Your Honor, relevancy.

1   It's the relevance of this particular case, Your Honor.  He's

2   testified directly about his knowledge in Texas as to this

3   individual.  Whether he has other places or not, Your Honor, we

4   believe is beyond the scope of direct and unnecessary in this

5   case, Your Honor.

6          THE COURT:  The objection is overruled.

7   A.  Yes, I have.

8   Q.  In what other jurisdictions have you testified, if you can

9   recall some?

10  A.  I've testified specifically to Tent I recall Georgia,

11  particularly I believe in Kansas as well.

12  Q.  And so were these images of the Tent series also found in

13  those states?

14  A.  Yes, they were.

15  Q.  Do Exhibits 13a and 13b fairly and accurately depict the

16  child at the time she was sexually assaulted?

17  A.  Yes, it does.

18         MR. EDWARD BARTOLOMEI:  Objection.

19         MS. THOMPSON:  Government offers Exhibits 13a and b.

20         MR. EDWARD BARTOLOMEI:  Your Honor, he doesn't have

21  personal knowledge of that, Your Honor.

22         THE COURT:  What's the basis of his knowledge to

23  answer that question.

24         MS. THOMPSON:  He's met the victim and talked to the

25  victim.

1          THE COURT:  The objection is overruled.

2          MS. THOMPSON:  Government offers permission -- well,

3    may I approach again, Your Honor?

4          THE COURT:  You may.

5    BY MS. THOMPSON:

6    Q.  Special Agent Mullen, I'll ask you, what do Exhibits 13a

7    and 13b depict?

8    A.  Well, they depict the victim in the Tent series who is

9    approximately ten years old at the time being sexually

10   exploited by a known offender to me.

11   Q.  And what is the sexual activity depicted in Exhibit 13b?

12   A.  13b, it's digital penetration of her vagina.

13   Q.  Thank you.

14         MR. EDWARD BARTOLOMEI:  Your Honor, may we --

15         THE COURT:  Yes, you can object.  I'm happy to have

16   you object.

17         MR. EDWARD BARTOLOMEI:  Now I will object, Your Honor.

18   Based on the testimony of this officer concerning his interview

19   and the fact that he's described the nature of the conduct,

20   Your Honor, and the age of the child, the photographs are

21   totally unnecessary to demonstrate what pornography is because

22   Judge, it's cumulative at best and only there to heighten and

23   to excite the jury concerning this type of conduct.  Your

24   Honor, we're not here to educate them on pornography.  It's

25   possession we're interested in.

1          THE COURT:  Okay.  The objection is overruled.

2    BY MS. THOMPSON:

3    Q.  Are you also familiar with the child pornography series

4    known as the C Baby?

5    A.  Yes, I am.

6    Q.  How many children did that involve?

7    A.  That involved four child victims.

8    Q.  Describe for the jury how you're familiar with that series?

9    A.  That series, the offender in that series is the same

10   offender in the Tent series.  Through our investigation of the

11   Tent series victim, she identified potential other victims

12   which led us to the four other victims of his and most of those

13   occurred within the Austin, Texas and city limits of Austin

14   Texas.

15          MR. EDWARD BARTOLOMEI:  Your Honor, this is all

16   predicated on hearsay.  Does he have personal knowledge?

17          MS. THOMPSON:  He did the investigation himself.

18          THE COURT:  The objection is overruled.

19   BY MS. THOMPSON:

20   Q.  Have you personally met the child victims depicted in the C

21   Baby series?

22   A.  I have.

23          MS. THOMPSON:  May I approach?

24          THE COURT:  You may.

25          MR. EDWARD BARTOLOMEI:  Your Honor, before we begin

1   testimony, we renew our objection previously stated in a prior

2   hearing in this matter, Your Honor, regarding these particular

3   items of evidence.

4          THE COURT:  The objection has already been sustained

5   to your previous questions.  The objection has been overruled

6   as to her questions on this area where the record reflects

7   those objections.  So you can be seated.

8          MR. EDWARD BARTOLOMEI:  Thank you, Your Honor.

9   BY MS. THOMPSON:

10  Q.  Showing you what's been marked as Government's Exhibit A

11  through S and ask that you take a look at those.

12       (Pause.)

13         MR. EDWARD BARTOLOMEI:  Your Honor, may we approach

14  for just a brief moment before we go any further.  I have a

15  clarification question and I don't think it's appropriate in

16  front of the jury.

17         THE COURT:  You have a clarification question?

18         MR. EDWARD BARTOLOMEI:  Yes, sir.

19         THE COURT:  What is a clarification question?  A

20  clarification question to whom?

21         MR. EDWARD BARTOLOMEI:  To the Court, Your Honor,

22  concerning the ruling at a prior hearing regarding these

23  particular items.

24         THE COURT:  I see what you're saying.  All right.

25  Let's excuse the jury briefly.

1          COURT SECURITY OFFICER:  All rise.

2          *(2:29 p.m.)*

3          THE COURT:  The jury is excused.  Yes, sir.

4          MR. EDWARD BARTOLOMEI:  Your Honor, I believe when

5     these were first discussed, the objection was first raised --

6          THE COURT:  What are "these", first of all?

7          MR. EDWARD BARTOLOMEI:  All of these photos, Your

8     Honor, that are about to come in through these different

9     videos.  How many actual images are we going to allow to be

10    presented out of these types of evidence, Judge.

11         THE COURT:  She's already indicated the number.  And I

12    believe -- how much was it?

13         MS. THOMPSON:  I was planning on showing one from each

14    series.

15         THE COURT:  Right.  How many series are there?

16         MS. THOMPSON:  Just three now because we don't have

17    the other witnesses.

18         THE COURT:  All right, so three, that's it.

19         MR. EDWARD BARTOLOMEI:  That's fine, one from each.

20         *(Pause.)*

21         THE COURT:  Okay.  Who am I listening to?

22         MR. EDWARD BARTOLOMEI:  Your Honor, the older brother

23    was speaking now.  The question was, Your Honor, do we get to

24    testify about the image or each image, Your Honor, each time

25    they come up?  Do we give testimony on those and do we get to

1    renew our objection regarding those, Your Honor, even if she's

2    selected one.

3            THE COURT:  I've already ruled on the objections to

4    showing -- look, I don't know what the strategy is here on all

5    these objections.  I guess it's if you make enough objections

6    and maybe, maybe if there's a conviction, an appellate judge

7    will glom onto one of them, but quite frankly, I've been very

8    conservative in my rulings.  I have not -- I've sustained many

9    objections that you have, you or your brother have made.  I

10   certainly haven't been unbalanced there.  I think I've probably

11   sustained more objections in your favor than I have in the

12   government's favor.  The bottom line is, however, that when I

13   have ruled on a matter, I've ruled on it.  You don't need to

14   keep getting up and reemphasizing the same objection.  It

15   certainly doesn't assist anybody and it doesn't make a better

16   record, it makes a worse record actually.  So I would just

17   simply rest on whatever objection you have made.  We previously

18   discussed this matter.  There is no question whatsoever in my

19   mind that the government is entitled if they lay the proper

20   foundation which they're attempting to do here and they have

21   every right to attempt to do so.  They have every right to get

22   an example image into evidence as long as it is an image from

23   the series and they have laid the appropriate foundation.  And

24   I have said previously that I want the defendant to get a fair

25   trial.  I don't want the government to be putting in repetitive

1    images, images that are just simply designed to inflame the

2    jury.  I mean I'm not so sure that I couldn't allow the

3    government successfully if they wanted to do so to put in 20

4    images per set.  I don't know that the Fifth Circuit would say

5    that was excessive, given the nature of these charges, but I've

6    said no, they only get a very limited number of them because

7    they have the burden of proof.  They have to prove to this jury

8    beyond a reasonable doubt, if they can do so, that not only did

9    the defendant have the kind of contact necessary with these

10   images to meet the requirements of the charges against him, but

11   what the images were.  And if they didn't do so, the first

12   thing that would happen on closing argument or a motion for

13   directed verdict for judgment of acquittal is that the

14   government did not establish that these were child pornography

15   images.  And you'd have every right.  And if they didn't do it,

16   I would probably sustain that.  And if they didn't do it, I

17   would probably acquit.  But they have every right to try to do

18   that and that's all they're trying to do.  They have that

19   obligation and they're trying to meet that obligation and they

20   have every right to try to meet the obligation.  So repetitive

21   objections to the same material over and over and over again

22   certainly aren't impressing me.  I don't know what effect

23   they're having on the jury, but they're not impressing me.

