```
 1                    UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF TEXAS
 2                        SAN ANTONIO DIVISION

 3    UNITED STATES OF AMERICA      :
                                    :
 4    vs.                           : No. SA:17-CR-00347
                                    : San Antonio, Texas
 5    JEFFREY CLINTON MICHALIK(1),  : August 29, 2019
      Defendant.                    :
 6    ********************************************************

 7                TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                  BEFORE THE HONORABLE DAVID A. EZRA
 8                SENIOR UNITED STATES DISTRICT JUDGE

 9    APPEARANCES:
      FOR THE GOVERNMENT:
10      Tracy Thompson, Esquire
        United States Attorney's Office
11      601 N.W. Loop 410, Suite 600
        San Antonio, Texas  78216
12      (210)384-7150; tracy.thompson@usdoj.gov

13

14    FOR THE DEFENDANT:
        Edward A. Bartolomei, Esquire
15      Richard A. Bartolomei, Esquire
        Jonathan R. Perez, Esquire
16      Law Office of Edward A. Bartolomei, P.L.L.C.
        530 Lexington Avenue
17      San Antonio, Texas  78215
        (210)225-0393; edward@eabartlaw.com
18

19

20    COURT REPORTER:
      Angela M. Hailey, CSR, CRR, RPR, RMR
21    Official Court Reporter, U.S.D.C.
      655 East Cesar E. Chavez Blvd., Third Floor
22    San Antonio, Texas  78206
      Phone(210)244-5048
23    angela_hailey@txwd.uscourts.gov

24    Proceedings reported by stenotype, transcript produced by
      computer-aided transcription.
25
```

**I N D E X**

**DEFENSE WITNESS:**                                    **PAGE**

**Jeffrey Clinton Michalik**

By Mr. Richard Bartolomei                    8,101

By Ms. Thompson                                  76


**GOVERNMENT REBUTTAL EVIDENCE**

**GOVERNMENT WITNESSES:**

**Special Agent Argelia Juarez**

By Ms. Thompson                                  108

By Mr. Richard Bartolomei                    117


**Special Agent Steve Nutt**

By Ms. Thompson                              118,130

By Mr. Richard Bartolomei                  121,141

```
 1   (Thursday, August 29, 2019, 10:50 a.m.)

 2                         *   *   *

 3             COURT SECURITY OFFICER:  All rise.

 4             COURTROOM DEPUTY CLERK:  SA:17-CR-347, United States

 5   of America versus Jeffrey Michalik.

 6             THE COURT:  All right.  Anything before we bring in

 7   the jury?

 8             MS. THOMPSON:  Nothing from the government.

 9             THE COURT:  Counsel, anything before we bring in the

10   jury?

11             MR. EDWARD BARTOLOMEI:  Not at this time, Your Honor.

12                         *   *   *

13         (10:51 a.m.)

14             COURT SECURITY OFFICER:  All rise for the jury.

15             THE COURT:  All right.  Please be seated.  The Court

16   would note the presence of the ladies and gentlemen of the

17   jury, all counsel as well as the parties.  And I want to thank

18   the ladies and gentlemen of the jury again for their patience

19   this morning.  They had to sit in the courtroom, counsel did,

20   and listen to me over the telephone with this big LULAC case I

21   have and they can tell you it's complicated.  Are we ready to

22   proceed, counsel?

23             MR. RICHARD BARTOLOMEI:  I am, Your Honor.

24             THE COURT:  Do we have a fix now on who you're going

25   to call?
```

1          MR. RICHARD BARTOLOMEI:  We do.  We're going to at

2   this point call the defendant.

3          THE COURT:  Okay.

4          MR. RICHARD BARTOLOMEI:  At this time, we call

5   Mr. Jeffrey Michalik.

6          THE COURT:  I know you just sat down, but I'm going to

7   have to send you out for a second and I'll bring you right

8   back, I promise.  It will be just a couple minutes.

9          COURT SECURITY OFFICER:  All rise for the jury?

10         *(Jury exits.)*

11                          *  *  *

12         THE COURT:  Mr. Michalik, I need to address you and

13  make sure that you understand thoroughly your constitutional

14  rights, okay.  That's one of my -- that's probably the most

15  important thing I do is to ensure that your constitutional

16  rights are preserved in this trial.  Now, you have indicated

17  that you wish to take the stand and testify in your own behalf,

18  correct?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  You understand that you, of course, do

21  have the absolute constitutional right to testify in your own

22  defense, but you also have the right not to take the stand and

23  testify, you understand that?

24         THE DEFENDANT:  Yes, sir.

25         THE COURT:  If you choose not to take the stand, then

1  I would instruct the jury that they may draw absolutely no

2  inference whatsoever of any kind against you and may not even

3  consider the fact that you have not testified in reaching a

4  verdict.  Do you understand that?

5           THE DEFENDANT:  Yes, sir.

6           THE COURT:  So by taking the stand, of course, you

7  subject yourself to having your testimony evaluated and your

8  credibility determined by the jury in the same manner as any

9  other witness.  Do you understand that?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  And you will also be subject to

12  cross-examination which will include, I am quite sure, any

13  previous statements you may have made.  I know that you contest

14  the fact that there are some statements that the agents have

15  said you made that you believe you haven't made, but they have

16  the right to cross-examine you on that and you have the right

17  to deny that you made those statements.  Do you understand

18  that?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  And of course, the testimony that you gave

21  under oath during the suppression hearing is also subject to

22  being used to cross-examine you.  Do you understand that?

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  Now, in making the decision to testify in

25  this case, I assume that you have consulted with your

1    attorneys.

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  Well, you have excellent attorneys and I'm

4    sure they explained to you all the ramifications of that.  Am I

5    right?

6              THE DEFENDANT:  Yes, sir.

7              THE COURT:  Now, you understand, however, that the

8    attorneys are not the client in this case, they're not the

9    defendant, you are.  So the right to either testify or not

10   testify is your right, it is not their right.  You understand

11   that?

12             THE DEFENDANT:  Yes, sir.

13             THE COURT:  So while you absolutely have every right

14   to listen to their advice, in the end it is you who must make

15   the decision whether you wish to testify and/or not testify.

16   Do you understand that?

17             THE DEFENDANT:  Yes, sir.

18             THE COURT:  Has anyone forced you, coerced you or

19   intimidated you in any way into deciding to testify?

20             THE DEFENDANT:  No, sir, they have not.

21             THE COURT:  Have you carefully thought about taking

22   the stand and testifying in your own defense?

23             THE DEFENDANT:  Yes, sir, I have.

24             THE COURT:  Is this your independent decision to

25   testify?

1          THE DEFENDANT:  Yes, sir, it is.

2          THE COURT:  And you are making this independent of

3     your attorneys?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  Okay.  All right.  Thank you very much.

6          THE DEFENDANT:  Thank you.

7          THE COURT:  Believe it or not, I've actually had

8     defendants say, Wait a minute, you mean I had the right not to

9     testify?  And I said, Yes.

10          My attorney told me I needed to testify.  And they got

11     right off the stand.

12          MR. EDWARD BARTOLOMEI:  And they've done it in the

13     reverse, Your Honor.  I wanted to, but my attorney never told

14     me I could.

15          THE COURT:  That was a 2255 waiting to happen.

16          MR. EDWARD BARTOLOMEI:  For the record, Your Honor, we

17     reviewed that extensively.

18          THE COURT:  I'm sure that you did, counsel, but you

19     and your co-counsel understand that I have an absolute

20     obligation to query him and it would be malfeasance on my part

21     not to do so.

22          MR. EDWARD BARTOLOMEI:  Yes, sir.

23          THE COURT:  And it has nothing to do with you.  I do

24     this in every single criminal case I have where the defendant

25     has either taken the stand or not taken the stand.  Can we

1    bring the jury back in and then he'll be sworn in front of the

2    jury.  And who is going to conduct the examination?

3           MR. RICHARD BARTOLOMEI:  I will.

4           COURT SECURITY OFFICER:  All rise for the jury.

5           *(10:58 a.m., jury enters.)*

6           THE COURT:  Thank you very much.  Please be seated.

7    The Court would again note the presence of the jury, all

8    parties, as well as counsel.  Counsel, you're going to be

9    calling your client here?

10          MR. RICHARD BARTOLOMEI:  Yes, Your Honor, we request

11   and we call Mr. Jeffrey Michalik, the defendant in this case.

12          THE COURT:  Would you please swear him in.

13          COURTROOM DEPUTY CLERK:  Raise your right hand.

14                          *   *   *

15          *(JEFFREY CLINTON MICHALIK, Defendant, Sworn.)*

16                          *   *   *

17          THE DEFENDANT:  Yes, ma'am.

18          COURTROOM DEPUTY CLERK:  You can have a seat.

19          THE COURT:  You may proceed, counsel.

20                       DIRECT EXAMINATION

21   BY MR. RICHARD BARTOLOMEI:

22   Q.  Please state your full name please, spell your last name

23   and your first name for the court reporter.

24   A.  Jeffrey Clinton Michalik, J-E-F-F-R-E-Y, M-I-C-H-A-L-I-K.

25   Q.  You are the defendant in this case?

1  A.  Yes, sir.

2  Q.  I'm going to take you back to October 22nd of 2015.  Do you

3  remember that date?

4  A.  Yes, sir.

5  Q.  And what was significant about that date?

6  A.  My house was raided that day by several agents.

7  Q.  How did you come into contact with the agents and when?

8  A.  I was walking outside to my truck to go to work and it was

9  about 6:10 in the morning and a male agent approached from my

10  right.  I heard some footprints to my right and I turned and

11  there was a male agent to my right approach me with his hand on

12  his gun in a vest.

13  Q.  Did you see any lettering on his vest?

14  A.  I was just looking at the gun because he had his hand right

15  by the gun the whole time.

16  Q.  He had a vest.  What type of vest was it?

17  A.  A bullet-proof.

18  Q.  How was he dressed?

19  A.  Khakis, bullet-proof vest and the gun.

20  Q.  Were there other agents near him?

21  A.  At that time they weren't near him, but two female agents

22  approached from my left around the bed of my truck.

23  Q.  So they came around the back of your truck?

24  A.  Yes, sir.

25  Q.  Who spoke first?

1    A.  One of the female agents.

2    Q.  Did you come to know who that was?

3    A.  I did.  It was Juarez.

4    Q.  Ms. Juarez?

5    A.  Ms. Juarez spoke first.

6    Q.  What did she say?

7    A.  She asked me if I was Jeff Michalik and I responded yes,

8    ma'am.  And then I continued just looking at the male agent

9    because they're approaching me fairly quick at my truck.

10   Q.  So there are three agents in front of you?

11   A.  Yes, ma'am -- yes, sir.  Sorry.

12   Q.  That's all right.  I get that from time to time.  Back to

13   the three agents.  All of them are armed?

14   A.  They had them, but the male was displaying it more visible

15   than the two females.

16   Q.  What was your reaction?

17   A.  I was freaked out, didn't know what to do.  I mean just

18   freaked me out.

19   Q.  What was said next to you?

20   A.  At that time when I was looking at the male agent, someone

21   said, We have a Search Warrant, we need to get back into your

22   house.  I don't know which one of the two female agents said

23   that and --

24   Q.  Did you go to the house?

25   A.  Yes, sir.

1   Q.  Were the agents with you?

2   A.  Yes, sir, the two female agents already had corralled me up

3   and started guiding me toward the front door.

4          MR. RICHARD BARTOLOMEI:  May I approach?  Could we put

5   up 1f please?

6   BY MR. RICHARD BARTOLOMEI:

7   Q.  Let me hand you Defendant's Exhibit 1f.  Could you please

8   take a look at it?  It's also on the screen.

9   A.  Okay.

10  Q.  What location is that?

11  A.  That is my driveway.

12  Q.  Do you see a silver truck?

13  A.  Yes, sir.

14  Q.  Where was the truck that you were entering when you were

15  first --

16  A.  From that picture it's to the left on the gravel driveway.

17  Q.  So you're not on the far right side, you're on the open

18  space?

19  A.  Yes, sir, the open gravel part, yes, sir.

20  Q.  1g.  What does that depict?

21  A.  That's my walkway to my front door.

22  Q.  Looking back at 1f, do you see a sidewalk there in front of

23  the house?

24  A.  Yes, sir.

25  Q.  Going back to 1g, that's where the sidewalk goes to the --

1    to what?

2    A.   To the front porch.

3    Q.   And of course on the front porch there's also a --

4    A.   The porch itself, the patio, the little patio.

5    Q.   And?

6    A.   And my front door.

7    Q.   That's where I was going.  Now, do you remember who

8    unlocked the door?

9    A.   At that time I did.  I unlocked the screen door and the

10   front door.

11   Q.   Are you told anything about the other occupants or what to

12   do in relation to the occupants by any of the agents?

13   A.   When we entered the residence, one of the female agents

14   told me to call up to try to bring everybody to the nearest

15   room which was the living room.

16   Q.   And did you do that?

17   A.   I did.  I yelled, "Babe, come down."  Or I said, "Lisa,

18   Crystal, Crista, come here.  Babe, come down."  And then chaos

19   kind of started after that.

20   Q.   Chaos started after that?

21   A.   Yes.

22   Q.   What do you mean by that?

23   A.   Well, immediately as I was yelling, I just hear a bunch of

24   stomping, yelling, screaming.  I can't quite tell what's going

25   on because they're behind me.  And Juarez and DePaola are

1   immediately corralling me back to the corner of the living

2   room.

3   Q.   Were there armed agents?

4   A.   I saw guns, but I couldn't tell exactly what was going on.

5   Q.   Were they calling out to the other occupants?

6   A.   They were, they were yelling, screaming, stomping.   There

7   was a lot of chaos.

8   Q.   When you're talking -- being talked to by Ms. Juarez, is

9   she inviting you to do things or directing you?

10  A.   No, they're telling me where to go.

11  Q.   What tone of voice are they using?

12  A.   Very aggressive.   They're very assertive, they're making

13  sure they know I know they're in command.

14  Q.   Are you told that point, Sir, this is a Search Warrant,

15  you're free to leave?

16  A.   No, sir.

17  Q.   You're guided where?

18  A.   To the corner of the living room.

19          MR. RICHARD BARTOLOMEI:   May I approach?

20          THE COURT:   You may.

21  BY MR. RICHARD BARTOLOMEI:

22  Q.   Could I have 2a please?   Is that the hallway you enter?

23  A.   Yes, sir.

24  Q.   Were the lights on when you enter?

25  A.   Just that light was on.

Jeffrey Clinton Michalik - Examination          14

1   Q.   Where does that hallway lead to?

2   A.   To my living room.

3   Q.   2b please.  Is that where the hallway goes to?

4   A.   Yes, sir.

5   Q.   You discussed where the agents took you, where would that

6   be and is that in the picture?

7   A.   Yes, sir, it sure is.

8   Q.   And where would that be?

9   A.   It's right there by the -- it's by the TV stand between the

10  fireplace and the window, right in that corner.  We were

11  between that corner by the fireplace and the window.

12  Q.   Where are you in relation to the corner?

13  A.   I'm the closest one to the actual TV entertainment center.

14  Q.   Where are the agents?

15  A.   Behind me and to my left.

16  Q.   When you all arrive at the corner, how are they positioned?

17  A.   They're positioned immediately behind me, they had me up

18  against the entertainment center kind of around the wall and

19  DePaola is to my left.

20  Q.   Are they talking to you?

21  A.   Yes, sir.

22  Q.   How are they talking to you?

23  A.   They're telling me they have a Search Warrant and they're

24  being very aggressive.  They're telling me we need to go

25  outside and talk.  And they're just talking to myself and each

1   other and telling me we need to talk, we need to go outside.

2   And at that point, one of them hands me this Search Warrant and

3   I'm trying to read it and they take it away from me and start

4   shuffling me around.

5   Q.  When you say they start shuffling you around, what do you

6   mean?

7   A.  Well, they're trying to get me to go back outside to talk.

8   Q.  Did they tell you that they were offering you an option to

9   go outside and talk?

10          MS. THOMPSON:  Objection, leading.

11          THE COURT:  This is particularly important with your

12   client, counsel.  No leading is allowed.

13   BY MR. RICHARD BARTOLOMEI:

14   Q.  How did it come to pass that you go outside?

15   A.  They tell me we need to go outside to talk, so they start

16   turning me back toward my window away from my family and they

17   guide me back around toward the front door.

18   Q.  Were you told at that point you understand this is

19   completely voluntary?

20          MS. THOMPSON:  Objection, leading.

21          THE COURT:  Sustained.

22   BY MR. RICHARD BARTOLOMEI:

23   Q.  What were you told about the nature of this decision?

24   A.  They told me I had to go outside.

25   Q.  Was there any discussion about going somewhere else in the

1  house?

2  A.  No, sir.

3  Q.  Was there any discussion about whether you could bring

4  someone with you?

5          MS. THOMPSON:  Objection, leading.

6          THE COURT:  Sustained.

7  BY MR. RICHARD BARTOLOMEI:

8  Q.  Be as precise as you can.  What did they tell you?

9  A.  They told me we need to go outside to talk and they started

10  guiding me right out the front door.

11  Q.  Did you see other agents?

12  A.  Yes, sir.

13  Q.  Did you see where your family was?

14  A.  At that point, I could tell they're in the living room.  I

15  didn't know what was going on again because DePaola at that

16  point was to my right and she's making sure that I don't get a

17  view of what's going on.

18  Q.  Where do you go?

19  A.  We walk out the front door and down to my walkway.

20  Q.  Tell me the position of the agents as you walk out?

21  A.  At that point they were -- they went around and they both

22  ended up behind me and they're pushing me forward.  And then as

23  we got on the front porch, they were trying to switch positions

24  to where it was one of them -- DePaola was behind me, Juarez is

25  trying to walk as close to my left as possible and they kept me

1  up against the wall of my house as close as they could.

2  Q.  That's the walkway we saw earlier?

3  A.  Yes, sir.

4  Q.  How did you know where you were going?

5  A.  I didn't.

6  Q.  How did you end up where you went?

7  A.  DePaola tapped my shoulder twice and guided me and pointed

8  toward a light-colored SUV to my left.

9          MR. RICHARD BARTOLOMEI:  May I have 1a?

10 BY MR. RICHARD BARTOLOMEI:

11 Q.  What does that show?

12 A.  That shows the front of my house.

13 Q.  Could I have 1L?  Where was the vehicle that you were taken

14 to?

15 A.  Between the palm tree and the sign, the Hidden Iron sign in

16 the street.

17 Q.  Is that directly in front of your house or to the side of

18 your house?

19 A.  It's to my left, it's in the cul de sac area.

20 Q.  Do you have a backyard to that house?

21 A.  Yes, sir.

22 Q.  Does it have a privacy fence?

23 A.  Yes, sir.

24 Q.  Does it have a patio or deck?

25         MS. THOMPSON:  Objection, leading.

1          THE COURT:  Sustained.

2    BY MR. RICHARD BARTOLOMEI:

3    Q.  We'll go through the progression a different way.  Please

4    tell me the configuration of your backyard?

5    A.  The backyard has a privacy fence with a patio and swing and

6    another lawn chair.

7    Q.  Was there access?

8    A.  Yes, sir.

9    Q.  From the house?

10   A.  Yes, sir.

11   Q.  Would that be the -- looking at 1a please, is that the

12   privacy fence?

13   A.  Yes, sir.

14   Q.  And that would be to the right-hand side?

15   A.  Yes, sir.

16   Q.  How did you get to the vehicle in the sense that you know

17   that's where you're going?

18   A.  It was after she directed me, she told me to go over there

19   so they could record our questioning and they just guided me

20   straight to the vehicle through the yard.

21   Q.  They told you they were going to record it?

22   A.  Yes, sir.

23   Q.  What did you understand that to mean?

24   A.  Recording with, like, a recording device.

25   Q.  Did you ever see a recording device?

Jeffrey Clinton Michalik - Examination          19

1   A.  No, sir.

2   Q.  Did you have a device capable of recording anything?

3   A.  No, sir.

4   Q.  Why is that?

5   A.  I mean the only thing I could have done is use my phone,

6   but they already confiscated my phone.

7   Q.  When you came in to the building initially after they

8   directed you with regard to opening the front door, did you

9   take anything out of your pocket?

10  A.  I took my wallet, phone and keys.

11  Q.  Would that be keys to what?

12  A.  To my vehicle.

13  Q.  Any other keys on it?

14  A.  It's to my house, the vehicle, everything, it's everything

15  I -- my work, house, vehicle, everything.

16  Q.  And that was left where?

17  A.  They were confiscated.  The keys and the phone were

18  confiscated and the wallet I left on my little stand.

19  Q.  So when you go to the vehicle, how is it that you enter the

20  vehicle?

21  A.  DePaola directs me to get into the front passenger.  She

22  points.  I didn't know what to do, so I open the door and I got

23  in and she shut the door.

24  Q.  Where does Agent DePaola go?

25  A.  Agent DePaola hurries around to the front of the truck to

```
 1    the vehicle and gets into the driver's side and Juarez gets
 2    into the back.
 3    Q.  Do you remember whether or not the doors were locked?
 4    A.  Offhand I do not, too busy staring at them.
 5    Q.  Where is your family at this point?
 6    A.  They're inside with all the other agents.
 7    Q.  When you entered the vehicle, were you told anything about
 8    your rights to leave?
 9              MS. THOMPSON:  Your Honor, objection, leading.
10              THE COURT:  Sustained.
11    A.  They --
12              THE COURT:  I sustained the objection.
13              THE DEFENDANT:  Sorry.
14    BY MR. RICHARD BARTOLOMEI:
15    Q.  What are you told when you get in the vehicle?
16    A.  That they had a Search Warrant and I need to talk to them.
17    Q.  Were you ever offered an opportunity to get out of the
18    vehicle?
19    A.  No, sir.
20    Q.  Was there ever any inquiry about your privacy?
21              MS. THOMPSON:  Objection, leading.
22              MR. RICHARD BARTOLOMEI:  With respect, Your Honor --
23              THE COURT:  No.  Sustained.  That's leading.
24    BY MR. RICHARD BARTOLOMEI:
25    Q.  Who begins questioning you?
```

1   A.   Agent DePaola.

2   Q.   What's her demeanor, how did she look?

3   A.   Oh, she looked like she was ready to have at it at me.  I

4   don't know no other way to put it.

5   Q.   What tone of voice did she use?

6   A.   It was mad and aggressive the whole time.

7   Q.   And do you get to ask any questions?

8   A.   No, sir.

9   Q.   Who asked the questions?

10   A.   DePaola did most of the questioning.

11   Q.   Did Juarez actually ask any questions?

12   A.   She threw in some little tidbits here and there, but she

13   really didn't question anything.

14   Q.   Did anybody appear to be taking down notes?

15   A.   Juarez was.

16   Q.   Did you have any means or method by which you could take

17   notes?

18   A.   No, sir.

19   Q.   You don't have your phone, correct?

20   A.   No, sir.

21   Q.   You don't see any devices that could record it, correct?

22   A.   No, sir.

23   Q.   Now, I'm going to jump a little bit ahead.  At the end --

24   let's talk about how long was this interrogation?