24          MR. EDWARD BARTOLOMEI:  Your Honor, I've never

25   attempted to try to impress the Court.  I think what I've

1   always try to differentiate to the Court in our original

2   objection to these photographs is that we have verbal

3   description, confirmation to visitation of age and content.

4          THE COURT:  That's what they're trying to do.

5          MR. EDWARD BARTOLOMEI:  Your Honor, he's done that.

6   And then the question would be --

7          THE COURT:  Your co-counsel has made every effort to

8   suggest they didn't have the right to do that in his

9   objections.  So now you're saying they've done it.  Okay.

10  Well, I don't think so.  I think they have every right to try

11  to do it.  I don't think they've gone far enough.

12         MS. THOMPSON:  Your Honor, the jury is also allowed to

13  decide for themselves if that's a real child.

14         THE COURT:  They have the obligation, the government

15  has the obligation to prove that this is a child and not as

16  we've discussed on many occasions the fact that there are adult

17  actresses, if you can call them that, or trafficked individuals

18  or whoever is in there who are 18 or 19 or 20 who are dressed

19  as if they are children, all right.  And there was, in fact, we

20  looked at one photograph that I said I would absolutely not let

21  the jury see and I would not let them use as proof which showed

22  what was supposed to be a 12 or 14-year-old, but who was, as

23  we've discussed, quite well developed.  And I thought, you

24  know, maybe it is a 15-year-old because that does happen.  But

25  it could easily have been a 19-year-old dressed as a

1    15-year-old.  So I said no dice, as a matter of law.  But these

2    other photographs are clearly such that the jury can make that

3    determination and they have every responsibility to if the

4    government is going to prove your client guilty beyond a

5    reasonable doubt.

6              MR. EDWARD BARTOLOMEI:  One brief response?

7              THE COURT:  Sure.

8              MR. EDWARD BARTOLOMEI:  Your Honor, the position has

9    been from the inception that the verbal description

10   confirmation and the age by the agent as to what he saw and the

11   child that he saw, Your Honor, in the photo is sufficient to

12   determine the age of the child and the nature of the content.

13   They don't need the photo.  That's our position, Your Honor.

14             THE COURT:  I understand that, but he's not the finder

15   of fact.  The jury has to find the facts, not him.  He can give

16   his assessment of the photograph, okay, but his assessment only

17   is his assessment.  He went through and picked out photographs,

18   he talked to families, he's talking -- he's going to give that

19   proof, but ultimately it's for the ladies and gentlemen who sit

20   in that box to make the determination whether these are, in

21   fact, photographs of children.  We can't just have trials where

22   people stand up and say, well, in my opinion so and so was the

23   bank robber.  And then that's it.  I instruct the jury you've

24   got to follow the individual who says that's the bank robber,

25   he's the finder of fact, you have to accept it, that has the

1    same effect as a stipulation from the defense.  That's not the

2    way we operate and you know that, counsel.  You're a very, very

3    experienced lawyer.

4           MR. EDWARD BARTOLOMEI:  I realize that, Your Honor,

5    but I just wanted to clarify our position has been that that is

6    sufficient based on the fact that he is the person who

7    interviewed the child in that photo based on his history and,

8    therefore, there would be no need for a photo if he determined

9    the age of the child and she's the victim.  That's all.

10          THE COURT:  Okay.

11          MS. THOMPSON:  Your Honor, the record should also

12   reflect that the defendant in this case has not stipulated that

13   these are real children or to the ages of these children, so

14   those are issues that are essential elements that the

15   government has to prove beyond a reasonable doubt.

16          THE COURT:  Mr. Bartolomei.

17          MR. EDWARD BARTOLOMEI:  Your Honor, again goes to my

18   very objection.  He interviewed the -- excuse me, the agent --

19          THE COURT:  The fact that he interviewed them doesn't

20   mean anything.  Look, I am sure that he is an exceptional FBI

21   agent.  We don't have a jury here, I can make this statement.

22   I'm sure that he has a wonderful background, okay, I have great

23   regard for the FBI over the years, they've been in front of me

24   for 31 years, but the fact of the matter is he has no more

25   right than I do to find the facts for the jury, he doesn't.

1   And boy, I'll tell you, your brother doesn't miss much.  And

2   I'll tell you if they didn't put before the jury for their

3   determination the evidence from which they could find these to

4   be children for themselves, he'd be up like a jackrabbit on a

5   motion for judgment of acquittal at the end of the case.  And

6   boy, oh, boy, if they hadn't done that -- I've granted

7   judgments of acquittal before.

8            MR. EDWARD BARTOLOMEI:  Yes, sir, I respect that.

9            THE COURT:  More than once, believe me.

10           MR. EDWARD BARTOLOMEI:  Your Honor, closing on that,

11   thank you very much for the opportunity.

12           THE COURT:  At this point, we'll take just a very

13   short recess.  We might as well call this our afternoon recess

14   and let everybody use the restroom and we will come back and

15   you may continue.

16           *(2:41 p.m.)*

17                              *   *   *

18           *(3:34 p.m.)*

19           COURT SECURITY OFFICER:  All rise.

20           THE COURT:  Please be seated.  We're going to break at

21   4:30 this afternoon.

22           MR. EDWARD BARTOLOMEI:  Judge, is 40 pictures in a

23   picture a picture?

24           THE COURT:  I don't know what you're talking about?

25           MS. THOMPSON:  There is each image.

1          MR. EDWARD BARTOLOMEI:  Each image, Your Honor, is a

2     collage.

3          MS. THOMPSON:  But that's how it was found on the

4     defendant's computer was as a collage, so I am going to focus

5     in on part of that collage.

6          THE COURT:  That's how they were allegedly downloaded?

7          MS. THOMPSON:  That's how they were saved.

8          THE COURT:  Well, it is what it is, yes.

9          MR. EDWARD BARTOLOMEI:  I reviewed them in the break,

10    Your Honor.  That was why I was always concerned.

11         THE COURT:  Have I seen these?  These are the ones

12    that I saw.

13         MS. THOMPSON:  Correct.

14         THE COURT:  You don't have that one in there, that

15    collage in there that has the questionable woman in there.

16         MS. THOMPSON:  No.

17         MR. EDWARD BARTOLOMEI:  That was my question.

18         THE COURT:  I was talking about a set of images, to

19    clarify.  How many different collages are there?

20         MS. THOMPSON:  Like for the C Baby series there's 19,

21    I'm going to show one.

22         THE COURT:  And I didn't want them to show 19 collages

23    of pictures, that's what I was speaking of.  That's right

24    because we've seen those before.  And quite frankly, the images

25    are very small and the detail is not good and they're almost

1    all virtually the same thing, to be honest with you, so there

2    isn't anything there that would be like a dozen if there's 12.

3    I don't know how many pictures are in each collage, but there

4    may be more, but whatever it is it isn't like -- it's I think

5    all the same girl.

6              MS. THOMPSON:  Correct.

7              THE COURT:  And it's basically if there's a sex act

8    being performed in the collage, it's basically the same sex

9    act.  There may be some difference, getting on the bed, getting

10   off the bed, something like that.

11             MS. THOMPSON:  Correct.

12             THE COURT:  All right.  Let's just proceed.  I think

13   you have your answer.

14             MR. EDWARD BARTOLOMEI:  Thank you for the

15   clarification, Your Honor.

16                              *   *   *

17             COURT SECURITY OFFICER:  All rise.

18             THE COURT:  The Court would note the presence of the

19   ladies and gentlemen of the jury, counsel, of course the

20   parties.

21   BY MS. THOMPSON:

22   Q.  Special Agent Mullen, have you reviewed the 19 pages that

23   make up Exhibit 11, specifically Exhibits 11A through S?

24   A.  Yes, I have.

25   Q.  Does each page in that exhibit depict one of the victims of

1  the C Baby series?

2  A.  Yes, it does.

3  Q.  Do they fairly and accurately depict the victims at or near

4  the time of the sexual exploitation?