25   A.   I'd say at least an hour.

1  Q.  At the end of it, were you offered any opportunity to

2  review --

3          MS. THOMPSON:  Objection, leading.

4          MR. RICHARD BARTOLOMEI:  Excuse me, Your Honor, I

5  didn't finish the question.

6          THE COURT:  Go ahead and finish your question.

7  BY MR. RICHARD BARTOLOMEI:

8  Q.  Were you offered any opportunity to review their notes?

9  A.  No, sir.

10  Q.  Were you invited to compare notes?

11  A.  No, sir.

12  Q.  Were you told you had a right to do so?

13          MS. THOMPSON:  Objection, leading.

14          THE COURT:  I'm going to overrule that.

15  BY MR. RICHARD BARTOLOMEI:

16  Q.  Were you told you had a right to do so?

17  A.  No, sir.

18  Q.  You mentioned the positioning of Ms. Juarez.  How is she

19  positioned in the vehicle in relation to the front seats?

20  A.  She's sitting in the back, leaning toward the center with

21  her note pad on the center console, trying to adjust herself

22  where she can hear and see what's going on.

23  Q.  Let's talk about some of the questions, excuse me.

24  Ms. DePaola is the primary questioner, correct?

25  A.  Yes, sir.

1          *(Pause.)*

2                    MR. RICHARD BARTOLOMEI:  Excuse me.

3          *(Pause.)*

4    BY MR. RICHARD BARTOLOMEI:

5    Q.  Skip forward a little bit.  Was there a discussion about a

6    laptop that was not at the house during this interrogation?

7                    MS. THOMPSON:  Objection, leading.

8                    THE COURT:  That is sustained.

9    BY MR. RICHARD BARTOLOMEI:

10   Q.  Sir, how did the subject of a laptop come up in the

11   interrogation?

12   A.  Well, toward the end of the interview when they asked me to

13   view the pictures, I had mentioned I saw them on an old work

14   computer at HomeArama and they asked me to view them again to

15   confirm if I recognized any.  I said, well, I did, two looked

16   sort of familiar.  And when they asked me to initial the two

17   that looked familiar, I was looking down and as soon as I

18   initialed the one, one blurted out, "We need to get that

19   laptop."  One of the agents blurted that out, "Well, we need to

20   get that laptop."

21   Q.  Was there any communication to anyone else by one of the

22   agents to anyone else about the laptop and the need to get it?

23   A.  Not that I'm aware of.

24   Q.  Now with regard to the pictures, your testimony was you may

25   have seen them on an old work computer, correct?

Jeffrey Clinton Michalik - Examination          24

1    A.  Yes.

2              MS. THOMPSON:  Objection, leading.

3              THE COURT:  That is sustained.

4              MR. RICHARD BARTOLOMEI:  He just testified to it.

5              THE COURT:  Yes, but that doesn't excuse a leading

6    question subsequent.  Just ask him where he saw it.

7              MR. RICHARD BARTOLOMEI:  I was going to.

8    BY MR. RICHARD BARTOLOMEI:

9    Q.  Where did you see it, if you saw it?

10   A.  It was on a work computer at HomeArama.

11   Q.  Were any of those images on your computer?

12   A.  No, sir.

13   Q.  Did you ever search for those images?

14   A.  No, sir.

15   Q.  Did you ever tell them it was on your laptop?

16             MS. THOMPSON:  Objection, leading.

17             THE COURT:  Sustained.

18   BY MR. RICHARD BARTOLOMEI:

19   Q.  Were you ever questioned about various terms?

20   A.  They asked me about terms, yes.

21   Q.  Did you suggest these terms?

22   A.  No, sir.

23   Q.  Who is controlling the questioning?

24   A.  DePaola was.

25   Q.  Were there ever any disagreements about terms?

1   A.  If they asked me if I saw them, I'd say no.  And then

2   they'd ask me again.  I'd say no.  And then she'd ask me, like,

3   Do you search "teen"?  I'd say no ma'am.  Do you search

4   "pre-teen"?  I'd say no, ma'am.  Then she'd ask me, So you're

5   saying you don't know what teens mean?  I'd be like, I know

6   what it means.  She'd say, So you're saying you searched it?

7   I'd say, no, ma'am, I didn't say that.

8   Q.  So that's the manner in which you were questioned?

9   A.  Yes, sir.

10  Q.  Were you challenged if you didn't give an answer that they

11  appeared to approve of?

12          MS. THOMPSON:  Objection, leading.

13          THE COURT:  I think she's technically right, but I'm

14  going to go ahead and allow the question.

15  BY MR. RICHARD BARTOLOMEI:

16  Q.  Were you challenged if you gave an answer that they

17  appeared not to approve of?

18  A.  Yes, sir.

19  Q.  Were you ever called any names?

20  A.  Yes, sir, they said I was a liar because I didn't know what

21  one of the terms they said I knew what it meant supposedly,

22  they insisted that I knew what one of the terms meant.

23  Q.  What term was that?

24  A.  That PTHC.

25  Q.  Can you tell us how that exchange occurred?

1  A.  Yes, sir, it started off with her asking me again, So you

2  know what pre-teen means?  I was like, Well, yes, pre-teen,

3  it's young.  And then DePaola asked me again, So do you know

4  what PTHC means?  I said, No, ma'am, I don't.  She's asking me

5  more aggressively, You're saying you don't know what PTHC

6  means?  I said, No, ma'am, I don't.  And then I'm looking at

7  Juarez.  And DePaola is like, You're telling me you don't know

8  what PTHC means, pre-teen hard core?  I looked up at her, I

9  said, Ma'am, I actually did not know what that meant.  And

10  that's when she got aggressive, pointed at my face and started

11  calling me a liar saying, You're lying, you're lying, I know

12  you're lying.  And she pointed at Juarez asking, You think he's

13  telling the truth?  You think he's lying?  And Juarez shook her

14  head and said yes.  She kept on and then she calmed down right

15  after that.

16  Q.  When she calmed down, where did she go after that with

17  questioning?

18  A.  She just calmed down, stood back and asked me, So what's

19  your computer savvy on a scale of one to ten?  I said two or

20  three.  And then she went on with more questioning.

21  Q.  Would she interrupt you if you answered?

22          MS. THOMPSON:  Objection, leading.

23          THE COURT:  That objection is sustained.  I'm trying

24  to give you as much latitude as I can, but you're leading.

25  BY MR. RICHARD BARTOLOMEI:

Jeffrey Clinton Michalik - Examination          27

1  Q.  Was there difficulty in communication in finishing what you

2  said?

3  A.  Yes, sir, if they didn't like my answer, they would

4  immediately interrupt.  She would immediately interrupt.  And

5  again occasionally Juarez would throw in a little question here

6  and there.

7          MR. RICHARD BARTOLOMEI:  May we approach briefly, Your

8  Honor?

9          THE COURT:  No, sir.  Not now.  It's unnecessary.

10  BY MR. RICHARD BARTOLOMEI:

11  Q.  Throughout this interrogation, do you see any members of

12  your family leave the house?

13  A.  No, sir.

14  Q.  Where do you believe them to be?

15  A.  In the house still.

16  Q.  At the end of the interrogation, how do you exit?

17  A.  I get out of the vehicle.  And as I'm getting out, Juarez

18  is already getting out, but I get out kind of quick because

19  they start getting a little aggressive, I guess you can say, in

20  saying things.  So I get out kind of quick and then Juarez is

21  out immediately before me, she's out, already has the door

22  shut.

23  Q.  Where is DePaola?

24  A.  She's coming around the front real aggressively.

25  Q.  What does she say to you?

1  A.  Well, due to the interview being cut short, I guess you can

2  say, she comes up and she's mad and she's telling me, "You

3  think you're so smart, so smart, don't you.  I'm telling you we

4  got guys that are good, real good with computers and they can

5  do anything they want.  They're never going to question them,

6  never going to question us."

7      And I'm just like, well, I don't know what else to do or

8  say because she's approaching me.  She's right there and Juarez

9  has me pinned up between the door and her body and they're

10 coming at me this way, so --

11 Q.  How did you extricate yourself from that position?

12 A.  All I can do is try to move to the right to get away from

13 the door.

14 Q.  Where are they positioned and where do you go?

15 A.  At that point, DePaola is already walking by me and Juarez

16 is already kind of filtering off and then they start walking to

17 my right.

18 Q.  Where are you going at that point?

19 A.  Right then I'm still just kind of standing there because

20 I'm confused where to go, so I shut the door and then DePaola

21 looks back at me.

22 Q.  What did she say?

23 A.  She tells me, "We need to go get that laptop."

24 Q.  Was there ever any agreement in the car whereby you

25 consented to take them to your place of business and get the

 1  laptop?

 2          MS. THOMPSON:  Objection, leading.

 3          THE COURT:  That is sustained.

 4  BY MR. RICHARD BARTOLOMEI:

 5  Q.  Did you ever reach any agreements with them in the car

 6  about anything?

 7  A.  No, sir, there was no mention of anything about getting any

 8  devices in the car at all.

 9  Q.  Where do you go?

10  A.  I start following them.  After she tells me, "We need to

11  get the laptop", I just start following them back toward the

12  house.

13  Q.  Did any other agents approach you at that point?

14  A.  Yes, sir, as I got to my walkway where it intersects, goes

15  the other two ways, a male agent approaches me with something

16  in his hand and asks me, "Is this your iPod?"  I said, Yes,

17  sir.  He handed me something and said, "Sign this."  I just

18  sign it, hand it back to him because I'm trying to keep up with

19  the agents.

20  Q.  Where do you sign it?

21  A.  Right here on my leg.

22  Q.  Did you read it?

23  A.  No, sir.

24  Q.  Did anybody read it to you?

25  A.  No, sir.

Jeffrey Clinton Michalik - Examination                30

1   Q.  Did anybody offer to let you read it?

2   A.  No, sir.

3   Q.  And then you follow the other agents back into the house?

4   A.  Yes, sir.

5   Q.  Where do you go then?

6   A.  As I'm approaching the house, Juarez and them are already

7   in the house.  And Juarez comes to me and tells me to go to the

8   kitchen table to look over the inventory.

9   Q.  Did you do that?

10  A.  I did.

11  Q.  What was the inquiry to you?  What were they asking?

12  A.  They just asked if I knew if everything was there.  And I

13  have no idea what I was even looking for.  I didn't know what

14  to do there.  I mean I didn't know what to do.  I didn't know

15  what I was supposed to be looking for.

16  Q.  How would you characterize the exchange between DePaola and

17  yourself and the interrogation?

18  A.  Oh, it was one-sided.  She was aggressively telling me,

19  like, direct questions, direct suggestions, it was aggressive.

20  Q.  Wasn't a cordial, polite exchange?

21  A.  No, sir.

22  Q.  Obviously you didn't have a weapon, correct?

23  A.  No, sir.

24  Q.  Had you given consent to search your vehicles prior to this

25  agent coming up to you?

1  A.  No, sir.

2  Q.  Did he have anything in his hands that you knew to come

3  from the vehicle?

4  A.  The iPod.

5  Q.  When you go into the house, my understanding is you go to

6  the kitchen?

7  A.  Yes, sir, they guide me towards the kitchen.

8        MR. RICHARD BARTOLOMEI:  May I approach, Your Honor?

9        THE COURT:  Yes.

10        MR. RICHARD BARTOLOMEI:  Please put up 2g.

11  BY MR. RICHARD BARTOLOMEI:

12  Q.  Is the location of where the electronic devices were

13  displayed in that picture?

14  A.  Yes, sir.

15  Q.  Where?

16  A.  On the table.

17  Q.  Where are Agent Juarez and DePaola at that point?

18  A.  Agent Juarez is to my right, I'm up against the stairs and

19  DePaola is talking to another male agent.

20  Q.  Did you have any contact with Agent DePaola -- strike that.

21     Would you please look through these pictures and show me

22  where in one of these pictures Agent DePaola is?

23  A.  At that time she is right around this area by the

24  fireplace.

25        MR. RICHARD BARTOLOMEI:  Could you put up 2c please?

1  BY MR. RICHARD BARTOLOMEI:

2  Q.  The fireplace is shown on the right?

3  A.  Yes, sir.

4  Q.  Where would Agent DePaola be?

5  A.  She's between the fireplace and that window.  She's right

6  there.

7  Q.  Where is the kitchen?

8  A.  Kitchen is immediately in front.  From the stairway it's to

9  the left, by the glass doors.

10 Q.  So how close is she to you at that point talking to the

11 other agent?

12 A.  Within 5 feet, if that much.

13 Q.  Were there any other armed agents in the kitchen with you

14 and Ms. Juarez?

15 A.  Yes, sir, there are several surrounding the table and

16 sitting at the table.

17 Q.  Now, do you have any contact with Agent DePaola after

18 looking at the table and the items that are on the table?

19 A.  Yes, sir, she signaled me to come talk to her.

20 Q.  She gestures to have you come talk to her?

21 A.  Yes, sir.  She gestured me to come talk to her.  She

22 signaled me over to talk to her.

23 Q.  What does she tell you?

24 A.  She tells me that we need to go get the laptop or I will go

25 to jail for impeding investigation.

1    Q.  What did you think in response to that?

2    A.  All I could say was okay.  I didn't know what else to do.

3    Q.  Were you permitted to talk with your family before you

4    left?

5            MS. THOMPSON:  Objection, leading.

6            THE COURT:  Sustained.

7    BY MR. RICHARD BARTOLOMEI:

8    Q.  Who else did you talk with before you left other than Agent

9    DePaola and Agent Juarez?

10   A.  No one.  They immediately told me to get that laptop and

11   they corralled me back up like two dogs herding a sheep.

12           MS. THOMPSON:  Your Honor, I object to that

13   classification of the agents.

14           MR. RICHARD BARTOLOMEI:  Excuse me, Your Honor.

15           THE COURT:  Well, it's pejorative, but it's all right.

16           MR. RICHARD BARTOLOMEI:  Thank you.

17   BY MR. RICHARD BARTOLOMEI:

18   Q.  How is it determined -- excuse me.  How is it determined

19   where you're going?

20   A.  At that point when they say get the laptop, I just assumed

21   we had to go to my office.

22   Q.  Was there any discussion about the location of your office?

23   A.  No, sir.

24   Q.  Was there any discussion about how anyone would get to your

25   office?

1    A.   No, sir.

2    Q.   Did you have your keys?

3    A.   Not at that point, no, sir.

4    Q.   Who had them?

5    A.   One of the male agents.  I don't know who it was handed me

6    my keys back as we were walking out.

7    Q.   Was it the agent who had had you sign the consent?

8    A.   I don't remember that, I don't remember who it was.

9    Q.   So throughout the entire time you're in the interrogation

10   in the vehicle, do you have your keys?

11   A.   No, sir.

12   Q.   And when you go to leave, an agent has to hand them to you,

13   correct?

14   A.   Yes, sir.

15   Q.   Was there a discussion about any stops to be made?

16   A.   Yes, sir.  As we're going outside, right around the same

17   spot of the walk, intersection walk, Donna asked me if they

18   could stop to go to the restroom, so I suggested McDonald's on

19   Culebra and Tezel.  And at that point, they just sort of

20   separated and kind of just left me there.  So I just assumed I

21   was supposed to go in my own vehicle.

22   Q.   When you say Donna, that's Agent DePaola?

23   A.   I'm sorry.  Agent DePaola, sorry.

24   Q.   Did you go to the McDonald's?

25   A.   Yes, sir, we stopped over there.

Jeffrey Clinton Michalik - Examination          35

```
 1   Q.  What did you do?
 2   A.  I just parked and they parked two spots to my left.
 3   Q.  Did you ever get out of your vehicle?
 4   A.  No, sir.
 5   Q.  Did anybody ever come up and talk to you at your car?
 6           MS. THOMPSON:  Objection, leading.
 7           THE COURT:  Sustained.  Wait a minute.  Did anybody
 8   come to talk to you at your car.  The objection is overruled.
 9   BY MR. RICHARD BARTOLOMEI:
10   Q.  Anybody ever come up in the vehicle?
11   A.  No, sir.
12   Q.  Any agent ever talk to you?
13   A.  No, sir, no one approached me.
14   Q.  You never got out of your vehicle, correct?
15   A.  No, sir.
16   Q.  How did you know to proceed on to your business?
17   A.  I just sat in my truck until I saw the taillights come back
18   on of the truck, the SUV.
19   Q.  What did you do?
20   A.  I proceeded to back out and get back on Culebra.
21   Q.  What was the weather like that day?
22   A.  It was raining.
23   Q.  Was there any discussion at the McDonald's about your right
24   to decide not to go to the business?
25   A.  No, sir, there was no discussion at all.
```

Jeffrey Clinton Michalik - Examination          36

1    Q.  Were you ever thanked for your cooperation?

2    A.  No.

3    Q.  At the McDonald's?

4    A.  No, sir.

5    Q.  Were you ever told you were free to leave?

6    A.  I was not, no, sir.

7    Q.  How long were you sitting there?

8    A.  Maybe ten minutes.

9    Q.  How long does it take you to go on to your place of work?

10   A.  From that point on, about 35 minutes or so, 40 minutes.

11   Q.  Who arrives first?

12   A.  I do, sir.

13   Q.  Where do you park?

14   A.  I park right up front, right by the two front doors.

15   Q.  3a please.  What does 3a depict?

16   A.  The front of my office building.

17   Q.  And that was the front of your office building on

18   October 22nd, correct?

19   A.  Yes, sir.

20   Q.  Is there two addresses on the doors?

21   A.  Yes, sir.

22   Q.  Which address is your business?

23   A.  The 5723.

24   Q.  Where do the other vehicles park and how many are there?

25   A.  Well, I park where the white truck is at and the other

1  vehicles happen to park where the black truck is at and

2  there's -- I only see the one vehicle.

3          MR. RICHARD BARTOLOMEI:  Could I have 3c?

4  BY MR. RICHARD BARTOLOMEI:

5  Q.  What does that picture show?

6  A.  That shows as you're walking into the front door going

7  toward the office.

8  Q.  Where is the office in that picture?

9  A.  The little black thing in the background, that little black

10  opening in the background.

11  Q.  That's the edge of a doorway?

12  A.  That is, yes, sir.

13  Q.  That would be the vantage point?

14  A.  From the front door, yes, sir.

15  Q.  Can you see in the office at that point?

16  A.  No, sir.

17  Q.  Where do you go and where do the agents go?

18  A.  While we're in the office?

19  Q.  Yes.

20  A.  When we enter the office I turn to turn on the lights and

21  the two female agents already had walked in and they're already

22  -- before I even get the lights on, they're already at my TV

23  stand which is in that picture against that one wall.

24  Q.  Let me go through this more slowly.  Who opens the door?

25  A.  I unlock the door.

1  Q.  Did you use your keys?

2  A.  Yes, sir.

3  Q.  Who walks through the door first?

4  A.  The two female agents.

5  Q.  Who walks in next?

6  A.  I do.

7  Q.  Is there another agent there?

8  A.  There is a male agent, but he walks and stands behind me

9  like as if he's standing guard.

10  Q.  The two female agents are already walking down the corridor

11  in 3c?

12  A.  Yes, sir.

13  Q.  How is it that you all end up in the office?

14  A.  Well, they stop again right by the TV area, I'm trying to

15  catch up to them and I pass them up and I walk into the office

16  first and turn on the lights.

17  Q.  Did you tell them anything as you walked in?

18  A.  Yes, sir.  As I was passing them up and getting ready to

19  turn on the lights, I said, "I just want to warn y'all there's

20  a loaded shotgun in the storage room and I'm going in there to

21  put my stuff up."  And they didn't say or do anything.  They

22  followed me right on in, Juarez went to my left and DePaola

23  stayed by the door.

24  Q.  Was there a rifle leaning against the wall?

25  A.  No, sir.  It was in a case in the storage room behind the

1   door.

2   Q.  Was it a rifle?

3   A.  It was a shotgun.

4   Q.  There was no rifle in plain view leaning against the wall?

5   A.  No, sir, it was in a case behind my door.

6   Q.  Did you ever do anything with the shotgun?

7   A.  No, sir, no one touched the shotgun.

8   Q.  Was the shotgun ever seized by anybody?

9   A.  No, sir.

10        MR. RICHARD BARTOLOMEI:  Could you please put up 3f?

11  May I approach, Your Honor?

12        THE COURT:  Yes.

13  BY MR. RICHARD BARTOLOMEI:

14  Q.  3f, whose desk is this?

15  A.  That is my desk.

16  Q.  Is the storage area or the closet shown in that picture?

17  A.  Yes, sir.  It's that opening to the left.

18  Q.  3g please.  I'm going to switch that to 3e.

19       What does that view depict?

20  A.  That is my desk as you walk right into the doorway.

21  Q.  That's what you'd see through the doorway?

22  A.  If the lights were on, that's what you would see.

23  Q.  Were the lights on?

24  A.  No.

25  Q.  Who turned them on?

1   A.  I did.

2   Q.  So was it dark?

3   A.  Yes, sir.

4   Q.  How dark?

5   A.  It was dark.  There's no way you could see it, it was dark.

6   I can't depict dark, sorry.

7          MR. RICHARD BARTOLOMEI:  Now could I have 3g?

8   BY MR. RICHARD BARTOLOMEI:

9   Q.  Whose desk is that?

10  A.  That is my brother's.

11  Q.  Does it appear to have a computer on it?

12  A.  Yes, sir.

13  Q.  Was that computer password protected?

14  A.  No, sir.

15  Q.  Was your laptop password protected?

16  A.  No, sir.

17  Q.  Did you ever put Windows 10 on your computer to your

18  knowledge?

19  A.  No, sir, I can't use Windows 10.

20  Q.  Why can't you use Windows 10?

21  A.  Because three of our programs do not work with Windows 10.

22  Q.  What three programs would that be?

23  A.  2020, Legacy ordering program and one of our other cabinet

24  manufacturing ordering programs.

25  Q.  What do they operate on?

1    A.   They have to use Windows 7.

2    Q.   With regard to -- excuse me.  You go in the storage closet,

3    correct?

4    A.   Yes, sir.

5    Q.   Do you hear anything?

6    A.   Yes, sir.

7    Q.   What did you hear?

8    A.   When I was in there putting my wallet and stuff behind, I

9    hear one of them say, "There it is."  And it kind of caught my

10   attention.

11   Q.   What did you do in response to that statement?

12   A.   I walked out and asked them what did they say.  And at that

13   point, DePaola was like, Oh, well, we assume that's the laptop.

14   And she's pointing at my laptop.

15   Q.   Where is it?

16   A.   It's on my desk.

17   Q.   Did you ask them anything about getting the laptop?

18   A.   At that point when I walked out, I saw them kind of look at

19   each other and the way they asked I just asked, "Should y'all

20   have a warrant for this?"

21   Q.   What was their response?

22   A.   Well, DePaola held up paper and shook it and said, "We have

23   a Warrant that's good for all electronics you use."  And she

24   said, "Well, we can get one, you'd just wait in jail, we don't

25   know how long that will be."