5  A.  Yes, it does.

6          MS. THOMPSON:  Government offers Exhibit 11.

7          MR. EDWARD BARTOLOMEI:  Renew our objection as

8  previously stated.

9          THE COURT:  They'll be received.

10 BY MS. THOMPSON:

11 Q.  Special Agent Mullen, with regard to Exhibit 11, I'll have

12 you look at specifically Government Exhibit 11a, Exhibit M,

13 Exhibit N, as in Nancy, Exhibit O and Exhibit P.  Do those all

14 depict the child known as C Baby One?

15 A.  Yes, they do.

16 Q.  Do the rest of the exhibits in Government Exhibit 11 depict

17 the victim known as C Baby Two?

18 A.  Yes, they do.

19 Q.  I'm going to draw your attention specifically to Exhibit

20 11N titled Kitty Five-year-old C Baby Seven.  Do you see that

21 one?

22 A.  Yes, I do.

23 Q.  What is depicted in that exhibit?

24 A.  It depicts a approximately three-year-old, she was either

25 three or four at the time depending on the exact date of this

1  video.  She is performing oral sex on an adult male with adult

2  male standing up and there's a computer behind it.

3  Q.  And she's a real child?

4  A.  She is.

5  Q.  You have met her as well as C Baby Two?

6  A.  Yes, ma'am.

7  Q.  How old was the victim identified as C Baby Two in the

8  images that depict her?

9  A.  She was eight at the time.

10  Q.  Are you aware of whether or not those images of C Baby One

11  and Two have been located in other jurisdictions?

12  A.  Yes, they have.

13  Q.  How do you know that?

14  A.  I testified in numerous states and in Germany where they've

15  been found in other investigations.

16  Q.  Are you also familiar with the child pornography series

17  known as MC Girl?

18  A.  Yes, I am.

19  Q.  What does that stand for?

20  A.  The MC stands for Minecraft, and then Girl.

21  Q.  What was your role in that investigation?

22  A.  I was the lead investigator on that case as well.

23  Q.  How did that case begin?

24  A.  I received the lead from our headquarters where they had

25  conducted an undercover session online and received one of the

1   videos via e-mail depicting the two girls.

2   Q.   And FBI headquarters is located in what state?

3   A.   I'm sorry, Major Case Coordination Unit operates out of

4   Linthicum, Maryland.

5   Q.   What happened when you received that lead?

6   A.   Well, that lead -- from that video they identified a shirt

7   which they believed might possibly be associated with an

8   elementary school in the Austin area.  I went out and talked to

9   the elementary school and they were able to provide me

10  yearbooks of that particular year with those girls T-shirts on.

11  And from there, due to the names that the offender mentions

12  during the video, we were able to match the names and then go

13  find the girls and talk to them and their family.

14  Q.   So you personally met both victims depicted in the MC Girl

15  series?

16  A.   Yes, ma'am.

17  Q.   How old were they at the time the images were produced?

18  A.   Four and five.

19          MS. THOMPSON:  May I approach, Your Honor?

20          THE COURT:  You may.

21  BY MS. THOMPSON:

22  Q.   Where were those two children sexually assaulted and

23  exploited?

24  A.   In an apartment complex on the Northwest side of Austin.

25  Q.   Showing you what's been marked for identification as

Special Agent Sean Mullen - Examination          130

1   Government Exhibit 12 that contains three pages, 12a, b and c,

2   do you recognize those?

3   A.   I do.

4   Q.   What do they depict?

5   A.   They depict the two victims known as MC Girl One and Two

6   engaged in masturbation and oral sex as well as the adult male

7   offender in at least one of them.

8   Q.   Are those the two children that you rescued during the MC

9   Girl investigation?

10          THE COURT:  Which ones are these?

11  A.   Yes, they are.

12          THE COURT:  All right.

13          MS. THOMPSON:  Government offers Exhibit 12 containing

14  12a, b and c?

15          MR. EDWARD BARTOLOMEI:  Note our objection as

16  previously stated, Your Honor.

17          THE COURT:  It will be received.  The objection is

18  overruled.

19  BY MS. THOMPSON:

20  Q.   Based on an interview with the perpetrator in the MC Girl

21  series, are you aware of whether those images were posted

22  online?

23  A.   Yes, they were posted on a site called Lolita City which is

24  on the TOR network, it's known as a hidden service website.

25  Q.   Briefly explain, or if you can do it briefly, the TOR

1   website?

2   A.   Sure.   The TOR network stands for the onion router is what

3   the T-O-R stands for, the series of computers that allow folks

4   to search the Internet anonymously, kind of hides you.   So if

5   you're a hidden service, for example, it would be on one side

6   of this network of computers and you'd be on this side.   And as

7   I try to go to it -- typically if you go to CNN or ESPN, you're

8   going straight to the website.   Through TOR you are going to

9   bounce around several TOR nodes which are other computers.   If

10  I wanted to at my home I could set it up as a TOR node, anybody

11  could, and then it bounces around before it gets there, kind of

12  masking who you are.   And on the same node, the hidden service

13  because it's connected directly to the TOR network and can only

14  be accessed from the TOR network, you can't tell who that true

15  IP address is or who the provider or the hoster of that service

16  is.

17  Q.   You said they were posted on LolitaCity.com?

18  A.   Well, Lolita City is the name of the website, the actual

19  URL will be a random string of numbers and end in .onion.

20  Q.   Based on your experience and training, is the term "Lolita"

21  significant to child pornography investigations?

22  A.   Yes, it typically references child pornography.

23            THE COURT:   I have a question here.   I think there may

24  be some confusion, not on your part, but I've noted this in

25  other matters.   When someone opens up, typical person opens up

1  a computer and let's say they go to Yahoo or Google and

2  something and they're looking for a recipe or they're looking

3  for some news about an event that happened somewhere in the

4  country, they're not on the TOR network, are they?

5          THE WITNESS:  Not typically, no, you have to

6  install --

7          THE COURT:  You have to install special software to

8  get onto the TOR network, is that right?

9          THE WITNESS:  Correct.  Or plug into a browser.

10          THE COURT:  Plug into a browser.  You can't just open

11  up Google and Google something.

12          THE WITNESS:  Typically, no, you cannot do that.

13          THE COURT:  You're not going to get on the TOR

14  network.

15          THE WITNESS:  No.

16          MS. THOMPSON:  Your Honor, at this time I'd like to

17  publish one image from each series.

18          THE COURT:  You may do so.

19          MS. THOMPSON:  Thank you, Your Honor.

20          MR. EDWARD BARTOLOMEI:  Again, Your Honor, we renew

21  our objections.

22          THE COURT:  All right.

23  BY MS. THOMPSON:

24  Q.  I'm showing you what's been admitted as Government Exhibit

25  11n, is that the child known as C Baby One?

1    A.  Yes, it is.

2            THE COURT:  And this child was how old at the time?

3            THE WITNESS:  She was three or four.  The videos, the

4    exact recording date on them is not known, but we do know when

5    the time frame of the videos had to have occurred was.

6            THE COURT:  Three or four years old.

7            THE WITNESS:  Correct.

8    BY MS. THOMPSON:

9    Q.  I'm now showing Government Exhibit 13b.  Is this the child

10   identified in the Tent series?

11   A.  Yes, it is.

12   Q.  And was she approximately ten years old at the time she was

13   sexually exploited?

14   A.  Yes, she was.

15   Q.  And the series you just described, the MC Girl series,

16   Exhibit 12c shows both the children, Exhibit 12a shows one of

17   the children.  Is that one of the children you identified in

18   the MC Girl series?

19   A.  Yes, it is.

20   Q.  And the title of that image is MC Girl Common Vibe.  Is

21   that a vibrator that's being used in the images?

22   A.  Yes, it is.

23   Q.  And in some of the images is she bound by a white rope at

24   her ankles?

25   A.  Those are actually I believe her underwear.

Special Agent Sean Mullen - Examination          134

1  Q.  That's her underwear around her ankles?

2  A.  Yes, I believe it is.  I can't see from that video, but

3  from my recollection, that's what it was.

4          THE COURT:  How old was this child?

5          THE WITNESS:  She was either four or five.  They look

6  very similar so without the other one next to them, I can't

7  determine which one is which.