1    Q.  That was her response?

2    A.  Yes, sir.

3    Q.  How did you interpret that?

4    A.  Basically forfeit the computer or else.  I mean it was

5    pretty direct, they were going to put me in jail if I didn't

6    obey them.

7    Q.  What happened next?

8    A.  Juarez -- I'm sorry, DePaola, when I said okay, she grabbed

9    the laptop and started taking it already.

10   Q.  What did Agent Juarez do?

11   A.  She slammed down a paper on my desk, like that, and told me

12   to sign it and she pointed to a blank spot on the page.

13   Q.  Could you read the document?

14   A.  No, sir.

15   Q.  Were you offered the opportunity to read it?

16   A.  No, sir.

17   Q.  Did you read it?

18   A.  No, sir.

19   Q.  What did you do in relation to the document?

20   A.  I just signed it.  I didn't know what else to do.

21   Q.  You said she slapped it down?

22   A.  Yes, sir.  She slammed it down like that with her hand on

23   the page and told me to sign it right there and just pointed.

24   Q.  Could you even read it through her hand?

25   A.  No, sir.

Jeffrey Clinton Michalik - Examination          43

1   Q.  With either of the consents you've talked about, did you
2   ever get to read it?
3   A.  No, sir.
4   Q.  Did you ever get to read the form before you signed it?
5   A.  No, sir.
6   Q.  I want to talk to you about the laptop computer.  Where did
7   that laptop computer come from?
8   A.  HomeArama.  And it was Dave Smith's computer originally.
9   Q.  And how long did you get to use that computer while you
10  were at HomeArama?
11  A.  We started using all the computers around 20 -- I guess
12  2012, 2013.
13  Q.  Was there any one computer that you were not allowed to
14  use?
15  A.  Just his personal computer in his office.  Well, actually
16  two, I'm sorry.  It was his personal computer in his office and
17  Crystal's accounting computer because she did all the
18  accounting work.
19  Q.  Was Crystal ever given a computer?
20  A.  Yes, sir.
21  Q.  When was that?
22  A.  When she quit.  I don't know exact dates.  I know she gave
23  them, but I don't remember what those dates were.
24  Q.  Did you continue to work for HomeArama from home?
25  A.  Yes, sir.

1    Q.  Were any of the laptops that you used at HomeArama password

2    protected?

3    A.  No, sir.

4    Q.  Did you ever use other laptops there?

5    A.  Yes, sir.

6    Q.  How did you get on the computer?

7    A.  I'm sorry?

8    Q.  How would you get on the computer?

9    A.  We would just use them, turn them on and use them.

10   Q.  Did you ever hear about a program called Log Me In?

11   A.  Yes, sir.

12   Q.  Did you know how to use Log Me In?

13   A.  I have no idea how to do any of that, sir.  I have no idea.

14   Q.  Did you ever observe a computer you were using being

15   operated when you weren't touching it?

16   A.  At HomeArama, no, sir.

17   Q.  Did you ever observe it after HomeArama goes out of

18   business and I think that's around March of 2015?

19   A.  Yes, sir.

20   Q.  Did you ever view unusual things happening on the computers

21   after March?

22   A.  Yes, sir.

23   Q.  What did you observe?

24   A.  I'm sorry?

25   Q.  What did you observe that was odd?

1   A.   There would be music playing and then the computer -- when

2   it would be on my desk it would just start flashing, continuous

3   white flashes and it would disappear and it would tell me my

4   downloads are complete, my updates are complete and it would

5   reset itself, sometimes it would reset itself two, three hours

6   just continuous resetting two or three hours of resetting.

7   Q.   Were you operating the computer to make it do that?

8   A.   No, sir.

9          MR. RICHARD BARTOLOMEI:  Could you put 7g please?

10         MS. THOMPSON:  Your Honor, I object.  I don't believe

11  this is in evidence.

12         THE COURT:  I don't know what 7g is.

13         MR. RICHARD BARTOLOMEI:  You're right.  I'll show him

14  first, then I'll offer it.

15  BY MR. RICHARD BARTOLOMEI:

16  Q.   7g, can you identify that?

17  A.   Actually that is what happened to my brother's computer.

18         MS. THOMPSON:  I object as to relevance.

19         THE COURT:  Sustained.

20         MR. RICHARD BARTOLOMEI:  Well, Your Honor, I think I

21  can tie it up.

22         THE COURT:  All right.  You can try.

23  BY MR. RICHARD BARTOLOMEI:

24  Q.   Which computer would that be?

25  A.   That was the work desktop.

1  Q.  That's the one that's shown in the picture on his desk?

2  A.  Yes, sir.

3  Q.  7g, did you ever see this notice?

4       MS. THOMPSON:  Objection, relevance.  It's to a

5  computer that's not related to this case.

6       THE COURT:  That objection is sustained.

7       MR. RICHARD BARTOLOMEI:  May we approach, Your Honor?

8       THE COURT:  No, sir.  I know exactly what this is all

9  about.  We've gone over this before many times.

10  BY MR. RICHARD BARTOLOMEI:

11  Q.  Has your computer ever been hacked or contacted by a source

12  you did not recognize?

13  A.  Yes, sir, it would pop up, yes, sir.

14       MS. THOMPSON:  Your Honor, I would object to which

15  computer he's referring to.

16       MR. RICHARD BARTOLOMEI:  Your Honor, the laptop and I

17  think everyone knows in context that's where it was.

18       THE COURT:  Well, I don't know, but in any event

19  you're asking him about the laptop?

20       MR. RICHARD BARTOLOMEI:  Yes.

21       THE COURT:  All right.

22       MR. RICHARD BARTOLOMEI:  May I approach?  Could you

23  please put up 7a?

24       THE COURT:  Is that in evidence?

25       MS. THOMPSON:  Your Honor, no, it is not in evidence.

1          MR. RICHARD BARTOLOMEI:  Excuse me.

2     BY MR. RICHARD BARTOLOMEI:

3     Q.  Take a look at 7a.  Do you recognize that?

4     A.  Yes, sir.

5     Q.  What is it?

6          MS. THOMPSON:  Objection, I don't know which exhibit

7     he's referring to.

8          THE COURT:  Can you show counsel before you do

9     anything further with it.

10         *(Pause.)*

11         MS. THOMPSON:  Your Honor, I'll object.  The computer

12    screen is dated May 6th of 2017, which is a year and a half

13    after his computer was seized.

14         MR. RICHARD BARTOLOMEI:  Your Honor, it goes to

15    whether there are external accesses to this computer that

16    cannot be accounted for.

17         THE COURT:  No.  That's way, way after the subject of

18    this case.  The objection is sustained.

19         MR. RICHARD BARTOLOMEI:  May we mark it as an offer of

20    proof?

21         THE COURT:  Sure, of course.

22         MR. RICHARD BARTOLOMEI:  May we also mark 7g an offer

23    of proof?

24         THE COURT:  What is 7g?

25         MR. RICHARD BARTOLOMEI:  7g was the prior notice

1    regarding the brother's computer.

2             THE COURT:  Yes.

3             MR. RICHARD BARTOLOMEI:  Just the offer of proof.

4             THE COURT:  Sure.

5             MR. RICHARD BARTOLOMEI:  Approach?  7d.  Since you

6    claim you don't know the number.

7             MS. THOMPSON:  Thank you.

8    BY MR. RICHARD BARTOLOMEI:

9    Q.  Do you recognize that?

10   A.  Yes, sir, that's my e-mail.

11   Q.  And does it show anything coming into your computer?

12   A.  Yes, sir, all those little happy faces, I have no idea what

13   those are.

14   Q.  How many of them are there?

15            MS. THOMPSON:  Your Honor, I'll object as to the lack

16   of foundation.  There's no date on this photo and it's unclear

17   what computer this came from.

18            MR. RICHARD BARTOLOMEI:  Well, I'll lay a little more

19   foundation if you'd like, Judge.

20            THE COURT:  It's not whether I'd like it, the rules

21   require it.

22   BY MR. RICHARD BARTOLOMEI:

23   Q.  What's the date of the e-mail?

24   A.  10:54 a.m.

25   Q.  Do you know what year it was?

1    A.   That was back around the 2015.

2    Q.   Okay.  Who was the e-mail to?

3    A.   To my fiance.

4    Q.   The one below it, is that an e-mail from you?

5    A.   No, sir.

6    Q.   Is that something coming into your computer?

7            MS. THOMPSON:  Your Honor, I'm still going to object.

8    I don't know what computer this is even referring to.

9            THE COURT:  You don't say on what computer and when.

10   Counsel, why don't you go back over there so I can see you

11   because there's a monitor here.

12           MR. RICHARD BARTOLOMEI:  Your Honor, I believe the

13   context of the questioning, since we're not allowed to ask

14   about any other computers, it's very clear we're talking about

15   the laptop.

16           THE COURT:  I don't know that because you were talking

17   about the brother's computer a little while ago.

18           MR. RICHARD BARTOLOMEI:  And you told me I couldn't.

19           THE COURT:  Well, you can't because it's not the

20   subject matter of this case.

21   BY MR. RICHARD BARTOLOMEI:

22   Q.   The references to the e-mails, that's your laptop, isn't

23   it?

24   A.   Yes, sir.

25   Q.   The laptop that was ultimately seized by the government?

1    A.   Yes.

2            MR. RICHARD BARTOLOMEI:  With that additional

3    foundation, Your Honor, I'd like to offer 7b?

4            THE COURT:  And this is allegedly from when?

5            MR. RICHARD BARTOLOMEI:   2015.

6            THE COURT:  And it was an e-mail somebody sent his

7    wife?

8            MR. RICHARD BARTOLOMEI:  No, he sent an e-mail, this

9    pops up as an incoming e-mail.

10           MS. THOMPSON:  I'm still going to object, Your Honor.

11   2015 is a little too broad and I don't see the relevance.

12           THE COURT:  It has to be before -- well, it had to be

13   before the computer was seized in 2015 or else he wouldn't have

14   been able to have access to it.

15           MS. THOMPSON:  Correct, except there's no way to

16   authenticate what this is, when it happened or what computer

17   it's on.

18           THE COURT:  Well, he said it happened in 2015, he said

19   it happened on the laptop.  And what was your other objection?

20           MS. THOMPSON:  Lack of foundation.  There is no timing

21   and --

22           THE COURT:  Well, there is timing.  He said 2015.  It

23   had to be before the computer was seized.  Look, it will be for

24   the jury to decide the credibility of this evidence, okay.

25   They have to decide the credibility of his testimony.  This all

1   goes to credibility.  The objection is overruled.  The document
2   will be received.
3           MR. RICHARD BARTOLOMEI:  Could you put 7g up please?
4   May I once again approach?
5           THE COURT:  Yes.  It's 7d, counsel.  You said 7g.
6   BY MR. RICHARD BARTOLOMEI:
7   Q.  7d, do you see the 12 attachments?
8   A.  Yes, sir.
9   Q.  Are those attachments to your e-mail that you sent to
10  Crystal?
11  A.  No, sir.
12  Q.  Do you know where they even come from?
13  A.  I have no idea, sir.
14  Q.  Does it show where it comes from or from whom?
15  A.  No, sir.
16  Q.  Do you know what's behind every one of those little smily
17  faces?
18  A.  I do not, sir.
19  Q.  Did you ever open them?
20  A.  I didn't even mess with it.
21  Q.  Didn't even mess with it?
22  A.  I didn't even mess with it when I saw that.
23          MR. RICHARD BARTOLOMEI:  May I approach again?
24          THE COURT:  Sure.
25  BY MR. RICHARD BARTOLOMEI:

Jeffrey Clinton Michalik - Examination          52

1  Q.  Keeping in mind that the computer, the laptop was seized on

2  October 22nd, I'm going to hand you 7e.  Do you recognize that?

3  A.  Yes, sir.

4  Q.  What is that?

5  A.  That is my Inbox.

6  Q.  Inbox for what?

7  A.  For my e-mail.

8  Q.  Is that on your laptop?

9  A.  Yes, sir.

10 Q.  Is it on your laptop before October 22nd?

11 A.  Yes, sir.

12 Q.  What, if anything, do you note that's unusual to you?

13 A.  The little thing before went faster and you could have --

14 just a bunch of weird lettering or hieroglyphics, I guess you

15 could say.

16 Q.  Did you ever open those?

17 A.  No, sir, I just deleted everything but the one that says

18 Linda.

19 Q.  Does it show where these two entries come from according to

20 the left side?

21 A.  Says Dave and Buster's and Geek Squad.

22          MR. RICHARD BARTOLOMEI:  Offer 7e.

23          MS. THOMPSON:  No objection.

24          THE COURT:  Received.

25 BY MR. RICHARD BARTOLOMEI:

1  Q.  You spoke about hieroglyphics.  Did you understand any of

2  it?

3  A.  I did not, sir.

4  Q.  Do you know what language that is?

5  A.  I do not, sir.

6  Q.  Do you know what alphabet that is?

7  A.  I do not, sir.

8  Q.  Would you have had any occasion to be in e-mail

9  correspondence with the Geek Squad?

10  A.  No, sir.

11  Q.  Do you know who Dave and Buster are?

12  A.  Dave and Buster's is a restaurant, yes, sir.

13  Q.  Did you solicit anything from Dave and Buster to cause that

14  response or that e-mail?

15  A.  Not that particular one.  I have a Dave and Buster's card.

16  Q.  Different question.

17  A.  But no, I didn't solicit any sort of e-mail from them, no,

18  sir.

19  Q.  Did you open it?

20  A.  No, sir, I deleted them.

21          MR. RICHARD BARTOLOMEI:  May we approach briefly, Your

22  Honor?

23          THE COURT:  About what?  Why don't we send the jury

24  out to lunch.  It's 12:00 and then we'll take it outside the

25  presence of the jury.  Have a nice lunch, ladies and gentlemen.

```
1              COURT SECURITY OFFICER:  Rise for the jury.
2              (11:59 p.m., jury exits.)
3                           *   *   *
4              THE COURT:  You can step down, sir.  What do you want
5    to discuss?  The jury is absent.
6              MR. RICHARD BARTOLOMEI:  7g.
7              THE COURT:  What is it?
8              MR. RICHARD BARTOLOMEI:  7g.
9              THE COURT:  I understand.  What does this have to do
10   with anything?  I get a thousand of these things every day.  We
11   get these all the time.  What proof is this of anything?  I
12   just got yesterday and I've been getting for the last week
13   announcements that tell me -- and it looks just like Amazon,
14   exactly, I mean it's more Amazon than Amazon.  And it tells me
15   that my credit card on Amazon, my prime credit card on Amazon
16   has expired, please click the following link and provide your
17   credit card information to update your account.  And I
18   immediately closed it.  I went to the Amazon site and my credit
19   card on Amazon is perfectly fine.  So every time this stupid
20   thing pops up I have to take it down.  And I get more of those
21   than you would imagine.  I mean this is endemic.
22             MS. THOMPSON:  Your Honor, also with regard to 7g,
23   it's clear from the photograph that is a desktop computer
24   screen.
25             THE COURT:  Yeah, it is.
```

 1          MS. THOMPSON:  It's not a laptop.

 2          THE COURT:  That's not a laptop.

 3          MS. THOMPSON:  I believe defense counsel informed me

 4   when they provided the exhibits that all of them came from the

 5   brother's computer.  I realize the defendant testified two of

 6   them were on his laptop, but this one is clearly a desktop

 7   computer.

 8          THE COURT:  That is a desktop computer.

 9      *(Pause.)*

10          MR. RICHARD BARTOLOMEI:  Your Honor, I think we've

11   already made our offer of proof on it anyway, so at this

12   point --

13          THE COURT:  Well, it's a desktop computer.  It isn't

14   even the correct computer, number one.  And this is not

15   evidence of a hack.  It's evidence of a fishing e-mail which

16   everybody gets.  I mean I get these e-mails for Silver Singles,

17   I get those.  I get e-mails -- and all my male friends get the

18   same e-mails, I'm not the only one, get these e-mails for male

19   enhancement.  I get these e-mails about my computer is

20   infected, you have to clean your computer with all kinds of

21   various junk.  And it's all fishing, it's all fishing,

22   including pornography, by the way.

23          MR. RICHARD BARTOLOMEI:  Your Honor, this one

24   specifically gives a warning from Microsoft regarding

25   pornography.

 1          THE COURT:  We don't know that that's Microsoft, first

 2    of all.  We have no idea whether that's really Microsoft,

 3    number one.  And number two, more importantly, it isn't even

 4    the computer at issue here.  So you've made your proof.  I'm

 5    not going to allow evidence to come in about some other

 6    computer about an e-mail that we don't even know is truly from

 7    whom it says it is.  I just told you I got -- we all get them.

 8          MR. RICHARD BARTOLOMEI:  All I can say is I don't.

 9          THE COURT:  You don't get any fishing e-mails?  Wow.

10          MR. RICHARD BARTOLOMEI:  I don't get anything from

11    Microsoft.

12          THE COURT:  I've gotten them from Apple.  I got one

13    the other day saying it was from Apple telling me I need to

14    change my compromised Apple ID and put my compromised Apple ID

15    and click a link below and put in your new Apple ID and your

16    new password.  Holy moly.  And of course, I went to Apple.  I

17    couldn't really tell one way or the other, so I called Apple.

18    They said no, that's a fishing e-mail, it's going all over the

19    place.  I said it looks just like Apple.  And they said, Yes,

20    you're right, but it isn't.

21          So we don't have any evidence that that is -- you

22    know, the jury and the Court are not supposed to leave their

23    common sense at the door of the courthouse.  And I have to

24    admit I have never gotten one from Microsoft because I don't

25    use Microsoft except at the court.  I do use Apple and I've got

1  them from Apple.  Not really Apple, fake Apple.

2          MR. RICHARD BARTOLOMEI:  I can appreciate that there

3  are obviously people that try to mimic and use that.

4          THE COURT:  Millions of them.  They're all out there,

5  they're from Bulgaria and strange places.

6          MR. EDWARD BARTOLOMEI:  Russia, Your Honor.

7          THE COURT:  By the way, that's one of the ways that

8  we've had people hack into political computers for political

9  purposes.

10          MR. RICHARD BARTOLOMEI:  I think I've been allowed to

11  make my record.

12          THE COURT:  You did, but it's not even the right

13  computer.  We'll stand in recess for lunch.

14          I don't know what your expert is doing.  I know in the

15  testimony the other day, at some point I don't know whether we

16  were on the record or off, you gave some indication you were

17  going to have the IP addresses on these various e-mails

18  compared.

19          MS. THOMPSON:  Yes, I will be calling Special Agent

20  Steve Nutt in rebuttal.

21          THE COURT:  And that's on the IP addresses for these

22  different things?

23          MS. THOMPSON:  And the testimony of both the Michalik

24  brothers.

25          THE COURT:  I want to give you fair notice of what's

 1   going on.
 2           MR. RICHARD BARTOLOMEI:  This will be the first notice
 3   we've had in what he might be talking about.
 4           THE COURT:  That's why I'm doing it.
 5           MS. THOMPSON:  Yes, the IP addresses, the operating
 6   system on the computer.  He will address the defendant's
 7   statements about -- or the statements made about music playing.
 8           THE COURT:  Okay.  All right.  That's fine.  I don't
 9   like anybody to be surprised.
10           MS. THOMPSON:  It just addresses the testimony already
11   given.
12           MR. RICHARD BARTOLOMEI:  Your Honor, that's a little
13   broad because let me go to the next thing, if we could.  If
14   they get to testify and have a rebuttal expert testify about
15   all these things, then what I'm trying to figure out is are
16   they going to be able to go into 6 and 6b?
17           THE COURT:  I don't know what 6 and 6b are.
18           MR. RICHARD BARTOLOMEI:  6b were their own reports, so
19   they would be impeaching their own reports or explaining their
20   own reports.  I don't think they're permitted to do that.
21           THE COURT:  They're certainly permitted to explain --
22   if you attack the report, they're entitled to go back in with
23   an expert and explain why this is this and this is this.
24   That's not attacking it, that's explaining it.  They have every
25   right to do that.

 1          MR. RICHARD BARTOLOMEI:  Then are we entitled to bring

 2   a witness to rebut that?

 3          THE COURT:  We don't play tennis here.  The time for

 4   you to bring your expert to do that is now, not then.

 5          MR. RICHARD BARTOLOMEI:  That's why I was asking, Your

 6   Honor.

 7          THE COURT:  But you don't have an expert.

 8          MR. RICHARD BARTOLOMEI:  We could designate --

 9          THE COURT:  No, it's too late to be designating

10   experts.  We already went through this.  I gave you plenty of

11   opportunity to do that.

12          MR. RICHARD BARTOLOMEI:  We could put on the fact

13   witness who did the very same thing as Mr. Linares and he would

14   be a fact witness and we could put him on, I believe, in order

15   to do the very same thing that Mr. Linares did which is why the

16   Court gave us two days to do it.  So now I can't put on the

17   witness that I was permitted.

18          THE COURT:  You didn't tell me you were going to put

19   any witness on.

20          MS. THOMPSON:  And nothing has been provided to the

21   government.

22          THE COURT:  I gave you until 7:00 to do the report and

23   if he didn't do the report, then he couldn't testify.

24          MR. RICHARD BARTOLOMEI:  With respect, he couldn't

25   testify as an expert on our case in chief.

1          THE COURT:  Right.

2          MR. RICHARD BARTOLOMEI:  However, then when it came

3    out -- and I would also point out to the Court there was

4    another report that was put in which we've never seen that I

5    objected to and Mr. Linares was allowed to rehabilitate his

6    prior testimony on a report that I have never seen which

7    discusses errors and other matters, we never got that.  I

8    objected and the Court overruled it and said he could talk

9    about a report we've never seen.

10          THE COURT:  I don't think that's true.  I gave you two

11    days and then two weekend days to review.  You had four days.

12          MR. RICHARD BARTOLOMEI:  He's not allowed to testify.

13    That's what I'm trying to --

14          THE COURT:  Counsel, I've given you plenty of time.  I

15    understand what you're doing.  You're trying to make some sort

16    of record or create error.  Fortunately what's happening is

17    you're kind of changing horses in the middle of the stream

18    throughout this trial.  You say one thing one day, then we get

19    something else and then we get something new.  And I tried to

20    do you a favor.  They don't have any obligation to tell you at

21    all what their rebuttal expert is going to testify to, but I

22    inquired of it to try to give you an opportunity to be

23    prepared.  And then you come back and say wait a minute, now we

24    want this guy to testify.  Fortunately -- and I'm very happy to

25    say this, otherwise we'd get reversed probably in every case --

1  these Court of Appeals judges are not numbskulls.  They are

2  bright, articulate, professional jurists who have been around

3  and they know this tactic just as well as I do, if not better.