8          MS. THOMPSON:  May I approach, Your Honor?

9          THE COURT:  Yes.

10  BY MS. THOMPSON:

11  Q.  In Exhibit 12a that we just saw a part of, I don't know if

12  that will help you, but there are a few screen shots of the

13  child's face.  I know they do look very similar.

14  A.  That is MC Girl Two.  She's the younger of the two.

15          MS. THOMPSON:  Exhibits 11, 12 and 13 have been

16  offered and admitted.  Is that correct, Your Honor?

17          THE COURT:  It is.

18          MS. THOMPSON:  Thank you.  Nothing further.

19          THE COURT:  Any cross-examination?

20          MR. EDWARD BARTOLOMEI:  Just briefly, Your Honor.

21                    CROSS-EXAMINATION

22  BY MR. EDWARD BARTOLOMEI:

23  Q.  How are you today, agent?

24  A.  Doing well.  How are you doing?

25  Q.  Seen you in the lobby, but we haven't visited about this

1    case, have we?

2    A.  We have not.

3    Q.  I notice you have extensive experience in this particular

4    area, is that correct?

5    A.  Twelve years, yes.

6    Q.  And you've testified in many states, is that correct?

7    A.  I have.

8    Q.  And you've identified certain photos here as being in

9    different states at different times, is that correct?

10   A.  That's correct.

11   Q.  I want to ask you this.  If it came on a thumb drive to

12   those states from some person handing it to another, do you

13   know whether it happened in those states?

14   A.  I do not know that, no.

15   Q.  How about -- that goes to any of those exhibits, would that

16   be correct?  Of the ones that you've shown.

17          THE COURT:  Are you asking him whether these images

18   came on a thumb drive or whether they could come on a thumb

19   drive in addition to the Internet?  What are you asking him?

20   BY MR. EDWARD BARTOLOMEI:

21   Q.  What I'm asking, Your Honor, is the states that you've

22   testified in other states, do you know how they arrived in

23   those states in the computers that they were seized?

24   A.  No, I do not.

25   Q.  And do you know who put them in there?

1   A.  No, I do not.

2   Q.  In this particular case, you viewed evidence.  Do you know

3   how they arrived in the computer that they are allegedly seized

4   from?

5   A.  No, I do not.

6   Q.  And do you know who put them in there?

7   A.  No, I do not.

8   Q.  So they are photos of young children engaged,

9   unfortunately, in rather compromising and distasteful conduct,

10  is that correct?

11  A.  That is correct.

12       MR. EDWARD BARTOLOMEI:  Nothing further, Your Honor.

13  Thank you.

14       MS. THOMPSON:  Your Honor, just a few questions to

15  clarify.

16                    REDIRECT EXAMINATION

17  BY MS. THOMPSON:

18  Q.  In Exhibit Number 12, the MC Girl series, were those images

19  uploaded to Lolita City?

20  A.  Yes, they were.

21  Q.  And that's on the Internet?

22  A.  Yes, it is.

23  Q.  Are you aware of the images in Exhibit 11, the C Baby

24  series and 13, the Tent series also being traded online on the

25  Internet?

1          MR. EDWARD BARTOLOMEI:  Objection to the word

2    "traded", Your Honor, how they traveled, Your Honor, is the

3    issue, how they arrived.  It's leading for sure.

4          MS. THOMPSON:  I'll change the question.

5    BY MS. THOMPSON:

6    Q.  Are you aware of whether those images have traveled in

7    interstate commerce on the Internet?

8    A.  Yes, I am.

9    Q.  And have they?

10   A.  Yes, they have because I've seen them in my own

11   investigations as well.

12          MS. THOMPSON:  Thank you.  Nothing further.

13          MR. EDWARD BARTOLOMEI:  One follow-up question.

14          THE COURT:  Sure.

15                    RECROSS-EXAMINATION

16   BY MR. EDWARD BARTOLOMEI:

17   Q.  In this particular case and in those particular cases where

18   you testified previously, you don't know how they arrived.

19   They've been in interstate somewhere, but you don't know

20   specifically whether in this case they came through the

21   Internet, do you?

22          MS. THOMPSON:  Objection, asked and answered.

23          THE COURT:  Overruled.

24   BY MR. EDWARD BARTOLOMEI:

25   Q.  Do you?

1   A.  Can you repeat the question please?

2          THE COURT:  Are you asking him whether they ever went

3   through the Internet or are you asking him if they got into the

4   computer through the Internet or got into the computer through

5   them being downloaded from the Internet onto a hard drive and

6   then put on the computer?  I don't know what you're asking him.

7          MR. EDWARD BARTOLOMEI:  He testified previously, Your

8   Honor, on direct examination --

9   BY MR. EDWARD BARTOLOMEI:

10  Q.  You testified in Georgia, you testified in some of those

11  other states that you didn't know how they arrived on the

12  computers, isn't that true?

13  A.  Rephrase.  I'm not exactly sure what you're asking.

14         THE COURT:  I'm having a hard time understanding that

15  as well.

16         MR. EDWARD BARTOLOMEI:  I'll rephrase, Your Honor.

17  BY MR. EDWARD BARTOLOMEI:

18  Q.  In Georgia you testified you had seen the photo, correct?

19  You saw the photo from a computer, that was recovered from a

20  computer?

21  A.  Okay.  Rephrase again.  I'm sorry, I'm not understanding

22  what you're trying to ask me.

23  Q.  Let me go forward.  In this particular case, photos were

24  allegedly recovered from a computer.

25  A.  I don't know the details of the case.

```
 1    Q.  Could they have come by a thumb drive?
 2            MS. THOMPSON:  Objection, calls for speculation.
 3            THE COURT:  Yeah, he doesn't know the details of this
 4    case, so he can't answer that question.
 5    BY MR. EDWARD BARTOLOMEI:
 6    Q.  Do you know if they came in the interstate?
 7    A.  I know that they're images of victims I've met.  I do not
 8    know how they got here.
 9            MR. EDWARD BARTOLOMEI:  That's all I need.  Thank you.
10            MS. THOMPSON:  Nothing further.
11            THE COURT:  You can step down special agent.  Thank
12    you.
13            THE WITNESS:  Thank you, sir.
14            MS. THOMPSON:  May he also be excused, Your Honor.
15            THE COURT:  He may be, yes.
16            MS. THOMPSON:  Government calls former special agent,
17    Donna DePaola.
18                          *   *   *
19            COURTROOM DEPUTY CLERK:  Please raise your right hand.
20                          *   *   *
21         (DONNA DePAOLA, Government Witness, Sworn.)
22                          *   *   *
23            THE WITNESS:  Yes, ma'am.
24            COURTROOM DEPUTY CLERK:  You can have a seat.
25                       DIRECT EXAMINATION
```

Special Agent Donna DePaola - Examination          140

1    BY MS. THOMPSON:

2    Q.  Please state your name for the record.

3    A.  Donna DePaola.

4    Q.  Where are you currently employed?

5    A.  I am unemployed.  I retired last year.

6    Q.  Where did you retire from?

7    A.  The Department of Homeland Security.

8    Q.  What was your position within the Department of Homeland

9    Security?

10   A.  I was a special agent for the last 27 years.

11   Q.  And when did you retire?

12   A.  September last year.

13   Q.  Prior to your retirement, what was your assignment as a

14   special agent?

15   A.  I was assigned in the San Antonio Office to the Child

16   Exploitation Group.

17   Q.  How long did you work child exploitation crimes?

18   A.  Approximately 14 years.

19   Q.  What was your educational background prior to joining

20   Homeland Security Investigations?

21   A.  I graduated with a Bachelor's degree in jurisprudence.

22   Q.  Are you familiar with the case against the defendant,

23   Jeffrey Michalik?

24   A.  Yes, ma'am.

25   Q.  What was your role in the investigation of this case?

1   A.   I helped the case agent Special Agent Juarez basically with

2   surveillance, the search warrant and interviewing of

3   Mr. Michalik.

4   Q.   Did you also review the lead information that was sent from

5   the Cyber Crimes Center in Virginia to San Antonio?

6   A.   Yes, I reviewed the images.

7   Q.   When you were assisting in surveillance of this case, did

8   you ever see the defendant at 9718 Hidden Iron Street?

9   A.   Yes, ma'am.

10  Q.   Did you notice anything about what he had with him that was

11  significant to your investigation?