4  They see it every single day.  So you can make whatever record

5  you want to make.  I have bent over backwards to give your

6  client a fair trial, but I can't keep jumping from one thing to

7  the next.  It's totally unfair to the government.  I've already

8  prejudiced the government on several occasions by giving in to

9  allow you and your co-counsel to do things that I wouldn't

10  normally allow to do because of the nature of this case.  But

11  this isn't like you haven't been on this case.  Your brother

12  has been on this case with his partner for a year.  How many

13  continuances has this had?

14          MR. EDWARD BARTOLOMEI:  Your Honor, it had a number of

15  continuances for health purposes.

16          THE COURT:  I know, I understand that.

17          MR. EDWARD BARTOLOMEI:  And there were some before

18  then too, Your Honor.

19          THE COURT:  There's like eight continuances.  I'm not

20  blaming you.  I gave you the continuances.

21          MR. EDWARD BARTOLOMEI:  I understand, Judge.

22          THE COURT:  So I'm just saying that this is not a case

23  that was rushed to trial by this Court with a bulldozer,

24  pushing the defendant into a ditch.  It's quite the opposite.

25  So now to pop up after all this literally years and say now,

1  well, now that we know what they're going to testify to -- they

2  don't have an obligation to tell you what they're going to

3  testify to. I could have not said a thing. No obligation.

4          MR. RICHARD BARTOLOMEI: All I'm saying, and I want to

5  lay it out very simply, the report that is 6b was not given to

6  us timely, it was not given to us prior to in the discovery.

7  And that's the very report that we were then given some time,

8  if I may say, given some time to have him review. Now I

9  understand we are not going to be permitted to put on the

10  witness who reviewed it for the defendant. Is that what I am

11  to understand?

12          THE COURT: Counsel.

13          MS. THOMPSON: 6b was provided to them prior to -- I

14  believe prior to the start of the -- right at the start of the

15  trial and that's why the Court gave them two days and the

16  weekend.

17          THE COURT: And we also have a record that the

18  government's fact witness took a look at it and it took an hour

19  and a half to review it.

20          MS. THOMPSON: And the defense computer person has

21  looked at -- had access to the entire hard drive including the

22  information in 6b. He's had access to that for a year. He's

23  looked at it for multiple days a year ago, again in May and

24  then over the weekend that we were in trial, for eight hours on

25  Saturday. I've still not gotten one bit of information.

1      THE COURT:  And I said if you're going to have that

2  person testify and they're going to testify about it, let us

3  know by 7:00 p.m.  So we come in the next day.  Are they

4  testifying?  No.

5      MR. RICHARD BARTOLOMEI:  Your Honor, at the time that

6  exchange occurs -- first let me clarify the record.

7      THE COURT:  No more.

8      MR. RICHARD BARTOLOMEI:  This came in on August 21st,

9  it was during trial was the first time we were handed it.  It

10  was not given to us as pretrial discovery.

11      THE COURT:  She said at the beginning of the trial.

12      MR. RICHARD BARTOLOMEI:  Beginning of the trial,

13  that's not the first day of trial, but the point that I'm

14  trying to make is clearly it was not created and given to us

15  and that's been an objection.  But the other thing that I

16  wanted to say was, and this is why I was confused, if he was

17  given the opportunity to review it, incidentally that was

18  before he had the opportunity to review it that you ask if we

19  gave her a report on it, he hadn't even gotten an opportunity

20  to review it, so how could he give a report?  That's all I'm

21  saying.

22      MS. THOMPSON:  He had the opportunity to review that

23  material for over a year.  In fact, he was the -- their

24  computer person was employed by previous counsel, so he's had

25  access to everything on the hard drive for well over a year.

1          MR. RICHARD BARTOLOMEI:  I think we've made our record

2     clear.

3          THE COURT:  I think I already put an order in.

4     There's actually an order filed.  Counsel, just take your seat.

5     Everybody sit down and take their seat.  I want the defendant

6     to have a fair trial.  Maybe that's a mistake on my part, but I

7     really want him to have a fair trial.  The government has

8     absolutely no legal obligation at all to tell you or me what

9     their rebuttal expert is going to testify to.  And in fact, he

10    probably doesn't know all he's going to testify to and neither

11    does she because your case isn't even over, so that's number

12    one.  But out of an abundance of trying to be fair, I asked

13    counsel what is it that you intend to have him testify to.

14    Now, she could have said, Judge, I would prefer not to tell

15    you.  And you know what, I would have no way of compelling her

16    to do so, but she does.  And then all of a sudden you jump up,

17    You mean you're not going to let my person testify?

18          I mean three minutes before that, you had no

19    intentions of calling him.  You didn't notify me, you didn't

20    notify counsel.  All of a sudden when I put them on the spot

21    and she's gracious enough to let us know, all of a sudden then,

22    oh, Judge, you're being harsh, you're not letting us put on our

23    defense, you're not letting our man testify.  As if this was

24    somehow completely unknown to the defense in this case when

25    that is abjectly untrue.  The expert -- don't you dare get up.

1   Do not get up.  Your expert, and I've seen the record, has had

2   access to this material for over one full year.  There's

3   nothing here new.  Number two, when she actually had the

4   documents printed out off that hard drive, printed out and

5   handed them to you at the beginning of the trial, which by the

6   way, she didn't need to do, but she did because your expert has

7   already had access to it, so they've already been turned over,

8   then you raised Cain on the theory that somehow this is all new

9   and who knows where it came from and our expert didn't have a

10  chance to look at it.  Okay.  So I said fine.  And what I did

11  at that time was I gave you Thursday -- I recessed the trial,

12  Thursday, Friday, Saturday and Sunday, four days.  Now, it took

13  the government's expert an hour and a half to look at it and

14  come up with an understanding of exactly what it was.  But I

15  said if you want to have him testify, you need to let the

16  government know by 7:00 p.m.  I asked government's counsel the

17  next day, Did you receive any notice?  No.  And then I turned

18  to counsel, Are you going to have him testify?  No.  Fine.

19          Now all of a sudden this is horrible, nobody knows

20  anything, this is a trial by ambush.  You know, I understand

21  what counsel is doing.  There's two things that are going on

22  here.  First of all, one is to set up or try to set up --

23  assuming that the appeals judges don't read the record, which

24  they do -- an appeal on the basis that somehow I have cut the

25  defense off and prevented them from providing critical defense

1    information or, failing that, set up a 2255 motion for

2    ineffective assistance of counsel.  Both of those are going

3    nowhere on this record.  First of all, there's very little

4    additional that is coming out.  All counsel is going to do is

5    have her expert address what has been brought out on

6    examination on these documents.  It's nothing new, nothing.

7    And that's what she said.  And what else were you going to have

8    him do?  Explain or look at the IP addresses.

9            MS. THOMPSON:  The IP address and then the music.

10           THE COURT:  Yeah, which you brought out.

11           MS. THOMPSON:  And the operating system which has been

12   brought out by the defense.

13           THE COURT:  The defense, right.  And that's proper and

14   appropriate rebuttal.  They don't even have to designate a

15   rebuttal expert or rebuttal witness until after defendant's

16   case.  They don't even have to designate one.  It's appropriate

17   to do so and under our local rules we require it, but I don't

18   think the Federal Rules of Criminal Procedure require that and

19   they control when they're in conflict with the local rules, but

20   we require the government to do it here and they do do it.

21           MR. RICHARD BARTOLOMEI:  Your Honor, I appreciate that

22   she's identified three areas that she is going to have him

23   testify about and I appreciate the opportunity.  I'm not trying

24   to engineer an appeal.  I'm simply making a record in case

25   there is one.  And I'm not trying to set up a 2255 obviously

 1  because that would involve all of us.  My point is I'm simply

 2  making the record so that if there's a need to review it, then

 3  at least I preserved --

 4          THE COURT:  Who are you thinking about calling to

 5  testify?

 6          MR. RICHARD BARTOLOMEI:  The person that was

 7  allowed --

 8          THE COURT:  Who is this?  Don't tell me "the person".

 9  Give me a name.

10          MR. RICHARD BARTOLOMEI:  Scott Broderhausen.  He's the

11  person that was permitted to review and was the person who

12  reviewed it 18 months ago based on the initial report in 6.

13          THE COURT:  And what do you propose to have him

14  testify to.

15          MR. RICHARD BARTOLOMEI:  He does the same forensic

16  search that Mr. Linares did.

17          THE COURT:  Mr. Linares has already testified.

18          MR. RICHARD BARTOLOMEI:  That's correct.

19          THE COURT:  And you never told me based on his

20  testimony that you wanted him.

21          MR. RICHARD BARTOLOMEI:  Your Honor, he hadn't gotten

22  an opportunity to review 6b because 6b wasn't provided as an

23  exhibit --

24          THE COURT:  No, no, all that was in.  That was all in.

25  You've had 6b, 6b isn't new.

Jeffrey Clinton Michalik - Examination          68

1           MS. THOMPSON:  The information in 6b just like 6 is

2    all on the hard drive.  Their expert has had access to it for,

3    like he said, 18 months.  He's looked at it for hours on end.

4    If he were going to testify to anything, they should have --

5           THE COURT:  Well, Mr. Linares testified a long time

6    ago in this case.  So his testimony was well known.  Why didn't

7    you tell me you were going to have him testify?

8           MR. RICHARD BARTOLOMEI:  Your Honor --

9           THE COURT:  You told me he wasn't going to be

10   testifying actually.

11          MR. RICHARD BARTOLOMEI:  As an expert.  We hadn't

12   designated him.

13          THE COURT:  I asked you whether he was going to be

14   testifying, period.

15          MR. RICHARD BARTOLOMEI:  Your Honor.

16          THE COURT:  We're not going to have him testify.

17          MR. RICHARD BARTOLOMEI:  You have a clear picture of

18   the record, I've made my record.

19          THE COURT:  I don't know what kind of a record you're

20   making here.  It's called a floating defense or trying to

21   confuse the judge or something, maybe the Appeals Court.  I'm

22   not sure exactly what it is.

23          MR. RICHARD BARTOLOMEI:  It's not my personal

24   intention.

25          THE COURT:  All right.  So you want him to testify as

1    a fact witness to do what?

2         MR. RICHARD BARTOLOMEI:  He reviewed the same

3    information that is now in 6b which was not presented to us as

4    an exhibit prior to trial, not disclosed to us until the middle

5    of trial.

6         THE COURT:  That isn't true.  It was all on the hard

7    drive.  You keep saying that, counsel.  Look, if you're going

8    to have a winning argument to me, don't misrepresent the

9    record.  He had the hard drive, he looked at the hard drive, it

10   was on the hard drive.

11        MR. RICHARD BARTOLOMEI:  I don't believe it is a

12   misrepresentation to say that the fact that -- or excuse me,

13   the report that generates the Court's generosity of letting us

14   look at it, that's what we're talking about.

15        THE COURT:  No.  That's for your benefit, your

16   benefit, to help you.  That information was just extracted by

17   the government to use at trial off the hard drive.  He had over

18   a year that exact information on the hard drive.  And in fact,

19   he reviewed the hard drive for quite a bit of time I think.

20        MS. THOMPSON:  Multiple days and multiple hours.  It

21   may have been as much as 20 separate days.

22        THE COURT:  Twenty days.

23        MR. RICHARD BARTOLOMEI:  Your Honor, taking the

24   government's representation -- could I make a little

25   representation also?  She says it only took an hour and a half.

1    Mr. Linares never testified it only took an hour and a half.

2    It's the government's representation.  Our representation --

3    and she did stand up and say, Oh, he was there all day on

4    Saturday.  So obviously he didn't just take one hour and a

5    half.

6            THE COURT:  I don't know his competence, I don't know

7    what he's doing.  Who knows what this guy is doing?  It

8    certainly didn't tickle your fancy to have him come and testify

9    until just now.  If he's such a great expert, why isn't he

10   testifying here as an expert for you?  Well, apparently he

11   isn't.  So now you want to call him as a fact witness.  If I do

12   permit you to have him testify, he is absolutely not going to

13   testify as an expert under any circumstances because you

14   specifically informed the government and this Court that he was

15   not going to be an expert.  Now you want to call him as a fact

16   witness.  You are not going to get to call him as a fact

17   witness and then put him up there and start examining him as an

18   expert.  It isn't going to happen.  And believe me, I know the

19   difference.  So you better over the lunch hour talk to your

20   co-counsel and figure out exactly what you want to do.

21           MS. THOMPSON:  Your Honor, Mr. Broderhausen was on the

22   witness list for the defense that was disclosed the week

23   August 12th.

24           THE COURT:  That's why I gave him the opportunity to

25   call him.

1          MS. THOMPSON:  But there was no witness summary as to

2   what his relevance was to the case, so I called him and that's

3   when I found out that he worked with computers and he indicated

4   to me on the phone that he had written a report.  So prior to

5   him testifying, I would request a copy of his report.  That's

6   part of the report that the Court asked them to provide to me

7   by 7:00 that night.

8          THE COURT:  Which they didn't because they weren't

9   going to call him.  If you want to call this guy, get his

10  report.

11         MR. RICHARD BARTOLOMEI:  Thank you, Your Honor.  I

12  appreciate the opportunity and thank you for letting us --

13         THE COURT:  As a fact witness, not as an expert,

14  right?

15         MR. RICHARD BARTOLOMEI:  That's fine at this point.

16  You've told me --

17         THE COURT:  Not at this point.  Listen --

18         MR. RICHARD BARTOLOMEI:  I accept that, Your Honor,

19  and I understand the instruction is what I'm saying.  I accept

20  it and I understand it exactly.

21         THE COURT:  You talk about bending over backward here.

22         MR. RICHARD BARTOLOMEI:  And I appreciate it.  I do.

23         THE COURT:  You better get him here.

24         MR. RICHARD BARTOLOMEI:  He's right outside because I

25  believe -- was he not under a continuing Subpoena from the

1   government?

2          MR. EDWARD BARTOLOMEI:  Yes.

3          MR. RICHARD BARTOLOMEI:  He was.  He was under a

4   Subpoena from the government.  He's been here every day.

5          MS. THOMPSON:  He's never checked in with the

6   government.

7          THE COURT:  He hasn't?

8          MS. THOMPSON:  No.

9          THE COURT:  So you didn't even know he was out there?

10          MS. THOMPSON:  I knew he was out there, but he was on

11   their witness list.

12          THE COURT:  Did you Subpoena him?

13          MS. THOMPSON:  I did Subpoena him for the morning of

14   trial, but I did not see him.  He did not check in with me.

15          MR. EDWARD BARTOLOMEI:  And never released.

16          THE COURT:  Let's release him from the Subpoena.  He's

17   released from his Subpoena, but he's going to now come and

18   testify for you as a fact witness.

19          MR. RICHARD BARTOLOMEI:  That's what we're going to be

20   discussing over lunch as you've instructed us to do, Your

21   Honor.

22          MS. THOMPSON:  And I'll object.

23          THE COURT:  I hope I didn't go through all this so

24   that just you and your co-counsel could discuss this over

25   lunch.

1               MR. RICHARD BARTOLOMEI:  I was trying to be polite,

2     Your Honor.

3               THE COURT:  If you choose not to call him, that's

4     fine.  Okay.  If you choose to call him, I'm going to let you

5     call him as a fact witness, but you get that report to

6     government's counsel as promised a long time ago.

7               MR. RICHARD BARTOLOMEI:  Thank you.

8               COURT SECURITY OFFICER:  All rise.

9               *(12:27 p.m.)*

10                              *   *   *

11              *(1:50 p.m.)*

12                              *   *   *

13              COURT SECURITY OFFICER:  All rise.

14              THE COURT:  Are we ready to go?

15              MR. EDWARD BARTOLOMEI:  Ready, Your Honor.  Your

16    Honor, after visiting with my client, visiting over lunch,

17    there's a fine line between expert and fact witness and at this

18    point in time, Your Honor, we respectfully would not be calling

19    him.

20              THE COURT:  You're not going to call him?

21              MR. EDWARD BARTOLOMEI:  No.

22              THE COURT:  You can call him.

23              MR. EDWARD BARTOLOMEI:  I understand, Judge.

24              THE COURT:  You decided not to?

25              MR. EDWARD BARTOLOMEI:  Yes, sir.

1          THE COURT:  All right.  Sir, you can retake the stand.

2          MR. EDWARD BARTOLOMEI:  Thank you, Your Honor.  And

3   thank you for the Court's consideration on that point.

4                            *   *   *

5      (1:54 p.m.)

6          COURT SECURITY OFFICER:  All rise for the jury.

7          THE COURT:  Please be seated.  It's so cold up here

8   that they got me one of these space heaters.

9          Counsel, you may continue.

10  BY MR. RICHARD BARTOLOMEI:

11  Q.  I believe we were at your building site.  And you had asked

12  about a Warrant.  Do you remember?

13  A.  Yes, sir.

14  Q.  And what was the response of the agent?

15  A.  Agent DePaola held up paper and shook it on me saying --

16          MS. THOMPSON:  Your Honor, I'm going to object.  This

17  calls for hearsay.

18          THE COURT:  It does.  Sustained.

19          MR. RICHARD BARTOLOMEI:  May I for the record make my

20  same 801(d)2, she is the agent for the government executing the

21  Warrant and getting a consent.  She speaks for the government

22  with authority.

23          THE COURT:  Okay.  You've got it on the record.

24          MR. RICHARD BARTOLOMEI:  Thank you.

25  BY MR. RICHARD BARTOLOMEI:

1  Q.  Returning.  You were presented with the consent, you've

2  gone through that?

3  A.  Yes, sir.

4  Q.  Now, did they say anything or did they react after they had

5  gotten the computer?

6  A.  Yes, sir, when they got the computer, they put it in the

7  bag and both Juarez and DePaola started walking out and they

8  said, We're done here.  But then DePaola turned around and told

9  me to stay away from my family until the investigation is over

10 or I'll go to jail.

11 Q.  Have you been separated from your family since you were

12 indicted?

13 A.  Yes, sir.

14 Q.  Why are you separated from your family?

15 A.  I am now under house arrest and in my mom's house.

16 Q.  How long has that been?

17 A.  Almost three years.

18 Q.  Mr. Michalik, have you ever downloaded child porn onto your

19 computer?

20 A.  No, sir.

21 Q.  Did you know of any child pornography on your computer?

22 A.  No, sir.

23         MR. RICHARD BARTOLOMEI:  Thank you, Mr. Michalik.

24         THE DEFENDANT:  Thank you.

25                    CROSS-EXAMINATION

1   BY MS. THOMPSON:

2   Q.  Mr. Michalik, you don't dispute that there is child

3   pornography on your computer?

4   A.  I don't know if there is or not, ma'am, I was told there

5   was.

6   Q.  You sat through the entire trial, correct?

7   A.  Yes, ma'am.

8   Q.  You've heard all the witnesses testify?

9   A.  Yes, ma'am.

10  Q.  Isn't it true that you're aware that over 2500 images and

11  over a hundred movie files of child pornography were found on

12  your laptop?

13  A.  It was on a work laptop --

14       MR. RICHARD BARTOLOMEI:  I object to the form of the

15  question.  The question asks him to acknowledge the

16  government's evidence.  That is inappropriate and also it is a

17  manner of what we call negative bolstering.

18       THE COURT:  Okay.  I don't think it's negative

19  bolstering.  I don't know what negative bolstering is, but I

20  don't think that's it.  You asked him the question whether he

21  was aware there was child pornography and he said --

22       MS. THOMPSON:  Whether he disputed that there was

23  child pornography found on his computer.

24       THE COURT:  He said he's heard there was.  Let's just

25  move on from there.

1   BY MS. THOMPSON:

2   Q.  Mr. Michalik, up until the Search Warrant, you lived at

3   9718 Hidden Iron Street in San Antonio, correct?

4   A.  Yes, ma'am.

5   Q.  And isn't it true you moved in there in about June of 2013?

6   A.  It was around July, end of July of 2013.

7   Q.  And the entire time you lived there, isn't it true that

8   Ms. Crystal Rivas lived there as well?

9   A.  Yes, ma'am.

10  Q.  Along with her minor daughter?

11  A.  Yes, ma'am.

12  Q.  And her mother?

13  A.  Yes, ma'am.

14  Q.  And you had AT&T Internet service, is that correct?

15  A.  I did, yes, ma'am.

16          MS. THOMPSON:  Can you pull up page two of 1a.

17          MR. RICHARD BARTOLOMEI:  Your Honor, before we get

18  into that, I never asked any questions regarding AT&T

19  whatsoever at any time.  This would be beyond the scope of my

20  cross.  When the defendant takes the stand he is treated like

21  any other witness in that regard.

22          MS. THOMPSON:  This goes to his statement that he

23  didn't download child pornography.

24          MR. RICHARD BARTOLOMEI:  Your Honor --

25          THE COURT:  The objection is overruled.

1   BY MS. THOMPSON:

2   Q.  That page shows the details that you had AT&T Internet

3   service at 9718 Hidden Iron in San Antonio, correct?

4   A.  It shows it, yes, ma'am, but I didn't actually --

5          MR. RICHARD BARTOLOMEI:  May he finish?

6          MS. THOMPSON:  It was a yes or no and he said yes,

7   ma'am.  So I'll object to anything else as nonresponsive.

8          THE COURT:  The objection is sustained.  His answer,

9   "Yes, ma'am" will stand.

10  BY MS. THOMPSON:

11  Q.  Do you see in the box farthest to the right where it says

12  account established June 10th of 2013?

13  A.  Yes, ma'am.

14         MS. THOMPSON:  And will you show page one of that

15  exhibit.

16  BY MS. THOMPSON:

17  Q.  Do you agree that the IP address at that house is

18  75.1.83.139?

19         MR. RICHARD BARTOLOMEI:  Objection, Your Honor.  Form

20  of the question is is he being asked to agree that's what it

21  says on the document?  If so, that would be the best evidence.

22  If he is being asked if that is his IP number, that is not

23  clear and I would object.

24         THE COURT:  Overruled.

25  A.  I don't know what my IP address is, ma'am.

Jeffrey Clinton Michalik - Examination          79

1   Q.  Do you see the IP address on page one of Exhibit 1a?

2   A.  I do, yes, ma'am.

3   Q.  The entire time -- well, on November 22nd of 2015 when the

4   Search Warrant was executed, you were not arrested, correct?

5   A.  On November 22?

6   Q.  On October 22nd.  You were never arrested?

7   A.  No, ma'am, they did not actually arrest me, no, ma'am.

8   Q.  You were never handcuffed, is that true?

9   A.  I was not handcuffed, no, ma'am.

10  Q.  And you sat in Agent DePaola's vehicle for about an hour,

11  is that true?

12  A.  They made me sit there, yes, ma'am.

13  Q.  Is it true that you sat in her vehicle for an hour?

14  A.  Yes, ma'am, they made me sit there.

15  Q.  Did you talk to her during that hour, yes or no?

16  A.  She did all the talking.  I got a few responses in.

17  Q.  Well, let's talk about your responses then.  You were shown

18  five images of child pornography, correct?

19  A.  Yes, ma'am.

20  Q.  And you told the agents that you recognized two of them,

21  isn't that correct?