12  A.   On one occasion he had a bag with him, a satchel.

13  Q.   Approximately how big was the bag?

14  A.   So big, like a brief case.

15  Q.   And what did he do with it?

16  A.   He placed it in his vehicle.

17  Q.   Was he leaving the home on Hidden Iron Street?

18  A.   Yes, ma'am.

19  Q.   Did you also review the Search Warrant in this case

20  including the application for the Search Warrant?

21  A.   Yes, ma'am.

22  Q.   Did you do that prior to assisting with the execution of

23  the warrant?

24  A.   Correct.

25  Q.   Why?

Special Agent Donna DePaola - Examination        142

1    A.  Just to be familiar with the case, look what we're

2    searching for, the websites of interest.

3    Q.  What is a Search Warrant?

4    A.  A Search Warrant is a document that is signed by a Federal

5    judge that commands us to execute it at a location, in this

6    case, Mr. Michalik's residence, for computers and other things

7    related to child pornography violations.

8    Q.  Was that Search Warrant executed on October 22nd of 2015?

9    A.  Yes, ma'am.

10   Q.  And did the defendant live at 9718 Hidden Iron Drive in San

11   Antonio?

12   A.  Yes, ma'am.

13   Q.  What time did the Search Warrant occur?

14   A.  Approximately around 6:30 we saw the individual depart the

15   residence.

16   Q.  And when you say "the individual", who do you mean?

17   A.  I'm sorry.  Mr. Michalik.

18   Q.  How many agents were present for the execution of the

19   Search Warrant?

20   A.  I would say seven to eight agents and probably three other

21   forensic analysts that do not carry guns.

22   Q.  How are you dressed when you execute a Search Warrant?

23   A.  We're dressed in obviously our gear, I have a bullet proof

24   vest on and my firearm.

25   Q.  Is that standard procedure for every Search Warrant that's

1  executed?

2  A.  Yes, ma'am.

3  Q.  Do the special agents have weapons with them during the

4  execution of the Search Warrant?

5  A.  Yes, ma'am.

6  Q.  Is that also standard procedure?

7  A.  Yes, it is.

8  Q.  You mentioned the forensic examiners may not be carrying

9  weapons, correct?

10  A.  The three Wounded Warriors that were forensic analysts do

11  not carry weapons.  In fact, they would have never made the

12  initial entry.  They would have stayed in their vehicles until

13  we cleared the scene.

14  Q.  And then they're brought into the scene?

15  A.  Correct.

16  Q.  You said you got to the defendant's house.  What happened

17  right when you got there?

18  A.  Myself and Special Agent Juarez were parked across the

19  street waiting for Mr. Michalik to depart the residence and go

20  to his vehicle.

21  Q.  Why do you wait for him to come out of the house?

22  A.  It's safer for both the agents and the occupants of the

23  house.  Instead of going up to the residence at 6:00 in the

24  morning, banging on their door, agents with a Warrant,

25  collectively in a group that we've worked together for, you

1   know, numerous years, we thought it was, you know, safer for

2   everybody concerned to do it at the vehicle instead of waking

3   everybody up and rousing them that way.

4   Q.  Were you aware of, other than the defendant, who else may

5   live in the house?

6   A.  Yes.

7   Q.  Who did you believe lived in the house prior to the

8   execution of the Search Warrant?

9   A.  His common-law wife, Ms. Rivas, and I believe maybe

10  Ms. Rivas's son -- sorry, brother and sister-in-law.

11  Q.  When the defendant comes out of the house, you said that

12  was about 6:30, what happens?

13  A.  Myself and Special Agent Juarez and Special Agent Miller

14  approach him at his vehicle.

15  Q.  What, if anything, do you say to him?

16  A.  That we're executing a Search Warrant at his residence.

17  Q.  Do you identify yourselves?

18  A.  Yes.

19  Q.  How do you identify yourselves?

20  A.  That we're special agents with Department of Homeland

21  Security with a Warrant.

22  Q.  How did he react?

23  A.  He was a little startled, 6:30 in the morning, but he was

24  compliant.

25  Q.  At this time it's just the three of you, yourself, Special

1    Agent Juarez and Special Agent Miller that have approached him,

2    correct?

3    A.   Correct.

4    Q.   The other agents are not yet in the vicinity?

5    A.   They may be making their way towards the door.

6    Q.   What else do you tell him other than to identify yourself

7    and that you have a Search Warrant?

8    A.   We asked if there was any weapons in the house, if there

9    was a dog present and how many occupants were in the house.

10   Q.   What did the defendant tell you?

11   A.   He said there weren't any weapons and there were not any

12   animals and that there are approximately three people in the

13   residence.

14   Q.   What happens after that?

15   A.   We ask him if he would go to the front door with us and

16   open the door.  And I'm not positive if he opened the door or

17   if his keys were given to Special Agent Miller and Special

18   Agent Miller opened the door.

19   Q.   What happens after the door to the residence is opened?

20   A.   We all go in and then we ask Mr. Michalik if he would call

21   down to the other occupants so we can gather them in the living

22   room.

23   Q.   Why is that necessary?

24   A.   For everybody's safety.  We want everybody in one common

25   area so that we can then conduct a security sweep for safety.

Special Agent Donna DePaola - Examination          146

1   Q.  Why did you ask the defendant to call down his family?

2   A.  So that people would hear a familiar voice.

3   Q.  You mentioned doing a security sweep of the home.  What is

4   that?

5   A.  A security sweep is when all the agents will basically

6   clear all the rooms of the house and they're searching for

7   weapons and other individuals that may be present.

8   Q.  Is that done upon initial entry into the house?

9   A.  Yes.

10  Q.  And that's done for what reason?

11  A.  It's done for, you know, the safety of the agents present

12  and obviously the occupants as well.

13  Q.  How long did the security sweep of the defendant's house

14  take?

15  A.  Probably seven to nine minutes, roughly.

16  Q.  Is that also standard procedure for the execution of any

17  Search Warrant?

18  A.  Yes, ma'am.

19  Q.  Who was found inside the house?

20  A.  Mr. Michalik's common-law wife, Ms. Rivas, Ms. Rivas's

21  mother and then also Ms. Rivas's 12 to 13-year-old daughter.

22  Q.  And during the security sweep, where did you say the

23  occupants of the house are?

24  A.  They are placed in like the living room area.

25  Q.  During the protective or the security sweep, do agents have

1  guns out?

2  A.  During the security sweep, yes.

3  Q.  Why is that?

4  A.  Because we're not sure who we're going to encounter.

5  Q.  After the security sweep is done, after those first few

6  minutes, what happens to the weapons that the agents have out?

7  A.  They're holstered.

8  Q.  During the security sweep of the house, what are you doing?

9  A.  I'm talking with Mr. Michalik with Special Agent Juarez.

10  Q.  What do you tell him?

11  A.  I tell him that there's a Search Warrant being executed at

12  the house, that it's not an arrest warrant.  He's free to

13  leave.

14  Q.  Is anybody handcuffed inside the house?

15  A.  No, ma'am.

16  Q.  Is anybody physically restrained in the house?

17  A.  No, ma'am.

18  Q.  They're told there was a Search Warrant being executed.

19  Are they provided a copy of the Search Warrant?

20  A.  I believe we gave it to Mr. Michalik.

21  Q.  Are they told about -- what are they told about the Search

22  Warrant that's ongoing in the house?

23  A.  That agents are going to search the home, that it is just a

24  Search Warrant and that no one is under arrest.  That if people

25  needed to leave to go to work or school, just inform the people

1   at the Search Warrant location or the agents at the Search

2   Warrant location.

3   Q.  Are they told they're free to leave?

4   A.  Yes, they are.

5   Q.  Are they told they can't interfere with the search?

6   A.  Correct.

7   Q.  Why is that?

8   A.  Well, we want them normally in one specific place and

9   that's common to all of our Search Warrants.  That way they're

10  not interfering with us and we don't have random people just,

11  you know, walking around the house.

12  Q.  So when you execute a Search Warrant, I can leave?

13  A.  You can leave.

14  Q.  I just can't walk around the house?

15  A.  You cannot.

16  Q.  What was the demeanor of the defendant as you were

17  explaining that this was a Search Warrant and nobody would be

18  arrested?