22  A.  I said two of them look similar, yes, ma'am.

23  Q.  Look similar or look familiar?

24  A.  Look familiar, sorry, looked familiar.

25  Q.  And the other three did not look familiar to you, correct?

1  A.  I didn't recognize them at all, no, ma'am, I had no idea

2  what they were.

3  Q.  So you didn't just agree with what Agent DePaola was

4  saying, you identified -- isn't it true you identified two of

5  them and didn't identify the other three?

6          MR. RICHARD BARTOLOMEI:  Objection, Your Honor.  One,

7  it's a compound question.  And two, it asks him to respond both

8  to the pictures and to the manner in which he was questioned.

9          THE COURT:  Why don't you rephrase the question,

10  counsel.

11  BY MS. THOMPSON:

12  Q.  Isn't it true that you disputed recognizing three of those

13  images?

14  A.  I didn't say anything.  I didn't dispute anything.  She

15  showed them to me, she asked me if it didn't look familiar.  I

16  said two of them look familiar.  She showed them to me again,

17  said can you pick out the two.  I said three and five.  I

18  didn't dispute her saying anything else.  I didn't recognize

19  them.

20          MS. THOMPSON:  May I approach?

21          THE COURT:  Yes.

22  BY MS. THOMPSON:

23  Q.  And then you initialed them, correct?

24  A.  Yes, ma'am.  She asked me to initial them.

25  Q.  So Exhibit 5a, those are your initials, correct?

Jeffrey Clinton Michalik - Examination          81

1    A.   That was not one of the pictures.

2    Q.   Are those your initials on Exhibit 5a?

3    A.   That is.

4    Q.   Are those your initials on 5b?

5    A.   That is my initials, but when I saw this picture, there was

6    no face on it.

7    Q.   You just recognized the vagina?

8    A.   The legs, yes, ma'am.

9    Q.   Okay.  And you initialed it, correct?

10   A.   Yes, ma'am.

11   Q.   And you put the date of October 22nd, 2015?

12   A.   Yes, ma'am.

13        MR. RICHARD BARTOLOMEI:  Your Honor, before we go

14   further on this, could we have a brief sidebar?

15        THE COURT:  No, no sidebar.  Unnecessary at this

16   point.  You can take it up with me at a break.

17   BY MS. THOMPSON:

18   Q.   Isn't it true that you were told by Special Agent DePaola

19   that all five of those images had been downloaded to your house

20   on Hidden Iron Street?

21   A.   No, ma'am, she didn't say that.

22   Q.   Isn't it true you told her that you recognized those from a

23   variety of websites?

24   A.   No, ma'am, I did not say that.

25   Q.   You told the agents that you had a laptop computer at your

1   office, correct?

2   A.  No, ma'am, I didn't tell them.  They told me, We need the

3   laptop.  And I didn't mention anything about it until they

4   mentioned they needed a laptop.  And I said the only laptops I

5   use is at work.

6   Q.  Let's talk about going to work.  You were in the car with

7   Special Agent DePaola and Special Agent Juarez, correct?

8   A.  Yes, ma'am.

9   Q.  And at the end of the interview, instead of getting out of

10  the car -- well, strike that.

11      At the end of the interview, everybody got out of the car,

12  isn't that correct?

13  A.  Yes, ma'am, we got out.

14  Q.  Special Agent DePaola did not drive you and Special Agent

15  Juarez to your office, correct?

16  A.  No, ma'am.

17  Q.  You drove all by yourself to the office?

18          MR. RICHARD BARTOLOMEI:  Excuse me.  May he be

19  permitted to answer?

20          THE COURT:  He said no.  And then she said, "You drove

21  all by yourself".  And he said yes.

22  BY MS. THOMPSON:

23  Q.  Isn't it true you drove yourself to your office?

24  A.  Yes, ma'am, they told me I had to go get the laptop, so

25  yes.  They commanded me to get the laptop, so I did what they

1   said.

2   Q.  And you drove yourself?

3   A.  Yes, ma'am.

4   Q.  Isn't it true, they asked if they could make a stop and you

5   are the one that suggested stopping at McDonald's, isn't that

6   true?

7   A.  Yes, ma'am.

8   Q.  And you drove to McDonald's, isn't that true?

9   A.  Yes, ma'am.

10  Q.  And isn't it true you sat at McDonald's and waited for the

11  agent to use the restroom?

12  A.  Yes, ma'am, I did.

13  Q.  And then isn't it true that you continued driving all the

14  way to your office?

15  A.  Well, I had no choice.  They commanded me to go to work --

16          THE COURT:  Sir, you have to understand, she's just

17  asking you a question, you can't editorialize.  Just yes or no

18  if it calls for a yes or no.  Your attorney will have plenty of

19  opportunity to get back up and redirect you.

20  BY MS. THOMPSON:

21  Q.  And Exhibit Four is the Dell laptop that they took from

22  your desk in your office, isn't that correct?

23  A.  You're correct, they took it from me, yes, ma'am.

24  Q.  And you signed the consent form?

25  A.  I didn't know it was a consent form.  She put it on there.

1          MS. THOMPSON:  Will you put up Exhibit Three please?

2     BY MS. THOMPSON:

3     Q.  Is this the consent form that you signed, yes or no?

4     A.  That is a document, that is the document I signed, yes,

5     ma'am.

6     Q.  And at the very bottom you printed your name, isn't that

7     true?

8     A.  Yes, ma'am.

9     Q.  And then right after that, you sign your name, isn't that

10    true?

11    A.  Yes, ma'am.

12    Q.  And then you dated it, correct?

13    A.  Yes, ma'am.

14    Q.  And then you put the time?

15    A.  Yes, ma'am.

16    Q.  You did graduate from high school, correct?

17    A.  I did.

18    Q.  After you met with the agents that day after they left the

19    business, did you write down any notes about what happened?

20    A.  No, ma'am.

21    Q.  Did you even go home after they left the business to check

22    on your family?

23          MR. RICHARD BARTOLOMEI:  Objection, Your Honor,

24    relevance.

25          MS. THOMPSON:  Your Honor, he's testified that he was

1  very worried about his family that was at home with armed

2  agents.

3          THE COURT:  The objection is overruled.

4          MR. RICHARD BARTOLOMEI:  Your Honor.

5          THE COURT:  No.

6  BY MS. THOMPSON:

7  Q.  After the agents left your office, isn't it true you did

8  not drive back home to your house?

9  A.  No, ma'am, they told me to stay away from my family or I'd

10  go to jail, so no, I did not.

11  Q.  And you stayed away for days, isn't that correct?

12  A.  Because I was told to stay away, yes, ma'am.

13  Q.  Isn't it true that you didn't even call Ms. Rivas to tell

14  her where you were, isn't that correct, yes or no?

15  A.  They told me not to contact them and I didn't have a phone.

16  Q.  It's a yes or no question, Mr. Michalik.  Is it yes or no?

17  Isn't it true that you did not tell Ms. Rivas where you were?

18          MR. RICHARD BARTOLOMEI:  Now may I interpose my

19  objection?

20          THE COURT:  Yes, you can.

21          MR. RICHARD BARTOLOMEI:  My objection is the relevance

22  of this and it's argumentative.

23          THE COURT:  The objection is overruled.

24  BY MS. THOMPSON:

25  Q.  Isn't it true you did not tell Ms. Rivas where you were?

1    A.  I didn't have a phone, ma'am, and I couldn't tell them.  I

2    was too scared to tell them.

3    Q.  It's a yes or no please.

4              MR. RICHARD BARTOLOMEI:  Your Honor.

5              THE COURT:  She's right.  It's a yes or no answer.  He

6    keeps editorializing and he needs to just answer the question.

7    You will have an opportunity to get back up and redirect, but

8    he needs to just answer the question.

9    BY MS. THOMPSON:

10   Q.  Isn't it true that after the agents left the business, you

11   did not contact Ms. Rivas for days?

12   A.  Yes, ma'am.

13   Q.  And when you left the house prior to taking the agents to

14   the business, didn't you hear Ms. Rivas say if any of this is

15   true, she'd kill you?

16             MR. RICHARD BARTOLOMEI:  Your Honor, now I object to

17   the relevance, clearly beyond the scope and absolutely no

18   relevance whatsoever to any material issue in this case and

19   solely for the purpose of embarrassing the defendant.

20             THE COURT:  No, I don't think so.  Ms. Rivas testified

21   to that already in this trial.  Ms. Rivas gave testimony on

22   this already.  She did.

23             MR. RICHARD BARTOLOMEI:  I understand that, Your

24   Honor.

25             THE COURT:  The objection is overruled.

1   BY MS. THOMPSON:

2   Q.  Isn't it true that Ms. Rivas told you as you were leaving

3   if any of this is true, she'd F'ing kill you?

4   A.  I honestly didn't hear it.  It was so much chaos, I didn't

5   hear anything.

6   Q.  You walked by yourself to Agent DePaola's vehicle, is that

7   right?

8   A.  No, they escorted me.

9   Q.  They stood next to you?

10  A.  They escorted me, yes, ma'am.

11  Q.  Isn't it true neither agent touched you?

12  A.  DePaola touched me.  She touched me and guided me that way.

13  They did not physically push me or touch me, but they tapped my

14  shoulder and guided me that way.

15  Q.  She tapped your shoulder and pointed to where her car was

16  parked?

17  A.  And she told me to go that way, yes, ma'am.

18  Q.  Neither one of them grabbed your arm and led you to the

19  vehicle, isn't that correct?

20  A.  No, ma'am, they stood real close and guided me that way

21  yes, ma'am.

22  Q.  And during the interview, you told the agents who lived at

23  the house at the time, isn't that true?

24  A.  Yes, ma'am.

25  Q.  And you told her that you had lived there for about two

1   years, isn't that true?

2   A.  Yes, ma'am.

3   Q.  And that you graduated from Jefferson High School, is that

4   true?

5   A.  That never came up.

6   Q.  And that you had Internet at your house?

7   A.  Yes, ma'am.

8   Q.  And that was through AT&T, correct?

9   A.  Correct.  They asked me who my Internet service was, I said

10  AT&T, yes ma'am.

11  Q.  Isn't it true you told them that you use the Internet for

12  fantasy football and work?

13  A.  Yes, ma'am.

14  Q.  And then didn't you discuss with the agents all the

15  different computers and electronic devices that were in the

16  house?

17  A.  Yes, ma'am.  They asked me what was there and I told them I

18  had a land line upstairs, an external hard drive.

19  Q.  What do you mean a land line?

20  A.  Sorry, I say land line.  It's a tower unit.

21  Q.  A desktop computer.

22  A.  A desktop, yes.  Sorry.  And then an external hard drive

23  and my phone.

24  Q.  And isn't it true you mentioned there was an iPod in your

25  truck?

1   A.  I did not mention that, no, ma'am.

2   Q.  Isn't it true that that's when you mentioned that you also

3   had a Dell laptop at work?

4   A.  No, ma'am, laptop never came up in my conversation.

5   Q.  So are you claiming you did not tell the agents that you

6   got the laptop from David Smith?

7   A.  I did not mention David Smith at all, ma'am.

8   Q.  But you've had that laptop to be able to use since about

9   2012, isn't that right?

10  A.  Probably 2013.  It was at work, yes, ma'am, HomeArama.

11  Q.  And you brought it home on occasion?

12  A.  If I needed to for some sort of projects, yes, ma'am.

13  Q.  And isn't it true that you told the agents that you have

14  searched pornography websites on that laptop at work?

15  A.  No, ma'am, I didn't tell them anything about searching

16  pornography.

17  Q.  And I think you testified on direct, isn't it true you gave

18  them the terms you used to search when you searched for

19  pornography?

20  A.  I did not give any terms when I searched pornography, no,

21  ma'am.

22  Q.  Is it your testimony that they made that up?

23      MR. RICHARD BARTOLOMEI:  Objection, Your Honor.  That

24  is negative bolstering because it requires him to comment upon

25  the credibility --

1          THE COURT:  The objection is sustained.

2          MR. RICHARD BARTOLOMEI:  Thank you.

3  BY MS. THOMPSON:

4  Q.  You testified on direct that you had seen the images of

5  child pornography that were identified on a laptop computer,

6  right?

7  A.  On a work computer.  I didn't specify any type, I didn't

8  know what type it was, it was at HomeArama and I had no idea

9  what computer it was, it was so long ago.

10  Q.  After you saw the images of child pornography on a

11  computer, what law enforcement agency did you call to report

12  that?

13  A.  I didn't --

14          MR. RICHARD BARTOLOMEI:  Objection, Your Honor.

15  Relevance and it also requires him -- it's actually a legal

16  question which it suggests he is to know and respond to.  It

17  has no relevance to this case at all.  It's also an attempt to

18  try to prove some uncharged criminal activity and to have him

19  so acknowledge.

20          THE COURT:  Ms. Thompson.

21          MS. THOMPSON:  It goes to credibility.  He

22  acknowledged he saw child pornography.

23          THE COURT:  The objection is overruled.

24  A.  Ma'am, when I saw those they were actually just in a random

25  folder when I was looking for clients' folders.  And there was

1  a series of things, there was naughty nannies, horny housewives

2  mills, I didn't even pay attention.  A client came in, I just

3  closed on and moved on.  I didn't identify them as being child

4  porn, I didn't know, I just identified --

5  Q.  You didn't contact law enforcement?

6  A.  I had no idea -- I didn't examine them to see that they

7  were actually child porn, no, ma'am.

8  Q.  Did you tell anybody that you had seen them?

9  A.  I did not.  I got a customer come in and I just continued

10 on working.

11 Q.  Isn't it true that you told Special Agent DePaola that you

12 recognized those two images from a variety of websites

13 including one titled Little Puffy Pussies?

14 A.  Ma'am, those words did not come out of my mouth, I did not

15 say that.

16     MS. THOMPSON:  Could you pull up Defense Exhibit 7d

17 please?  May I approach, Your Honor?

18     THE COURT:  You may.

19 BY MS. THOMPSON:

20 Q.  Mr. Michalik, I'm going to show you -- you said that e-mail

21 was drafted on this computer, correct?

22 A.  I believe so, yes, ma'am.

23 Q.  And when did you say you wrote that e-mail?

24 A.  It was in 2015, if I recall, yes, ma'am.

25 Q.  Can you pick one of the ten months you had the computer in

1   2015?

2   A.  I don't remember because I was trying to get pictures of

3   weird things going on on my laptop and I don't know -- at that

4   time I don't remember, I had many pictures of things and I

5   don't remember exact dates.

6   Q.  And so that's why you took the screenshot of this?  Who did

7   you send this screen shot to?

8          MR. RICHARD BARTOLOMEI:  Compound question, Your

9   Honor.

10  BY MS. THOMPSON:

11  Q.  Okay.  Who did you send this screen shot to?

12  A.  The screen shot itself was on an old phone which is no

13  longer good.

14  Q.  But you took it for a reason, so when you took the picture,

15  who did you send it to?

16  A.  I took it to keep documents of what was going on, I didn't

17  send it specifically to anybody.

18  Q.  You just kept it for years?

19  A.  Yes, ma'am, I kept anything because I have from 2015 all

20  the way up until now I have hundreds of pictures of all sorts

21  of stuff going on on my computer.

22  Q.  I'll have you look at Exhibit Four.  Do you see on Exhibit

23  Four this red writing down here?

24  A.  Yes, ma'am.

25  Q.  Where is that on Exhibit 7d?

1  A.  I don't know, ma'am.

2  Q.  Do you not know because it's not there?

3  A.  I don't know if it's there or not, ma'am.

4  Q.  Well, it would be right here.  Do you see where Dell is

5  written right there?

6  A.  Yes.

7  Q.  There's the Dell --

8          MR. RICHARD BARTOLOMEI:  Your Honor --

9          THE COURT:  Just a minute.  What is it, counsel?

10          MR. RICHARD BARTOLOMEI:  If there is an Exhibit Four,

11  she hasn't requested that it be put up, but I would like to at

12  least approach and see what she's questioning about if she's

13  not going to put it up.

14          MS. THOMPSON:  I don't have a picture of the inside of

15  Exhibit Four.  The computer is item four, but I didn't have a

16  picture.

17          MR. RICHARD BARTOLOMEI:  Now I understand what you're

18  saying.

19  BY MS. THOMPSON:

20  Q.  Mr. Michalik, you'll agree that there is no -- there is red

21  writing on Exhibit Four, but there's no red writing on Exhibit

22  7d?

23  A.  No, ma'am, I do not see it on there, that is correct.

24          MS. THOMPSON:  Your Honor, may I publish the inside of

25  Exhibit Four to the jury?

```
 1              THE COURT:  Yes.
 2              (Pause.)
 3   BY MS. THOMPSON:
 4   Q.  Mr. Michalik, with regard to the pictures that were
 5   admitted into evidence that show your business MB Cabinetry,
 6   would you agree that those pictures have been taken recently
 7   like in the last few weeks and not in October of 2015?
 8   A.  Yes, ma'am.  I was trying to -- sorry.  Yes, ma'am.
 9   Q.  One other question.  You stated that when you were in the
10   interview and you recognized the child pornography pictures,
11   that your testimony was you saw them on an old laptop at
12   HomeArama, correct?
13   A.  I didn't say laptop, I said an old work computer.
14   Q.  You saw those on an old work computer at HomeArama?
15   A.  Yes, ma'am.
16   Q.  Why then did you take the agents to your business?
17   A.  They told me I had to go get the laptop.
18   Q.  The laptop that you say was never mentioned during the
19   interview?
20   A.  Correct.  They mentioned the laptop during the interview, I
21   did not mention it.
22   Q.  They somehow figured out you had a laptop?
23   A.  Correct.  As soon as I signed that picture, one of them
24   said, "We need to go get that laptop."  I looked up at him, I
25   was like I didn't mention a laptop.  The only laptops we use
```

 1    were at work.

 2    Q.  That was when you were looking at one of the images that

 3    you identified?

 4    A.  When they asked me to sign one that looked familiar, that's

 5    when they had said that, yes, ma'am.

 6              MS. THOMPSON:  May I approach, Your Honor?

 7              THE COURT:  Yes.

 8    BY MS. THOMPSON:

 9    Q.  Mr. Michalik, here is one of the images that you said

10    looked familiar.  I'll just draw your attention to -- that is

11    one that you initialed, correct?

12              MR. RICHARD BARTOLOMEI:  Your Honor.

13              THE COURT:  Yes.

14              MR. RICHARD BARTOLOMEI:  Before we go any further,

15    could we have a sidebar on this?

16              THE COURT:  What are you offering now, Ms. Thompson?

17              MS. THOMPSON:  I'm asking him about the pictures, it

18    was during when he viewed the pictures that somehow Agent

19    DePaola knew there was another laptop.

20                            *   *   *

21         (Sidebar.)

22              MR. RICHARD BARTOLOMEI:  Your Honor, I'm perplexed.

23    They've already acknowledged these pictures are not on the

24    computer, so they're not relevant to anything because the issue

25    is not whether he ever viewed child pornography.  They already

1   admitted it's not on the computer.  The continued questioning

2   about something that's not on the computer is not relevant and

3   I -- frankly, that's what I was going to take up with the Court

4   is I was going to move to strike those because they are not

5   part of the charge and they are not relevant to the charge.

6   The question is not whether he ever viewed it, it's did you

7   possess it, was it on your computer.  And that is an entirely

8   different question as you've made abundantly clear.  So why are

9   we still going over these two images which they know are not on

10  the computer?

11         MS. THOMPSON:  The issue is whether he knowingly

12  possessed it and this goes directly to knowledge, whether he's

13  seen it before.  He brought out testimony that he's never

14  downloaded child pornography.  There's evidence in the Search

15  Warrant application that five images of child pornography were

16  downloaded solely to his house.  My questioning right now is

17  related to somehow after they view the images of child

18  pornography Special Agent DePaola miraculously realized there

19  was another laptop that was relevant.  So I'm going to go over

20  the information that is listed on the pictures that is not

21  related to any laptop.  It goes to his credibility.

22         MR. RICHARD BARTOLOMEI:  Your Honor, I don't believe

23  it does.

24         THE COURT:  I think it does, but it's okay.  I've got

25  the argument.

1          MS. THOMPSON:  Thank you.

2          *(Sidebar concluded.)*

3                              *   *   *

4          THE COURT:  The objection is overruled.

5    BY MS. THOMPSON:

6    Q.  Mr. Michalik, I'm going to show you the same exhibit I

7    showed you before with your initials.  You said that when you

8    were reviewing these with Special Agent DePaola, that's when

9    she on her own figured out there was a laptop computer that she

10   needed to look at, right?

11   A.  Correct.  One of them said, "We need to get that laptop",

12   correct.

13   Q.  So there is information on the picture that you were shown

14   during the interview, is that right?

15   A.  I did not see any of that up there, no, ma'am.

16   Q.  You'll agree, though, this is the original picture with

17   your initials, right?

18   A.  This was not on there and her face was cut off, the

19   pictures I saw.

20   Q.  That is your initial, though, right?

21   A.  There was only that little --

22          MR. RICHARD BARTOLOMEI:  Your Honor, she's arguing

23   with the witness.

24          THE COURT:  She's trying to get him to admit or deny

25   that those are his initials.

1    BY MS. THOMPSON:

2    Q.  Are those your initials?

3    A.  They are, yes, ma'am.

4    Q.  And at the top of that -- at the top of Exhibit 5b is

5    listed IP address 75.1.83.139, is that correct?

6    A.  That is on there, yes, ma'am.

7    Q.  And does it also contain information that the date and time

8    is August 4th of 2014 at 4:27?

9         MR. RICHARD BARTOLOMEI:  Your Honor, at this time I'd

10   like to object.  Perhaps we need to have some form of voir dire

11   outside the presence of the jury.

12        THE COURT:  About what?

13        MR. RICHARD BARTOLOMEI:  May we have a sidebar?

14        THE COURT:  All right.

15                         *   *   *

16        (Sidebar.)

17        MR. RICHARD BARTOLOMEI:  She has shown him, he has

18   told her it was not on it, so to continue to have him answer

19   about something that he says was not on it this is obviously

20   not a true and correct copy of what was shown him, but is what

21   their evidence shows.  It is not on there and was not on there

22   according to him, so it's unfair to ask him about things that

23   he has already said were not on the image.

24        MS. THOMPSON:  Which is why it goes to credibility.

25   It goes to his credibility.  The agent testified that this was

1    the original picture he was shown and his initials are on it.

2            THE COURT:  Okay.

3            *(Sidebar concluded.)*

4                              *   *   *

5            THE COURT:  The objection is overruled.

6    BY MS. THOMPSON:

7    Q.  Mr. Michalik, there is also the file name of the image on

8    the Exhibit 5b, correct?

9    A.  Yes, ma'am.

10   Q.  And then the website at Amateur Lover no IP.org, correct?

11   A.  That is on there, yes, ma'am.

12   Q.  There's nothing on that exhibit that shows that was

13   downloaded using a laptop computer, is that right?

14   A.  Yes, ma'am.

15   Q.  And the IP address that's at the top of that picture is the

16   same one that was assigned to you on Hidden Iron Street, isn't

17   that correct?