19  A.  He was cooperative.

20  Q.  What else did you ask him?

21  A.  I asked him if he would be willing to talk with Special

22  Agent Juarez and I in my vehicle.

23  Q.  How did he respond to that question?

24  A.  He said that he was willing to speak with us.

25  Q.  Why did you suggest speaking with him in your vehicle?

1  A.  Typically because the agents are going to be throughout the

2  house conducting the Search Warrant and, therefore, we don't

3  want to be -- when we're interviewing him we don't want to be

4  interfered with.  And it's more private and the material that

5  we're discussing, child pornography, is sometimes embarrassing

6  to people, so we found it more comfortable for people to be in

7  the vehicle.

8  Q.  And you mentioned the defendant said he was willing to

9  speak with you?

10  A.  Yes, ma'am.

11  Q.  Did he ever ask to have somebody else present during the

12  interview with you?

13  A.  He did not.

14  Q.  After he agrees to speak with you in your vehicle, what

15  happens?

16  A.  Myself, Special Agent Juarez and Mr. Michalik walk to my

17  vehicle.

18  Q.  And where was your vehicle?

19  A.  I believe across the street.

20  Q.  What type of vehicle was it?

21  A.  A GMC Acadia.

22  Q.  Who arrived for the execution of the Search Warrant in your

23  vehicle?

24  A.  I believe myself and Special Agent Juarez.

25  Q.  Did you park across the street so you could see the front

1  door of the house?

2  A.  Yes, ma'am.

3  Q.  When you went out to your vehicle, what happens for the

4  interview?

5  A.  I get into the driver seat, Mr. Michalik gets into the

6  passenger seat and Special Agent Juarez gets in the rear seat.

7  Q.  So the defendant is in the front passenger seat?

8  A.  Yes, ma'am.

9  Q.  Is the car locked once he gets in?

10 A.  I do not recall.

11 Q.  Is the air conditioner on?

12 A.  It is.

13 Q.  Why?

14 A.  Because it's Texas and it might be hot, for everybody's

15 comfort.

16 Q.  What's the demeanor of the defendant at this point?

17 A.  He was cordial and cooperative.

18 Q.  Describe your interview with the defendant, what do you say

19 to him when you get in the car?

20 A.  When we get in the vehicle, again I reiterate that it is

21 just a Search Warrant, that he's not under arrest, he's free to

22 leave and he doesn't have to answer any of my questions.

23 Q.  Does he indicate in any way that he understood that?

24 A.  Yes, he said he understood that.

25 Q.  How long does the interview last?

1   A.   Forty-five minutes to an hour.

2   Q.   Did the defendant ever stop the interview at any time?

3   A.   He did not.

4   Q.   Did he ever refuse to answer any of your questions?

5   A.   He did not.

6   Q.   Did he ever ask you any questions?

7   A.   Towards the end.

8   Q.   Do you remember what he asked?

9   A.   He just asked what was going to happen after the Search

10  Warrant was over.

11  Q.   During the interview, did his demeanor change at all?

12  A.   No.

13  Q.   Did he remain cooperative?

14  A.   Yes, he did.

15  Q.   Did anybody raise their voice during the interview?

16  A.   No, ma'am.

17  Q.   Were any threats made to the defendant?

18  A.   No, ma'am.

19  Q.   Any promises made to him?

20  A.   No, ma'am.

21  Q.   After you tell him that he's free to leave and doesn't have

22  to talk to you, how does the interview progress?

23  A.   I basically ask him if he was from San Antonio, Texas.  He

24  advised that he was, that he had gone to Jefferson High School.

25  I asked him how long he had resided at that particular house

1    and I think he said two years.

2    Q.  Did you discuss his employment?

3    A.  I did.

4    Q.  What did he tell you?

5    A.  He owned a cabinet shop with his brother.

6    Q.  What else do you ask him?

7    A.  I ask him who else resides permanently at the residence and

8    that's when he advised Ms. Rivas, Ms. Rivas's mother and also

9    Ms. Rivas's 12 to 13-year-old child.

10   Q.  You mentioned that during -- prior to the Search Warrant,

11   you had information that perhaps two other adults, the

12   defendant's brother and sister-in-law perhaps lived at the

13   residence.  Did the defendant address that in the interview at

14   all?

15   A.  I believe he addressed that it was Ms. Rivas's brother and

16   sister.  I might have that wrong, it might be sister and

17   brother-in-law.

18   Q.  Did they live at the residence?

19   A.  I know that they would stay there occasionally.

20   Q.  Did you ask him about his Internet service?

21   A.  I did.

22   Q.  Why?

23   A.  Because we're there for computer-related crimes.

24   Q.  What did he tell you about the Internet provider?

25   A.  He advised that it was AT&T and that it was a secure

1    connection.

2    Q.  What does it mean to be a secure connection?

3    A.  That you need a password to access it and log on to the

4    Internet at that particular residence.

5    Q.  Did the lead information that you received indicate that

6    AT&T was the service provider at that house in August of 2014?

7    A.  Correct.

8    Q.  At this point as you're executing the Search Warrant, do

9    you have information that child pornography files were

10   downloaded from the IP address at that house?

11          MR. RICHARD BARTOLOMEI:  Objection, Your Honor,

12   leading.

13          THE COURT:  Sustained.

14   BY MS. THOMPSON:

15   Q.  What led to the Search Warrant in this case?

16   A.  An IP address that was associated with the residence was

17   linked to that -- to Mr. Michalik because he was the subscriber

18   of the Internet during the dates that the downloads occurred.

19   Q.  Prior to the execution of the Search Warrant, did you know

20   who had downloaded child pornography from that residence?

21   A.  We did not.

22   Q.  During the interview, do you talk about the electronic

23   devices that are at the house?

24   A.  We do.

25   Q.  What does the defendant tell you?

1  A.  He advises that there was a desktop computer, a tablet,

2  some phones, an external hard drive, a thumb drive that he

3  believed that was connected into the desktop computer, an iPod

4  that was in his vehicle and the Dell laptop that was at his

5  office.

6  Q.  Did you ask him what he used the Internet for?

7  A.  I did.

8  Q.  What did he tell you?

9  A.  Work and fantasy football.

10  Q.  And he stated he used the Internet at home for work?

11  A.  Correct.

12  Q.  Is that when the defendant tells you he also has a Dell

13  laptop at his office?

14  A.  Correct.

15  Q.  What else does he say about that?

16  A.  He advised that he uses it primarily at his office and

17  occasionally he would bring it home.

18  Q.  Did he indicate how long he's had that Dell laptop

19  computer?

20  A.  For a couple of years.  I think three years to be exact.

21  Q.  Did he say where he obtained the laptop computer?

22  A.  From the owner of the business that he used to work at, I

23  think HomeArama.

24  Q.  Did you then have a discussion about his use of the Dell

25  laptop computer?

Special Agent Donna DePaola - Examination          155

1    A.   Yes.

2    Q.   What did he tell you he used that for?

3    A.   To search pornography at his work.

4    Q.   What did you ask him after he provided that information?

5    A.   I asked him if he had viewed child pornography on the

6    laptop and he said he doesn't like to look at child pornography

7    because, you know, the younger ones, but it was more of a high

8    school age that he preferred.

9    Q.   Did he indicate whether he has seen child pornography on

10   that Dell laptop?

11   A.   Yes.

12   Q.   Did he say where he obtained the child pornography that he

13   saw on the laptop?

14   A.   Various websites.

15   Q.   Did you ask him about a specific website?

16   A.   I did.

17   Q.   Why?

18   A.   Because that was the original lead.

19   Q.   And what was that website that was connected to the

20   original lead?

21   A.   Amateur Lovers.

22   Q.   What did he tell you about his familiarity with Amateur

23   Lovers?

24   A.   He was not familiar with it.

25   Q.   Did he indicate whether anybody else had used the Dell

1    laptop computer?

2    A.   He advised that he was the sole user.

3    Q.   What else do you ask him?

4    A.   I asked him what search terms that he used.

5    Q.   What did he tell you he used for search terms?

6    A.   Excuse my language.   Puffy pussies.

7    Q.   And that's puffy, P-U-F-F-Y?

8    A.   Yes.

9    Q.   What else?

10   A.   Sexy teens, young sexy teens, yoga pants and Lolitas.

11   Q.   Based on your experience and training, what does the term

12   "Lolitas" refer to?