18           MR. RICHARD BARTOLOMEI:  Asked and answered at least

19   twice.

20           THE COURT:  I'm going to overrule that.

21   BY MS. THOMPSON:

22   Q.  Isn't that correct that that's your IP address?

23   A.  I don't know my IP address, but if it says it's mine, then

24   I would have to agree, yes, ma'am.

25   Q.  And August 4th of 2014 is when you were living at the

1  house?

2  A.  Yes, ma'am, I was living there.

3  Q.  So somebody at that house downloaded child pornography?

4         MR. RICHARD BARTOLOMEI:  Objection, Your Honor, calls

5  for speculation both as to location from which it would have

6  been downloaded and there is no evidence --

7         THE COURT:  He's already testified and his testimony

8  is that he didn't do it, he wouldn't have any -- he's already

9  testified he didn't do it, so I'm going to sustain that

10  objection.

11  BY MS. THOMPSON:

12  Q.  During your interview with Special Agent DePaola and

13  Special Agent Juarez, at no time did you ask to take a break,

14  correct?  You didn't ask to take a break during the interview?

15  A.  I didn't think I could, ma'am.  No, ma'am.

16  Q.  Isn't it true you never asked to stop the interview?

17  A.  No, ma'am.

18  Q.  The conversation went on for a whole hour?

19  A.  Yes, ma'am, they continued interrogating me for an hour,

20  yes, ma'am.

21  Q.  Do you remember the conversation of discussing a video

22  titled Dogie Style?

23  A.  No, ma'am, I did not say anything like that.

24  Q.  Do you recall discussing a child pornography file on the

25  laptop titled Good or Great Blow Job?

```
 1   A.  No, ma'am.  They actually were asking me specific things.

 2   Q.  And so your testimony is they somehow figured out that

 3   there was a laptop computer?

 4   A.  I did not mention a laptop at all in the car, ma'am.

 5   Q.  And your testimony is --

 6         MR. RICHARD BARTOLOMEI:  Excuse me, Your Honor, could

 7   he finish his answer.

 8         THE COURT:  He already finished it.  I thought he was

 9   done with his answer and I think he was.

10   BY MS. THOMPSON:

11   Q.  And is it your testimony that the file titled Dogie Style

12   just happened to be on your laptop computer?

13   A.  I don't know if it was on there or not, ma'am.  First time

14   I heard about that was during these proceedings in the courts

15   or whatever, I didn't know that was on there at all, ma'am.

16         MS. THOMPSON:  I have nothing further, Your Honor.

17         THE COURT:  Okay.

18         MR. RICHARD BARTOLOMEI:  May I approach, Your Honor?

19         THE COURT:  Yes.

20                   REDIRECT EXAMINATION

21   BY MR. RICHARD BARTOLOMEI:

22   Q.  You were shown Exhibit Five.  Remember, 5a?

23   A.  Yes, sir.

24   Q.  You see all the lettering on the top?

25   A.  Yes, sir.
```

Jeffrey Clinton Michalik - Examination          102

1    Q.  Was any of that on the picture that you were shown?

2    A.  It was not, sir.

3    Q.  So this is not a true and correct copy of what was shown to

4    you, correct?

5    A.  That is not, sir.

6    Q.  With regard to 5b, was any of the lettering on the picture

7    when it was shown to you?

8    A.  No, sir.

9    Q.  So that is not a true and correct copy of what you were

10   shown, isn't that correct?

11   A.  That is correct.

12   Q.  And you didn't --

13   A.  I don't want to see those.

14   Q.  Excuse me?

15   A.  I don't want to see those.

16       (Pause.)

17       MR. RICHARD BARTOLOMEI:  I believe the next exhibit

18   would be 12, am I correct?  May I approach?

19       THE COURT:  Sure.

20   BY MR. RICHARD BARTOLOMEI:

21   Q.  You were asked about the operating system on your computer,

22   do you recall?

23   A.  Yes, sir.

24       MS. THOMPSON:  Objection, Your Honor, I think this is

25   beyond the scope of cross.  I did not ask about the operating

 1   system.

 2              THE COURT:  I don't think she did.

 3              MR. RICHARD BARTOLOMEI:  She asked about the computer.

 4              THE COURT:  She asked about the computer, but I don't

 5   think she specifically asked about the operating system.  I

 6   think she asked about other things having to do with the

 7   computer, I don't think she asked about the operating system.

 8   Wait a minute.  You did ask about IP address.  I'm going to

 9   overrule the objection.

10              MR. RICHARD BARTOLOMEI:  I was about to address that,

11   Your Honor.

12              Could you put up Six please?

13   BY MR. RICHARD BARTOLOMEI:

14   Q.  Can you see that, sir?

15   A.  Yes, sir, I sure can.

16   Q.  Does it have a reference to Windows 12?

17   A.  Windows 10.

18   Q.  Excuse me, Windows 10.  Does it have a reference there?

19   A.  Yes, sir.

20   Q.  Does it have a date?

21   A.  Yes, sir, it says install 8/27/2015, 11:08:34 a.m.

22   Q.  I want you to take a look at Defendant's Exhibit 12, what

23   is that?

24   A.  That is a receipt for buying some stamps at a Post Office.

25   Q.  What type of stamps?

1          MS. THOMPSON:  Objection, relevance.

2          MR. RICHARD BARTOLOMEI:  Your Honor, give me a little

3     latitude.  I think I'll demonstrate the relevance in two

4     questions.

5          THE COURT:  All right.  I'll let you proceed.

6     BY MR. RICHARD BARTOLOMEI:

7     Q.  Is that a receipt from your purchase?

8     A.  Yes, sir.

9     Q.  And what is the date?

10    A.  It's 8/27/2015.

11    Q.  At what time?

12    A.  11:06:16 a.m.

13    Q.  You're not physically in the presence of this computer at

14    all on the date that is shown as the Windows download, am I

15    correct?

16    A.  That is correct.

17         MR. RICHARD BARTOLOMEI:  Offer Exhibit 12.

18         MS. THOMPSON:  I'll still object.  Being present for

19    the installation of an operating system is not necessary, it's

20    not relevant.

21         THE COURT:  I'm going to overrule the objection.  I'll

22    receive it.  I'll let the jury make that determination.

23         MS. THOMPSON:  I would also object as to authenticity

24    in that there's no name on the receipt at all.

25         MR. RICHARD BARTOLOMEI:  He's testified to it.

1     THE COURT:  That's a credibility question for the

2  jury.

3          (Pause.)

4          I'm waiting.

5          MR. RICHARD BARTOLOMEI:  May I approach?

6          THE COURT:  Yes.

7  BY MR. RICHARD BARTOLOMEI:

8  Q.  In reference to what I had marked as Defendant's Exhibit

9  12a, do you recognize this document?

10 A.  That is my work bank statement.

11 Q.  What month?

12 A.  August of 2015.

13 Q.  What's the statement period?

14 A.  8/1/2015 through 8/31/2015.

15 Q.  Turning to the second page, do you see a reference to the

16 purchase just discussed?

17 A.  I do right there, U.S. Post Office Medical Center.

18 Q.  What's the amount?

19 A.  29.40, San Antonio, Texas.

20 Q.  On what date?

21 A.  8/27.

22          MR. RICHARD BARTOLOMEI:  Offer Defendant's 12a.

23          MS. THOMPSON:  No objection.

24          THE COURT:  It will be received.

25 BY MR. RICHARD BARTOLOMEI:

1  Q.  You were asked on cross-examination whether you ever got

2  out of the vehicle?

3  A.  Yes, sir.

4  Q.  Did you ever believe you could?

5  A.  No, sir.

6  Q.  Why did you believe you couldn't?

7  A.  Because they were in total control the whole time, they had

8  guns, I didn't know what to do.  When they were telling me I

9  have to talk to them, I have to do this, I just assumed, you

10 know, I don't know what to think.  I believed I was under

11 complete control of them.

12 Q.  Were you ever left alone other than to drive the car to the

13 business throughout the entire execution of the Search Warrant

14 and continued interdiction, were you ever left alone outside

15 the presence of an agent?

16          MS. THOMPSON:  Objection, cumulative.

17          MR. RICHARD BARTOLOMEI:  She went through six

18 questions about --

19          THE COURT:  The objection is overruled.

20 A.  I was not.  If they were not --

21          THE COURT:  No, no, that's it.  You answered it.

22          THE WITNESS:  Sorry.

23 BY MR. RICHARD BARTOLOMEI:

24 Q.  Why did you go to the business?

25 A.  Because I was told we have to go get that laptop or I'd go

1    to jail for impeding an investigation while I was in the house.

2            MR. RICHARD BARTOLOMEI:  No further questions.  Thank

3    you very much, Mr. Michalik.

4            MS. THOMPSON:  Nothing from the government, Your

5    Honor.

6            THE COURT:  Okay.  You can step down.

7            MR. EDWARD BARTOLOMEI:  Your Honor, at this time the

8    defense would rest and close subject to verification of all

9    admissions of evidence, Your Honor.

10           THE COURT:  All right.  Now, I understand the

11   government does have a rebuttal case.

12           MS. THOMPSON:  Yes, Your Honor.

13           THE COURT:  What happens, ladies and gentlemen, is

14   that the government presents its case in chief and you've heard

15   that evidence, then the defense has the opportunity, if they so

16   wish, to present their defense case and they've done that.  So

17   now the government, because it bears the burden of proof, has

18   the opportunity to address the defendant's information or

19   evidence by presenting or attempting to do so by presenting

20   what we call rebuttal witnesses.  This is not a rehash of the

21   government's case.  What it is is strictly limited to

22   addressing matters raised in the defense case.  You may call

23   your first witness.

24           MS. THOMPSON:  Thank you, Your Honor.  Government

25   calls Special Agent Juarez.

1          (Pause.)

2          THE COURT:  You can take the stand, you remain under

3     oath.

4          THE WITNESS:  Thank you.

5        (ARGELIA JUAREZ, Government witness, previously sworn.)

6                   GOVERNMENT REBUTTAL EVIDENCE

7                      DIRECT EXAMINATION

8     BY MS. THOMPSON:

9     Q.  Welcome back Special Agent Juarez.

10    A.  Thank you.

11    Q.  During your investigation into this case, did you have the

12    opportunity to interview Mr. Eddie Michalik?

13    A.  Yes.

14    Q.  When did that interview take place?

15    A.  It was on the same day of the Search Warrant, on the 22nd

16    of October.

17    Q.  In 2015?

18    A.  Correct.

19    Q.  Do you remember where the interview took place?

20    A.  It was outside of the business that him and his brother

21    own, operate.

22    Q.  Do you recall what time of day the interview took place?

23    A.  It was around 2:00 in the afternoon.

24    Q.  What did he tell you during the interview?

25          MR. RICHARD BARTOLOMEI:  Objection, Your Honor.  Calls

 1    for hearsay.  This is not anything about the defendant.  They

 2    have had the opportunity to cross-examine Mr. Michalik.  This

 3    is clearly hearsay and in violation of my client's right at

 4    this point since Mr. Michalik is no longer present to confront

 5    the witness, to confront the purported testimony.  This is

 6    hearsay, the same objections that were sustained on behalf of

 7    the government.

 8              MS. THOMPSON:  Your Honor, it's a prior inconsistent

 9    statement by Mr. Michalik.

10              MR. RICHARD BARTOLOMEI:  Your Honor, prior

11    inconsistent statement under 611 has to be presented to the

12    witness, it cannot be introduced through another witness.  This

13    is just an attempt to circumvent a clear hearsay objection and

14    denial of right of confrontation.  It is the exact same thing

15    that this government stood up and raised and was sustained.

16              MS. THOMPSON:  Your Honor, he was asked these

17    questions and he denied making these statements.

18              THE COURT:  Yes, I think government's counsel is

19    exactly right, but let me double-check.

20              MR. RICHARD BARTOLOMEI:  When you're done looking, I

21    have one more thing.

22              THE COURT:  I don't think you could possibly.  I think

23    you went through every possible objection.

24              MR. RICHARD BARTOLOMEI:  I've got one more point.

25              THE COURT:  Just let me look at this one, all right.

1          *(Pause.)*

2          MS. THOMPSON:  Your Honor, if it helps, I believe it

3    falls under 613.

4          THE COURT:  I'm looking at 806, but let me look at

5    613.  I was looking under hearsay exceptions.

6          *(Pause.)*

7          What are you looking at, 613(b)?

8          MS. THOMPSON:  Yes, Your Honor.

9          MR. RICHARD BARTOLOMEI:  For the second time, Your

10   Honor, I made the wrong reference.  It is 613(b), but the other

11   day I made the same one, 611.  My memory is just locked on

12   that, but it's 613(b).

13         *(Pause.)*

14         THE COURT:  It's admissible.  The objection is

15   overruled.

16         MS. THOMPSON:  Thank you, Your Honor.

17   BY MS. THOMPSON:

18   Q.  What did Mr. Michalik tell you during that interview?

19   A.  His concern was as to where his -- initially his concern

20   was where his brother was at.  I think also like Crystal they

21   were wondering if he had been under arrest and we noted or

22   advised him that he was not under arrest.  Further asked him --

23         MR. RICHARD BARTOLOMEI:  Your Honor, this has nothing

24   to do with statements made.  It is clearly not an inconsistent

25   statement, but the introduction of her version of what they

1    asked him and his response.  This is not relevant, it is not

2    being shown to be an inconsistent statement.

3              THE COURT:  Well, he said one thing, she's saying

4    something else, so I think there's an inconsistency there.

5              MR. RICHARD BARTOLOMEI:  Not on this subject.

6              THE COURT:  The jury will -- maybe I missed something.

7              MR. RICHARD BARTOLOMEI:  Your Honor, he never

8    testified about any of that exchange whatsoever about his

9    concern, their explanation of anything regarding his brother.

10             MS. THOMPSON:  I can move on.

11             THE COURT:  Yes.

12   BY MS. THOMPSON:

13   Q.  Did Mr. Eddie Michalik give you information about the

14   computers at MB Cabinetry?

15   A.  Yes.

16   Q.  What did he tell you about the computers?

17   A.  He was asked if he had his own computer.

18   Q.  And how did he respond?

19   A.  He stated that he had his own computer and that his

20   brother, Mr. Jeffrey Michalik, had his own computer.

21   Q.  Did he tell you whether or not he ever used the defendant's

22   computer?

23   A.  He stated he never used his brother's computer, never used

24   it, never used it to print anything.

25   Q.  Did he also give you information on whether or not the

1   defendant took his Dell laptop home with him at night?

2          MR. RICHARD BARTOLOMEI:  Your Honor, I don't believe

3   there was any inconsistent testimony of Mr. Michalik unless she

4   is now going to say something that I don't anticipate, but

5   again under 611(b) there has to be a showing of inconsistent

6   statement, not simply asking what he said.

7          THE COURT:  That objection, whatever it was, is

8   overruled.

9          MS. THOMPSON:  You may answer.

10          MR. RICHARD BARTOLOMEI:  613(b), I'm sorry.

11  A.  He stated that Jeffrey Michalik would take the computer

12  back and forth with him to and from home and the office.

13  Q.  Thank you.  On the same day as the Search Warrant, same day

14  you interviewed Eddie Michalik, after the Search Warrant was

15  executed and after you left the business, did you have a

16  conversation with Ms. Crystal Rivas?

17  A.  Yes, I did.

18  Q.  Did you, in fact, have a number of phone calls back and

19  forth?

20          MR. RICHARD BARTOLOMEI:  Objection, Your Honor.  Where

21  is the inconsistency in this?

22          THE COURT:  I don't know.  She hasn't gotten that far

23  yet.  She's laying the foundation, so if that's an objection,

24  that's overruled.

25  BY MS. THOMPSON:

1  Q.  Did you receive a phone call from Ms. Rivas at about 11:00?

2  A.  Yes.

3  Q.  What did she tell you?

4  A.  She was concerned because she hadn't heard from Jeffrey

5  Michalik.

6         MR. RICHARD BARTOLOMEI:  Your Honor, now, that's not

7  about an inconsistent statement.  I move to strike.

8         THE COURT:  I think she's still laying a foundation

9  here.

10 BY MS. THOMPSON:

11 Q.  Did Ms. Rivas call back -- after you provided information,

12 did she call back another time that day?

13 A.  Yes, she did.

14 Q.  Did you end up meeting Ms. Rivas at Jim's Restaurant?

15 A.  Yes, we did.

16 Q.  What time did you meet her?

17 A.  It was approximately afternoon, after lunch, maybe 1:00,

18 1:30.

19 Q.  Did you tell her when you met with her that that meeting

20 was voluntary?

21 A.  Yes, we did.

22 Q.  How long did the meeting with her last?

23 A.  I would say 30 to 40 minutes.

24 Q.  Did the topic of the Dell laptop computer that the

25 defendant used come up in the conversation?

1          MR. RICHARD BARTOLOMEI:  Your Honor, if this is still

2    coming in under 613(b), wouldn't that have to be shown to have

3    been inconsistent with something, since I know I didn't ask

4    Ms. Rivas about any of that?  If it's coming in as rebuttal,

5    then we're back to the hearsay and right of confrontation.

6          THE COURT:  Is there an inconsistent statement here?

7          MS. THOMPSON:  Yes.  Ms. Rivas testified she didn't

8    call Special Agent Juarez, that she wasn't told it was

9    voluntary and that they didn't talk about the computer.

10          THE COURT:  The objection is overruled.

11          MR. RICHARD BARTOLOMEI:  Your Honor --

12          THE COURT:  The objection is overruled.

13    BY MS. THOMPSON:

14    Q.  Did you discuss the Dell laptop computer that belongs to

15    the defendant during your conversation with Ms. Rivas?

16    A.  Yes, we did.

17    Q.  What information did she give you at that time?

18    A.  She stated that the laptop was given to Jeffrey Michalik by

19    their previous employer, I believe it was Dave Smith had given

20    them the computer probably around like three years ago from

21    that date which would have been 2013.

22    Q.  Or 2012?

23    A.  2012, 2013.

24          MR. RICHARD BARTOLOMEI:  Your Honor, again where is

25    the showing of an inconsistent statement?  I never -- I simply

 1   am not aware.  Is she simply going to be able to put in hearsay

 2   testimony under the guise of claiming that there's something

 3   inconsistent?

 4          THE COURT:  I think she laid out where she's going to

 5   get to the alleged inconsistent statement.  Let's get right to

 6   it, okay, counsel.

 7          MS. THOMPSON:  That was.  Ms. Rivas testified that he

 8   had not had the computer that long.  Ms. Rivas told Special

 9   Agent Juarez that he had the computer since 2012.

10          THE COURT:  Okay.  That appears to me to be a

11   difference in the two testimonies, so what we need to have is

12   for the jury to decide the credibility of that, not me and not

13   you and not the government.  Go ahead.

14   BY MS. THOMPSON:

15   Q.  What did Ms. Rivas tell you about the defendant bringing

16   the laptop computer home?

17   A.  She stated that he would bring the computer to the home

18   from the business back and forth, that it was rare that he

19   would not do that, but it was something he periodically did.

20   Q.  What did she tell you about whether Eddie Michalik used the

21   defendant's laptop computer?

22   A.  Eddie had his own computer.

23   Q.  Did you continue to get calls from Ms. Rivas?

24   A.  Yes.

25          MR. RICHARD BARTOLOMEI:  Your Honor, that is certainly

1  beyond the scope of any witness testimony given by Ms. Rivas

2  and I think we were not allowed to go into certain matters, but

3  certainly this is not leading to an inconsistent statement and,

4  therefore, it is clearly hearsay and unless we're allowed to

5  recall Ms. Rivas, but this, I can't see the relevance here.

6          MS. THOMPSON:  On the risk of delaying this trial, I

7  will withdraw that question or to avoid the delay.

8          THE COURT:  All right.

9          MS. THOMPSON:  May I approach the witness, Your Honor?

10         THE COURT:  Yes.

11  BY MS. THOMPSON:

12  Q.  Special Agent Juarez, I'm going to show you Government

13  Exhibit Five.  Well, let's go with 5a and 5b.  Are those the

14  original images that were shown to Mr. Michalik during the

15  interview?

16         MR. RICHARD BARTOLOMEI:  Leading.

17         THE COURT:  Yes, I think it is leading.

18  BY MS. THOMPSON:

19  Q.  Was the information contained on the top of the image

20  present when you showed him the image?

21  A.  Yes.

22         MR. RICHARD BARTOLOMEI:  Leading.

23         THE COURT:  No, that isn't.  Overruled.  That's a yes

24  or no answer.

25  BY MS. THOMPSON:

1    Q.  Are Exhibits 5a and 5b photocopies or the original

2    documents that he signed?

3    A.  These are the original documents.

4          MS. THOMPSON:  Thank you.  Nothing further.

5          MR. RICHARD BARTOLOMEI:  May I approach?

6          THE COURT:  Yes, sure.

7                        CROSS-EXAMINATION

8    BY MR. RICHARD BARTOLOMEI:

9    Q.  Do you see the cover sheet on this?

10   A.  Yes.

11   Q.  That's not something that was ever shown nor was it created

12   at the time you showed images to the defendant, correct, this

13   first page?

14   A.  This cover sheet, no.

15   Q.  The date and time that's shown is 2014/08/04.  That's

16   what's shown on the top in the information, correct?

17   A.  Correct.

18   Q.  And there's a website about Amateur Lover, correct?

19   A.  Correct.

20   Q.  He denied knowing anything about Amateur Lover, didn't he?

21   A.  Correct.

22   Q.  And these images were never found on his computer, isn't

23   that true?

24   A.  Correct.

25          MR. RICHARD BARTOLOMEI:  No further questions.

1          MS. THOMPSON:  Nothing further, Your Honor.

2          THE COURT:  Okay, ma'am.  You can step down.

3          MS. THOMPSON:  Government calls Special Agent Steve

4   Nutt.

5             *(Pause.)*

6          COURTROOM DEPUTY CLERK:  Please raise your right hand.

7                          *   *   *

8          *(STEVEN SCOTT NUTT, Government Witness, Sworn.)*

9                          *   *   *

10         THE WITNESS:  I do.

11         COURTROOM DEPUTY CLERK:  You can have a seat.

12                        EXAMINATION

13   BY MS. THOMPSON:

14   Q.  Please state your name for the record and spell your last

15   name.

16   A.  Steven Scott Nutt.  Last name is N-U-T-T.

17   Q.  Where are you employed?

18   A.  I am a computer forensic agent with Homeland Security

19   Investigations here in San Antonio.

20   Q.  How long have you been employed with Homeland Security

21   Investigations?

22   A.  I've been a special agent for 17 years and I've been doing

23   computer forensics for the last 12.

24   Q.  What is your educational background?

25   A.  I have a Bachelor of Psychology from Texas A&M University.

1   Q.  What training do you have with regard to being a special

2   agent?

3   A.  I have attended the Criminal Investigator Training Program

4   and the Customs Basic Enforcement School, it's a combined five

5   months of training at the Federal Law Enforcement Center in

6   Glencoe, Georgia.

7   Q.  What training did you go through to become a computer

8   forensic agent?