13   A.   Typically depicts children that are minors and they're

14   naked displaying their genitalia in a lascivious manner or

15   engaged in sexual activity.

16   Q.   Did you ask him about a specific child pornography term?

17   A.   I did.

18   Q.   What was that?

19   A.   PTHC.

20   Q.   What does PTHC mean?

21   A.   Pre-teen hard core.

22   Q.   How did he respond when you asked him if he was familiar

23   with that term?

24   A.   That it referred to younger ones.

25   Q.   At this point in the interview, has his demeanor changed at

1    all?

2    A.   No, ma'am.

3    Q.   Is he still being cooperative?

4    A.   Yes, ma'am.

5    Q.   How would you describe the atmosphere in the vehicle?

6    A.   I mean we were all engaging, cordial and respectful.

7    Q.   Do you ask him about his level of computer experience?

8    A.   I do.

9    Q.   How do you ask that?

10   A.   I asked him how computer savvy he was.

11   Q.   What did he say?

12   A.   That he was not very computer savvy.

13   Q.   At some point in the interview, do you show him some

14   images?

15   A.   I do.

16   Q.   What are those images of?

17   A.   Those five images were from the original lead.

18   Q.   Do they depict child pornography?

19   A.   They do.

20           MS. THOMPSON:  May I approach, Your Honor?

21           THE COURT:  Sure.

22   BY MS. THOMPSON:

23   Q.   Special Agent DePaola, I'm going to show you what has been

24   admitted as Government Exhibit A and B and marked for

25   identification as C, D and E and ask that you review those.

Special Agent Donna DePaola - Examination          158

```
 1         (Pause.)
 2         Do you recognize those?
 3    A.   I do.
 4    Q.   What are they?
 5    A.   They're the images that I presented to Mr. Michalik.
 6    Q.   How did you present those to him during the interview?
 7    A.   I asked him if he would be willing to see five of the
 8    images that we believe he downloaded, and he agreed.
 9    Q.   Did you explain that they -- you said that he downloaded,
10    that they were downloaded from his house?
11    A.   Correct.
12    Q.   What happened when he reviewed them?
13    A.   He did not identify three of them and only identified two
14    of the images that he had seen previously.
15    Q.   What happened after he identified two of them?
16    A.   I had him initial and date those.
17              MS. THOMPSON:  May I approach again, Your Honor?
18              THE COURT:  Yes.
19              MR. RICHARD BARTOLOMEI:  Your Honor, may I accompany
20    so I can see?
21              THE COURT:  Of course, no problem.
22              MR. RICHARD BARTOLOMEI:  Excuse me.
23              (Pause.)
24    BY MS. THOMPSON:
25    Q.   Are exhibits 5a and 5b the two that were shown to the
```

1   defendant and that he said he recognized?

2   A.   Yes, ma'am.

3   Q.   And did you watch him initial those?

4   A.   I did.

5   Q.   Did you ask him where he recognized them from?

6   A.   Yes, ma'am.

7   Q.   What did he say?

8   A.   Initially he said he had seen them on several websites.

9   Q.   Did he give you the name of a specific website?

10  A.   He recollected that after talking about it for a little

11  bit, he said that it was from the Little Puffy Pussies website.

12  Q.   Did he say what computer he used to -- what computer he was

13  using when he saw these images?

14  A.   His laptop computer that's at the office.

15  Q.   How does the interview progress from there?

16  A.   I basically ask him when was the last time he saw child

17  pornography.

18  Q.   How did he answer?

19  A.   He said the last child pornography video or image he saw

20  was titled Little Blow Job and it depicted a 14-year-old

21  performing fellatio.  And then I guess a couple days before the

22  Warrant on October 19th, there was a video that was called Best

23  Good Lay and Dogie Style that he had seen which depicted a

24  minor engaged in sexual activity.

25  Q.   Did he give you the date of October 19th?

1   A.   Yes.

2   Q.   Did he indicate whether or not he had recently searched for

3   any pornography?

4   A.   He said that a couple days prior to the Warrant he did use

5   yoga pants, I believe and -- I'm sorry -- the Puffy Pussy one.

6   Q.   What happens after he describes seeing child pornography on

7   the laptop computer?

8   A.   Since there was a minor in the house, I asked him did we

9   need to be concerned about the 13-year-old that was present at

10  the house.

11  Q.   How did he respond?

12  A.   He said that he had not had any -- he did not have any

13  inappropriate relations with that individual and that the

14  grandmother was very protective of the child.

15  Q.   Did you learn during the execution of the Search Warrant or

16  during the investigation where the grandmother slept in the

17  house?

18  A.   Yes, ma'am.

19  Q.   Where did she sleep?

20  A.   In the first floor of the house in a bedroom --

21         MR. RICHARD BARTOLOMEI:  Your Honor, excuse me.  I'm

22  going to object to the relevance of any of this with regard to

23  the charge, has absolutely no relevance.

24         MS. THOMPSON:  I'll withdraw that question.

25         MR. RICHARD BARTOLOMEI:  Can I have, if it was, the

1    answer.

2              THE COURT:   She never answered.

3    BY MS. THOMPSON:

4    Q.  Did the defendant indicate who shared a room with the

5    grandmother?

6    A.  Yes, ma'am.

7    Q.  What did he say?

8    A.  He said that the 13-year-old child and the grandmother

9    slept in the room downstairs.

10   Q.  Did you ask the defendant about his level of honesty?

11   A.  I did.

12   Q.  Why did you do that?

13   A.  When we're basically finishing up, we always pose the

14   question, being honest, one not being very honest and ten being

15   honest, where would you rank yourself.  And he answered eight.

16   Q.  Were you made aware that during the execution of the Search

17   Warrant, the minor child and the grandmother left the house?

18   A.  I was.

19   Q.  Do you know where they went?

20   A.  I believe she was taken to school.

21   Q.  After you find out that the defendant has viewed child

22   pornography on the Dell laptop computer, what else do you ask

23   him?

24   A.  We ask if he would be willing to give us access to that

25   laptop.

1   Q.  How did he respond to that?

2   A.  He was cooperative and said he would.

3   Q.  Was he asked specifically about signing a consent form?

4   A.  He was.

5   Q.  Do you remember what you said to him?

6   A.  I said to get the laptop that it had to be voluntary and he

7   had to give us consent.

8   Q.  How did he respond?

9   A.  That he would.

10  Q.  Did the defendant also during the interview mention an

11  iPod?

12  A.  He did.

13  Q.  Where did he say that was located?

14  A.  In his vehicle.

15  Q.  What happened after he told you there was an electronic

16  device in the vehicle?

17  A.  We proceeded to go into the house.  I wasn't privy to the

18  search of the vehicle and I don't believe I was present when he

19  signed that consent form.  I believe that was Special Agent

20  Juarez.

21  Q.  The defendant provided consent, though, to search his truck

22  as well?

23  A.  Yes, ma'am.

24  Q.  At the time that he tells you -- or did he tell you where

25  the laptop computer was located?

1   A.  At his place of business.

2   Q.  At that time, did you know where his place of business was

3   located?

4   A.  Because he told us, yes.

5   Q.  He told you during the interview?

6   A.  Correct.

7   Q.  How does the interview in the vehicle end?

8   A.  We basically exit the vehicle and then we proceed to the

9   house and we're basically going to get Mr. Michalik's keys and

10  we're all going to take off and go to the office.

11  Q.  Did everybody let themselves out of the vehicle?

12  A.  To the best of my knowledge, yes.

13  Q.  What happens when you got into the house?

14  A.  We get his keys, myself and Special Agent Juarez go to my

15  vehicle and Special Agent Hefner goes to his and Mr. Michalik

16  goes to his vehicle.

17  Q.  He drives his own vehicle to the office?

18  A.  He does.

19  Q.  Is it just those three vehicles that leave, the defendant's

20  vehicle, you and Special Agent Juarez and then Special Agent

21  Hefner?

22  A.  Yes, ma'am.

23  Q.  In what order do you drive?

24  A.  Mr. Michalik is leading the way because he knows where

25  we're going and the rest of us follow and I'm not sure -- I

Special Agent Donna DePaola - Examination        164

1    would assume it was myself and Argie second, Special Agent

2    Juarez.

3    Q.  Are you two close friends?

4    A.  We are.

5    Q.  Do you stop anywhere on the way to the business office?

6    A.  We do.

7    Q.  Where do you stop?

8    A.  At the McDonald's.

9    Q.  Why do you stop at the McDonald's?

10   A.  Because Special Agent Hefner had to go to the restroom.

11   Q.  What happens when you make the stop at McDonald's?

12   A.  It was briefly, but I made it a point to go over to Mr.

13   Michalik and thank him for his cooperation and for taking us to

14   get the laptop.