9   A.  My initial training was eight weeks, two weeks for the A

10  Plus certification course and then six weeks for the Basic

11  Computer Evidence Recovery training, also attended the two-week

12  Advanced Computer Evidence Recovery training and I've had

13  periodic and ongoing training at both general computer forensic

14  topics as well as software specific topics.

15  Q.  Do you have any computer forensic certifications?

16  A.  Yes, I do.

17  Q.  Please name them and describe them briefly for the jury?

18  A.  I have the CompTIA A Plus Certified Computer Technician.  I

19  also have the Computer Forensic Certified Examiner from the

20  International Association of Computer Investigative

21  Specialists.  And I have the Global Information Assurance

22  certifications for Advanced Smartphone Forensics and Computer

23  Forensic Examiner.

24  Q.  Are any of those certifications updated periodically as

25  well as the training?

1    A.  All of them except A Plus require recertification.

2    Q.  How often do you have to recertify those certifications?

3    A.  Each of them are three years, since I've got them at

4    different times it's all staggered.

5    Q.  How many forensic examinations on digital devices have you

6    completed?

7    A.  Hundreds.

8    Q.  What forensic tools do you use in the forensic examination

9    process?

10   A.  I have a wide variety of tools I use.  The most common ones

11   I use are EnCase, Internet Evidence Finder and Registry Viewer.

12        MR. RICHARD BARTOLOMEI:  Sorry, your voice trailed

13   off.  What was the last one?

14        THE WITNESS:  Registry Viewer.

15   BY MS. THOMPSON:

16   Q.  Are all of those commonly used in the forensic community?

17   A.  Yes, they're all commercially available to us.

18   Q.  You did not complete the forensic examination of the Dell

19   laptop computer in this case, correct?

20   A.  That's correct.  I did assist and advise CFA Linares and

21   I'm generally familiar with the results of the exam.

22        MS. THOMPSON:  Your Honor, at this time I tender

23   Special Agent Steve Nutt as an expert witness in the field of

24   computer forensics.

25        THE COURT:  Any objection?

 1          MR. RICHARD BARTOLOMEI:  I would like to voir dire

 2   very briefly while the jury was out.  If we take a break, I

 3   could do that.

 4          THE COURT:  We'll let you get your recess.

 5          COURT SECURITY OFFICER:  All rise for the jury.

 6          *(3:02 p.m., jury exits.)*

 7                         *   *   *

 8          THE COURT:  Please be seated.  You can proceed,

 9   counsel.

10                  VOIR DIRE EXAMINATION

11   BY MR. RICHARD BARTOLOMEI:

12   Q.  Agent, you talked about certifications every three years,

13   correct?

14   A.  Correct.

15   Q.  Is there any testing that you're required to go through

16   where somebody else grades you?

17   A.  For the certifications, yes.

18   Q.  Who does that?

19   A.  The certifying body.

20   Q.  Now, you talked about doing hundreds of forensic

21   examinations.  What's your error rate?

22   A.  What do you define as error?

23   Q.  How many times are you wrong partially in terms of your

24   conclusion?  Have you ever been found to be wrong in your

25   conclusions?

1   A.   Found wrong by who?

2   Q.   Any court?

3   A.   No.

4   Q.   Any reviewing person within your agency, anyone at all.  Or

5   are you perfect in your results?

6   A.   If anyone has ever found me wrong, they've never told me

7   they found me wrong.

8   Q.   So that's never occurred in a courtroom where you've been

9   challenged and has there ever been a finding that you were not

10  accurate?

11  A.   No.

12  Q.   How many times have you testified at trial?

13  A.   As a forensic agent, just once prior to this.

14  Q.   So you haven't been -- you've only had one case in which

15  you've had to testify, correct?

16  A.   Correct.

17  Q.   I take it that's for the government, correct?

18  A.   Yes.

19  Q.   Were you challenged as to your forensic qualifications as

20  an expert in that trial?

21  A.   No.

22  Q.   So no one ever actually raised a challenge, correct?

23  A.   No.

24  Q.   Meaning yes, they did not?

25  A.   Nobody ever raised a challenge.

1   Q.  They just accepted that you were qualified to speak?

2   A.  I guess.

3          MR. RICHARD BARTOLOMEI:  Can I have one moment, Your

4   Honor?  One second, if I may step out?

5          THE COURT:  Sure.

6          *(Pause.)*

7   BY MR. RICHARD BARTOLOMEI:

8   Q.  And am I correct you did not conduct a forensic examination

9   yourself resulting in either Exhibit Six or 6b, isn't that

10  correct?

11  A.  I did not directly do it, I did assist though.

12  Q.  By that, when you say assist, do you mean advising Agent

13  Linares about his testimony?

14  A.  No.

15  Q.  Excuse me?

16          THE COURT:  His answer was no.

17          MS. THOMPSON:  Your Honor, I'm going to object.  I

18  think this is improper voir dire.

19          THE COURT:  Yes, I think you're kind of

20  cross-examining him.  We're really only interested at this

21  point on his qualifications.

22          MR. RICHARD BARTOLOMEI:  All I was getting at was if

23  he didn't conduct the forensic examination on this particular

24  thing and you've never been qualified over challenge by the

25  Court because they simply acquiesced, that there's not a

1   sufficient history that permits him to be qualified as a

2   forensic expert, which is what I was going for, whether or not

3   the judge so determines is, of course, up to the judge under

4   702.  If I could ask that question about what his assistance

5   was, could I have that permission in terms of Six and 6b?

6          THE COURT:  Are you trying to determine the relevance

7   of his testimony?  Is that what you're trying to do?  I'm

8   having a hard time trying to decide what you're trying to do

9   here on voir dire.

10          MR. RICHARD BARTOLOMEI:  I'm trying to figure out

11   since the Court -- and if you bear with me just a moment.

12          THE COURT:  I haven't done anything yet.

13          MR. RICHARD BARTOLOMEI:  I understand.  Your Honor, my

14   understanding is his testimony was going to go to IP -- what

15   were the other things?

16          He was going to testify about 6a and 6b or something

17   in reference to those, so I thought that's why I was entitled

18   to examine him about what his participation was rather than

19   have him testify without knowing what his opinion or basis

20   or -- excuse me, what his basis was or what opinions he would

21   be opining about, so that's why I asked that question.

22          MS. THOMPSON:  I believe he said he reviewed the

23   reports, he's assisted in the investigation.  Although he

24   didn't complete the forensic examination himself, he assisted

25   CFA Linares in doing it.  And the rest of that does not go to

 1    his qualifications as an expert.  702 says he must be competent

 2    and qualified through knowledge, skill, experience, training or

 3    education, any of those or a combination which will help the

 4    trier of fact to understand evidence and determine factual

 5    issues.

 6              MR. RICHARD BARTOLOMEI:  That's why I ask.

 7              THE COURT:  Why don't you continue with your

 8    examination.  We're wasting more time than --

 9              MR. RICHARD BARTOLOMEI:  I only had two more

10    questions.

11              THE COURT:  Please proceed.

12    BY MR. RICHARD BARTOLOMEI:

13    Q.  What was your assistance of Agent Linares?

14    A.  I would give him advice on where to look for certain things

15    or what artifacts to look for, how to find them.

16    Q.  By any chance, do you have a curriculum vitae that you've

17    brought with you?

18    A.  No.

19              MR. RICHARD BARTOLOMEI:  That's all the questions I

20    have.  If I could make my objection?

21              THE COURT:  Sure.

22              MR. RICHARD BARTOLOMEI:  But I just wanted to talk

23    with co-counsel for a second.

24              THE COURT:  Sure.

25              *(Pause.)*

1  BY MR. RICHARD BARTOLOMEI:

2  Q.  Sir, do you have your certification status with you today

3  on the date of any of your examination or review which would

4  be, I assume, sometime in -- could I have a look at 6a?

5          THE COURT:  I don't know what you're asking him.

6          MR. RICHARD BARTOLOMEI:  Certification on the date and

7  time and it has to be current.

8          MS. THOMPSON:  That's 6a.

9          MR. RICHARD BARTOLOMEI:  Excuse me, Six.  I'm just

10  asking if he had current certification on those dates by any

11  forensic agency or reviewing body.

12  A.  Yes, I had certifications on the date that that report was

13  created.

14  Q.  Which agencies?

15  A.  I had the A Plus then, I had CFCE.  I had not gotten the

16  other two yet at that point.

17  Q.  So when you testified about the other certifications, that

18  would have been after your involvement, correct?  With this

19  report in this forensic examination, correct?

20  A.  After the initial forensic analysis, yes.

21  Q.  And if I understand the A Plus, that was a two-week course?

22  A.  We did it in two weeks.

23  Q.  And the other one was six weeks?

24  A.  That was not a certification course.  That was my Basic

25  Computer Evidence Recovery training.

1   Q.  So the only certification that you have is from A Plus, the

2   two-week course at the time of your involvement with this

3   forensic examination, is that accurate?

4   A.  No, I also had my CFCE certification at that time.

5   Q.  And how long was that process to train you for that?

6   A.  I started it in May and finished it in September.

7   Q.  Was that online?

8   A.  I submitted results online.  That's a two-step process.

9   It's got a peer-review process where I conduct my analysis,

10  conduct my answered questions and submit that to a peer, to a

11  coach.  And then the actual certification portion, the answers

12  are submitted online.

13  Q.  Is that all within the government, not an outside agency or

14  an independent peer review?

15  A.  No, neither one of those are government.  They're both

16  industry.

17          MR. RICHARD BARTOLOMEI:  I have no further questions

18  at this time.

19          THE COURT:  Okay.

20          MR. RICHARD BARTOLOMEI:  My objection is, Your Honor,

21  he's never been certified over challenge or accepted as an

22  expert in any trial.  He's had one trial and he had two

23  certifications at the time.  He did not have the other two

24  certifications, but the main objection is he's never been shown

25  over challenge in open court to be accepted by any Court and it

1   does not demonstrate with regard to what I believe are the

2   three particular areas that the government identified that he

3   will assist the jury in understanding any of the things with

4   regard to the IP address where the evidence has already been

5   introduced.  One, the IP address involving the images did not

6   result in them being found on the computer.  And the other one

7   we've already had the testimony of Mr. Linares and he's already

8   gone through that, so what they're essentially either going to

9   have to do is rehabilitate Mr. Linares through this witness or

10  impeach their own witness.  So I would object to him being,

11  one, qualified as an expert and, two, permitted to testify with

12  regard to each area that he testifies.  They have to have a

13  further showing of why he would be considered an expert and why

14  he would be beneficial to the understanding of the jury.  Thank

15  you.

16          MS. THOMPSON:  Government believes he's qualified

17  under Federal Rule of Evidence 702.

18          THE COURT:  Well, first of all, he did testify that

19  he -- you previously have testified as an expert, is that

20  right?

21          THE WITNESS:  I testified as a forensic agent, not as

22  an expert.

23          THE COURT:  As a forensic agent.

24          THE WITNESS:  Yes.

25          THE COURT:  And you gave forensic testimony in that

1  case?

2           THE WITNESS:  Yes, I did.

3           THE COURT:  The question here is not how many times

4  he's testified.  I've rejected a proffer of someone as an

5  expert in an area where they had testified as an expert many

6  times in slightly different areas and had been accepted as an

7  expert, but I said no, I didn't think they were an expert in

8  the area and I was affirmed by the Ninth Circuit Court of

9  Appeals in that decision and cert. was denied at the Supreme

10  Court.  So I also don't put a lot of stock and weight in the

11  fact that somebody hasn't testified as an expert previously.

12           I was the first judge in the country, to my knowledge,

13  I've been told so, to allow the woman who formulated the

14  Battered Woman's Syndrome to testify in a criminal proceeding

15  in Federal Court.  Her testimony in my court was the first time

16  she testified.  And she went on to testify in dozens of

17  other -- qualify as an expert in dozens of other cases.  So

18  being the first is not the answer.  The question is whether his

19  credentials qualify him and his experience.  And in my view,

20  given the limited area that we're talking about here, we're not

21  talking about the creation of a super computer here, we're

22  talking about analysis of what are clearly topics that are

23  beyond the general knowledge of the average person, but not

24  beyond the knowledge of the average person who understands

25  computers, so this is not, as they say, rocket science for a

1   computer person who has the forensic knowledge that this

2   gentleman has.  So I am going to overrule the objection and

3   accept his testimony as an expert.  All right.  So we'll take a

4   brief recess and then we'll come back and he can testify.

5              COURT SECURITY OFFICER:  All rise.

6          *(3:16 p.m.)*

7                          *   *   *

8              COURT SECURITY OFFICER:  All rise.

9          *(3:39 p.m., the Judge enters.)*

10                         *   *   *

11             COURT SECURITY OFFICER:  All rise for the jury.

12             THE COURT:  Please be seated.  The Court would note

13   the presence of the members of the jury, ladies and gentlemen

14   of the jury, the counsel as well as the parties.  You may

15   continue.

16             MS. THOMPSON:  Thank you, Your Honor.

17                        DIRECT EXAMINATION

18   BY MS. THOMPSON:

19   Q.  Can you put up Exhibit Six, page three.  Special Agent

20   Nutt, what type of operating system was installed and running

21   on the Dell laptop computer, that's Exhibit Four?

22   A.  Windows 10.

23   Q.  Do you see the date of August 27, 2015?

24   A.  Yes.

25   Q.  What does that date signify with regard to the operating

1  system?

2  A.  That would be the date that it was installed, or since it's

3  Windows 10 it could also be the date that it received the last

4  major upgrade.

5  Q.  If the computer was given the last major upgrade on that

6  date, does someone have to be present for that to happen?

7  A.  No.

8  Q.  Is that automatically done by the computer?

9  A.  Yes.

10 Q.  Have you reviewed the forensic reports in this case?

11 A.  Yes, I have.

12 Q.  Was the program Log Me In installed on the Dell laptop

13 computer?

14 A.  I did not see it.

15 Q.  How would you know if it was installed?

16 A.  It would have an additional user account.

17 Q.  And there is only one useable account which is David S?

18        MR. RICHARD BARTOLOMEI:  Leading.

19        THE COURT:  Sorry, sir?

20        MR. RICHARD BARTOLOMEI:  She's leading.

21        THE COURT:  Sustained.

22 BY MS. THOMPSON:

23 Q.  How many useable user accounts were on the Dell laptop

24 computer?

25 A.  One.

1   Q.  Also Exhibit Six, it's page 149 of the exhibit, item number

2   946?

3            MR. RICHARD BARTOLOMEI:  May I have a moment?

4            (Pause.)

5            MS. THOMPSON:  946 is the item number, it's on page

6   149 of the actual exhibit.

7   BY MS. THOMPSON:

8   Q.  Special Agent Nutt, walk us through the file path of the

9   file titled Girl 14-year-old Blow Job?

10  A.  It starts with J. Michalik, that's the name of the image

11  file that was given when the original hard drive was

12  forensically copied.

13  Q.  And does that reference the Dell laptop computer hard

14  drive?

15  A.  Yes, it does.

16  Q.  What about the D in the next file folder?

17  A.  When Windows is installed on a computer, it creates

18  multiple partitions.  A partition is just a data storage area.

19  When EnCase looks at the image file, it starts at the first

20  partition and labels that C, labels the second partition D and

21  so forth and so on.  So with this partition being labeled D by

22  EnCase, that means it's simply the second partition that EnCase

23  saw on the image file.  I know this is what is commonly

24  referred to as the C drive or the drive that has the operating

25  system on it because I know how to recognize a C drive folder

1    structure.

2    Q.   So that D does not signify any type of external drive?

3    A.   Correct.

4    Q.   Was there a cabinet design program installed on the Dell

5    laptop computer?

6    A.   Yes.

7    Q.   How do you know that?

8    A.   Within the program files there's a program called 2020.

9    Q.   Looking at Exhibit 6b, page 43 of the exhibit, what is

10   record two on that exhibit?

11   A.   That is the prefetch file for an application called

12   design.exe.

13   Q.   And is that related to the 2020 cabinet design program,

14   software program?

15   A.   Yes, it is.

16   Q.   And you stated that was installed on the computer.  Can you

17   tell whether or not it had been run?

18   A.   Yes.  The file created date for the prefetch file is the

19   first time that the executable was launched.  And the prefetch

20   file also records up to the last seven times, so on this we see

21   file created date, last run date time, second last run date

22   time, third last run date time, fourth last run date time,

23   fifth last run date time and sixth last run date time.  Those

24   are all times that the program was run.  The sixth last run

25   date time is the oldest.  And the last run date time is the

1    most recent.

2    Q.  You were sitting in the courtroom during the trial, is that

3    correct?

4    A.  Correct.

5    Q.  There was testimony that that Dell laptop computer played

6    music when it was shut, when it was shut down or shut together,

7    do you recall that?

8    A.  Yes, I do.

9    Q.  Is that possible?

10   A.  No.

11   Q.  Why not?

12   A.  When a laptop is closed, it goes into hibernation or

13   suspend mode.  What it does is it essentially suspends all the

14   processes on the laptop at the time.

15   Q.  There was also testimony about computers being wiped or

16   reformatted.  Can you explain for the jury what those two

17   concepts are?

18   A.  Wipe is using a software tool to completely overwrite all

19   the data on a hard drive.  Depending on which tool that's used,

20   computer hard drives do everything in binary so ones and zeros,

21   so depending on the tool could overwrite the whole hard drive

22   with either all zeros or all runs or just all random data, kind

23   of like white noise.  When you wipe a drive, there is no data

24   left behind it.  Reformatting a drive is putting a new file

25   system on top of the existing file system.  To the home user,

1  reformatting destroys all the data on the drive as well.

2  Forensically it's possible to recover some data on a drive that

3  has been reformatted.

4  Q.  When you reformat a computer, all the data is erased,

5  correct?

6  A.  Correct.

7        MR. RICHARD BARTOLOMEI:  Objection.  Leading,

8  suggestive.

9        THE COURT:  That's true.

10  BY MS. THOMPSON:

11  Q.  What happens after you reformat a computer?  What do you

12  have to do to make it usable?

13        MR. RICHARD BARTOLOMEI:  With respect, Your Honor,

14  well, now it's a compound question, but with respect, she just

15  asked about reformatting two questions ago, so it's asked and

16  answered.

17        THE COURT:  I think this was part of another question,

18  so I'm going to overrule the objection.

19  BY MS. THOMPSON:

20  Q.  At what point -- well, how does reformatting work with

21  reinstalling an operating system?

22  A.  When you reinstall an operating system, if you start from

23  scratch, it will reformat the drive and then put the new

24  operating system on top of it.

25  Q.  Is there any way to forensically tell whether the laptop

1  computer had been wiped or reformatted?

2  A.  By definition it wouldn't have been any earlier data left

3  on it, so no.

4  Q.  This computer, was C Cleaner also installed on this

5  computer?

6  A.  Yes.

7  Q.  How does that affect the forensic examination of a

8  computer?

9  A.  C Cleaner can be used to erase what to the user would be

10  useless data, clean up deleted files, clean up temporary

11  Windows files, clean up other types of artifacts that we would

12  look for to determine if files had been accessed.

13  Q.  What's a file creation date?

14  A.  That's the date the file was created.

15  Q.  What is a last access date?

16  A.  It used to mean that was the date that the file was last

17  accessed.

18  Q.  What does it mean now?

19  A.  Since Windows Vista, that date does not get updated, so

20  when a file is first saved onto a Windows hard drive, the file

21  created date and the last access date match.  If you go back

22  and subsequently access that file, the last access date does

23  not update to show that it was accessed.

24  Q.  So if a file on the laptop, like item 946 that we looked at

25  on Exhibit Six, for example, so item number seven, if the file

1    creation date and the last access date are the same, can you

2    tell forensically because this is the a Windows 10 operating

3    system, whether that file was accessed?

4    A.   Not from this --

5              MR. RICHARD BARTOLOMEI:  Excuse me, Your Honor.  One,

6    I would object to the form of the question as assuming

7    something that has not been testified to.  And two, it is

8    leading, but the foundation, there is no evidence to support a

9    question as she asked it.

10             MS. THOMPSON:  The information is in evidence on page

11   five of the exhibit.

12             THE COURT:  The objection is overruled.

13             MR. RICHARD BARTOLOMEI:  Your Honor, he never

14   testified to anything about which program is running in this

15   report.

16             THE COURT:  The objection is overruled.

17   BY MS. THOMPSON:

18   Q.   Special Agent Nutt, from what we're looking at on Exhibit

19   Six, page five, does anything there tell you whether or not

20   that file was accessed?

21   A.   No, not from this information.

22   Q.   Do link files tell you whether files have been accessed?

23   A.   Yes.

24   Q.   What are link files?

25   A.   A link file is a shortcut that's created when a user

1    accesses a file or a folder.

2    Q.  On Exhibit 6b, page eight, record 12, the file name is

3    Open-F07.jpg.  Is that same file listed in this report in three

4    different locations?

5          MR. RICHARD BARTOLOMEI:  Objection, Your Honor.

6    Without reference and are we talking exclusively about 6b?

7          MS. THOMPSON:  Yes, 6b.

8          THE COURT:  The objection is overruled.

9          MS. THOMPSON:  May I approach the witness, Your Honor?

10          THE COURT:  Yes.

11   BY MS. THOMPSON:

12   Q.  6b, will you look at record number 12.  Is that file

13   Open/F07?

14   A.  Yes, it is.

15   Q.  Will you now look at record number 52?  Is that the same

16   file name?

17   A.  Yes, Open-F07.jpg.

18   Q.  What about record number 90?

19   A.  Yes, that is also Open-F07.jpg.

20          MR. RICHARD BARTOLOMEI:  Your Honor.

21          THE COURT:  Yes, sir.

22          MR. RICHARD BARTOLOMEI:  I'm not showing that this is

23   coming up.  I went to 52 and it never went to 90 for me, so I

24   apologize.

25          MS. THOMPSON:  Do you have the written exhibit?

1           MR. RICHARD BARTOLOMEI:  If I have a moment, I'll try

2    to get that.

3           (Pause.)

4           I just wanted to let the Court know that our monitor,

5    we had problems before.  In fairness to the electronics expert,

6    she says she doesn't have page numbers.

7           THE COURT:  Okay.

8           MR. RICHARD BARTOLOMEI:  So it's not her fault.

9           MS. THOMPSON:  Exhibit 12 is on page eight -- or

10   record 12, sorry, is on page eight.  Record 52 is on page 25.

11   And record 90 is on page 40.

12   BY MS. THOMPSON:

13   Q.  What does it mean that that file is in there three separate

14   times?

15   A.  Three different link files for this file means that it was

16   opened or accessed at least three different times.

17   Q.  Have you personally viewed that file?

18   A.  Yes.

19   Q.  Does it depict a child engaging in sexual conduct?

20          MR. RICHARD BARTOLOMEI:  Objection, Your Honor.

21   Requires no expert testimony and no qualification shown for

22   this witness to make that testimony and it is not rebutting

23   anything.