15   Q.  How did he respond?

16   A.  He was cooperative.

17   Q.  How long did you stay at McDonald's?

18   A.  Not long.  I would say five to eight minutes tops.

19   Q.  Did the defendant ever indicate that he had changed his

20   mine?

21   A.  He did not.

22   Q.  After you stop at McDonald's, what happens?

23   A.  We proceed to the business.

24   Q.  How long does it take to get to the business?

25   A.  It was rush-hour traffic, to the best of my recollection,

1   you know, 20 to 30 minutes.

2   Q.  What happens when you get to the business?

3   A.  Mr. Michalik -- it's locked, so he actually unlocked the

4   door.

5   Q.  And this is the MB Cabinetry?

6   A.  Yes, ma'am.

7   Q.  Prior to him unlocking the door, do you ask him anything

8   about what's in the business?

9   A.  We asked the usual questions, Are there any weapons.

10  Q.  How did he respond?

11  A.  I believe he said that there was a rifle or a shotgun

12  somewhere in the business.

13  Q.  After he unlocks the door, what do you do?

14  A.  We all enter.  I know as soon as we enter there's some

15  cabinets.  I made some small-talk saying that those look very

16  nice.  And then we proceeded to follow him back to the office

17  space.

18  Q.  What does Special Agent Hefner do when you enter the

19  building?

20  A.  I can't recall whether -- I believe that the weapon was in

21  a closet or in a room off to the left, but my memory is failing

22  me there.  And if so, Special Agent Hefner cleared that weapon.

23  Q.  Did you ever see the weapon?

24  A.  No.

25  Q.  After the weapon is cleared, what happens?

1    A.   We proceed to where the offices are in the rear of the

2    business.

3    Q.   And who walks to the office first?

4    A.   Mr. Michalik.

5    Q.   Do you know where the office is in the building?

6    A.   I do not.

7    Q.   What happens when you get to the office area?

8    A.   We get to the office area, he grabs the laptop and he hands

9    it to Special Agent Juarez.

10   Q.   What happens after that?

11   A.   He's presented with a consent form to search that

12   particular laptop.

13        MS. THOMPSON:  Government Exhibit Three please.

14   BY MS. THOMPSON:

15   Q.   Is the consent form filled out at the time it's presented

16   to him?

17   A.   Yes, ma'am.

18   Q.   How does it get filled out?

19   A.   Special Agent Juarez filled it out.

20   Q.   Does she fill it out right there in the cabinet business?

21   A.   Yes.

22   Q.   What is the defendant doing at the time Special Agent

23   Juarez is filling out the consent form?

24   A.   He's standing next to her.

25   Q.   What happens after it's filled out?

 1   A.  He's presented with it by Special Agent Juarez, told to

 2   read it and then he signs it.

 3              MR. RICHARD BARTOLOMEI:  Excuse me, I'm going to

 4   object.  The hearsay statement, we've had the testimony of

 5   witness Juarez.  I would ask that the statement about what

 6   Juarez told him be stricken as hearsay and denial of right of

 7   confrontation after her testimony.

 8              THE COURT:  The objection is sustained.  The testimony

 9   will be stricken.

10              MR. RICHARD BARTOLOMEI:  May we have the answer

11   stricken?

12              THE COURT:  I just did it.

13   BY MS. THOMPSON:

14   Q.  Why is the consent form filled out at the business and not

15   at the house, if you know?

16   A.  Because we didn't have possession of the laptop yet.

17   Q.  Is that standard for individuals providing consent?

18              MR. RICHARD BARTOLOMEI:  I object, Your Honor.

19              THE COURT:  On what basis?

20              MR. RICHARD BARTOLOMEI:  One, it's not particularly

21   relevant, but two, if she's going to make self-serving

22   statements about a policy, I would ask for permission to voir

23   dire.  If you would like me to simply handle it on cross, I

24   will do so.

25              THE COURT:  I'm going to overrule the objection.  You

1    can handle that on cross.

2    BY MS. THOMPSON:

3    Q.   Did the defendant appear to read the consent form?

4    A.   Yes, ma'am.

5    Q.   Did he sign the consent form?

6    A.   He did.

7    Q.   Did you watch him sign the consent form?

8    A.   I did.

9    Q.   Did he ask any questions about the consent form?

10   A.   He did not.

11   Q.   Did he hesitate at all in signing the consent form?

12   A.   He did not.

13   Q.   What happened after the consent form was signed?

14   A.   We took the laptop and departed the location.

15   Q.   You and Special Agent Juarez get into your vehicle?

16   A.   Correct.

17   Q.   Does Special Agent Hefner get into his?

18   A.   He does.

19   Q.   And all of you leave?

20   A.   Correct.

21   Q.   What happens to the defendant?

22   A.   I would assume he just stayed at the business.

23   Q.   Did you conduct other interviews in this case?

24   A.   I did.

25   Q.   Did you meet with Crystal Rivas, the defendant's common-law

1   wife, later the same day that the Search Warrant was executed?

2   A.  Yes, ma'am.

3   Q.  How did that meeting come about?

4   A.  She had called Special Agent Juarez multiple times.  She

5   asked --

6           MR. RICHARD BARTOLOMEI:  May I interpose my objection

7   and ask that it precede the partial answer?  Now going into a

8   claim of statements made by a witness out of court, therefore,

9   hearsay and I would object and ask that the answer be stricken.

10          MS. THOMPSON:  It's not offered for the truth of the

11  matter asserted, it's offered to show her progress with regard

12  to the investigation and what happened next.

13          THE COURT:  The objection is overruled.

14  BY MS. THOMPSON:

15  Q.  After her second phone call, did you meet with her?

16  A.  We did.

17  Q.  Who was present during the meeting?

18  A.  It was myself, Special Agent Juarez and Ms. Rivas.

19  Q.  How long did that meeting last?

20  A.  Thirty minutes, 40 minutes.

21  Q.  After meeting with her, did the focus of your investigation

22  change at all?

23  A.  It did not.

24  Q.  Did you also meet with the defendant's brother, Eddie

25  Michalik?

1  A.  We did.

2  Q.  Did you ask for consent to search any of his computers?

3  A.  We did not.

4  Q.  After you met with Mr. Michalik -- Mr. Eddie Michalik, did

5  the focus of your investigation change?

6  A.  It did not.

7          MS. THOMPSON:  Thank you.  Nothing further at this

8  time.

9          THE COURT:  Counsel, would you prefer to begin your

10  cross-examination tomorrow?  I'm afraid we're going to get

11  right --

12          MR. RICHARD BARTOLOMEI:  We probably would be better

13  and more efficient.

14          THE COURT:  What I'm afraid of is we'll get into it

15  and have to stop.

16          MR. RICHARD BARTOLOMEI:  Thank you, Your Honor.

17          THE COURT:  This is I believe the government's last

18  witness, so we're moving along.  Thank you.  You're excused for

19  the day.

20          COURT SECURITY OFFICER:  All rise.

21                          *   *   *

22          (4:13 p.m., jury exits.)

23                          *   *   *

24          THE COURT:  All right.  You can be seated and excused.

25                          *   *   *

```
1                      *   *   *   *   *

2   UNITED STATES DISTRICT COURT

3   WESTERN DISTRICT OF TEXAS

4

5        I certify that the foregoing is a correct transcript from

6   the record of proceedings in the above-entitled matter.  I

7   further certify that the transcript fees and format comply with

8   those prescribed by the Court and the Judicial Conference of

9   the United States.

10

11  Date signed:  October 1, 2019

12

13  /s/ Angela M. Hailey

14  Angela M. Hailey, CSR, CRR, RPR, RMR
    Official Court Reporter
15  655 East Cesar E. Chavez Blvd., Third Floor
    San Antonio, Texas  78206
16  (210)244-5048

17

18

19

20

21

22

23

24

25
```