24          THE COURT:  He can testify generally about whether the

25   file was opened or not, but he can't really testify about the

1   contents of the file.  The objection is partially sustained.  I

2   think you have some other testimony about the contents of that

3   file you can refer to.

4          MS. THOMPSON:  I do.  Exhibit 6a, which is in evidence

5   contains that file.

6          THE COURT:  Okay.

7   BY MS. THOMPSON:

8   Q.  Special Agent Nutt, does the user of the computer have to

9   be present the entire time multiple files are being downloaded

10  from the Internet?

11  A.  No.

12  Q.  If someone is downloading multiple files at the same time,

13  what determines how long it will take those files to download?

14         MR. RICHARD BARTOLOMEI:  With respect, Your Honor,

15  foundation, no showing that these files were ever downloaded

16  from the Internet, therefore, they are irrelevant and no

17  foundation has been laid to show they were downloaded from the

18  Internet.

19         MS. THOMPSON:  I will withdraw that question at this

20  time and back up.

21  BY MS. THOMPSON:

22  Q.  From Exhibit Six, you have reviewed Exhibit Six, the main

23  forensic report, correct?

24  A.  Yes, I have.

25  Q.  Were most, most, not all of the files downloaded on two

1  specific dates?

2  A.  Yes.

3  Q.  That's October 18th and October 19th of 2015?

4  A.  Correct.

5  Q.  Can you tell how those files got on the computer?

6  A.  No, I can't.

7  Q.  Could they have been downloaded from the Internet?

8          MR. RICHARD BARTOLOMEI:  Objection, Your Honor, calls

9  for speculation and is irrelevant.

10          THE COURT:  The objection is overruled.  She's asking

11  could they have been and that is not speculation.  The

12  objection is overruled.  If she would have asked him "were

13  they", then you would have a good objection.

14  A.  Yes, they could have come from the Internet.

15  Q.  Based on your training and experience, do you have an

16  opinion as to how long it may take for those files to download?

17  A.  It's going to depend on the total amount of data.

18          MS. THOMPSON:  Thank you.  I have nothing further.

19          MR. RICHARD BARTOLOMEI:  Could I have Exhibit Six?

20                    CROSS-EXAMINATION

21  BY MR. RICHARD BARTOLOMEI:

22  Q.  Turning to page five, agent, turning to number -- let's

23  take eight, you testified the file created 10/18/15 would show

24  a time, that's when it goes into the computer?

25  A.  That's when the file was saved at that location, yes.

1   Q.  Saved or when it was entered into the computer?

2   A.  I don't know what you mean by entered.

3   Q.  Well, let's make it simple.  Data goes into a computer,

4   right?

5   A.  Okay.

6   Q.  And you said 10/18, 11:05:35 would not show when it was

7   last actually anything was done with it because you're saying

8   Windows doesn't update that, correct?

9   A.  Correct.  It's not recorded here.

10  Q.  That's what I'm saying.  The report doesn't tell you when

11  or if anyone actually ever looked at the file, isn't that true?

12  A.  This section of the report does not.

13  Q.  Thank you.  Now, and if I look through all of these

14  hundreds of pages, there will not be one piece of forensic

15  evidence that tells you if anybody viewed the files, correct?

16  A.  Not in this section of the report, correct.

17  Q.  Certainly there will be no forensic evidence that

18  Mr. Michalik looked at any of these files, isn't that true?

19  A.  A specific person, no.

20  Q.  He's the specific person I'm asking about.  Isn't it true

21  that if you look through all these hundreds of files, there

22  will not be one shred of forensic evidence in Six that

23  demonstrates that Mr. Michalik ever opened any of those files?

24  A.  Specifically the defendant, no.

25  Q.  Thank you.  Now, also by the nature of the times, is this

1    an archived file or compressed file, would that be your

2    opinion?

3    A.   This individual file?

4    Q.   There are two files, sir.  Large dumps.

5            MS. THOMPSON:  Objection, Your Honor, that's a

6    misstatement of the evidence.  There are thousands of files.

7            THE COURT:  Yes, the objection is sustained.

8    BY MR. RICHARD BARTOLOMEI:

9    Q.   Now, you testified that there were two dates that the data

10   was input into the computer, correct?

11   A.   Correct.

12   Q.   And that's what I'm asking about.  So now we understand

13   what I'm talking about in terms of dates, correct?

14   A.   I think so, but there's more than two files.

15   Q.   Sir, I'm directing your attention to the data input into

16   the computer on the 18th and 19th.  Do you understand the

17   question?

18   A.   Okay.

19   Q.   Good.  Now, with regard to those, Six doesn't show that any

20   of that data was input through the Internet, correct?

21   A.   Correct.

22   Q.   So could have been a manual transmission through a thumb

23   drive, through a CD ROM, through a phone, correct?

24   A.   Correct.

25   Q.   Now, I want to go back a little bit.  You mentioned about

1   and if you'd look if you would to -- I think it's page three.

2   Do you see that report that says System Info L1D1 Jeff

3   Michalik?

4   A.   Yes.

5   Q.   That was input by either the EnCase or it was labeled by

6   the government in their forensic exam, correct?

7   A.   Which portion of it?

8   Q.   I just read it to you, sir, System Info L1D1 Jeff Michalik.

9   A.   Did you mean specifically those words or did you mean the

10  graph that's underneath those words?

11  Q.   Sir, if I had asked about the graph, I would have got

12  there.

13          MS. THOMPSON:  Your Honor, I object.

14          THE COURT:  Now you're arguing with him.

15          MR. RICHARD BARTOLOMEI:  He's arguing with me.

16          THE COURT:  Let's just ask the next question.

17  BY MR. RICHARD BARTOLOMEI:

18  Q.   Paragraph three, System Info L1D1 Jeff Michalik, that's the

19  language, all right?

20  A.   Okay.

21  Q.   That's not from the -- excuse me.  That is something that

22  is input by the forensic examiner, correct?

23  A.   Correct.

24  Q.   So that's not something that is from the computer itself,

25  correct?

Special Agent Steve Nutt - Examination            145

1   A.   Correct.

2   Q.   And you talked about Windows 10 Home, do you see the graph

3   underneath, it's not actually a graph, it's a chart, but do you

4   see the next line?

5   A.   Yes.

6   Q.   The one that says One?

7   A.   Yes.

8   Q.   Now Windows 10 Home shows the registered owner is David S,

9   correct?

10  A.   Correct.

11  Q.   And it shows an install date of 8/27/15, correct?

12  A.   Correct.

13  Q.   That would be the date that this program or this operating

14  system was put in, correct?

15  A.   Or the data with the last major update.

16  Q.   And I accept that.  You can put Windows 10 in a computer as

17  an overlay to Windows 7, isn't that true?

18  A.   You could, yes.

19  Q.   And that would allow --

20  A.   Sorry.  What do you mean by overlay?

21  Q.   You'd have to help me, I'm not a computer expert.  My point

22  is you can have two operating systems, Windows 10 can be put in

23  the computer and still have Windows 7 operating programs,

24  correct?

25  A.   You're going to have to ask the question again.

1    Q.  You can put Windows 10 in a computer and still have Windows

2    7 as an operating system operating within the computer, isn't

3    that true?

4    A.  They would be on two separate partitions.

5    Q.  So the answer is yes, correct, you can?

6    A.  It's possible for a single computer to have two different

7    operating systems, yes.

8    Q.  That was my question.  Now, nowhere in paragraph three does

9    it show that Windows 7 or anywhere in this report that Windows

10   7 was removed from the computer, correct?

11   A.  Correct.

12   Q.  So for all anyone knows, Windows 7 was the operating system

13   that could be used by anybody operating the laptop, there's

14   nothing in the report that tells you, correct?

15   A.  If Windows 7 was on this computer, there would be a second

16   entry that says Windows 7 in this chart.

17   Q.  Are you saying that this report automatically tells you

18   that Windows 7 is or is not on the computer?

19   A.  I'm saying the EnCase software automatically identifies the

20   operating system that's installed on the computer.  When the

21   report is created, the analyst tells EnCase to include that

22   information.

23   Q.  So the analyst might have had Windows 7, but simply chosen

24   only to include Windows 10, isn't that true?

25        MS. THOMPSON:  Objection, calls for speculation.

1          THE COURT:  Sustained.

2    BY MR. RICHARD BARTOLOMEI:

3    Q.  You don't know whether that's the case from your

4    examination of the report, correct?

5          THE COURT:  You're now asking him to follow up on a

6    question which I have sustained.

7    BY MR. RICHARD BARTOLOMEI:

8    Q.  Now, with regard to the user registry, once again, the

9    input from the forensic examiner applies the name registry Jeff

10   Michalik L1D1, correct, paragraph four?

11   A.  Yes, those words are input by the analyst.

12   Q.  Thank you.  And you talked about -- excuse me, I think

13   there was a question about administrator?  An administrator has

14   access to the computer?

15         MS. THOMPSON:  Your Honor, I'm going to object.  This

16   goes beyond the scope of cross -- I mean of my direct.

17         Nevermind, I'll withdraw the objection.

18   BY MR. RICHARD BARTOLOMEI:

19   Q.  There is an administrator that is shown for the paragraph

20   four, is there not, just says administrator, correct?

21   A.  Correct.

22   Q.  And it says last log on 11/20/10, correct?

23   A.  Correct.

24   Q.  So this computer, this laptop L1D1, could not have been

25   wiped to eliminate all of the information on it because it is

1   still reporting the administrator from 11/20/10, isn't that

2   correct?

3   A.  This administrator account is not a useable account,

4   therefore --

5          MR. RICHARD BARTOLOMEI:  Move to strike as not

6   responsive.

7          THE COURT:  No, I think it was responsive.

8          MR. RICHARD BARTOLOMEI:  No.  If I may ask again?

9   BY MR. RICHARD BARTOLOMEI:

10  Q.  My question was isn't it a fact that if you, quote, wipe

11  the computer, meaning eliminate all data on the computer, you

12  would not be able to find administrator 11/20/10 on the

13  computer when this report was run, isn't that true?  Because

14  there wouldn't be any data on the computer?

15  A.  I would not draw that conclusion because this is not an

16  account that somebody can log on, therefore, I would not trust

17  that as an accurate log on date because nobody logged on the

18  computer using the administrator account on 10/20/10.

19  Q.  You did not examine anything on this computer regarding

20  that date, isn't that true, that was all done by Mr. Linares,

21  correct?

22  A.  Okay, but I understand user account --

23  Q.  Excuse me, sir, wasn't that done by Mr. Linares?

24  A.  Correct, with my assistance.

25  Q.  Well, your assistance.  Sir, perhaps I don't understand

1    your answer, so I'll ask it again.  Isn't it true that any

2    reference in the computer would have to be from data in the

3    computer, that's how computers forensically are examined,

4    correct?

5            MS. THOMPSON:  Objection, argumentative.

6            THE COURT:  Sustained.

7    BY MR. RICHARD BARTOLOMEI:

8    Q.  Sir, obviously am I correct that paragraph four refers to

9    data showing a last log on and a security ID from 11/20/2010,

10   doesn't it show that?

11   A.  No, I would not agree with that because that administrator

12   account cannot be used to log on by a user.

13   Q.  Didn't ask that question, sir.  I asked doesn't it show the

14   data and it shows the date.

15           MS. THOMPSON:  Objection, argumentative and

16   cumulative.

17           THE COURT:  You want to just ask him about a date, you

18   can ask him about a date, but what you're trying to do is to

19   get him to agree with you that it shows something that he said

20   in his opinion it doesn't show.

21           MR. RICHARD BARTOLOMEI:  I'll try to break it down

22   even more simpler.

23   BY MR. RICHARD BARTOLOMEI:

24   Q.  The computer program in order to reflect the administrator

25   information would have to be showing data from 11/20/10,

1  otherwise it wouldn't show up even to EnCase, isn't that true?

2  The data giving rise to this line of information would have to

3  be in the computer, wouldn't it?

4  A.  Correct.

5  Q.  Thank you.  Now, that would mean that this computer was

6  never wiped clean, otherwise that data wouldn't be there,

7  correct?

8          MS. THOMPSON:  Objection, asked and answered.

9          THE COURT:  I think he did answer that question.  The

10  objection is sustained.

11          MR. RICHARD BARTOLOMEI:  Your Honor, this was --

12          THE COURT:  He answered the question previously.

13  BY MR. RICHARD BARTOLOMEI:

14  Q.  Second line, paragraph four, refers to a David S, correct?

15  A.  Correct.

16  Q.  And it shows David S as what, the administrator?

17  A.  Well, that is the administrator account.

18  Q.  Thank you.  Okay.  Now, these two security ID numbers, do

19  not match any security ID for Mr. Michalik, isn't that true?

20  A.  These security IDs match to an account on the computer, not

21  to a physical human.

22  Q.  My question, sir --

23          MR. RICHARD BARTOLOMEI:  Motion to strike as not

24  responsive because it's changing my question.

25          MS. THOMPSON:  Your Honor, I object.  It was

1    responsive.

2            THE COURT:  I'll let the jury make the determination.

3    Let's get on with the next question.

4            MR. RICHARD BARTOLOMEI:  Well, I wanted to finish that

5    one.

6            THE COURT:  Why don't you start again because that's

7    going to be very confusing.

8    BY MR. RICHARD BARTOLOMEI:

9    Q.  There's a line of data and it shows two -- excuse me, two

10   lines of data and it shows security IDs, long numbers and

11   letters and dates, does it not?  Well, not dates.  For David S

12   it's S15-21 -- a long series of numbers.  Do you see that?

13   A.  Yes.

14   Q.  Under paragraph one.  That doesn't match any ID whatsoever

15   in relation to Mr. Michalik, isn't that true?  Doesn't show his

16   name as having that ID, correct?

17   A.  I'm not familiar with all of the defendant's IDs.  I don't

18   know if that matches that or not.

19   Q.  Wouldn't that be an important thing to determine if you are

20   having a forensic report?

21           MS. THOMPSON:  Objection, argumentative, assuming

22   facts not in evidence, confusing and misleading.

23           MR. RICHARD BARTOLOMEI:  Your Honor.

24           THE COURT:  He can ask whether he thinks that is

25   important to know, so the objection to that extent -- wasn't

1   exactly the right way to ask the question, but you can ask

2   that, you can ascertain that kind of information.

3   BY MR. RICHARD BARTOLOMEI:

4   Q.  Wouldn't it be important as part of your forensic --

5           THE COURT:  Instead of "wouldn't it be important", why

6   don't you just say "would it be important".

7           MR. RICHARD BARTOLOMEI:  I'll do it that way, Judge.

8   BY MR. RICHARD BARTOLOMEI:

9   Q.  Would it be important to identify in terms of forensic

10  examination whether any identification of Mr. Michalik matches

11  David S or the administrator?  Wouldn't that be important to

12  know?

13          MS. THOMPSON:  Your Honor, I'm going to object.  The

14  security ID is related to the computer, not a person.  That's

15  been testified to multiple times.

16          THE COURT:  He can answer the question.  Objection is

17  overruled.

18  A.  When I do a forensic analysis, my concern is for the data

19  on the computer.

20  Q.  And wouldn't that be among the data on the computer, making

21  a comparison of the ID numbers?  Wouldn't that be part of your

22  forensic examination?

23  A.  Comparing what ID numbers?

24  Q.  How about the ID numbers I just read to you?  Let's use

25  those.

1   A.   But that's the only ID number on it.

2   Q.   No, there are several ID numbers on this report, I will

3   suggest to you, but we've already established that nothing in

4   Exhibit Six forensically demonstrates that Mr. Michalik ever

5   put any of the information onto the computer or knew that it

6   was there, isn't that true?

7   A.   Him specifically, correct.

8   Q.   And when you talk about an IP number, right, you're

9   familiar with IP addresses?

10  A.   Sure.

11  Q.   So if I have a router in my house and I have ten computers,

12  just as an example, something coming to the IP number will not

13  identify to a specific computer, it will just simply show the

14  IP of the router, correct?

15  A.   Correct.

16  Q.   So simply having an IP number that is somehow attached to

17  Mr. Michalik doesn't demonstrate anything or establish that

18  Mr. Michalik personally on a particular computer did anything,

19  isn't that true?

20  A.   That would be correct.

21  Q.   And let me try and go back to one thing about Exhibit Six.

22  Am I correct that nothing in the report contained in Exhibit

23  Six shows whether or not Windows 10 was the operating system

24  for the EnCase examination as opposed to Windows 7, correct,

25  not in the report?

Special Agent Steve Nutt - Examination          154

1    A.   Sorry.  Ask that again?

2    Q.   Windows 7?

3    A.   Okay.

4    Q.   Windows 10?

5    A.   Okay.

6    Q.   Two different operating systems, correct?

7    A.   Sure.

8    Q.   You've already testified I can have Windows 7 and I can

9    have Windows 10 operating as an operating system in the same

10   computer at the same time, correct?

11   A.   It wouldn't be at the same time.  What you're talking about

12   is a dual boot computer --

13   Q.   I'm not talking about a dual boot at this point.

14   A.   Then I don't understand what you're asking.

15   Q.   Two operating systems can be in the same computer.  We've

16   established that, correct?

17   A.   The same physical computer, but in two different

18   partitions.  They cannot exist on the same partition.  You

19   cannot operate from the same --

20   Q.   I'm not asking about partitions.

21        MS. THOMPSON:  Your Honor, I'm going to object.  He's

22   not even letting him finish the answer of his own question.

23        THE COURT:  You can finish the answer.

24   A.   When you turn a computer on and log on and it starts, it

25   cannot be in both Windows 10 and Windows 7.  When I turn the

 1    computer on, I can choose between Windows 7 or Windows 10 and
 2    it will go to that operating system.
 3    Q.  Thank you.  Nothing in this report shows that this was
 4    using Windows 10.  I've read the report, it doesn't show that
 5    that's the operating system that generates this report through
 6    the use of your forensic EnCase, isn't that true?
 7              MS. THOMPSON:  Objection, argumentative.
 8              MR. RICHARD BARTOLOMEI:  How can it be argumentative?
 9              THE COURT:  The objection is overruled.
10    BY MR. RICHARD BARTOLOMEI:
11    Q.  Nothing in your report shows that Windows 10 was the
12    operating system on this forensic examination that generates
13    Exhibit Six, nothing, correct?
14    A.  I'm confused.  Are you talking about the operating system
15    on the laptop or are you talking about the operating system on
16    the forensic computer used to create the report?
17    Q.  Well, are you saying -- thank you for clarifying that.  I
18    was thinking about L1D1 the laptop.  So you're now saying that
19    EnCase uses Windows 10?
20    A.  EnCase is a piece of software.
21    Q.  Yes, it is, sir, so I'm trying to clarify for the benefit
22    of this jury whether or not anywhere in this report it shows
23    which operating system was in operation to generate this
24    report.  Am I correct it does not?
25    A.  The part that's confusing me is the computer that generates

1    the report is the forensic machine, not the Dell laptop.

2    Q.  Okay.  So if I understand that correctly, what you're

3    saying is the limitation of EnCase, the forensic report is --

4    are you saying it uses Windows 10?

5            MS. THOMPSON:  Your Honor, objection.  He's

6    mischaracterizing the testimony.

7            THE COURT:  That objection is sustained.

8    BY MR. RICHARD BARTOLOMEI:

9    Q.  Well, which operating system generates Six?

10   A.  The operating system installed on the forensic computer.

11   Q.  And what system is that?

12   A.  I believe that was Windows 10.

13   Q.  So because Windows 10 was used, that's the only reason that

14   the last access is, as you say, not updated, correct?

15   A.  No.

16   Q.  Well, since you can't, as I understand it, tell me whether

17   the computer when it was forensically examined was operating

18   Windows 7 or Windows 10 from the report, am I correct it

19   doesn't tell you that?

20   A.  No, it says it was Windows 10.

21   Q.  And that's because EnCase operates on Windows 10, correct?

22   A.  No, it's because that's the operating system that was on

23   L1D1.

24   Q.  Nonetheless, the failure to update simply doesn't provide

25   you any information as to when or if that file was last

1  accessed, correct?  That's what you said, right?

2  A.  Correct.  The last access date is not accurate as to when a

3  file was accessed.

4  Q.  So when you look at this list of files, you can tell that

5  they're coming in rapid sequence, correct?

6  A.  Yes, it appears that way.

7  Q.  It's not a situation where a person is manually opening

8  each one, transferring them to the computer, isn't that true?

9  A.  Probably not.

10 Q.  Probably not or definitely not due to the timing?

11 A.  Probably not.

12 Q.  Now, with regard to --

13         THE COURT:  Counsel, how much more do you have of this

14 witness?

15         MR. RICHARD BARTOLOMEI:  I'm going to have more than

16 ten minutes.

17         THE COURT:  All right.  We're going to break for the

18 afternoon, ladies and gentlemen.  We'll start at -- we can

19 start at 9:00 tomorrow morning.  I had a whole bunch of things

20 to do and I've cleared my calendar for tomorrow, so we're going

21 to start at 9:00.

22         COURT SECURITY OFFICER:  Rise for the jury.

23         THE COURT:  You can step down, sir.

24         *(4:22 p.m., jury exits.)*

25                          *   *   *

1          THE COURT:  Anything before we break?

2          MS. THOMPSON:  No, Your Honor.  I just had a question

3    on timing.  I don't know how long the defense has, but given

4    the limited scope of direct, I'm wondering about how the timing

5    for tomorrow is going to go.

6          THE COURT:  Well, I would expect that counsel will be

7    done with his examination within another half an hour because

8    we're going in circles here and I think that enough is enough.

9    With respect to -- do you have another rebuttal witness?

10          MS. THOMPSON:  I do not.

11          THE COURT:  So at that point, that will be it, you'll

12    close the case.

13          MS. THOMPSON:  Yes.

14          THE COURT:  So I have to go through the proposed jury

15    instructions and get them out to you and I will do that -- I'm

16    going to try to take them with me this evening and work on them

17    this evening at home.  So I'm going to try to get them to you

18    tomorrow and hopefully we'll settle the jury instructions.

19    There shouldn't be too many disputes, I don't think.  There's a

20    lot of disputes in the case, but I don't think there's a lot of

21    disputes on the instructions.  The instructions are pretty well

22    settled in this area.

23          MR. RICHARD BARTOLOMEI:  There's one part where I

24    might have put something in twice and I just wanted to alert

25    you to that and I didn't get a chance yet --

1          THE COURT:  We'll look at it.  And then I think once

2    that's done, we'll instruct the jury and go into closing

3    arguments.  I'm hoping we're going to get this case to the jury

4    tomorrow.  Probably not before noon, that's for sure, but maybe

5    in the early afternoon, right after lunch, I'm hoping.

6          MS. THOMPSON:  Thank you, Your Honor.

7          THE COURT:  We'll stand in recess until tomorrow

8    morning.

9               *(4:24 p.m.)*

10                              *   *   *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5        I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.   I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  October 7, 2019

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   655 East Cesar E. Chavez Blvd., Third Floor
     San Antonio, Texas  78206
16   (210)244-5048

17

18

19

20

21

22

23

24

25