```
 1                 UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3   UNITED STATES OF AMERICA      :
                                   :
 4   vs.                           : No. SA:17-CR-00347
                                   : San Antonio, Texas
 5   JEFFREY CLINTON MICHALIK(1),  : August 30, 2019
     Defendant.                    :
 6   **********************************************************

 7            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
               BEFORE THE HONORABLE DAVID A. EZRA
 8            SENIOR UNITED STATES DISTRICT JUDGE

 9   APPEARANCES:
     FOR THE GOVERNMENT:
10     Tracy Thompson, Esquire
       United States Attorney's Office
11     601 N.W. Loop 410, Suite 600
       San Antonio, Texas  78216
12     (210)384-7150; tracy.thompson@usdoj.gov

13

14   FOR THE DEFENDANT:
       Edward A. Bartolomei, Esquire
15     Richard A. Bartolomei, Esquire
       Jonathan R. Perez, Esquire
16     Law Office of Edward A. Bartolomei, P.L.L.C.
       530 Lexington Avenue
17     San Antonio, Texas  78215
       (210)225-0393; edward@eabartlaw.com
18

19

20   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
21   Official Court Reporter, U.S.D.C.
     655 East Cesar E. Chavez Blvd., Third Floor
22   San Antonio, Texas  78206
     Phone(210)244-5048
23   angela_hailey@txwd.uscourts.gov

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25
```

# I N D E X

**GOVERNMENT REBUTTAL EVIDENCE**

**GOVERNMENT WITNESS:**                                    **PAGE**

**Special Agent Steve Nutt**

By Mr. Richard Bartolomei                          6,21

By Ms. Thompson                                      18


**JURY INSTRUCTIONS**

By The Court *(read by Laura Cauley)*          77


**CLOSING ARGUMENTS**

By Ms. Thompson                              94,129

By Mr. Richard Bartolomei                      107

By Mr. Edward Bartolomei                       126

 1    *(August 30, 2019, 9:13 a.m.)*

 2                          *  *  *

 3          COURT SECURITY OFFICER:  All rise.

 4          THE COURT:  Please be seated.

 5          COURTROOM DEPUTY CLERK:  SA:17-CR-00347, United States

 6    of America versus Jeffrey Michalik.

 7          THE COURT:  Let's talk a little bit about logistics

 8    here, if we can.  So we currently have the government's expert

 9    on cross.  When that is done that will be the end -- I don't

10    think we have any more witnesses, do we?

11          MS. THOMPSON:  No, Your Honor.

12          MR. EDWARD BARTOLOMEI:  No, Your Honor.

13          THE COURT:  All right.  So at that point, we'll take a

14    recess.  I need to do a few tweaks on the jury instructions,

15    the proposed jury instructions and then we will settle the jury

16    instructions which we have to do before final argument as you

17    know by rule.  So we'll settle the jury instructions.  Once

18    I've settled the jury instructions with you, which I don't

19    think is going to take a long time.  I mean I try to put out a

20    fair set of jury instructions.  I try to do a balanced and fair

21    set of jury instructions.  This could be the first case, but in

22    31 years I've never been reversed for a bad jury instruction.

23    This could be the first one, knock on wood, because I don't

24    allow skew jury instructions for anybody.  So once we settle

25    the jury instructions, then I will have Laura, if you have no

1    objection, read the jury instructions to the jury for me.  Any

2    problem with that by the defense?  I always have my law clerks

3    read it because it's very tough for me with my voice.

4              MR. EDWARD BARTOLOMEI:  Not a problem, Judge.

5              THE COURT:  So once that's done, then you'll go right

6    into closing argument.  And depends upon where we are and

7    time-wise.  It would be brilliant if we could get closing

8    arguments started before lunch.  Are we ready?

9              MS. THOMPSON:  Yes, Your Honor.

10             THE COURT:  Okay.

11                           *   *   *

12             COURT SECURITY OFFICER:  All rise for the jury.

13             THE COURT:  Please be seated.  Good morning, ladies

14   and gentlemen.  I try to keep my jurors as informed as I

15   possibly can in terms of what is happening.  The witness we

16   have on the stand now is the last witness who will testify.

17   And so when counsel is done with any cross-examination and then

18   we have any redirect and we're done with that, then we're done

19   with all of the evidence in this case.  At that point, I have

20   to take a short recess because I have to go over the jury

21   instructions with the lawyers.  Okay.  And then once we have

22   done that, we will bring you back.  And my law clerk, Laura, is

23   going to read -- Laura Cauley, she's going to read my jury

24   instructions to you with the agreement of the parties because

25   it's real hard for me to read with my voice.  And then we will

1    start closing arguments.  And I've limited the lawyers to 40

2    minutes each because there's no need for them to go any longer

3    than that.  Beyond that, they're just repeating things.  This

4    is not that factually complicated a case.  There are issues

5    which they need to cover obviously, but this case is largely a

6    credibility case for you, who you believe and who you don't

7    believe and I don't think I'm telling you anything new here.

8    You're going to find the facts and you're going to decide who

9    to believe and who not to believe.  And once we get those

10   closing arguments done, you're going to start to deliberate.

11   I'm hoping we get all of that done, to be honest with you,

12   before lunch, but I could be wrong.  If we don't, then we will

13   come back right after lunch and finish it up.  I'm going to

14   order lunch for you.  The government is going to pay for your

15   lunch from now on, including today.  Where are they going to

16   go?  Either Bill Miller's or the sandwich shop.  Which would

17   you prefer?

18            *(Pause.)*

19            When I say "the government" I don't mean them.  The

20   prosecution doesn't pay for your lunch, I promise you.  It's

21   the court that pays for your lunch, okay.  I don't want you to

22   think that they're paying for your lunch.  It's not the U.S.

23   Attorney's Office or the Federal government in that sense, it's

24   the court that pays for your lunch and we're totally separate

25   from them.  All right, so it's the court.  I don't mean the

1    government.  I don't mean them.  Believe me.  It's the court

2    that pays for your lunch.  All right, are you ready to proceed?

3           MR. RICHARD BARTOLOMEI:  I am, Your Honor.

4           THE COURT:  Sir, I remind you that you remain under

5    oath.

6                        CROSS-EXAMINATION

7    BY MR. RICHARD BARTOLOMEI:

8    Q.  Mr. Nutt, do you remember when you testified that in

9    relation to record number 12, number 52 and number 90, that

10   they were accessed on three different times?  Do you remember

11   your testimony?  And if you could put up page eight of Exhibit

12   6b.  Right now, sir, I'm just asking if you remember your

13   testimony.

14   A.  Yes.

15   Q.  And you said that record 12, record 52 and record 90 were

16   separate accesses of the file reflecting that it was accessed

17   three different times, remember?

18   A.  Yes.

19   Q.  Would you agree that a person can't -- well, would you

20   agree that three different files were actually created by the

21   computer, same time, all referencing the same subject matter,

22   isn't that really what happened?

23   A.  No, this is three separate link files.

24   Q.  Well, let's look at that.

25           MR. RICHARD BARTOLOMEI:  Before we do, could you put

1   up page eight?

2   BY MR. RICHARD BARTOLOMEI:

3   Q.  Turning to record number 12, see that?

4        MR. RICHARD BARTOLOMEI:  May I approach?

5        THE COURT:  Sure.

6        MR. RICHARD BARTOLOMEI:  Well, I don't really need to

7   approach.

8   BY MR. RICHARD BARTOLOMEI:

9   Q.  What's the time that it shows that the target file was

10  created?

11  A.  10/15/2015.

12  Q.  Turning to record number 52, page 25, do you see it?

13  A.  Record 52, yes.

14  Q.  Same time, isn't it?

15  A.  Yes.

16  Q.  Turning to 90, page 40, exact same time, isn't it?

17  A.  That's the time the accessed file was created, not the time

18  the link file was created.

19        MR. RICHARD BARTOLOMEI:  Motion to strike as

20  nonresponsive.  I asked whether or not it shows the exact same

21  time.

22        MS. THOMPSON:  Your Honor, well, I'll object.  It's

23  assuming incorrect facts that the witness is trying to

24  establish.

25        THE COURT:  I am going to sustain that objection.  I

1    remember his testimony.  It does assume incorrect facts.

2    BY MR. RICHARD BARTOLOMEI:

3    Q.  The fact is that's what it shows on the report, doesn't it,

4    exact same time?

5    A.  It says target file created date, yes.

6    Q.  And time?

7    A.  Yes, of the target file which is the accessed file, not the

8    link file itself.

9    Q.  I didn't ask about the link file at this point, so I'm

10   going to move to strike your testimony.

11        THE COURT:  Well, I don't know.  I think that's

12   confusing, so you need to rephrase your question.

13        MR. RICHARD BARTOLOMEI:  Your Honor.

14        THE COURT:  Or you need to clarify what the difference

15   is between the target file and the link file because you're

16   asking him about -- you're asking him about something that he

17   can answer either way depending upon which file.  And there's

18   only one file I think that makes a difference here.

19        MR. RICHARD BARTOLOMEI:  With respect, Your Honor,

20   that's what I'm trying to point out.

21        THE COURT:  Okay.

22   BY MR. RICHARD BARTOLOMEI:

23   Q.  Do you know what a hyper file is?

24   A.  A hyper --

25   Q.  Hyper file?

Special Agent Steve Nutt - Examination          9

1   A.   Yes.

2   Q.   Do you know what a DAT file is?

3   A.   Yes.

4   Q.   Do you know what an allocable space is?

5   A.   An allocated space, yes.

6   Q.   Tell the jury what a hyper file is?

7   A.   A hyper file is a file that takes essentially a snapshot of

8   the computer when you close the lid.  That way when you open it

9   back up again, the computer knows where it was.

10  Q.   You're saying it's controlled by the lid of the laptop?

11  A.   The hyper file -- not necessarily.  You can put the

12  computer in hibernation another way.

13  Q.   The point is it's done by the computer itself, correct?

14  A.   The hyper file is, yes.

15  Q.   And the DAT file is done by the computer itself, correct?

16  A.   Yes.

17  Q.   And there's also an allocable space that a hyperlink can go

18  into, correct?

19  A.   Yes.

20  Q.   And in this particular instance, am I correct that many if

21  not all of the images in 6b could not be viewed directly on the

22  file by a regular user, isn't that true?

23  A.   Could you repeat the question again?

24        MR. RICHARD BARTOLOMEI:  Could you read it back

25  please?

```
1                          *   *   *
2            (Court reporter read back the last question.)
3                          *   *   *
4    A.  6b doesn't contain the images.
5    Q.  It contains reference to images, correct?
6    A.  But it's not the --
7    Q.  Does it contain reference to images?
8    A.  References to images, yes.
9    Q.  Thank you.  You didn't look at all the images, correct?
10   A.  No, I did not.
11   Q.  So you could not say from examining the computer whether or
12   not there was an image that would have been visible to a
13   regular user because you didn't look yourself, correct?
14   A.  This report does not contain images.
15          MR. RICHARD BARTOLOMEI:  Motion to strike as not
16   responsive.
17          THE COURT:  No, it's not nonresponsive.  You asked him
18   whether he accessed images and he told you that the report
19   doesn't contain images which is an answer to your question,
20   isn't it?
21          MR. RICHARD BARTOLOMEI:  Not exactly, Your Honor.
22          THE COURT:  I think it is.
23   BY MR. RICHARD BARTOLOMEI:
24   Q.  Turning back to the comparison of record 12 on page eight,
25   record 52, I'm not asking it be put up and record on 90.  All
```

1   of the target file created times are exactly the same date and

2   exactly the same time?

3           MS. THOMPSON:  Objection, asked and answered.

4           MR. RICHARD BARTOLOMEI:  No.

5           THE COURT:  I'll overrule that objection.

6   BY MR. RICHARD BARTOLOMEI:

7   Q.  Record 90 is on page 40.  Record 52 is on page 25.  They're

8   all the same time, right?  To the second?

9   A.  Yes.

10  Q.  And then you said target file last accessed.  They're the

11  identical time as the target file creation date for all three

12  files, correct?

13  A.  Yes.

14  Q.  So a person couldn't simultaneously touch the computer and

15  access all three files at the exact same instance, wouldn't you

16  agree?

17  A.  The target file is the same file on each of these three

18  records.  It's not three different files.

19  Q.  That's my point.  All three of these are created from one

20  action, correct?

21  A.  No, that's not correct.

22  Q.  So are you testifying that even though the target file

23  creation date and time and the target file last access are

24  identical for all three, that they would have taken three

25  separate actions by a user or will you acknowledge that could

1  not occur?

2  A.  No, it's three separate actions.

3  Q.  All at the same time, right?

4  A.  The records --

5  Q.  Excuse me.  All at the same time?  That's what you're

6  saying?

7        MS. THOMPSON:  Your Honor, I'm going to object.  This

8  is a mischaracterization of the testimony.

9        THE COURT:  Sustained.

10        MR. RICHARD BARTOLOMEI:  Your Honor, I think I'm

11  entitled to examine --

12        THE COURT:  He's already testified that it wasn't

13  created at the same time necessarily.  He's testified to that.

14  And now you're asking him again and again whether it was

15  created at the same time.  He's already told you no.

16  BY MR. RICHARD BARTOLOMEI:

17  Q.  Target file last accessed.  You testified the other day,

18  did you not, that with regard to, say, 6a -- excuse me, Six,

19  you said that the access time, Windows doesn't update, correct?

20  A.  Correct.

21  Q.  In fact, sir, Windows does update, but they do it later,

22  but they refer back to the original time, isn't that what

23  Windows does, Windows 10?

24  A.  No, that's not what it does.

25  Q.  Do you know that for a fact?

Special Agent Steve Nutt - Examination          13

1   A.   Yes.

2   Q.   You have checked to see whether the access time even though

3   it's identical is never updated by Windows, is that what you're

4   saying?

5   A.   Yes.

6   Q.   So target file last access in 6b doesn't mean anything,

7   correct?

8   A.   Correct.

9   Q.   And turning to your link files, you would agree that all of

10   the link files that you refer to in record 12, record 52 and

11   record 90, according to your own report, they're all created at

12   the identical time and the identical seconds?

13   A.   No.

14   Q.   Isn't that true?

15   A.   No, that's not what this report says.

16   Q.   I'm going to go through them one at a time.  Twelve please

17   and that would be page eight.  Do you see it?

18   A.   Yes.

19   Q.   And it very clearly says, does it not, target file created

20   date and time, 10/15, 12:44:03, correct?

21   A.   The target file is Open-F07.jpg, not the link file.

22   Q.   All right.  JPG is an image file, correct?

23   A.   Correct.

24   Q.   And the word "open" doesn't mean that it was opened, that's

25   just the name of the file, correct?

1  A.  Correct.

2  Q.  So when you testified about the significance or meaning of

3  the word "open" using Exhibit 12, doesn't it say Open

4  Collection, correct?

5  A.  That's the name of the folder.

6  Q.  That's right.  It doesn't mean it was open, that's just the

7  name of the folder, correct?

8  A.  I never said it did.

9          MR. RICHARD BARTOLOMEI:  Motion to strike as

10  nonresponsive.

11          MS. THOMPSON:  It is responsive and he's

12  mischaracterizing the testimony.  That's what's causing the

13  confusion.

14          THE COURT:  Re-ask the question in a slightly

15  different way and you might get an answer.  I'm not going to

16  strike the answer because I don't think it was nonresponsive.

17  BY MR. RICHARD BARTOLOMEI:

18  Q.  Open Collection does not reflect an action by the computer,

19  it's just the name of that portion of the pathway, correct?

20  A.  Correct.

21  Q.  And Open F107.jpg doesn't mean it's opened, that's just the

22  name of the file referred to, that portion in the pathway,

23  correct?

24  A.  Correct.

25  Q.  Turning to page 52 -- excuse me, record 52, page 25.  I am

Special Agent Steve Nutt - Examination          15

1   correct, am I not, target file, created date and time
2   10/15/2015, 12:44:03 a.m., that's what it reflects, correct?
3   A.   Correct.
4   Q.   And that's something the computer assigns to it, correct,
5   tells you from the computer program of the C drive or whatever
6   drive that that's the time the file was created, correct?
7   A.   The JPG file, not the link file.
8   Q.   Sir, at the end of the pathway it says Open F07.jpg,
9   correct?
10  A.   Correct.
11  Q.   That's the same one as 12, correct?
12  A.   Correct.
13  Q.   And it tells you that that file was created at 10/15/2015
14  at exactly the same time as 12, doesn't it?
15  A.   It's the same file.  The target file is the same --
16  Q.   Thank you.  So what you're saying then, sir, is it doesn't
17  show when or if there are separate accesses to the same file,
18  isn't that true?
19  A.   The fact that there are two link files shows that there are
20  separate access.
21  Q.   But they're the same link file, aren't they?
22  A.   No, they're two different link files for the same image
23  file.
24  Q.   And what's the time of -- let's go to 90 first.  Page 40.
25  See it?

Special Agent Steve Nutt - Examination          16

1    A.   Yes.

2    Q.   There's a pathway and it ends in Open F107.jpg?

3    A.   Yes.

4    Q.   Same file, correct?

5    A.   Same image file.

6    Q.   That's right.  Same image file?

7    A.   Correct.

8    Q.   And once again target file created date/time is exactly the

9    same as it was in 12 and exactly the same as it was in 52,

10   correct?

11   A.   Yes, that's the same image file.

12   Q.   And there is nothing under any one of those three files

13   that shows any different access time by a user or by the

14   computer other than that same time and same date for each file,

15   isn't that true?

16   A.   These records don't show the time the file was accessed,

17   correct.

18   Q.   So there is nothing -- I'm just going to ask it.  Am I not

19   correct that all of these references to Open F07 are all

20   created at the very same instant and they are put in different

21   places within the computer by the computer, isn't that true?

22   A.   No, that's not true.

23   Q.   Well, you would agree that if a person were actually using

24   the file, accessing FP or F7.jpg, they can't hit the button to

25   access it themselves three times at the same instance, correct?

1          MS. THOMPSON:  Your Honor, objection, argumentative

2    and asked and answered.

3          THE COURT:  Sustained.

4    BY MR. RICHARD BARTOLOMEI:

5    Q.  Can a person access three files by pushing a button on the

6    computer and access all three files at the same time?  Can that

7    physically be done?

8    A.  Three files, no.

9    Q.  Now, let's talk about the times on 6b.  That's not the time

10   of day here in Texas, is it?

11   A.  No, this is UTC time.

12   Q.  And UTC time differs by Texas time by how many hours?

13   A.  Five hours -- six hours for standard time, five hours for

14   daylight saving time.

15   Q.  So these times that you show in the a.m., they're not

16   actually the time that a user would have done something to

17   generate this data, correct?  It's a different time.

18   A.  When you convert, no.

19   Q.  That's what I was asking.  When is 6b run, it's on

20   August 20, isn't it?

21   A.  Yes.

22   Q.  That's during this trial, isn't it?

23   A.  I believe it was the day before it started, the day before

24   testimony started.

25   Q.  Did you direct Agent Linares to run that or did you run it?

1    A.  I directed him to run it.

2    Q.  And you advised him why you wanted it run, didn't you?

3    A.  Yes.

4    Q.  And it was to try to find other evidence of somebody

5    accessing something, correct?

6    A.  Yes.

7    Q.  But if you look all the way through 6b, just like Six,

8    there is no forensic evidence whatsoever that establishes that

9    the defendant ever did anything to access those files, isn't

10   that true?

11   A.  A specific person, no.

12        MR. RICHARD BARTOLOMEI:  Thank you, sir.  I pass to

13   the government.

14                  REDIRECT EXAMINATION

15   BY MS. THOMPSON:

16   Q.  Special Agent Nutt, with regard to -- let's look at record

17   90 on page 40.  Record number 90 is the link file, correct?

18   A.  Correct.

19   Q.  And in the linked path, that's what shows the actual image

20   file of Open-F07, correct?

21        MR. RICHARD BARTOLOMEI:  Leading.

22        THE COURT:  Sustained.

23   BY MS. THOMPSON:

24   Q.  What does the linked path show?

25   A.  It shows the file that was accessed.

1  Q.  Right under that is the target file created date and time.

2  What does that refer to?

3  A.  That refers to the date and time that the file F -- excuse

4  me, the date and time the file Open-F07.jpg was saved on the

5  computer.

6  Q.  Is that why all three records, 90, 52 and 12 have the same

7  target file creation date?

8  A.  Yes.

9          MR. RICHARD BARTOLOMEI:  Leading.

10         THE COURT:  Yes.  Sustained.  Just ask why.

11  BY MS. THOMPSON:

12  Q.  Why are all those dates the same?

13  A.  Because each of those three records refers to the exact

14  same image file.

15  Q.  How do you know that those three -- that that one file was

16  accessed three different times?

17  A.  I know there's three link files because if you go further

18  down, if you go down to where it says Source and Location, the

19  location is the physical spot on the computer on the hard drive

20  where this link file was found.  Each of those three records is

21  a different location.  That's why I know it's three different

22  files.

23  Q.  You talked about an IP address being assigned to a router

24  in a location, correct?

25          MR. RICHARD BARTOLOMEI:  Your Honor, that's certainly

1    beyond the scope of my cross.

2            MS. THOMPSON:  He asked about the IP address

3    yesterday.

4            THE COURT:  Overruled.

5            MR. RICHARD BARTOLOMEI:  I did?

6            THE COURT:  Yes, you did.  You asked about the IP

7    address.

8    BY MS. THOMPSON:

9    Q.  If the Internet access is secure, what is needed to access

10   Internet at a specific location?

11   A.  The --

12           MR. RICHARD BARTOLOMEI:  Objection, Your Honor, if I

13   may.  Not only is it leading and suggestive, but it's premised

14   upon something not in evidence.

15           THE COURT:  She asked what is necessary -- no, it is

16   not.  The objection is overruled.

17   A.  The user would need both the name of the wireless network

18   and the password.

19   Q.  Would the operating system being used on the forensic

20   computer affect the forensic report in any way?

21   A.  It might affect the formatting of the report, but it's not

22   going to affect the data that's in the report.

23   Q.  You were asked yesterday about the security ID on

24   Government Exhibit Six, page three.  What is a security ID?

25   A.  It's an ID that the computer generates and it's assigned to

1   a specific user on that computer.

2   Q.  If for instance in on the Dell laptop computer if there's

3   only one user account, would there ever be a different security

4   ID?

5          MR. RICHARD BARTOLOMEI:  Objection, Your Honor.

6   Leading and suggestive.

7          THE COURT:  No, she's saying would there ever be,

8   she's not suggesting that there was.  Overruled.

9   A.  No, if there's no other user, there's not going to be

10  another S ID on it.

11         MS. THOMPSON:  Thank you, I have nothing further.

12                     RECROSS-EXAMINATION

13  BY MR. RICHARD BARTOLOMEI:

14  Q.  You never checked to see whether there was a password that

15  was required for the use of this computer, the laptop, isn't

16  that true?

17         MS. THOMPSON:  Objection, beyond the scope of

18  redirect.

19         MR. EDWARD BARTOLOMEI:  No.

20         THE COURT:  Just a minute.  Who else chimed in here?

21         MR. EDWARD BARTOLOMEI:  My apologies, Your Honor.

22         THE COURT:  Thank you for your apology.  I appreciate

23  it.  The objection is sustained.

24  BY MR. RICHARD BARTOLOMEI:

25  Q.  Did you ever in any of these --

```
 1              THE COURT:  I beg your pardon.  Let me think about

 2   that.  What was the question again?

 3              MR. RICHARD BARTOLOMEI:  It's just did he ever check

 4   to see --

 5              THE COURT:  The objection is overruled.

 6   BY MR. RICHARD BARTOLOMEI:

 7   Q.  You never checked to see whether the Internet access from

 8   this computer was password protected, isn't that true?

 9              MS. THOMPSON:  Objection, confusing and impossible to

10   answer.  The Internet access on the computer is confusing and

11   misleading.

12              THE COURT:  Why is that?

13              MS. THOMPSON:  There's Internet access on a router.

14              THE COURT:  I think he's asking about the personal

15   computer itself, are you not?

16              MR. RICHARD BARTOLOMEI:  Well, I'm going to get to the

17   next part.

18              THE COURT:  What are you actually asking?  So she's

19   right because now that I think about it, even I'm confused.

20   Are you asking about the computer itself which could or could

21   not have a password or are you asking about the router which is

22   the home Internet?  What are you asking about?  Are you asking

23   about both?

24              MR. RICHARD BARTOLOMEI:  I'll start with the Internet,

25   whether there's a password from the computer.
```

1          THE COURT:  Wait.  There is no such thing as that.

2     There is no such thing as a password from the computer to the

3     router.  You can have a password for your Internet, like you go

4     to somebody's house and you want to use their Internet, you

5     have to ask them either for the -- if they don't have the

6     guest, they could have a guest account or they can have an

7     actual account that they use or they both might be password

8     protected.  If you go to somebody's house and say, gee, can I

9     use your Internet so I can have Internet on my iPhone, let's

10    say --

11         MR. RICHARD BARTOLOMEI:  I think I can simplify.

12         THE COURT:  -- then you would have to have that, but

13    that's different from the password to get into your iPhone,

14    okay, so you can open up.

15         MR. RICHARD BARTOLOMEI:  And I can simplify that.

16    BY MR. RICHARD BARTOLOMEI:

17    Q.  You never checked to see whether there was a password to

18    even open the computer that's in question, isn't that true?

19         MS. THOMPSON:  Objection.  That's beyond the scope of

20    redirect.

21         THE COURT:  Overruled.

22    BY MR. RICHARD BARTOLOMEI:

23    Q.  You never checked, did you?

24    A.  I did not.

25    Q.  You don't know whether it's password protected or not then,

1    correct?

2    A.   I know it's not password protected.

3    Q.   And when the judge mentioned and counsel mentioned about a

4    password to the Internet through the router, did you ever

5    determine if there was a password through the router meaning

6    from there to the Internet?

7    A.   I don't recall if there was or not.

8        *(Pause.)*

9            MR. RICHARD BARTOLOMEI:  Mr. Nutt, no further

10   questions.

11           THE COURT:  Do you have anything else, counsel?

12           MS. THOMPSON:  No, Your Honor.

13           THE COURT:  Okay, Agent Nutt, you can step down.

14   Thank you.

15           All right.  Anything further, counsel?

16           MS. THOMPSON:  Nothing from the government.

17           MR. EDWARD BARTOLOMEI:  Nothing further from the

18   defense, Your Honor, at this time.

19           THE COURT:  So both sides have rested.  Ladies and

20   gentlemen, as I told you this morning now we need to get

21   together and work on these jury instructions.  I don't think

22   it's going to take us a lot of time, but I can't guarantee it.

23   And so we're going to take --

24           COURTROOM DEPUTY CLERK:  I need to get them to fill

25   out their menus.

1          THE COURT:  I don't think they're going to object to

2    filling out their menus.  Will you?  I'm going to let Priscilla

3    make the call as to whether it's the sandwich shop because I

4    don't want the jury fighting before they need to be fighting,

5    all right.  There's no sense in pitting one against the other.

6    So what is going to happen is -- I don't want you just sitting

7    in there, okay.  That's an awful little room to sit in for no

8    good reason.  So what I'm going to do is ask that you fill out

9    your menu.  And then I'm going to give you until about -- it's

10   ten minutes to 10:00 -- about 10:30.  So you can go out, walk

11   around, get some fresh air, do whatever you'd like to do, make

12   telephone calls, whatever you need to do.  And be back by

13   10:30.  I can't guarantee we'll be ready by 10:30, but I'm

14   hoping hope springs eternal here.  Thank you.  You can be

15   excused.

16         MR. EDWARD BARTOLOMEI:  For the record, we have some

17   motions of proof, Your Honor, we'd like to make.

18         THE COURT:  That isn't done before the jury.

19         MR. EDWARD BARTOLOMEI:  I understand.

20         THE COURT:  That's why I need to let them go.

21         COURT SECURITY OFFICER:  All rise for the jury.

22         *(9:50 a.m., jury exits.)*

23                        *  *  *

24         THE COURT:  What are your offers of proof?

25         MR. RICHARD BARTOLOMEI:  Can we just reference their

1    identification numbers?

2          *(Pause.)*

3          THE COURT:  I'm waiting.

4          MR. RICHARD BARTOLOMEI:  We need to get this on the

5    computer.

6          THE COURT:  What is this on the computer?

7          MR. RICHARD BARTOLOMEI:  Priscilla sent us a list of

8    what was identified.  We can do this after the jury

9    instructions, if you prefer.

10         THE COURT:  No, let's do it now.

11         *(Pause.)*

12         I'm waiting.

13         MR. RICHARD BARTOLOMEI:  We're unable to find the

14   proper link file.

15         THE COURT:  I'm here.

16         COURTROOM DEPUTY CLERK:  Do you want me to print you

17   another copy?

18         MR. RICHARD BARTOLOMEI:  If you could.

19         *(Pause.)*

20         MR. EDWARD BARTOLOMEI:  Your Honor.

21         THE COURT:  Yes, sir.

22         MR. EDWARD BARTOLOMEI:  11a would be the other one.

23         THE COURT:  I don't know what it is you're talking

24   about, so let's wait until we get everything together.

25         COURTROOM DEPUTY CLERK:  This is their 11a that they

1    identified.

2           MS. THOMPSON:  I don't have a copy of that.

3           *(Pause.)*

4           MR. RICHARD BARTOLOMEI:  I'm ready, Your Honor.

5           THE COURT:  Do you know where we are, counsel?  Are

6    you ready.

7           MS. THOMPSON:  Yes.

8           THE COURT:  Okay.  What is it that you want to do?

9           MR. RICHARD BARTOLOMEI:  Well, we had offered 7a.

10          THE COURT:  What is 7a?

11          MR. RICHARD BARTOLOMEI:  7a was the detection of

12   external virus and the warning and that is we sought to

13   introduce that.

14          THE COURT:  I need to see 7a.  This is the one that's

15   on the -- the problem was that it isn't on the laptop, it's on

16   the desktop, am I right?  Is that the one?

17          MR. RICHARD BARTOLOMEI:  I believe that was your

18   determination.

19          THE COURT:  It's not my determination.  You can see

20   that.  I'm not from outer space.  You can see that that's a

21   desktop monitor.

22          MS. THOMPSON:  In addition, Your Honor, it's dated

23   May 6th of 2017 in the bottom right-hand corner.

24          THE COURT:  Which is way after this case.

25          MR. RICHARD BARTOLOMEI:  And well before the seizure

1    of the computer, isn't it?

2              THE COURT:  No.  The laptop was seized in 2015.

3              MR. RICHARD BARTOLOMEI:  I misspoke, Judge.  Let me

4    correct myself.

5              THE COURT:  All right.

6              MR. RICHARD BARTOLOMEI:  The point is what we're

7    trying to put in there is to show this happens.

8              THE COURT:  What happens?

9              MR. RICHARD BARTOLOMEI:  Let me finish, if I could.

10   Before or after doesn't mean it doesn't happen in the world.

11   And that's the same thing with 7g which is why we attempted to

12   offer that because simply saying that something occurs after,

13   the jury might wish to consider that in determining whether or

14   not there are such invasions of a computer.

15             THE COURT:  Well, you know, in this case, one of the

16   main issues is whether this -- your theory of the case is that

17   somehow some unknown person or individual or individuals, who

18   knows who, got into his computer before it was seized and

19   injected it with child pornography.  That is your theory.  And

20   to put this up is very, very misleading because it gives the

21   impression to the jury that this is his computer before it was

22   seized and it isn't.  Just flat isn't.  And that is very

23   confusing.  Now, look, these jurors didn't leave their common

24   sense at the courtroom door.  They are entitled to take with

25   them into the jury room their common sense.  I have no problem

 1  whatsoever with you arguing to the jury that there are -- and

 2  they know from their own experience that there are instances

 3  where computers get viruses and get hacked.  That's fine, but

 4  to put a picture in that shows another computer at two years

 5  later getting a warning sign -- and by the way, we don't even

 6  know whether this is a legitimate warning sign.  Do you know

 7  that?

 8          MR. RICHARD BARTOLOMEI:  Your Honor, I didn't get to

 9  put it in because I wouldn't have been able to examine that, so

10  that would have been beyond the scope of the offer because I

11  wasn't permitted to put it in, so I couldn't develop that

12  legitimacy, that type of thing.

13          THE COURT:  We don't even know whether it's true.  One

14  of the big hacks -- I told you and this is just plain old --

15  the Court will take judicial notice of the fact that there are

16  fishing e-mails out there that replicate virus services like

17  MacAfee, which by the way I think -- is MacAfee the one that's

18  owned by the Russians?  That's Kapersky.  The Russians own the

19  Kapersky one.

20          MR. RICHARD BARTOLOMEI:  We'd like to call Mr. Muller.

21          THE COURT:  I know Bob Muller very well, believe me.

22  You want to come in my chambers, you'll see a picture of me and

23  Bob Muller together.  We've known each other for decades.

24          MR. RICHARD BARTOLOMEI:  That was the nature of my

25  offer, Your Honor.  You asked me about showing some other proof

1   and obviously I couldn't go into anything after that.

2           THE COURT:  What is the proof?  The proof is, Oh, this

3   happens?

4           MR. RICHARD BARTOLOMEI:  That is correct.

5           THE COURT:  You can tell them that it happens, but I'm

6   not going to put a picture in showing unknown PC or device

7   detected, leaving the jury with the impression that this was

8   this computer, which it isn't.  And as I said, we don't even

9   know whether this is legitimate.  Because what they do is --

10  you'll get a thing on your computer which will say your

11  computer has been compromised, click on here.  And then it

12  sends you either to an advertising site so you can buy

13  something or it will send you to a viral site where you can

14  find your computer has been attacked by them and then they want

15  money to unattack your computer.

16          MR. RICHARD BARTOLOMEI:  This one didn't have that,

17  but it may have been the next step.  I can't say.

18          THE COURT:  We don't know whether --

19          MR. RICHARD BARTOLOMEI:  The actual message doesn't

20  request money or anything else.

21          THE COURT:  It says, Open network map.  And if you hit

22  that, God only knows where it takes you.

23          MR. RICHARD BARTOLOMEI:  That's my point.  When you

24  asked me or you mentioned certain things --

25          THE COURT:  Well, if this is your point on appeal, I

 1   will agree with you that I did not let you get this in because

 2   it is more confusing, it is more prejudicial than it is

 3   probative.  And I have no problem, you arguing to the jury in

 4   closing -- I don't know whether you're going to do it or your

 5   brother is going to do it, but whoever does it, arguing that

 6   there are dozens of opportunities out there and people are

 7   always trying to get into people's computers and fish for their

 8   log in credentials.  There's no question about that.  I'll take

 9   judicial notice of that.  There isn't a single judge here

10   that -- I know a Supreme Court Justice, I know several of the

11   Supreme Court Justices well.  Justice Alito, Justice Breyer I

12   know, Sotomayor, Ginsburg.  They've all been out to Hawaii,

13   Chief Justice Roberts.  The only one actually I don't know is

14   Justice Kagan.  I know that one of the justices I know, as a

15   matter of fact, had a serious attack made on their computer

16   which fortunately they didn't fall for, but we discussed it

17   when he was in Hawaii.  So yes, you can make that argument, you

18   don't need this picture.

19            MR. RICHARD BARTOLOMEI:  Thank you, Your Honor.

20            THE COURT:  Next.

21            MR. RICHARD BARTOLOMEI:  That encompasses 7g as well,

22   correct?

23            THE COURT:  I don't know what 7g is.

24            MR. RICHARD BARTOLOMEI:  7g was the malicious spyware.

25            THE COURT:  What was the date on this?

1              MS. THOMPSON:  Your Honor, there's no date.  From the

2    bottom of the picture, it appears to be on a desktop computer.

3              THE COURT:  This is the one that was on the desktop

4    computer, we don't know whether it's legitimate or isn't

5    legitimate.  We have no date whatsoever, we don't know what

6    computer it came from.  Yeah, it's just not probative in this

7    case.

8              MR. RICHARD BARTOLOMEI:  I just wanted to make sure

9    that we had addressed both.

10             THE COURT:  You addressed both.  It isn't a bit

11   probative.  We don't know what computer, we don't know when, we

12   don't know where it came from.  We don't know whether it's

13   legitimate or it isn't legitimate.  This was one of the first

14   fishing scams that ever came out, I was told, and it's still

15   around because I get it all the time.

16             MR. EDWARD BARTOLOMEI:  Your Honor, when the Court was

17   giving its jury instruction --

18             THE COURT:  I didn't give a jury instruction.

19             MR. EDWARD BARTOLOMEI:  I mean explaining the

20   procedures to explain to the jury where we were in the time and

21   place of the court, Your Honor, we would object, Your Honor.

22             THE COURT:  To what?

23             MR. EDWARD BARTOLOMEI:  To the statements that this is

24   a very simple case, Your Honor, that it comes down to a

25   credibility issue, Your Honor.

1        THE COURT:  I said they find the evidence and they

2    find the credibility of the witnesses.  That's what I said.  It

3    isn't a complex case like a case that involves 25,000

4    documents, which I have had involving four months worth of

5    testimony and seven defendants.  You want me to clarify that to

6    the jury.  I'll be more than happy to.  I said they find the

7    facts.  I clarified and I said they find the facts -- can you

8    find that?

9        *(Off the record.)*

10                        *   *   *

11        *(Whereupon the court reporter read back the record*

12    *from page 5, lines 3 - 10:*

13        *"This is not that factually complicated a case.  There*

14    *are issues which they need to cover obviously, but this case is*

15    *largely a credibility case for you, who you believe and who you*

16    *don't believe and I don't think I'm telling you anything new*

17    *here.  You're going to find the facts and you're going to*

18    *decide who to believe and who not to believe.  And once we get*

19    *those closing arguments done, you're going to start to*

20    *deliberate.")*

21                        *   *   *

22        THE COURT:  I don't know what else I could say, find

23    the facts, apply the law to the facts and decide the

24    credibility of the witnesses.  Where did I go wrong?

25        MR. EDWARD BARTOLOMEI:  Well, Your Honor, I believe

1   that based on the way it was presented, that it was an unfair

2   comment on the weight of the evidence.

3           THE COURT:  Weight of the evidence?

4           MR. EDWARD BARTOLOMEI:  It's a very simple case, Your

5   Honor, credibility, Your Honor, those particular issues.

6           THE COURT:  I don't think that's the weight of the

7   evidence.  Federal judges, by the way, are allowed to comment

8   on the weight of the evidence.  I've never done it in my entire

9   career and I would never do it, but that is no comment on the

10  weight of the evidence.  I didn't say the government's case,

11  you both presented witnesses.

12          MS. THOMPSON:  You also didn't say it was a simple

13  case.  You said it wasn't a complicated case.

14          MR. EDWARD BARTOLOMEI:  I apologize.

15          THE COURT:  You and I both know what a complex case

16  is, this is not a complex case, but I'll be more than happy

17  when they come back in to clarify this.  And I've also

18  instructed them that nothing I say is to be construed by them

19  as any indication of what I believe the verdict should be.  I

20  think I told them that also, not in this instance.  It's in my

21  preliminary jury instructions.

22          MR. EDWARD BARTOLOMEI:  And Your Honor, also the

23  statements that contain the difference between the router, the

24  laptop, the Wifi and technical data that you commented and

25  directed in the --

1       THE COURT:  I was trying to explain to the lawyers

2  why -- I wasn't talking to the jury.  I was talking to counsel.

3  I was explaining to the lawyers why it was a confusing

4  question.

5       MR. EDWARD BARTOLOMEI:  Well, Your Honor, note our

6  objection for the record.  I believe that at that point in

7  time, Your Honor, that was an issue to be determined by the

8  jury and, at this point in time, may have constituted again a

9  comment on the weight of the evidence and actually appears,

10  Your Honor, to be testimony from the bench regarding an issue

11  in fact.

12       MS. THOMPSON:  I think the record should also reflect

13  that defense counsel misstated the evidence and

14  mischaracterized what the witness was saying and so the

15  government's perspective was the Court was stating facts, most

16  of which had already been testified to --

17       THE COURT:  These are uncontested.  Defense brought

18  out that there was -- here is the facts in this case that are

19  totally uncontested, that there was a password on the router

20  and there was no password on the laptop.  And that is a

21  favorable, favorable set of facts for the defendant.  It's

22  uncontested, totally uncontested in this case.  Nobody is

23  contesting it.  The government isn't going to get up and say

24  that computer had a password and only Mr. Michalik could get

25  into that computer.  They're not going to say that.  They

1    better not say it.  And nobody is going to say that the network

2    wasn't password protected because Mr. Michalik said it was

3    password protected in his own testimony.  So this is totally

4    uncontested.  And if that's the best you can do on appeal, if

5    there is a need for an appeal, heaven forbid for the defendant.

6    I don't think that was a comment on the weight of the evidence.

7    Those are totally uncontested facts and I was trying to fit

8    those facts into the question that was being asked which was

9    very, very confusing.  I know a little bit about computers,

10   just enough to be dangerous, I think.

11           MR. EDWARD BARTOLOMEI:  Yes, sir.

12           THE COURT:  And even I know that.

13           MR. EDWARD BARTOLOMEI:  Our objection for the record,

14   Your Honor.

15           THE COURT:  I don't know what the objection is, but

16   okay.  I'll try to clear that up again.  Remind me what these

17   two objections are.

18           COURTROOM DEPUTY CLERK:  Yes.

19           THE COURT:  Anything else?

20           MR. EDWARD BARTOLOMEI:  At this point in time, Your

21   Honor -- anything else, Richard?

22           MR. RICHARD BARTOLOMEI:  No.

23           MR. EDWARD BARTOLOMEI:  We renew our request for

24   directed verdict.

25           THE COURT:  I was going to remind you that you needed

1   to do that.  Right, Priscilla?

2          COURTROOM DEPUTY CLERK:  Yes.

3          MR. EDWARD BARTOLOMEI:  We renew our request for

4   directed verdict of acquittal, Your Honor.  We do not believe

5   that they've met the four elements necessary under the charges.

6   And specifically, Your Honor, once again interstate commerce

7   would be primary and knowledge would be the other, judge.

8          THE COURT:  So again for the same reasons which I have

9   previously denied the earlier motion, I deny this motion.

10  There is sufficient evidence when you take into account the

11  government's purported confession by the defendant.  That will

12  be for the jury to decide whether that was a confession or it

13  wasn't a confession, they've got to decide that.  And all of

14  the other circumstantial evidence which the government has -- I

15  understand the defense contests that obviously and that will be

16  what the jury believes or doesn't believe.  You know, I had a

17  big acquittal in this courtroom not that long ago in a big

18  case.  That was -- what's the guy's name?  Farthing.  And the

19  lawyer was jumping around.  I said I was absolutely fair in

20  this case.  And then when we took a recess, I said, The jury is

21  out, but I think this guy is going to get acquitted because he

22  did get a fair trial.  And guess what?  He got acquitted.  And

23  guess what?  The lawyer said, you know what, Judge, I apologize

24  because you did give my client a fair trial.

25          I guess if he would have been convicted, I wouldn't

1   have given him a fair trial, but anyway, what can you say.  You

2   got your objections on the record.

3            MR. EDWARD BARTOLOMEI:  And thank you, Your Honor.

4            MR. RICHARD BARTOLOMEI:  Thank you.  Your Honor, one

5   other quick thing.  If we were going to do a request for

6   reconsideration of the ruling of the motion to suppress, I'm

7   not sure that procedurally this would be the moment, but there

8   are two additional facts, but I think I can do that in some

9   kind of a post trial motion.

10           THE COURT:  Yeah, that's a post trial motion I think.

11           MR. RICHARD BARTOLOMEI:  Thank you.

12           THE COURT:  And it would be -- I mean if the motion to

13  suppress was granted, this case would go away, so it would

14  actually be a post trial motion for judgment for verdict of

15  acquittal which you can make yet again, if you wish, and you

16  would just include that in your motion.  I'll look at it

17  carefully, believe me.  I don't have any brief for any party in

18  these cases except to make sure that the defendant gets a

19  constitutionally fair trial with the proper presumption of

20  innocence.

21           MR. EDWARD BARTOLOMEI:  That would conclude the issues

22  from the defense, Your Honor.

23           THE COURT:  Thank you.

24           MR. EDWARD BARTOLOMEI:  And may I be seated?

25           THE COURT:  Yes.  You've already seen the

1    instructions, so we'll look at them now and try to settle them,

2    if we can.  We'll take a brief recess.

3              COURT SECURITY OFFICER:  All rise.

4         *(10:24 a.m.)*

5                          *   *   *

6         *(11:24 a.m.)*

7              COURT SECURITY OFFICER:  All rise.

8              THE COURT:  The Court would note the presence of

9    counsel, the absence of the jury.  I want to give you plenty of

10   time to have a chance to look at the proposed jury instructions

11   so we can proceed without further delay.

12             All right.  Are you ready to go?

13             MS. THOMPSON:  Yes, Your Honor.

14             MR. RICHARD BARTOLOMEI:  Yes, Your Honor.

15             THE COURT:  So here is what I do, the way I settle

16   these instructions and that is to read off the first few lines

17   and we start with the defense, you either say objection or no

18   objection.  Now, I need both counsel, I always say this, I know

19   you know this already, but I need to say it on the record.

20   Just because you submitted an instruction to me or you had a

21   different instruction or you objected to a government

22   instruction or a defense instruction doesn't mean anything.

23   You have to object here or your objection is waived and that's

24   because many times lawyers will relook at instructions and

25   sometimes I've modified instructions and they will determine

1   that the instruction that I have is better for their client

2   than the one that they proposed or had objected to, so it makes

3   no sense to have a whole bunch of useless objections flying

4   around clouding up the record, so you need to object if you

5   think there is an objection you need to make and then I need to

6   make a ruling, okay.  These are pretty fair instructions I

7   think.  So I don't think we're going to have too difficult a

8   time.

9           All right, the first instruction is In any jury trial,

10  there are in effect two judges.

11          Somebody has to speak for you.  You don't need to

12  stand up.  This is the one time you can remain seated.  Just

13  say either objection or no objection.

14          MR. EDWARD BARTOLOMEI:  No objection, Your Honor.

15          MS. THOMPSON:  No objection.

16          THE COURT:  The next instruction, You as jurors are

17  the judges of the facts.

18          MR. EDWARD BARTOLOMEI:  No objection, Your Honor.

19          MS. THOMPSON:  No objection.

20          THE COURT:  The next instruction was submitted by the

21  defendant and I've accepted it, The defendant has entered a

22  plea of not guilty to the charge in the indictment.  A plea of

23  not guilty is a complete denial of the charges.

24          MS. THOMPSON:  No objection.

25          MR. EDWARD BARTOLOMEI:  Definitely no objection, Your

 1   Honor.

 2          THE COURT:  Them first, you second, okay.  Next

 3   instruction is The indictment or formal charge against the

 4   defendant is not evidence of guilt.

 5          MR. EDWARD BARTOLOMEI:  No objection, Your Honor.

 6          MS. THOMPSON:  No objection.

 7          THE COURT:  The next instruction is, As I told you

 8   earlier, it is your duty to determine the facts.

 9          MR. EDWARD BARTOLOMEI:  No objection, Your Honor.

10          MS. THOMPSON:  No objection.

11          THE COURT:  The next instruction is, In considering

12   the evidence, you are permitted to draw such reasonable

13   inferences from the testimony, exhibits as you feel are

14   justified in the light of common experience.

15          MR. EDWARD BARTOLOMEI:  No objection with the request

16   for clarification, Your Honor.  Based on the motion prior to

17   the request for directed verdict, you indicated you were going

18   to address those two issues.

19          THE COURT:  What issues?

20          MR. EDWARD BARTOLOMEI:  The issue regarding the

21   computer, we talked about the tower.  Will this be the curative

22   instruction as to anything you said from the bench?

23          THE COURT:  I don't think that says anything about

24   that.

25          MR. EDWARD BARTOLOMEI:  That's what I was saying.

1          THE COURT:  This isn't it.  I'm going to tell them

2    myself.  I don't think I need a curative instruction, to be

3    honest with you, but I'm going to give one anyway.

4          MR. EDWARD BARTOLOMEI:  Thank you, Your Honor.

5          MR. RICHARD BARTOLOMEI:  Your Honor, I think that

6    comes later anyway, the instruction that talks about nothing I

7    have said was intended to --

8          THE COURT:  Right, but I'm still going to give it

9    verbally.

10         MR. EDWARD BARTOLOMEI:  Thank you, Judge.  Then no

11   objection.

12         MS. THOMPSON:  No objection from the government.

13         THE COURT:  The next instruction is number seven, I

14   remind you that it is your job to decide whether the government

15   has proved the guilt of the defendant beyond a reasonable

16   doubt.

17         MR. EDWARD BARTOLOMEI:  We have no objection with

18   that, Your Honor.

19         MS. THOMPSON:  No objection from the government.

20         THE COURT:  We're over to instruction number eight.

21   In determining whether any statement claimed to have been made

22   by the defendant outside of court and after the alleged crime

23   has been committed was knowingly and voluntarily made, you

24   should consider the evidence, consider such a statement with

25   great caution and great care.

1          MR. EDWARD BARTOLOMEI:  No objection, Your Honor.

2          MS. THOMPSON:  No objection.

3          THE COURT:  The ninth jury instruction, During the

4    trial, you've heard testimony of certain expert witnesses.

5    There was only actually one.  It should be, You heard testimony

6    of an expert witness.

7          MR. EDWARD BARTOLOMEI:  Your Honor, we have an

8    objection.  I noted that the language we requested in our

9    instruction would have been additional language, The testimony

10   and type of witness should be weighed the same as any other

11   witness, Your Honor.

12         THE COURT:  No, that's not in this instruction.

13         MR. RICHARD BARTOLOMEI:  Your Honor, I think what he's

14   referring to is ours had a little different language.  Your

15   sentence was you should judge such testimony like any other

16   testimony.  I think mine was a little more expanded.  That's

17   what we were referring to.  My language was, The testimony of

18   this type of witness should be weighed and its credibility

19   evaluated in the same way as that of any other witness.

20         THE COURT:  Well, this is the general instruction that

21   we give in every jury trial, so I'm going to give this one.  If

22   you want to lodge an objection, you can.

23         MR. RICHARD BARTOLOMEI:  That would be our objection.

24   And that was our suggested language, but I see where yours

25   differs.

1          THE COURT:  Well, it differs, but I don't think it's

2     less of an instruction.  I think it accurately reflects Fifth

3     Circuit law.  This is the Fifth Circuit pattern instruction and

4     I think it's been upheld many times.

5          MS. THOMPSON:  Your Honor, the government has no

6     objection and we just note it's a difference without a

7     distinction.

8          THE COURT:  Yes, okay.  So with the change from expert

9     witnesses to an expert witness, we're going to give this one.

10         The defendant has proposed an instruction on character

11    evidence and I'm going to give that instruction even though I

12    think it's somewhat redundant, but I'm going to go ahead and

13    give it.  And it starts where defendant is offered opinion

14    testimony concerning truth and veracity.  I don't think you

15    have an objection to it, it's your instruction.

16         MR. EDWARD BARTOLOMEI:  No objection.

17         THE COURT:  Do you have an objection?

18         MS. THOMPSON:  My only objection is with regard to

19    integrity or character as a law-abiding citizen.  I don't

20    believe that was testified to, but I do think the witness

21    testified to his opinion regarding the defendant's truth and

22    veracity, so I would just ask that truth, veracity and honesty

23    and then remove the other language.

24         THE COURT:  Well, I'm going to leave integrity in

25    because I believe he said that he thought he was a very great

1  guy, so that's kind of integrity, but you are right, there was

2  no specific question asked about law-abiding citizen.

3           MR. EDWARD BARTOLOMEI:  Your Honor, I believe there

4  was testimony, but I believe the Court instructed our first

5  witness, Mr. Just, Your Honor, when he expanded on

6  truthfulness, he was honest, he had integrity.  In that area

7  that came up and then the judge said we can't get into that and

8  then he said, well, he's truthful, Your Honor.  He did mention

9  he was a person of --

10          THE COURT:  I don't think so.  I don't remember that.

11          MS. THOMPSON:  I don't believe anything was elicited

12  regarding law-abiding citizen.  With that removed, I have no

13  objection.

14          THE COURT:  I don't remember ever telling somebody not

15  to testify whether they were a law-abiding citizen.

16          MR. EDWARD BARTOLOMEI:  No, Your Honor, it was a

17  running response to the initial question.

18          THE COURT:  I don't remember that, counsel, I'm sorry.

19  If I did, I would.  If I did remember it, I would.  I just

20  don't remember that.

21          MR. EDWARD BARTOLOMEI:  Again, Your Honor, that's my

22  recollection.

23          THE COURT:  Well, you might be right and I might be

24  wrong.  I just don't remember that ever coming up.  You want me

25  to see if I can have the reporter find it?

JURY TRIAL PROCEEDINGS                    46

```
1                          *   *   *
2              (Court reporter read back the record, August 28, 2019,
3      page 30, line 18 to page 31, line 9:
4      BY MR. EDWARD BARTOLOMEI:
5      Q.   Now, you've known Jeffrey Michalik for how many years?
6      A.   Probably about 14 years now.
7      Q.   And during that period of time, have you had an opportunity
8      to form an opinion concerning his veracity or truthfulness?
9      A.   Yes.
10     Q.   How would you characterize his veracity and truthfulness?
11     A.   One thing I'd say about Jeff is --
12              THE COURT:  No.  One thing you would say is not the
13     appropriate way to answer that question.  You just need to
14     answer how you would characterize him.
15     A.   He's a good guy, honest guy, truthful.  I mean I consider
16     him a good guy.
17     Q.   Well, the question, do you consider him to be truthful?
18     A.   Yes.
19              MR. EDWARD BARTOLOMEI:  Nothing further, Your Honor.
20     Thank you.)
21                          *   *   *
22              MR. EDWARD BARTOLOMEI:  Your Honor, we believe
23     law-abiding is implicit since there was no evidence presented
24     by the government to the contrary.
25              THE COURT:  I think they have.  That's what this whole
```

1  case is about.

2          MR. EDWARD BARTOLOMEI:  Well, Your Honor, I would

3  separate the two since he -- we haven't determined that yet at

4  this point, Your Honor.

5          THE COURT:  I understand that, but you said there's

6  been no evidence and they've presented evidence that he had

7  child pornography, so that's not lawful.  I understand that

8  that's not been proven because that's for the jury to decide,

9  not me.  I'm not going to put -- there was no testimony at all

10  about or character as a law-abiding citizen.  There's been

11  testimony about his truth and veracity, honesty and I'm going

12  to give you integrity.

13          MR. EDWARD BARTOLOMEI:  Thank you, Your Honor.

14          THE COURT:  With that, other than your objection, is

15  any other problem with that instruction?

16          MR. EDWARD BARTOLOMEI:  We have no other objection.

17  Thank you, Your Honor.

18          THE COURT:  Any objection?

19          MS. THOMPSON:  No, Your Honor.

20          THE COURT:  Instruction number eleven is, The

21  testimony of witness may be discredited or impeached by showing

22  that the witness testified falsely or by evidence that at some

23  other time the witness said or did something or failed -- and

24  it goes on.  Any objection to that instruction?

25          MR. EDWARD BARTOLOMEI:  May I just look at ours for

1    one second, Your Honor?

2           THE COURT:  Sure.

3             *(Pause.)*

4           MR. EDWARD BARTOLOMEI:  No, Your Honor, we don't have

5    an objection.

6           MS. THOMPSON:  No objection.

7           THE COURT:  Now, I might add that the proposed --

8    looking back at the previous instruction, I didn't give your

9    proposed instruction because I gave a much broader instruction.

10   The one that you proposed says, You have heard testimony of --

11   that would have been Mr. Just.  You also heard testimony from

12   others concerning the opinion about whether the witness is a

13   truthful person, the witness's reputation in the community,

14   where the witness lives, for telling the truth, it is up to you

15   to decide from what you heard here whether blank was telling

16   the truth at trial.

17           You didn't say anything about lawfulness.

18           MR. RICHARD BARTOLOMEI:  It escaped my attention.

19           THE COURT:  Well, you got a better instruction for you

20   than the one you proposed.

21           MR. RICHARD BARTOLOMEI:  I'll take that.  Thank you.

22           THE COURT:  Instruction number 12, you will note that

23   the indictment charges that the offense was committed on or

24   about a specified date.

25           MR. RICHARD BARTOLOMEI:  And that's part of the

1  confusion in this case.  Where they are claiming things came in

2  and they -- first of all, there's a question regarding Amateur

3  Lover.  The government has conceded through two witnesses that

4  Amateur Lover, they never found anything on the computer, so of

5  course the question becomes why they need to put in these

6  pictures, but the other aspect of it is it's on a specific --

7          THE COURT:  I think he identified two pictures, isn't

8  that the one where he identified two pictures?  That's why they

9  get to put it in because he identified them as pictures,

10  according to the government, that he saw.  That's why they get

11  to put it in, or he had viewed on the computer.  But let's go

12  on.  We're settling instructions.  Let's not argue about

13  evidence here.

14          It said "crimes".  It's "crime".

15          MS. THOMPSON:  There's also the rest of that sentence

16  says "near the dates stated in the indictment" and there's only

17  one date.

18          THE COURT:  Yes, the indictment sets out the number of

19  dates.  This is the general --

20          MR. RICHARD BARTOLOMEI:  I understand.

21          THE COURT:  This is not some special instruction for

22  this case.  This is general federal law.

23          MR. RICHARD BARTOLOMEI:  Well, I'm arguing for the

24  exception, but you understand what I'm saying is that where

25  they have elected to plead and indict under 12 and, of course,

1  the young ladies that are shown in five are clearly not under

2  12.

3           THE COURT:  Which one?  Five?

4           MR. RICHARD BARTOLOMEI:  The two images of the girls

5  that he apparently was supposed to have --

6           MS. THOMPSON:  It is not clear that those two images

7  do not depict children under the age of 12.

8           THE COURT:  That will be for the jury to decide

9  whether they are under 12, not for me to decide.  If I try to

10  decide they were under 12, I'd become the jury.  I've tried

11  these cases without a jury, but not in this case.  That's for

12  them to decide, not me or the government for that matter.

13           MR. RICHARD BARTOLOMEI:  We were looking for a

14  specific date because the computer seized on that date --

15           THE COURT:  This has nothing to do with that.  The

16  government only has to prove on or about a certain date that he

17  possessed child pornography, doesn't have to be a certain date.

18  Now, you can certainly argue that the government said he did it

19  at this time and it's clear that he -- I know you're going to

20  argue that he wasn't around.  That was that whole can it be

21  downloaded at a certain time.  And she's going to argue that he

22  doesn't have to be present for this stuff to be downloading.

23  Fine, that's an argument you are certainly and absolutely

24  entitled to make, but that has nothing to do with this.

25           MR. RICHARD BARTOLOMEI:  I appreciate it, Your Honor.

1    I simply lodged our objection.  I believe it should be on a

2    specific date.

3            THE COURT:  Do you think he has any merit to that

4    argument?

5            MS. THOMPSON:  No.

6            THE COURT:  Well, you know, it's in the government's

7    interest, if they think they've got a strong case and they're

8    going to get a conviction, they don't want me to give an

9    instruction that's error, I would hope.

10           Look, I had a huge fight with an AUSA in Honolulu,

11   good friend of mine actually, and I would not let evidence in.

12   Actually it was a terrible case.  It was a case involving a

13   rape and molestation by a hospital employee at Tripler Army

14   Medical Center of women in the ICU, if you can imagine such a

15   thing, and I refused to let him have an instruction that he

16   wanted and I refused to let certain evidence in and he was

17   furious.  Well, the defendant was convicted and a week later,

18   the Ninth Circuit came down with a decision reversing another

19   conviction where that very evidence came in.  So it's not in

20   the government's interest to have evidence come in that's going

21   to cause a reversal for many reasons.  The government is

22   supposed to be here trying to do justice, not to get a

23   conviction.  So now, where they believe that justice is done

24   with a conviction, that's fine.  That's what we're talking

25   about here, but not to try to sneak some instruction in.  But I

1  believe that this is still a credible instruction because there

2  are many dates where he's proffered to have done that.  And if

3  the suggestion is that, you know, the jury finds, well, he

4  didn't download pornography on June 8th, but he actually

5  downloaded it -- I'm using hypothetical dates -- June 9th and

6  we find beyond a reasonable doubt that he did that, he can be

7  convicted even though the indictment might say June 8th.  That

8  doesn't mean that you can't argue that they said it happened on

9  June 8th and it could not have possibly happened on June 9th,

10  then they wouldn't find that it happened on June 9th.  You see?

11  So that's why that argument is somewhat fallacious.

12        MR. RICHARD BARTOLOMEI:  The only thing is it's going

13  to tie in with your next instruction, so I might --

14        THE COURT:  We'll talk about that one.  Instruction

15  number 13, You are here to decide whether the government has

16  proved beyond a reasonable doubt that the defendant is guilty

17  of the crime charged.  The defendant is not on trial for any

18  act, conduct or offense not alleged in the indictment.  Neither

19  are you called upon to return a verdict as to the guilt of any

20  other person or persons not on trial as a defendant in this

21  case except as you were otherwise instructed.

22        And I'm not otherwise instructing them, so that is our

23  standard instruction.  I don't know what's wrong with that

24  instruction.  That's a defense centric instruction.  I mean we

25  don't want them to find him guilty because they determine on

1   their own that Mr. Smith, Dave Smith downloaded child

2   pornography.

3           MR. RICHARD BARTOLOMEI:  Well, so I could address

4   that.

5           THE COURT:  There's been no evidence of that.

6           MR. RICHARD BARTOLOMEI:  There's been no evidence that

7   we're allowed to get into, but anyway.

8           THE COURT:  I don't think there's been any evidence of

9   it at all.  Go ahead.

10          MR. RICHARD BARTOLOMEI:  The indictment -- they do

11  have a specific date.  And the other thing that's interesting

12  about of course is --

13          THE COURT:  They always have a specific date.  That's

14  in every indictment.

15          MR. RICHARD BARTOLOMEI:  Finishing the other part I

16  was moving to --

17          THE COURT:  Okay.

18          MR. RICHARD BARTOLOMEI:  Or the minor had not attained

19  12 years of age.  Now, with reference to that, that's a

20  specific subset of the indictment that they have elected to

21  charge and that, because again I point out to the images which

22  there is no evidence he ever possessed and the government --

23  several witnesses have acknowledged are not on the computer, so

24  therefore, they have no relevance in that sense.  They don't

25  show they're under 12 --

1          THE COURT:  What does that have to do with this

2   instruction?

3          MR. RICHARD BARTOLOMEI:  The defendant is not on trial

4   for any act, conduct or offense not alleged in the indictment.

5          THE COURT:  Right.

6          MR. RICHARD BARTOLOMEI:  So -- well, all right.  Let

7   me skip to the end sentence.  Except as you are otherwise

8   instructed, I believe would be superfluous because it says

9   guilt of any other person or persons not on trial as a

10  defendant in this case.

11         THE COURT:  Yeah, I would agree with you.  We don't

12  need to have that in there.  That's just standard language.

13         MR. RICHARD BARTOLOMEI:  And I understand, Judge, I

14  do.

15         THE COURT:  So we'll take that out.  I agree with you.

16  That's fine.

17         MS. THOMPSON:  No objection.

18         THE COURT:  Instruction number 14.  If the defendant

19  is found guilty, it will be my duty to decide what the

20  punishment will be.  You should not be concerned with

21  punishment in any way.  It should not enter your consideration

22  or discussion.

23         MR. EDWARD BARTOLOMEI:  No objection, Your Honor.

24         MS. THOMPSON:  No objection.

25         THE COURT:  Instruction number 15.  Title 18 U.S. Code

1    2252A(a)(5)(B).  This is the standard Fifth Circuit instruction

2    on this.

3              MR. EDWARD BARTOLOMEI:  One brief moment, Your Honor.

4              THE COURT:  Sure.

5              *(Pause.)*

6              And I've added in, by the way, something that you

7    asked me to add in, the defense asked to be added in, I've

8    added in, even though I don't have to, I've done it anyway,

9    which is two paragraphs, If you find the government has proved

10   all these elements beyond a reasonable doubt, the defendant is

11   guilty of the crime of possession.  If you find the government

12   has not, has failed to prove -- and then you had a typo, but

13   I've added "not guilty".  Those two paragraphs.

14             MR. RICHARD BARTOLOMEI:  I remember the typo.

15             THE COURT:  I've added those two paragraphs that

16   you've requested even though technically I'm not required to do

17   so, so this is as modified by you.  So I assume you don't have

18   any objection to it.

19             MR. RICHARD BARTOLOMEI:  No.

20             THE COURT:  Do you have any objection?

21             MS. THOMPSON:  No, Your Honor.

22             MR. RICHARD BARTOLOMEI:  Have we gone to 15?

23             THE COURT:  This was 15.

24             MR. RICHARD BARTOLOMEI:  That's what I'm saying, we're

25   at 15.

1           THE COURT:  Yes.  You have no objection to 15, so
2    let's go to --
3           MR. RICHARD BARTOLOMEI:  I just wanted to point out,
4    we're not going to get an instruction about he had to know it
5    moved in interstate commerce, that's not --
6           THE COURT:  You are not getting an instruction because
7    that isn't the law.  Do you have any law that shows me -- if
8    you can show me a case that says that in order to be convicted
9    of this crime, he had to know that it moved in interstate
10   commerce, I'd give that instruction in a heartbeat, but there
11   isn't such a case.  It's no different than firearms.
12          MR. RICHARD BARTOLOMEI:  Well, the only reason I
13   mention that, there's a case U.S. v. Colavita (ph), I believe
14   it's out of the Ninth Circuit where -- and you probably
15   remember the case because the interesting thing about it is
16   they seemed to suggest that you do have to have knowledge that
17   it moves in interstate commerce, except the guy pled guilty, so
18   they said it's not a problem because he entered a plea.
19          THE COURT:  If the Ninth Circuit would have said that,
20   they would have been reversed by the Supreme Court.  This is no
21   different than firearms.  I wrote an opinion on the firearms
22   for the Ninth Circuit involving the question of if you go in
23   today to buy a firearm at one of the stores that still sells
24   them, some of them don't anymore, but if you went in to buy a
25   firearm and you were a felon, okay, and you bought that firearm

1   and you went home and you got caught with it, it is not a

2   defense that you didn't know that that firearm traveled in

3   interstate commerce.  They have to prove that it traveled in

4   interstate commerce, but it isn't a defense that he didn't know

5   that it traveled in interstate commerce.  It's not even a

6   defense that he thought it was made in Texas.  That wouldn't be

7   a defense either.  They do make guns in Texas, but if he bought

8   a Smith and Wesson, it probably wasn't made in Texas, probably

9   made in Hartford, Connecticut.

10          MR. RICHARD BARTOLOMEI:  I've learned one thing -- you

11   know, with all the debate about assault rifles, my assistant is

12   married to a detective who does the instruction.  He walked out

13   with a blank AR receiver which is the guts of the gun.  He

14   says, Look at this.  I said, okay.  He says, Do you see an ID?

15   No.  You see that top?  He says, All you have to do is cut it

16   out and you can make this gun a 50 caliber, 30 caliber and

17   there's no tracing --

18          THE COURT:  You can also turn an AR15 into an M16

19   without much difficulty either.  They do it in Mexico all the

20   time.

21          You haven't cited me any case that says that he has to

22   know that it traveled -- other than this case that doesn't

23   stand for that proposition.

24          MR. RICHARD BARTOLOMEI:  The only case I found was

25   U.S. versus Colavita (ph) and that was I believe out of the

1    Ninth Circuit, but I pointed out they said, well, yeah, that

2    would seem to appear that he has to know that, but then they

3    said but he pled guilty, so what difference does it make.

4           THE COURT:  Well, I don't know who these judges were,

5    but it would be dicta anyway and it's just a wrong statement of

6    the law.

7           MR. RICHARD BARTOLOMEI:  I didn't want to mislead the

8    Court.  I thought it was dicta too, but that was the only

9    authority I found specifically on point.

10          THE COURT:  I've never even had anybody raise that

11   argument.  They don't have to know.  So that's your objection.

12          MR. EDWARD BARTOLOMEI:  Your Honor, one point to that,

13   just for the record, the difference between a gun case and a

14   pornography case, Your Honor, I think are significant

15   especially based on the status of this record because in a gun

16   case the establishment of the manufacturer is generally and

17   clearly identified and known to be out of the state or out of a

18   particular location and that would be the distinction.

19          THE COURT:  We did have, however, testimony, they have

20   to prove that and we did have testimony from the agent about

21   the fact that these images were on the Internet and were from

22   other locations.  There was one testimony about one set of

23   images that were produced in Austin, but they also went up on

24   the Internet, I think.

25          MS. THOMPSON:  Correct, Special Agent Sean Mullen

1    identified five children, three different series and testified

2    that all of them had traveled in interstate commerce.

3              THE COURT:  Because he's found them everywhere.

4              MS. THOMPSON:  Correct.

5              MR. RICHARD BARTOLOMEI:  There's two other parts of

6    this instruction, if I may.

7              MR. EDWARD BARTOLOMEI:  As to that issue, I'll be

8    seated.

9              THE COURT:  You can't both talk at once.

10             MR. RICHARD BARTOLOMEI:  Page 19, very top of the

11   page, do they get an instruction on constructive possession?  I

12   don't believe they do.  And that would mean all reference to

13   constructive possession would come out.  And the other one is

14   you have at the top of 20, the term minor means any person

15   under the age of 18.

16             THE COURT:  Where are you?

17             MR. RICHARD BARTOLOMEI:  Top of page 19, directly or

18   through another person or persons is in constructive

19   possession.  I don't think they should get an instruction on

20   this case regarding constructive possession.  They haven't

21   demonstrated anything like that.  Top of page 19.

22             THE COURT:  I'm there.

23             MS. THOMPSON:  Your Honor, the facts in this case

24   support this instruction.  The defense put in that other people

25   had access to the laptop, so the instruction is appropriate

1   with regard to whether possession may be sole or joint.  There

2   was also only one user account on the computer, so everybody --

3   anybody who used it would use that one account.  With regard to

4   the term "minor", that's part of the statute and defined in the

5   statute.

6          THE COURT:  So I understand your objection, I'm going

7   to overrule the objection, counsel, so your objection is there.

8          MR. RICHARD BARTOLOMEI:  Okay, but the "minor" part is

9   under 18 when they're only charged with under 12.

10         THE COURT:  If you're under 12, you're certainly under

11  18.

12         MR. RICHARD BARTOLOMEI:  Yes.

13         THE COURT:  By my calculation.

14         MR. RICHARD BARTOLOMEI:  Yes, but it actually

15  instructs the opposite which is you can go up to 18 instead of

16  under 12, which means you can go outside the scope --

17         THE COURT:  I don't think that's right, but anyway go

18  ahead.

19         MS. THOMPSON:  That is not correct at all and your

20  second element specifically says the child pornography involved

21  a prepubescent minor or a minor that had not yet attained the

22  age of 12 years.  The definition is just explaining what minor

23  means.  The element that has to be proven specifically states

24  it has to be prepubescent or under 12.  They are not

25  inconsistent at all and not misleading.

1          MR. RICHARD BARTOLOMEI:  Your Honor, what I'm saying

2   is it's like a Venn Diagram.

3          THE COURT:  Where are we?

4          MR. RICHARD BARTOLOMEI:  Top of page 20.  It's like a

5   Venn Diagram.  They've indicted under 12, so it's a small

6   circle in the large circle of the statute, so they're limited

7   to the small circle.  They're limited to --

8          THE COURT:  Wouldn't it be easier -- your case rests

9   on under 12.  That's what you charged him with, right?

10          MS. THOMPSON:  Yes.

11          THE COURT:  Wouldn't it be easier if we say for

12   purposes of this case, minor means any person under the age of

13   12.

14          MS. THOMPSON:  I think that's a misstatement.  I think

15   minor --

16          THE COURT:  I said for purposes of this case.  It

17   would generally be a misstatement, of course.

18          MS. THOMPSON:  I don't think that clarification is

19   necessary.  Everywhere that we talk about the element that has

20   to be proven, it specifies prepubescent minor.  It tells you

21   what kind of minor.  A minor is anybody under the age of 18.

22   The definition of minor has nothing to do with the elements

23   that the government has to prove beyond a reasonable doubt.

24          THE COURT:  I know, but so what's the harm?

25          MS. THOMPSON:  I think that could be problematic --

1          THE COURT:  Why?

2          MS. THOMPSON:  -- later because you're changing the

3    definition of minor and that is a general definition.

4          THE COURT:  Later?  What do you mean later?  There is

5    no later.  This case.

6          MS. THOMPSON:  Well, if he were to be convicted and

7    this goes up on appeal, the Court has changed the definition of

8    minor.  You could take out that sentence, although I think

9    minor as a pretty --

10         THE COURT:  Actually we talk about the specifics --

11   let's just remove that sentence because we talk about the

12   elements.  There's no need to have it there, it's redundant in

13   a way.  Because it's, First the defendant knowingly possessed

14   an item that contains an image of child pornography as alleged

15   in the indictment, second, the child pornography of

16   prepubescent minor or a minor that had not yet attained the age

17   of 12.  It's there, we don't need to have it anyplace else.

18         MS. THOMPSON:  I do not object to the sentence being

19   removed.

20         THE COURT:  Let's just remove the sentence.  It's

21   redundant and we don't need it.  Let's just take it out, The

22   term "minor" means any person under the age of 18.  We're just

23   going to remove that.

24         Usually we get these indictments and there's a couple

25   of counts and one count is just the child pornography, which

1  would mean anybody up to 17 --

2          MS. THOMPSON:  Eighteen.

3          THE COURT:  That's right, 18.  Then we would get a

4  specific other count because they had both.  They have these

5  16-year-olds and then they have the five year-olds.  Okay.

6  We're over to page 22 on number 16.

7          MR. EDWARD BARTOLOMEI:  Your Honor, I object to page

8  23, the conclusion of 22, Your Honor.

9          THE COURT:  What?  Where are we?

10         MR. EDWARD BARTOLOMEI:  The instruction carries over

11 to page 22, Your Honor, and our objection addresses 23, page

12 23.

13         THE COURT:  Right.  What do you object on page 23?

14         MR. EDWARD BARTOLOMEI:  I believe, Your Honor, the

15 bold acclamation as a matter of law constitutes an unfair

16 comment on the weight of the evidence.

17         THE COURT:  What is that?  What are you reading?  Give

18 me some specific.

19         MR. EDWARD BARTOLOMEI:  The last sentence, I instruct

20 you, in bold type.

21         THE COURT:  I bold it so we could discuss it.  Now, do

22 we have any law that says one way or the other about visual

23 depictions that have traveled -- moved in interstate or foreign

24 commerce?

25         MS. THOMPSON:  Yes, there is a body of law that holds

1   that, in fact, U.S. v. Winkler from the Fifth Circuit is one of

2   them that came from Judge Rodriguez's courtroom, that visual

3   depictions that have traveled on the Internet have moved in

4   interstate and foreign commerce.  I do not have a problem

5   taking that sentence out, though, because I think it's already

6   stated in there, that on page 22 where you say, The Internet is

7   considered a facility or means of interstate commerce.  I think

8   that's highlighting that part.

9           THE COURT:  So this is actually I believe -- my

10  recollection is this is a correct statement of the law, so

11  you're saying it isn't.  Do you have a case that says it isn't?

12  Mr. Bartolomei, do you have a case that states?

13          MR. EDWARD BARTOLOMEI:  I have Winkler here.

14          THE COURT:  Why don't you review it.  Take a minute.

15          MR. EDWARD BARTOLOMEI:  Thank you, Your Honor.

16           (Pause.)

17          MS. THOMPSON:  Your Honor, I do believe it's a correct

18  statement of the law, but I do not have a problem removing that

19  last sentence.

20          MR. EDWARD BARTOLOMEI:  We don't object if they don't

21  object.

22          THE COURT:  Well, the problem is -- who is going to

23  make the closing argument?

24          MR. EDWARD BARTOLOMEI:  We'll split time.

25          THE COURT:  Okay.  So the problem is if somebody gets

1    up and says, They have to prove beyond a reasonable doubt that

2    the article -- not just that the article transferred, was on

3    the Internet, but that this specific article traveled in

4    interstate commerce.

5              And that's going to be a problem because you're going

6    to jump up and object and say, Wait a minute, the fact that

7    it's on the Internet is as a matter of law interstate commerce.

8    So you see what I'm saying?  We can't have that.  I need to

9    know one way or the other.  Just look at Winkler.  That's the

10   Fifth Circuit case and that's the one that counts.

11             MR. EDWARD BARTOLOMEI:  Yes, sir.

12             (Pause.)

13             THE COURT:  Do you have that case, Tracy?

14             MS. THOMPSON:  No, not with me.  I tried that case.

15   That's how I remember.

16             THE COURT:  This is obviously an argument that

17   somebody else made that, according to Ms. Thompson, didn't go

18   anywhere.

19             MR. RICHARD BARTOLOMEI:  The other thing, if I may

20   point out, because I have discussed it with Ed Bartolomei, it

21   seems to say more than an instruction of the law, it reads as

22   if it is already determined.  They still have to prove it, but

23   it reads as if it's already determined and they don't have to

24   consider that.  So that's the only other question we had

25   amongst ourselves.  But pointing out if we strike that, then we

1    don't have an objection.

2          THE COURT:  Just a minute.

3          *(Pause.)*

4          Yes, Winkler clearly states without equivocation that

5    in U.S. versus Runyon which is a Fifth Circuit case also,

6    affirming a conviction where the government adduced adequate

7    circumstantial evidence to tie particular images of child

8    pornography to the Internet, therefore, the evidence at trial

9    is sufficient to support Winkler's conviction on count five.

10   That's it.

11         MR. EDWARD BARTOLOMEI:  That's a sufficiency issue,

12   it's not necessarily a matter of law that it's in interstate

13   commerce.

14         THE COURT:  But Winkler's argument was that just

15   because it was on the Internet the government had to prove

16   more.  And the Fifth Circuit said no, they just needed to tie

17   the images to the Internet through direct or circumstantial

18   evidence.

19         MR. EDWARD BARTOLOMEI:  Well, it's redundant, number

20   one, Your Honor, because I think it's discussed earlier in the

21   instruction, and secondly, more importantly, the way it's

22   manifested and presented in bold type --

23         THE COURT:  No, it wouldn't be in bold type.  It was

24   only in bold type because I wanted to draw it to your

25   attention, in fairness, I didn't want to just breeze past it.

1   No good deed goes unpunished, right?

2           MR. EDWARD BARTOLOMEI:  No, Your Honor, many times

3   good deeds are blessed.

4           MS. THOMPSON:  Perhaps it would alleviate their

5   concern if you took out the beginning of that sentence and just

6   started with visual depictions that have traveled on the

7   Internet have moved in interstate and foreign commerce.  And

8   therefore, you're not telling them that you're instructing them

9   as a matter of law, although you really are.  But it doesn't

10  highlight that.

11          THE COURT:  Is that better for you?

12          MR. EDWARD BARTOLOMEI:  I don't think so, Your Honor.

13          THE COURT:  Do we have the actual Winkler case?

14          MR. EDWARD BARTOLOMEI:  I have it, Judge, right here.

15  May I approach?

16          THE COURT:  You certainly may.

17          MR. EDWARD BARTOLOMEI:  I give it to you highlighted.

18          *(Pause.)*

19          THE COURT:  He argued that it couldn't be sustained

20  because the images were found on his temporary storage on his

21  computer rather than -- I don't know what he did.

22          MS. THOMPSON:  There were a variety of computers in

23  that case.  And on one of the computers the files were found in

24  a temporary cache folder.

25          THE COURT:  That you can clean, but he apparently

 1   didn't clean it.

 2           MS. THOMPSON:  Correct.  Those files were linked to a

 3   website that he paid for access to.

 4           *(Pause.)*

 5           THE COURT:  They're talking about at the Eighth

 6   Circuit case which reversed a child pornography conviction

 7   where the government could only show that the defendant had in

 8   his temporary cache some pictures which were automatically

 9   downloaded to that temporary cache and it could have been that

10   the defendant clicked on an adult pornography site, some child

11   pornography popped up on his computer and he goes, Oh, my God,

12   and got out of there immediately and it would have been stored

13   anyway.  So I certainly agree with that and the government at

14   least in this district has never prosecuted a temporary cache

15   child pornography case that I'm aware of.  But that's not our

16   issue here because these were actually on the hard drive.

17   These weren't temporary cache cases.

18           *(Pause.)*

19           It says, Prosecutors, judges and juries have a duty to

20   safeguard as best they are able potential defendants when

21   receipt of child pornography might well have been truly

22   inadvertent.

23           Something I've said time and time again.  However, in

24   this case it showed that the defendant -- I mean the evidence

25   was that the child pornography was downloaded.

1              *(Pause.)*

2              It says, One cannot be guilty of possession of child

3    pornography for simply having viewed an image on a website

4    thereby causing the image to be automatically stored in the

5    browser cache.  And I don't think you've ever prosecuted a case

6    like that, have you?  No.  There's enough of the other ones to

7    prosecute.

8              *(Pause.)*

9              This is so interesting.  This almost mirrors our case

10   perfectly.  It says, Winkler makes a series of arguments

11   disputing the proof the government adduced showing that he

12   downloaded the files at issue in count five.  He relies on a

13   Wal-Mart store receipt showing that he purchased several items

14   with his credit card at 10:52 p.m. on December 21st, 2004.  He

15   argues that because the government's evidence showed the elicit

16   files in question were downloaded at 10:53 p.m. on the same

17   day, it would be impossible for him to be the person at the

18   computer downloading the files at the time.  And he claims that

19   there were virus problems on that computer several years ago

20   and he had not changed his password in 12 to 15 years.  He also

21   argues that the government failed to show that there had been

22   an after-hours opening of the office and so forth.  That's

23   really almost on all fours.

24             *(Pause.)*

25             Winkler also argues that his conviction on count five

1    should be reversed because the government offered no evidence

2    to show that any of the files alleged in count five had ever

3    traveled on the Internet or had otherwise moved in interstate

4    commerce, and thus, the government failed to prove the

5    jurisdictional element of the crime.  Winkler is incorrect.

6    Evidence at trial established that zip files in that case

7    housing the individual videos at issue in the count were

8    obtained from a website.  Evidence at trial further

9    demonstrated the files at issue in count five were extracted

10   from those zip files onto Winkler's hard drive, and thus, that

11   the files came to Winkler's computer from the Internet.  See

12   United States versus Runyon affirming conviction where the

13   government adduced adequate circumstantial evidence to tie

14   particular images of child pornography to the Internet.

15   Therefore, the evidence at trial was sufficient to support

16   Winkler's conviction on count five.  That's it.

17          But you're willing to do what now?  Remove that

18   sentence entirely?  I don't think we really need it anyway.

19          MS. THOMPSON:  Correct.  And as the Court stated, as

20   long as defense counsel is not going to argue something to the

21   contrary --

22          THE COURT:  You cannot get up there and argue that

23   just because they showed it was on the Internet, that isn't

24   interstate commerce.  Because that's not the law.  You can

25   certainly argue that if you believe they haven't showed that

1  they came from the Internet, if that's --

2          MR. RICHARD BARTOLOMEI:  That's part of the two

3  charged downloads.  The evidence is pretty clear that didn't

4  come from the Internet.

5          MS. THOMPSON:  That's not the evidence.  We don't know

6  where they came from, could have been the Internet, could have

7  been a thumb drive.

8          THE COURT:  But the thumb drive would have had to come

9  from the Internet, right?  Unless he admits that he or somebody

10  else that he knows who had access to the computer produced that

11  child pornography.  We've already got evidence that they

12  came -- the government has evidence that this pornography was

13  on the Internet.  That's where this pornography came from.  And

14  they can argue that and you can argue otherwise and it will be

15  for the jury to decide.

16          MR. RICHARD BARTOLOMEI:  Agent Nutt, if you remember,

17  I pressed, Yeah, probably.

18          THE COURT:  All I'm saying is you cannot argue as a

19  matter of law that if it was on the Internet, then that is not

20  proof that it traveled in interstate commerce, because you know

21  that.

22          MR. RICHARD BARTOLOMEI:  That part, I got.

23          THE COURT:  Let's get to the next one.  The term

24  "knowingly" as that term has been used from time to time which

25  means an act done voluntarily and intentionally and not because

1   of mistake or accident.

2            (Pause.)

3            Is this a hard one?

4            MR. EDWARD BARTOLOMEI:  Sorry, Judge, no.

5            MR. RICHARD BARTOLOMEI:  No objection.

6            MS. THOMPSON:  No objection.

7            THE COURT:  The next one is Guilty knowledge may not

8   be inferred solely from ownership or access to a computer where

9   the government claims possession of images of claimed child

10  pornography on a computer, the government must prove the

11  defendant had actual knowledge that there was child pornography

12  on the computer on the specific date of the offense.

13           MR. EDWARD BARTOLOMEI:  No objection.

14           THE COURT:  It really should be "on or about the

15  specific date of the offense".

16           MS. THOMPSON:  Yes, or just end it with child

17  pornography on the computer.

18           THE COURT:  I don't know where "the specific date of

19  the offense" comes from because that isn't -- whose instruction

20  is this?

21           MS. THOMPSON:  This is the defense.

22           THE COURT:  That's not right.

23           MS. THOMPSON:  And I think the case law supports the

24  concept.  I'm not aware of any court actually giving this as an

25  instruction, but I don't object with the change on that very

1   last sentence.

2           THE COURT:  See, Mr. Bartolomei is getting me to give

3   all these defense instructions that nobody has ever given

4   before.

5           MR. EDWARD BARTOLOMEI:  Thank you.

6           THE COURT:  So with that change, I'm going to give the

7   instruction.  I'm going to remove "on the specific date of the

8   offense" because they don't have to prove a specific date.

9           MR. EDWARD BARTOLOMEI:  No objection, Your Honor, as

10  to 26.

11          THE COURT:  To reach a verdict, whether it is guilty

12  or not guilty, all of you must agree.

13          MR. EDWARD BARTOLOMEI:  No objection, Judge.

14          MS. THOMPSON:  No objection.

15          THE COURT:  And okay, that's it.  One of the

16  instructions I say, Also do not assume from anything I may have

17  said or done during the trial that I have any opinion on any of

18  the issues in this case.  Except for the instructions to you on

19  the law, you should disregard anything I may have said during

20  the trial at arriving at your own verdict.

21          MR. RICHARD BARTOLOMEI:  I knew that that was in, when

22  we were discussing it earlier, I knew you had that instruction.

23          THE COURT:  I'm still going to give a specific

24  instruction.  Okay.  She's got to make those changes.  You

25  should have lunch now.  The verdict form is just a simple

1   verdict form.  It just says, We the jury in the above-captioned

2   case unanimously return the following verdicts.  As to count

3   one of the indictment, possession of child pornography, we, the

4   jury, unanimously find the defendant, Jeffrey Clinton Michalik

5   either guilty or not guilty.  And they strike one of the boxes.

6   Any objection to the verdict form?  This is not an

7   interrogatory verdict.

8          MS. THOMPSON:  There is no objection by the

9   government.

10          THE COURT:  This is a standard verdict form we use in

11   these cases.

12          *(Pause.)*

13          MR. EDWARD BARTOLOMEI:  Your Honor, as to the specific

14   age, Your Honor, to the age of 18 or under or are we at 12

15   because in that case you would have to find that it was child

16   pornography containing a child 12 years or younger.

17          THE COURT:  Possession of child pornography.

18          MS. THOMPSON:  He's only charged with the prepubescent

19   charge.  That's one of the elements.

20          THE COURT:  That's all he's charged with.  We don't

21   have to put that on the verdict form.

22          MR. EDWARD BARTOLOMEI:  All right.

23          THE COURT:  So the verdict form is okay.  Okay, we can

24   go off the record.

25          *(12:30 p.m., lunch recess.)*

```
 1                          *   *   *
 2          (1:56 p.m.)
 3          COURT SECURITY OFFICER:  All rise.
 4          THE COURT:  Please be seated.  Mr. Bartolomei, what
 5   would you like?
 6          MR. EDWARD BARTOLOMEI:  Yes, Your Honor, Priscilla was
 7   gracious enough to tell me about the general instruction at the
 8   opening regarding use of the notes.  And I've had instructions
 9   given generally from the bench that when they take their notes
10   back there, they're personal notes.
11          THE COURT:  Right, not to be shared.  I will remind
12   them of that.
13          MR. EDWARD BARTOLOMEI:  Thank you very much.
14                          *   *   *
15          COURT SECURITY OFFICER:  All rise for the jury.
16          THE COURT:  The Court would note the presence of the
17   ladies and gentlemen of the jury, all counsel, as well as, of
18   course, the parties, the defendant and the government's case
19   agent.
20          A couple of things, ladies and gentlemen, I want to
21   remind you of.  First of all, because there was an interaction
22   between myself and counsel during examination, you need to
23   remember that nothing which I say, nothing which I say is
24   evidence in this case and certainly is not intended in any way
25   to suggest to you what the evidence is.  You are the sole
```

1    finders of fact -- I can't see all of you here.

2           You are the sole finders of fact here and nothing that

3    I say is testimony or is a comment on the evidence, you should

4    always remember that.  And secondly, you know, when I said to

5    you that this is not a complex case, well, it really isn't a

6    complex case.  When I talk about complex case, I'm talking

7    about the case that involves six or seven defendants or lasts

8    two to three months or has 25 to 30,000 documents.  It was not

9    intended by me to suggest to you this wasn't an important case.

10   You know that I think that this is an important case to both

11   the government and the defendant and you are the finders of

12   fact and you will take the facts, you will find them and then

13   you will take the law as I instruct you in just a moment and

14   then you will reach your verdict on that basis.  You are the

15   sole finders of fact, nobody else, so you just need to remember

16   that.  I always remind the jury about that.

17          I also will remind you that the notes that you have

18   taken during the evidentiary phase of this case are for your

19   use only and they're not to be shared with other members of the

20   jury, okay.  All right.  Okay.

21          Now, it's my job to instruct you on the law.  That's

22   my constitutional duty.  You don't take notes because you don't

23   need to take notes because I will send in a couple of copies of

24   the jury instructions with you.  Okay.  And you'd have to be a

25   real good note taker to take notes anyway.  My law clerk, my

1  career law clerk, Laura Cauley, is going to read the jury

2  instructions to you as a favor to me because my voice just

3  won't work this weekend if I try to read them and with the

4  concurrence of the parties.  But it's my instructions.  She's

5  just reading them for me, okay.  Laura, are you ready?

6          MS. CAULEY:  Yes.  Members of the jury, in any jury

7  trial there are in effect two judges.  I am one of the judges,

8  the other is the jury.  It is my duty to preside over the trial

9  and to decide what evidence is proper for your consideration.

10  It is also my duty at the end of the trial to explain to you

11  the rules of law that you must follow in applying and arriving

12  at your verdict.  First I will give you some general

13  instructions which apply in every case.  For example,

14  instructions about burden of proof and how to judge the

15  believability of witnesses.  Then I will give you some specific

16  rules of law about this particular case.  And finally, I will

17  explain to you the procedures you should follow in your

18  deliberations.  You as jurors are the judges of the facts, but

19  in determining what actually happened, that is in reaching your

20  decision as to the facts, it is your sworn duty to follow all

21  of the rules of law as I explain them to you.  You have no

22  right to disregard or give special attention to any one

23  instruction or to question the wisdom or correctness of any

24  rule I may state to you.  You must not substitute or follow

25  your own notion or opinion as to what the law is or ought to

1    be.  It is your duty to apply the law as I explain it to you

2    regardless of the consequences.  It is also your duty to base

3    your verdict solely upon the evidence without prejudice or

4    sympathy.  That was the promise you made in the oath you took

5    before being accepted by the parties as jurors and they have

6    the right to expect nothing less.

7            The defendant has entered a plea of not guilty to the

8    charge in the indictment.  The plea of not guilty is a complete

9    denial of the charges.

10           The indictment or formal charge against the defendant

11   is not evidence of guilt.  Indeed the defendant is presumed by

12   the law to be innocent.  The defendant begins with a clean

13   slate.  The law does not require a defendant to prove his

14   innocence.  The government has the burden of proving a

15   defendant guilty beyond a reasonable doubt.  And if it fails to

16   do so, you must acquit the defendant.  While the government's

17   burden of proof is a strict or heavy burden, it is not

18   necessary that the defendant's guilt be proof beyond all

19   possible doubt.  It is only required that the government's

20   proof exclude any reasonable doubt concerning the defendant's

21   guilt.  A reasonable doubt is a doubt based upon reason and

22   common sense after careful and impartial consideration of all

23   the evidence in the case.  Proof beyond a reasonable doubt,

24   therefore, is proof of such a convincing character that you

25   would be willing to rely and act upon it without hesitation in

1  making the most important decisions of your own affairs.

2          As I told you earlier, it is your duty to determine

3  the facts.  To do so, you must consider only the evidence

4  presented during the trial.  Evidence is the sworn testimony of

5  the witnesses including stipulations and the exhibits.  The

6  questions, statements, objections and arguments made by the

7  lawyers are not evidence.  The function of the lawyers is to

8  point out those things that are most significant or most

9  helpful to their side of the case and in so doing to call your

10 attention to certain facts or inferences that might otherwise

11 escape your notice.  In the final analysis, however, it is your

12 own recollection and interpretation of the evidence that

13 controls in the case.  What the lawyers say is not binding upon

14 you.

15          During the trial, I sustained objections to certain

16 questions.  You must disregard those questions.  Do not

17 speculate as to what the witness would have said if permitted

18 to answer the question.  Also certain testimony or other

19 evidence has been ordered removed from the record and you have

20 been instructed to disregard this evidence.  Do not consider

21 any testimony or other evidence that has been removed from your

22 consideration in reaching your decision.  Your verdict must be

23 based solely on the legally admissible evidence and testimony.

24          Also do not assume from anything I may have done or

25 said during the trial that I have any opinion concerning any of

1    the issues in this case.  Except for the instructions to you on

2    the law, you should disregard anything I may have said during

3    the trial in arriving at your own verdict.

4              In considering the evidence, you are permitted to draw

5    such reasonable inferences from the testimony and exhibits as

6    you feel are justified in the light of common experience.  In

7    other words, you may make deductions and reach conclusions that

8    reason and common sense lead you to draw from the facts which

9    have been established by the evidence.  Do not be concerned

10   about whether evidence is direct evidence or circumstantial

11   evidence.  You should consider and weigh all of the evidence

12   that was presented to you.  Direct evidence is the testimony of

13   one who asserts actual knowledge of a fact such as an

14   eyewitness.  Circumstantial evidence is proof of a chain of

15   events and circumstances indicating that something is or is not

16   a fact.  The law makes no distinction between the weight to be

17   given either direct or circumstantial evidence.  The law

18   requires that you, after weighing all of the evidence, whether

19   direct or circumstantial be convinced of the guilt of the

20   defendant beyond a reasonable doubt before you can find him

21   guilty.  I remind you that it is your job to decide whether the

22   government has proved the guilt of the defendant beyond a

23   reasonable doubt.  In doing so, you must consider all of the

24   evidence.  This does not mean, however, that you must accept

25   all of the evidence as true or accurate.  You are the sole

JURY TRIAL PROCEEDINGS                    81

 1   judges of the credibility or believability of each witness and
 2   the weight to be given to the witness's testimony.
 3          An important part of your job will be making judgments
 4   about the testimony of the witnesses including the defendant
 5   who testified in this case.  You should decide whether you
 6   believe all, some part or none of what each person had to say
 7   and how important that testimony was.  In making that decision,
 8   I suggest that you ask yourself a few questions.  Did the
 9   witness impress you as honest?  Did the witness have any
10   particular reason not to tell the truth?  Did the witness have
11   a personal interest in the outcome of the case?  Did the
12   witness have any relationship with either the government or the
13   defense?  Did the witness seem to have a good memory?  Did the
14   witness clearly see or hear the things about which he or she
15   testified?  Did the witness have the opportunity and ability to
16   understand the questions clearly and answer them directly?  Did
17   the witness's testimony differ from the testimony of other
18   witnesses?
19          These are a few of the considerations that will help
20   you determine the accuracy of what each witness said.  The
21   testimony of the defendant should be weighed and his
22   credibility evaluated in the same way as that of any other
23   witness.  Your job is to think about the testimony of each
24   witness you have heard and decide how much you believe of what
25   each witness had to say.  In making up your mind in reaching a

1    verdict, do not make any decisions simply because there were

2    more witnesses on one side than on the other.  Do not reach a

3    conclusion on a particular point just because there were more

4    witnesses testifying for one side on that point.  You will

5    always bear in mind that the law never imposes upon a defendant

6    in a criminal case the burden or duty of calling any witnesses

7    or producing any evidence.

8            In determining whether any statement, claims have been

9    made by the defendant outside of court and after an alleged

10   crime has been committed was knowingly and voluntarily made,

11   you should consider the evidence concerning such a statement

12   with caution and great care.  You should give such weight to

13   the statement as you feel it deserves under all the

14   circumstances.  You may consider in that regard such factors as

15   the age, sex, training, education, occupation and physical and

16   mental condition of the defendant.  His treatment while under

17   interrogation and all the other circumstances and evidence

18   surrounding the making of the statement.

19           During the trial, you heard the testimony of an expert

20   witness who expressed opinions in this case.  If scientific,

21   technical or other specialized knowledge might assist the jury

22   in understanding the evidence or in determining a fact in

23   issue, a witness qualified by knowledge, skill, experience,

24   training or education may testify and state an opinion

25   concerning such matters.  Merely because such a witness has

1    expressed an opinion does not mean, however, that you must

2    accept this opinion.  You should judge such testimony like any

3    other testimony.  You may accept it or reject it and give it as

4    much weight as you think it deserves, considering the witness's

5    education and experience, the soundness of the reasons given

6    for the opinion and all other evidence in this case.

7              Where a defendant is offered opinion testimony

8    concerning truth and veracity and honesty and integrity, you

9    should consider such evidence along with all the other evidence

10   in the case.  Evidence of a defendant's character, inconsistent

11   with those traits of character ordinarily involved in the

12   commission of the crime charged may give rise to a reasonable

13   doubt, since you may think it improbable that a person of good

14   character with respect to those traits would commit such a

15   crime.

16             The testimony of a witness may be discredited by

17   showing that the witness testified falsely or by evidence that

18   at some other time the witness said or did something or failed

19   to say or do something which is inconsistent with the testimony

20   the witness gave at this trial.

21             Earlier statements of a witness were not admitted in

22   evidence to prove that the contents of those statements are

23   true.  You may not consider the earlier statements to prove

24   that the content of an earlier statement is true.  You may only

25   use earlier statements to determine whether you think the

1  earlier statements are consistent or inconsistent with the

2  trial testimony of the witness and, therefore, whether they

3  affect the credibility of that witness.  If you believe that a

4  witness has been discredited in this manner, it is your

5  exclusive right to give the testimony of that witness whatever

6  weight you think it deserves.

7          You will note that the indictment charges that the

8  offense was committed on or about a specific date.  The

9  government does not have to prove that the crime was committed

10  on that exact date so long as the government proves beyond a

11  reasonable doubt that the defendant committed the crime on a

12  date reasonably near the date stated in the indictment.

13          You are here to decide whether the government has

14  proved beyond a reasonable doubt that the defendant is guilty

15  of the crime charged.  The defendant is not on trial for any

16  act, conduct or offense not alleged in the indictment.  Neither

17  are you called upon to return a verdict as to the guilt of any

18  other person or persons not on trial as a defendant in this

19  case.

20          If the defendant is found guilty, it will be my duty

21  to decide what the punishment will be.  You should not be

22  concerned with punishment in any way.  This should not enter

23  your consideration or discussion.

24          Title 18, United States Code, Section 2252A(a)(5)(B)

25  makes it a Federal crime for any person to knowingly possess

1  any material that contains an image of child pornography as

2  defined in Title 18, United States Code, Section 2256(8) that

3  involved a prepubescent minor or a minor that had not attained

4  12 years of age and that has been shipped or transported using

5  any means or facility of interstate or foreign commerce or that

6  was produced using materials that have been mailed or shipped

7  in or affecting interstate commerce by any means including by

8  computer.

9           For you to find the defendant guilty of this crime as

10  alleged in count one, you must be convinced that the government

11  has proved each of the following beyond a reasonable doubt.

12  First, that the defendant knowingly possessed an item that

13  contains an image of child pornography as alleged in the

14  indictment.

15           Second, the child pornography involved a prepubescent

16  minor or a minor that had not yet attained the age of 12 years.

17           Third, (a), the material was transported using any

18  means or facility of interstate or foreign commerce by any

19  means including by computer or, (b), the material was produced

20  using materials that had been mailed, shipped or transported in

21  or affecting interstate or foreign commerce by any means.

22           And fourth, when the defendant possessed the material,

23  the defendant knew the material contained child pornography.

24           If you find that the government has proved all of

25  these elements beyond a reasonable doubt, the defendant is

1    guilty of the crime of possession of child pornography

2    involving a minor that had not attained 12 years of age.  If

3    you find that the government has failed to prove any one of

4    these elements beyond a reasonable doubt, then the defendant is

5    not guilty of the crime of possession of child pornography

6    involving a minor that had not attained 12 years of age.

7            "Possession", as that term is used in these

8    instructions, may be one of two kinds, actual possession or

9    constructive possession.  A person who knowingly has direct,

10   physical control over a thing at a given time is in actual

11   possession of it.  A person who, although not in actual

12   possession, knowingly has both the power and the intention at a

13   given time to exercise dominion or control over a thing, either

14   directly or through another person or persons is in

15   constructive possession of it.  Possession may be sole or

16   joint.  If one person alone has actual or constructive

17   possession of a thing, possession is sole.  If two or more

18   persons share actual or constructive possession of a thing,

19   possession is joint.  You may find that the element of

20   possession is present if you find beyond a reasonable doubt

21   that the defendant had actual or constructive possession either

22   alone or jointly with others.

23           The term "computer" means an electronic, magnetic,

24   optical, electrochemical or other high-speed data processing

25   device performing logical, arithmetic or storage functions and

1   includes any data storage facility or communication facility

2   directly related to or operating in conjunction with such

3   device.  But such term does not include an automated typewriter

4   or typesetter, a portable handheld calculator, a thumb drive, a

5   CD or other similar device.

6           The term "child pornography" means any visual

7   depiction including any photograph, film, video, picture or

8   computer or computer-generated image or picture, whether made

9   or produced using electronic, mechanical or other means of

10  sexually explicit conduct where the production of such visual

11  depiction involves the use of a minor engaging in sexually

12  explicit conduct.

13          A "visual depiction" includes undeveloped film and

14  videotape, data stored on a computer disk or by electronic

15  means which is capable of conversion into a visual image and

16  data which is capable of conversion into a visual image that

17  has been transmitted by any means whether or not stored in a

18  permanent format.

19          "Sexually explicit conduct" means actual or simulated

20  sexual intercourse including genital-genital, oral-genital,

21  anal-genital or oral-anal, whether between persons of the same

22  or opposite sex, bestiality, masturbation, sadistic or

23  masochistic abuse or lascivious exhibition of the genitals or

24  pubic area of any person.  Be cautioned that not every exposure

25  of the genitals or pubic area constitutes lascivious

1    exhibition.  Whether a visual depiction constitutes such a

2    lascivious exhibition requires a consideration of the overall

3    content of the material.

4           You may consider such factors as whether the focal

5    point of the visual depiction is on the child's genitals or

6    pubic area, whether the setting of the visual depiction makes

7    it appear to be sexually suggestive, for example, in a place or

8    pose generally associated with sexual activity, whether the

9    child is displayed in an unnatural pose or in inappropriate

10   attire considering the age of the child, whether the child is

11   fully or partially clothed or nude, whether the visual

12   depiction suggests sexual coyness or a willingness to engage in

13   sexual activity or whether the visual depiction is intended or

14   designed to elicit a sexual response in the viewer.  This list

15   is not exhaustive and no single factor is dispositive.

16          Commerce includes travel, trade, transportation and

17   communication.  Interstate commerce means commerce or travel

18   between one state, territory or possession of the United States

19   and another state, territory or possession of the United States

20   including the District of Columbia.  Foreign commerce means

21   commerce or travel between any part of the United States

22   including its territorial waters and any other country

23   including its territorial waters.  Using a facility or means of

24   interstate commerce means employing or utilizing any method of

25   communication between one state and another.  A telephone is

1    considered a facility or means of interstate commerce, whether

2    it is used in the traditional manner or whether it is used in

3    conjunction with the computer and modem.  Likewise, the

4    Internet is considered a facility or means of interstate

5    commerce.

6           It is not necessary for the government to prove that

7    any use of a facility in interstate commerce was contemplated

8    or planned at the time the course of activity began or that the

9    defendant knew that he was actually using a facility of

10   interstate commerce.  It is not necessary for the government to

11   prove that the defendant knew the alleged child pornography had

12   moved in interstate or foreign commerce, only that it had so

13   moved.  It is not necessary that the government prove the

14   defendant knew the interstate nature of an instrument on which

15   a depiction of child pornography if produced.

16          The word "knowingly" as that term has been used from

17   time to time in these instructions means that the act was done

18   voluntarily and intentionally, not because of mistake or

19   accident.  Guilty knowledge may not be inferred solely from

20   ownership or access to a computer.  Where the government claims

21   possession of images of claimed child pornography on a

22   computer, the government must prove that the defendant had

23   actual knowledge that there was child pornography on the

24   computer.

25          To reach a verdict, whether it is guilty or not

1  guilty, all of you must agree.  Your verdict must be unanimous

2  on the count charged in the indictment.  Your deliberations

3  will be secret.  You will never have to explain your verdict to

4  anyone.  It is your duty to consult with one another and to

5  deliberate in an effort to reach an agreement if you can do so.

6  Each of you must decide the case for yourself, but only after

7  an impartial consideration of the evidence with your fellow

8  jurors.

9          During your deliberations, do not hesitate to

10  re-examine your own opinions and change your mind if you are

11  convinced that you were wrong.  But do not give up your honest

12  beliefs as to the weight or effect of the evidence solely

13  because the opinion of your fellow jurors or for the mere

14  purpose of returning a verdict.  Remember at all times, you are

15  the judges, judges of the facts.  Your duty is to decide

16  whether the government has proved the defendant guilty beyond a

17  reasonable doubt.

18          When you go to the jury room, the first thing that you

19  should do is select one of your number as your foreperson who

20  will help to guide your deliberations and will speak for you

21  here in the courtroom.  A verdict form has been prepared for

22  your convenience.

23          The foreperson will write the unanimous answer of the

24  jury in the space provided for each count of the indictment,

25  either guilty or not guilty.

1          At the conclusion of your deliberations, the

2    foreperson should date and sign the verdict.  If you need to

3    communicate with me during your deliberations, the foreperson

4    should write the message and give it to the court security

5    officer.  I will either reply in writing or bring you back into

6    the court to answer your message.  Bear in mind that you are

7    never to reveal to any person, not even to the court how the

8    jury stands numerically or otherwise on any count of the

9    indictment until after you've reached a unanimous verdict.

10         THE COURT:  Thank you very much.  All right.  Now,

11   ladies and gentlemen, we're going to take about a five-minute

12   recess.  You don't want a five-minute recess?  We do need to

13   take a five-minute recess and then we're going to come back,

14   because counsel needs to set up.  We're going to come back and

15   then counsel will be making their closing argument, all right.

16         COURT SECURITY OFFICER:  All rise for the jury.

17                             *   *   *

18         THE COURT:  Now that the jury is gone, what we need to

19   do at this time, counsel, this is the statutory time to make

20   objections to the jury instructions.  What I would propose to

21   do is to incorporate by reference at this time our jury

22   settlement conference that we had earlier today as if done at

23   this time, along with any objections, comments or statements by

24   counsel as well as any comments, statements or rulings by the

25   Court as if done at this time.  Any objection to that process?

1          MR. EDWARD BARTOLOMEI:  No, Your Honor.

2          MS. THOMPSON:  No, Your Honor.

3          THE COURT:  So ordered.  Okay.  Get yourself ready.

4   We'll come back in about two to three minutes and we'll get

5   going.

6          *(2:23 p.m.)*

7                              *   *   *

8          *(2:32 p.m.)*

9          COURT SECURITY OFFICER:  All rise.

10         THE COURT:  Please be seated.  Bring the jury in.

11                             *   *   *

12         COURT SECURITY OFFICER:  Rise for the jury.

13         THE COURT:  Please be seated.  The Court would note

14   the presence of the ladies and gentlemen of the jury, as well

15   as all the parties.

16         All right, ladies and gentlemen, you're now going to

17   be hearing the closing arguments of counsel.  As I told you in

18   the first day of trial when you heard the opening statements,

19   closing arguments of counsel is not evidence.  In the opening

20   statement, what the lawyers are supposed to be doing is telling

21   you what they believe the evidence will show.  We're going to

22   flip that on its head now because now they're supposed to be

23   telling you what they believe the evidence has shown, okay, and

24   they're going to be commenting on that evidence.  That is

25   they're going to be putting their spin, which is what they're

1    supposed to be doing, on the evidence in such a way that they

2    feel you should be looking at it, okay.  They're going to tell

3    you about what they believe is the right way for you to be

4    looking at the evidence.  And they're going to be recalling

5    items of evidence.  Now, if your recollection of the evidence

6    is different from the lawyer's recollection of the evidence,

7    your recollection controls.  Okay.  So it's really important

8    for you to remember that.  And it's also very important for you

9    to remember that the lawyer's job is to try to convince you of

10   something, okay.  Now, this does not mean, as I told you

11   before, that there's anything wrong with that.  That's their

12   job, but you need to be aware of that, okay, and that's true

13   for government's counsel, it's true for defense counsel, okay.

14   So there's nothing wrong with that.  They're doing their jobs,

15   but you need to be aware of that so that you keep that in mind,

16   okay.  Are you ready, counsel?

17            MS. THOMPSON:  Yes, Your Honor.

18            THE COURT:  First we hear from government's counsel,

19   then we hear from defense counsel and then we hear a short

20   rebuttal from government's counsel because they bear the burden

21   of proof.  Now, Ms. Thompson, are you going to reserve some

22   time for your rebuttal?  You have 40 minutes.  Are you going to

23   reserve some time for your rebuttal?

24            MS. THOMPSON:  I am planning on doing that.

25            THE COURT:  Well, you better because you won't get a

1   rebuttal if you don't reserve some time.  So you need to tell

2   her at what point you want her to let you know.

3           MS. THOMPSON:  I'm going to time it and then whatever

4   I have left I'll use for rebuttal.

5           THE COURT:  Well, you're going to hear from her also.

6           MS. THOMPSON:  Okay.

7           THE COURT:  You may start at any time you're ready.

8           MS. THOMPSON:  Thank you, Your Honor.

9           May it please the Court, members of the jury, in order

10  for you to find the defendant guilty of the sole count in the

11  indictment in this case, the government has to prove four

12  things to you beyond a reasonable doubt.  I mentioned those in

13  opening in order to try and give you a road map so that as you

14  listen to the evidence and hear the testimony, you would know

15  how to put those into perspective.  Those are on or about

16  October 22nd of 2015, the defendant knowingly possessed an item

17  containing an image of child pornography.  Two, the material

18  involved a prepubescent minor or a minor under the age of 12.

19  Three, that the material was transported using any means or

20  facility of interstate or foreign commerce.  And four, when the

21  defendant possessed the material, he knew it was child

22  pornography.  Those four things.  If you find that the

23  government has proven those four things beyond a reasonable

24  doubt, then you should find the defendant guilty.

25          The first element is the defendant knowingly possessed

1   an item containing an image of child pornography as alleged in

2   the indictment.  The item is the Dell laptop computer.  You

3   heard testimony that it contained over 2500 images depicting

4   child pornography and 112 videos depicting child pornography.

5   Those are listed in Exhibit Six.  And the images are contained

6   in Exhibit 6a as well as Exhibits 11, 12 and 13.

7          The "alleged in the indictment" part means the

8   defendant possessed it on October 22nd of 2015.  That's the day

9   that the Search Warrant was executed when the defendant was

10  interviewed by Special Agent Juarez and Special Agent DePaola

11  and then agreed, told them about his laptop computer and led

12  the agents to his office, unlocked the office, showed them

13  where his desk was, took the laptop off the desk, provided it

14  to law enforcement and signed the consent to search form which

15  allowed them to take it and search it.

16         The second element is that the material or the child

17  pornography involved prepubescent minors or minors under the

18  age of 12.  Special Agent Sean Mullen from the FBI testified

19  that he has personally met five of the victims listed in three

20  series.  Remember, he testified about the C Baby series and you

21  saw Exhibit 11n which was C Baby One who was three years old at

22  the time performing oral sex on an adult male.  He also

23  testified that C Baby Two was eight years old and that she was

24  engaged in a variety of sex acts that are listed on Exhibit 11.

25  MC Girl, the Minecraft girl, there were two sisters, he

1   testified they were four and five years old at the time the

2   images were produced.  And those images were found on the

3   defendant's computer.  And he also testified that the victim of

4   the Tent series was ten years old at the time the images were

5   found on the defendant's laptop.  That's element number two.

6           The third element is that the child pornography was

7   transported using any means or facility of interstate or

8   foreign commerce.  Special Agent Sean Mullen testified that the

9   images depicted in the MC Girl series, which is the one of the

10  four and five-year-old children, were first discovered by law

11  enforcement when the FBI in Maryland found them on a hidden

12  server and downloaded them in Maryland.  Those children you

13  heard were sexually assaulted in Round Rock, Texas.  After they

14  were downloaded by the FBI in Maryland, the lead went through

15  to Special Agent Mullen.  And remember, he, based on one of the

16  T-shirts the girls was wearing, went to the school and was able

17  to identify both children in a year book at the school.  He

18  also testified that those images were posted by the man that

19  took them on the Internet on a hidden server named Lolita City.

20  If you remember, one of the defendant's search terms was

21  Lolita.

22          The images of MC Girl One and Two were accessed

23  through the onion router on the Internet and downloaded in

24  Maryland.  They were clearly transported in interstate and

25  foreign commerce.  He also testified about C Baby One and Two.

1   C Baby One is the little three-year-old that was engaged in --

2   that was forced to perform oral sex and C Baby Two was the

3   eight-year-old.  He testified that those images, same ones that

4   were found on the defendant's computer, were found in a variety

5   of states, as well as in Germany.  When those images are found

6   in different states and those cases go to trial, he told you he

7   had to go testify in those states and in Germany and identify

8   the images of those children.  Those children were sexually

9   assaulted in Bastrop, Texas, he told you.  So those images have

10  been transported in interstate and foreign commerce having been

11  found in Germany.

12          With regard to the Tent series, that's the 10-year-old

13  little girl that you saw an image of.  In 13a she was

14  blindfolded and her genitals were lasciviously displayed.   In

15  13b she was being digitally penetrated by an adult male.

16  Special Agent Mullen testified that the C Baby series was

17  connected to the Tent series, they were both produced in

18  Bastrop, Texas.  The Tent series started out in Maine when law

19  enforcement identified the images and started that

20  investigation.  He told you that the same images found on the

21  defendant's computer in this case were found in states such as

22  Georgia and Kansas and he's had to testify in those states

23  after the images were found there.  Those images have traveled

24  in interstate commerce.

25          All of the images in 11, 12 and 13, the C Baby series,

1  MC Girl and Tent were all found in the music folder on the

2  defendant's computer and are listed in Exhibit Six, the big

3  forensic report listing all of the image and video files.

4        So then the last element that the government has to

5  prove beyond a reasonable doubt is that when the defendant

6  possessed the material, he knew it was child pornography.  How

7  do you know this?  Well, he told Special Agent DePaola and

8  Special Agent Juarez during the interview the day of the Search

9  Warrant that he had seen them, that he had visited different

10 websites, he searched for material and all of that happened on

11 his laptop computer.

12       You've been instructed by the Court that you are the

13 sole judges of the credibility and believability of each

14 witness and the weight to be given to the witness's testimony.

15 You get to factor in whether someone has a particular reason

16 not to tell the truth, whether a witness has a personal

17 interest in the outcome of the case and what weight to give

18 each person's testimony, if any.  You get to decide who to

19 believe, who not to believe, what to believe and how much to

20 believe.  In this case, the government submits that there's not

21 a whole lot of middle ground.  Special Agent Juarez and Special

22 Agent DePaola testified very differently than how the defendant

23 testified.  So this case comes down to who do you believe

24 because their testimony is day and night different.

25       The testimony of the special agents in regard to what

1    occurred on October 22nd of 2015, the government contends makes

2    sense and is supported by the forensic evidence and the other

3    facts in the case.  During the interview, the defendant was

4    asked what electronic devices were at the house.  Remember,

5    they went to the house and started the Search Warrant.  As soon

6    as they did the protective sweep, then the special agents went

7    into the living room and told people they were executing a

8    Search Warrant.  They could leave, they could stay, but you

9    can't interfere with a Search Warrant.  And they asked the

10   defendant if he would be willing to speak with them out in

11   Agent DePaola's car and he agreed.

12          They went out into the car, again the agents told him

13   he didn't have to talk to them, this had to be voluntarily, but

14   they wanted to ask him some questions about the child

15   pornography that had been downloaded to his house.  Remember,

16   the subject of the Search Warrant was five images that were

17   shown to Mr. Michalik during the interview.  Five images of

18   child pornography were downloaded on August 4th of 2014 from

19   the Amateur Lovers website directly to the defendant's house.

20   What they learned during the execution of the Search Warrant

21   and the interview --

22          MR. RICHARD BARTOLOMEI:  May we approach?

23          THE COURT:  On what basis?

24          MR. RICHARD BARTOLOMEI:  So we don't have to --

25          THE COURT:  All right.

1                          *   *   *

2          (Sidebar.)

3          MR. RICHARD BARTOLOMEI:  There is absolutely no

4    evidence that they were downloaded to the house, it goes to an

5    IP address and those are not even on the computer.  That is a

6    misstatement of the record.

7          MS. THOMPSON:  They weren't found on the computer at

8    the time of the Search Warrant months later, but they were

9    definitely downloaded to that house.  It's in the Search

10   Warrant application that he insisted I put in as evidence.

11         MR. RICHARD BARTOLOMEI:  Your Honor.

12         THE COURT:  I'm going to let -- if this is an

13   objection, I'm going to overrule the objection and I will let

14   the jury decide.  This is an issue you can raise in your

15   closing argument.

16         (Sidebar concluded.)

17                         *   *   *

18         THE COURT:  You may continue, counsel.

19         MS. THOMPSON:  Thank you, Your Honor.

20         If you'll recall, the Search Warrant was based on five

21   pictures that were downloaded from the Amateur Lover website to

22   the defendant's house, his IP address.  The woman from AT&T,

23   Ms. Caravello, testified that the IP address listed on the

24   images that were downloaded was 75.1.83.139.  And that that

25   specific IP address was assigned to the defendant at his house

1   at 9718 Hidden Iron Drive from June 10th of 2013 through the

2   date that the Search Warrant was signed.  Exhibit Number One

3   will show you that information and that he was the account

4   holder, that was the address and then that was the IP address

5   that was only used at that house.  And the way you would have

6   to use that IP address is you would have to know the name of

7   the Internet router and you would have to know the password for

8   that Internet access in order to get onto the Internet.

9          So after they started the interview and they're

10  explaining to Mr. Michalik why they're there, they're asking

11  him about the electronic devices that are found in the house

12  and he lists the different desktop computer and phones and the

13  tablet that were in the house.  When asked if there are any

14  other devices, he states I have an iPod in my truck and there's

15  a Dell laptop computer at my office.

16         The defendant's version, what he testified to is he

17  never mentioned that laptop computer, he never told Special

18  Agent DePaola that he had a laptop computer at work.  That she

19  just all of a sudden knew that there was this laptop computer

20  at his office that would contain child pornography.

21         Now remember, as the Search Warrant is ongoing at the

22  house, nobody has done a forensic preview, nobody from Homeland

23  Security knows what's on any of those devices.  Turns out none

24  of the devices at the house contained child pornography, but

25  nobody knew that then.  The defendant wants you to believe that

1   when nothing was found at the house, they had to find some

2   device that had child pornography.  You've been instructed to

3   use your reason and common sense and I will suggest to you that

4   those may be the most important tools you have as jurors.  You

5   get to determine what makes sense to you, what's logical, does

6   this make sense or does this make sense in determining the

7   believability of witnesses.

8           The search of the electronic devices at the house had

9   just started when the defendant agreed to be interviewed, so

10  they had no idea whether any child pornography had been found

11  at the house.  The defendant tells Special Agent DePaola and

12  Special Agent Juarez in the interview that he has the laptop

13  and he uses it at work and admitted that he has searched

14  pornography websites on the laptop.  That prompted the agents

15  to ask him if he had ever seen child pornography.  What was his

16  answer?  It wasn't no.  It was, Well, I don't really like the

17  young, the little child pornography, the little person younger

18  ones, I probably have seen child pornography with high school

19  age girls.

20          And remember, Special Agent Juarez and Special Agent

21  DePaola both testified about his interview.  And that he had

22  seen child pornography involving teens and young teens on a

23  variety of different websites.  The defendant claims he never

24  admitted to searching or viewing child pornography, that all of

25  that is made up by the agents, that he never said any of that.

1    I'm going to pose to you, if the agents are going -- I mean,

2    one, what does your common sense say about that? Does that

3    make sense given all the evidence in this case? Wouldn't it

4    make sense that his statement would be better than that? He

5    wouldn't say he preferred teenagers, he'd say he preferred

6    babies. Same with the search terms. He told Special Agent

7    Juarez and Special Agent DePaola that when he searches for

8    child pornography he uses a variety of terms, yoga pants, puffy

9    pussies, sexy teens, young sexy teens and Lolitas.

10           If you look through the files in Exhibit Six, there's

11   over 50 file titles that have the term "Lolita" in terms.

12   There's a variety of file titles that have "PTHC" and a variety

13   of the other terms. He was asked if he specifically recalled

14   the Amateur Lovers website when he is shown those five images.

15   He's asked about the Amateur Lovers website and he says he

16   doesn't recall that one. He did remember two of the images, as

17   you remember, 5a and 5b and initialed those, saying, Yup, I've

18   seen those before. But he didn't say he saw them on the

19   Amateur Lovers website, he said he saw them on a variety of

20   other websites including the one named Little Puffy Pussies.

21   Does it make sense that that is accurate? Or that that's made

22   up by the agents? I'm not suggesting the agents would ever

23   make up information, but wouldn't you say that he did recognize

24   the website that five images of child pornography that went to

25   his house came from?

1          He was asked if he knew the meaning of the term "PTHC"

2    and he stated it meant younger ones.  He was then shown the

3    five images and identified two out of the five.  His story is

4    that he was just going along, he didn't feel like he could say

5    no.  Well, he clearly said no to three of the images.  He

6    didn't initial those.  He differentiated which ones he

7    remembered seeing before and which ones he didn't remember

8    seeing before.

9          The defendant also told special agents that the last

10   child pornography video he remembered watching was titled Good

11   Blow Job or something like that and depicted a child about 14

12   years old.  In Exhibit Six there is a file titled Girl

13   14-year-old Blow Job.  There is a variety of other ones that

14   depict the same exact sexual activity.  Item 946 is 14-year-old

15   Blow Job, item 1337 is 9-year-old Girl Sucking Great Blow Job

16   and there's a variety of others that you can look through.  The

17   defendant also tells the agents in the interview that on

18   October 19th of 2015, he watched a video titled Dogie Style

19   that depicted a 12 to 14-year-old child.  Item number 300 is a

20   file titled Maja Dogie Style 12-year-old.  Remember, at this

21   time, the agents have no idea what's on this computer.  They're

22   talking to him in the car while the Search Warrant is going on.

23   They don't know what's on the computers at the house and they

24   have no way of knowing what's on the laptop computer.

25         He also tells the special agents that on October 21st

1  of 2019, he searched for yoga pants and puffy pussies.  And

2  while that may not seem directly connected to child

3  pornography, remember when he was looking through the five

4  images that were downloaded from the website to his house, he

5  recalled seeing them on a variety of websites, one of which was

6  called Little Puffy Pussies.

7          It's also important to factor in the Mozilla Firefox

8  folder evidence.  You heard testimony that some of the images

9  in the forensic report and they're listed at items 1174 to

10 1220, I believe.  When asked if he knew what the term "PTHC"

11 stood for, he didn't know what the actual acronym was, he

12 didn't know it meant pre-teen hard core, but he did know that

13 it meant younger ones.  He knew that if you put that in, you'd

14 get younger material.  And that's important in this case

15 because in Exhibit Seven, if you recall, Exhibit Seven is the

16 search query.  You heard testimony that somebody sitting at the

17 defendant's laptop had to physically type in VK PTHC and then

18 hit search.  You heard testimony that they were using the Bing

19 search engine and that they were searching for videos and that

20 it happened on November 14th of 2014 at 5:45 UTC time.

21         We heard that UTC time is six hours different than

22 central standard time.  So if someone is searching for PTHC on

23 the laptop on November 14th at 5:43, it's really November 13th

24 at 11:45 p.m. because you subtract the six hours.  So if I go

25 back six hours and it's November 13th at 11:45, I type in PTHC.

1           COURTROOM DEPUTY CLERK:  Twenty minutes.

2           MS. THOMPSON:  When you look at the Mozilla Firefox

3    folder, you'll see the 46 files that were downloaded or

4    viewed -- sorry, not downloaded, viewed on the Internet at

5    exactly that time.  1174, 1193, for example, was downloaded

6    using Mozilla Firefox, so he's going to the Internet.  And that

7    file was created on November 13, 2014 at 11:59 p.m., so he

8    types in PTHC at 11:43, 11:45 and just minutes later 46 child

9    pornography files are viewed using that laptop on the Internet.

10   That was only four months after the five child pornography

11   files were downloaded to his house using his secure Internet

12   from Amateur Lovers website.  And it was less than a year

13   before the execution of the Search Warrant when he gave consent

14   to search his laptop computer that had over 2500 images and 112

15   videos.

16           The government submits that the evidence in this case

17   shows beyond a reasonable doubt that the defendant knowingly

18   possessed child pornography on the laptop on November 22nd when

19   he provided it to law enforcement.  All of the evidence in this

20   case, all the credible evidence in this case points to the

21   defendant.  Thank you.

22           THE COURT:  So you have reserved some time.  Seventeen

23   minutes, you've got a full 17 minutes.

24           MS. THOMPSON:  Thank you, Your Honor.

25           MR. RICHARD BARTOLOMEI:  Your Honor, members of the

1    jury, opposing counsel, let's start out with dispelling a few

2    things that you were just told.  I asked Mr. Linares, Any

3    forensic evidence that any of this was ever downloaded, viewed,

4    saved by the defendant from your report.  Answer, No.  Any

5    evidence -- same thing was asked for Mr. Nutt.  Any evidence

6    that any of this from forensic evidence directly shows that the

7    defendant ever viewed much less downloaded or saved any of this

8    evidence.  You were present.  They said, each of them, no.

9    Were these exclusively within the possession of the defendant?

10   No.  The evidence is rather overwhelming, I would point out,

11   that this laptop was not password protected.

12        I believe the government stated that the Internet

13   access to the router was password protected or secured.  One of

14   the last questions that I asked Mr. Nutt, I asked when the

15   judge mentioned did you ever determine if there was a password

16   through the router to the Internet, Mr. Nutt said, I do not

17   recall if there was.

18        MS. THOMPSON:  Objection.  That's a misstatement of

19   the testimony.

20        MR. RICHARD BARTOLOMEI:  Excuse me.  I don't recall if

21   there was or there was not.  With that correction, he doesn't

22   know, they never checked.  That was his exact testimony.

23        Now, with regard to whether or not there were any

24   images, interestingly enough, in Six, Mr. Linares was asked did

25   you put in the name Mr. Michalik in the pathway.  Putting up

1    Six please, on page five.  Went through a series of questions

2    with Mr. Linares.  Remember Mr. Linares creates both of these

3    reports, but during the middle of trial, after opening

4    statements apparently portrayed a small whole, I would suggest

5    they came up with 6b.  And 6b which is given to us during the

6    middle of the trial --

7            MS. THOMPSON:  Your Honor, I'm going to object.

8            THE COURT:  I'm going to strike -- yes, I'm going to

9    strike that.  There's no need for that.

10           MR. RICHARD BARTOLOMEI:  Okay.  Let's go through a

11   little bit of what Mr. Linares said.  One, he acknowledged no

12   direct forensic evidence that the defendant or anyone in

13   particular downloaded, viewed or saved.  So we know that.  That

14   was confirmed by Mr. Nutt, both Six and 6b, no one ever finds

15   through these forensic examinations that the defendant ever

16   views, downloads, saves, retains or even opens any of these

17   files.  How do we know this is so?  Because on Six, the

18   government had two witnesses say, Oh, the access time doesn't

19   matter, it doesn't matter.  The file creation time and the

20   purported access time are identical.  And if you remember, one

21   of the last questions I asked Mr. Nutt is, You can't open three

22   different files that he was asked about that are created at the

23   same moment and the exact same instant it says they're

24   accessed, you can't do that manually as a human being.  And he

25   said correct.  So even their own forensic files do not show

1    that any of these purported files were ever viewed by anybody.

2            MS. THOMPSON:  Objection.  That's a misstatement of

3    the testimony.

4            THE COURT:  That objection is sustained.  Now, when I

5    sustain an objection like that, ladies and gentlemen, remember

6    what I say even my sustaining the objection, you are the ones

7    to determine and only you what the testimony was.

8            MR. RICHARD BARTOLOMEI:  With respect, Your Honor, I

9    have the exact testimony if I may read it.

10           THE COURT:  You can do whatever you want with your

11   time.

12           MR. RICHARD BARTOLOMEI:  If you look at 6b, just like

13   6a, there's no forensic evidence to show that the defendant

14   accessed those files, isn't that true?  His answer, Specific

15   person, no.

16           So I believe I'm correct in whatever I presented to

17   you.  Now, there's two aspects to this case, as I see it.  The

18   first part is the forensic evidence.  There's been a lot of

19   discussion and a lot of evidence regarding the forensic

20   evidence.  What we do know is that both Mr. Linares and Mr.

21   Nutt have conceded there's no direct forensic evidence linking

22   Mr. Michalik.  Furthermore, you've had testimony from Ed

23   Michalik, you've had testimony from Crystal Rivas and the

24   defendant, he didn't elect not to take the stand, he took the

25   stand.  Now why is this important?  Because Mr. Nutt finally

1   had to acknowledge the access from the company AT&T to the

2   router was not secured.  He didn't know.  And everyone, and I

3   mean everyone on both sides acknowledges the computer itself is

4   not password protected.  Why is that important?  Because you

5   have testimony from Mr. Michalik, you have testimony from

6   Ms. Rivas, you have testimony I believe from even Mr. Just and

7   you have testimony from the defendant how this computer was

8   used among and with the other computers.  The point is they

9   were open, anybody could use them, all you had to do was turn

10  them on and you could use them.  You didn't have an identifying

11  user.  How do we know from the forensic evidence that they

12  produced?  Because in every single file the user is David S,

13  Dave Smith.  So there is no identification of the user.  There

14  is no identification in the user pathway.  They would have you,

15  I would suggest, believe that the fact that that name doesn't

16  have Mr. Michalik, you should disregard that.

17          Well, computers are funny.  You must have determined

18  by now that these pathways that they forensically examined

19  actually are quite precise.  In one sense they tell you who the

20  user is, except it's always David S.  Now, I suspect their

21  explanation will be, well, that's the default because he's

22  still listed as the administrator.  Why would David Smith be

23  the administrator after closing the company and transferring

24  whatever assets or however when Michalik brothers start their

25  business?  I don't have an answer for that, but remember I

1   asked Mr. Nutt, can you have Windows 7 and Windows 10 in the

2   same computer?  And he talked about dual booting.  Their report

3   doesn't show whether they ever examined the other drive --

4   excuse me, the other operating system.

5         MS. THOMPSON:  Objection, Your Honor.  That's a

6   misstatement of the testimony.

7         MR. RICHARD BARTOLOMEI:  Your Honor --

8         THE COURT:  I'm going to leave it to the jury to

9   determine the facts of this case.

10        MR. RICHARD BARTOLOMEI:  I asked the question about

11  whether or not and I asked him about Windows 10, and obviously

12  EnCase runs by Windows 10, but remember the Michalik brothers

13  are not the world's greatest computer people.  They have to use

14  programs that are only consistent with Windows 7.  Now, why is

15  that important?  Nobody ever searched.  None of the forensic

16  search involves anything regarding the other drive or, excuse

17  me, the other operating system of Windows 7, none of them.

18  Now, with regard to back to Mr. Linares, I want to go through

19  this very quickly.  I asked Mr. Linares, nowhere in this report

20  does it show that Windows 7 was removed from the computer.  His

21  answer was correct.  And he acknowledged that the

22  administrator, the first line 11/20/10, he acknowledged if the

23  computer was wiped, that wouldn't be in there and --

24        MS. THOMPSON:  Again a mischaracterization of the

25  testimony, Your Honor.

1          THE COURT:  I'm going to sustain that objection.

2          MR. RICHARD BARTOLOMEI:  Well, I leave it to you on

3   your recollection.  There's a reason I have it.  Now, no

4   account matches the defendant, no security ID matches the

5   defendant.  Mr. Nutt said, well, I don't know all the

6   identifications.

7          There was another aspect of this about IP addresses.

8   Mr. Linares acknowledged, well, the IP address only goes to the

9   router.  I believe even Agent Juarez knew that.  Certainly

10  there's never been any testimony that the router is the same as

11  the computer.  And I believe I asked could other computers

12  using that router all come back to the same IP and the answer

13  was, well, yes.  So six computers, five computers, ten

14  computers, all access the same IP address.  Now, no one that I

15  know of ever established, at least from the government, it's

16  their burden of proof, I don't believe anyone ever proved that

17  that computer used other than at home wouldn't come to the same

18  IP address.  That's their burden of proof.  We can't negative

19  every possible permutation and combination.  They'll say we

20  can't do that either.  And there, ladies and gentlemen, is the

21  problem.  They can't negate it, but neither can they prove it

22  and it is solely their burden.

23          Now, with regard to other aspects of Mr. Linares,

24  because this is the forensic aspect, there was testimony both

25  by Mr. Nutt and Mr. Linares about certain records and we went

1    to records I think it was 12, record 12, record 52 and record

2    90, and pointing more to Mr. Nutt.  Mr. Nutt acknowledged,

3    well, the times for creation and the times -- remember, these

4    three involved the very same file, if you'll recall.  And for

5    all three files it was the exact same opening time, creation

6    time and the exact same access time.  And even he had to

7    acknowledge, well, you can't have opened all three manually at

8    the same time, that's physically not possible, notwithstanding

9    that he acknowledged we don't have any direct evidence that

10   Mr. Michalik did it, where Mr. Michalik was or who was there or

11   how it was used on a non-password protected computer.

12           Now, with regard to several other aspects of the case,

13   I'm going to go through some of the arguments that you heard

14   from the government.  One of them was that -- and this goes to

15   some of the claims about the statements and images from Amateur

16   Lover.  Even the government agents, Ms. Juarez and Ms. DePaola,

17   both say he didn't know anything about Amateur Lover.  All of

18   the government's witnesses that testify about those images

19   acknowledge, even Ms. Juarez, none of those images are found on

20   the computer.  So where did they go?  Well, they can't explain

21   that, but they all acknowledge, well, when we did get the

22   computer, none of the images are on the computer.  Yet the

23   government asks you to tie together two things.  You can look

24   at the images that he supposedly identifies.  Remember, his

25   testimony is a lot different, though subtly different from what

 1    the government says.  The government says he admitted he saw

 2    them on his laptop.  He said he may have seen them on an old

 3    work computer.  Let's look at the time.  Those images come

 4    through the IP address in 2014 when the business is still open

 5    with Dave Smith, when there are salesmen, customers, all manner

 6    of persons who have access to an open computer.  So certainly

 7    not within the exclusive possession of the defendant.  And I

 8    don't think anybody reasonably disputes that.  So also those

 9    images, if you view them, viewing something is not the same as

10    possessing something.  And that's why it's important to

11    remember if they're not in the computer, there is absolutely no

12    viable argument that the defendant possessed those images.

13    Very important.

14            Now, they talked about also recognizing websites.  I'm

15    going to start because I think this is very important about the

16    voluntary nature.  What is the one piece of evidence that the

17    government didn't bring?  Now, Agent Juarez, no, we didn't

18    record it.  Agent DePaola, well, we didn't record it.  They

19    said, well, we're not given body cams.  That's their

20    explanation.  We can give you assault rifles, flack vests, we

21    can have eight agents to ten agents, but we can't have a

22    recording device.  I asked Ms. DePaola, Do you have a policy on

23    that?  Well, no, not a policy.  Did you record it?  No.  Could

24    you have recorded it?  Well, yeah.

25            Now, let's think about that because that's very

 1    critical.  Why don't you bring the notes if those are the only

 2    recording or memorialization, why didn't the government come

 3    with the notes?

 4            MS. THOMPSON:  Objection, Your Honor, that would be

 5    inappropriate.

 6            THE COURT:  Sustained.

 7            MR. RICHARD BARTOLOMEI:  Your Honor, I'm entitled to

 8    argue what they do not bring.

 9            MS. THOMPSON:  Defense counsel was given the notes in

10    this case.

11            MR. RICHARD BARTOLOMEI:  Your Honor, I'm going to

12    object to that.  The question was did the government put into

13    evidence the only record and I think I'm entitled to argue that

14    to the jury.

15            THE COURT:  I think that what we have here is a

16    situation where the government put the witness on the stand

17    and, therefore, the notes would be hearsay to some degree and

18    the best evidence would be the witness's testimony and the

19    notes could be used to impeach the witness.

20            MR. RICHARD BARTOLOMEI:  With respect, Your Honor,

21    it's exactly the opposite.  The best evidence would have been

22    the written document, as we all know, it's called the best

23    evidence rule.

24            MS. THOMPSON:  That is inappropriate and incorrect.

25            THE COURT:  In any event, let's just go on with your

JURY TRIAL PROCEEDINGS                         116

1   argument.

2            MR. RICHARD BARTOLOMEI:  There's no notes.

3            MS. THOMPSON:  Objection.  There are notes.  That's a

4   misstatement and improper argument.

5            THE COURT:  Counsel, just go on with your argument.

6            MR. RICHARD BARTOLOMEI:  Thank you.  Let's talk about

7   whether or not these statements that they attribute to the

8   defendant, which incidentally he took the stand, she

9   cross-examined, meaning the government, and he said no, I

10  didn't say that, or I said something different.

11           But of course, what else can you do?  He's the only

12  other person there.  Let's talk about the voluntary nature of

13  this.  6:05 in the morning, they have to wait until after 6:00

14  because they need a special court order.  Three agents come up,

15  the defendant is leaving.  They meet him at the vehicle and

16  tell him, We have a Search Warrant, we have to get in the

17  house.

18           They walk him back.  I ask Agent Juarez, I believe,

19  Did you tell him at that point once the door got open you could

20  leave?  Well, no, not at that point.

21           He goes into the house and he's told, Call everybody

22  out.  He makes one statement calling people down, it's dark

23  inside the house, it's early in the morning and then other

24  armed agents begin yelling, Come down, come out!

25           Do you remember Agent Juarez couldn't say whether

1    their guns were drawn, but finally Agent DePaola said, well,

2    yes, they would have had guns drawn, but how do we know what

3    it's really like.  We know what it's really like because

4    Crystal Rivas is called down, she gets halfway down the

5    stairwell, there are flashlights, people yelling, Come down,

6    come down.  And at the bottom of the steps are two agents with

7    assault rifles.  I don't think I have to interpret for you how

8    frightening that is, but her statement was, First I thought we

9    were getting robbed, then they're pointing assault rifles at

10   us.  What was your reaction?  I was terrified.

11          There's certainly a conflict of testimony about what

12   the agents claim they said, but Crystal Rivas testifies they

13   didn't tell me I was free to leave, they didn't tell all of us

14   we were free to leave.  They told us they had a Search Warrant,

15   child pornography was coming through this house and they had a

16   Search Warrant for all the electronic devices.  Even Agent

17   DePaola acknowledges, well, yes, loud voices, commanding

18   voices.  That's how you secure the place.

19          Now, the government said, well, he wasn't handcuffed.

20          COURTROOM DEPUTY CLERK:  Twenty minutes.

21          MR. RICHARD BARTOLOMEI:  There's an old movie, Gary

22   Cooper starred in it, very famous lines, black and white, many

23   of you may not know it.  The point is in the movie, the cowboy

24   leaning against the bar makes a sny remark to Cooper, Cooper

25   spins, flips the gun up in his face and says, "Smile when you

1    say that."  And it became a famous line.  It's been passed down

2    for decades.  I think the better line was the line that

3    followed, "I always smile with a gun in my face."

4           I invite you to consider how docile you become with an

5    assault rifle in your face.  Do you forget it?  No.  Do you

6    forget it after five to seven minutes when the sweep is

7    completed?  I think not because they're still standing there

8    with the guns.  A child, a grandmother and Crystal Rivas are

9    put on the sofa.  Remember the testimony and this is

10   interesting I think for all of us, Agent Juarez, Agent DePaola

11   acknowledge we never left his side.  They went with him

12   everywhere.  So now you're guarded and escorted by two armed

13   agents.  He's in the corner, remember, we talked about it in

14   the house.  They don't ask him, according to him, and no one

15   else apparently hears them do so.  There's no discussion of his

16   privacy, how they can make this more comfortable for him.  I

17   posit to you that's not how these operations work.  Why do you

18   have to have it right away, you could have deferred this

19   interview like you did with Ms. Rivas.  Well, we wanted to do

20   it right then.  Well, of course you do.  Right after the shock

21   and awe of guns pointed at everybody, right after 6:00 when

22   you've got control when they're afraid, they're pretty docile,

23   they're pretty controlled.  The questions were asked, Did you

24   tell them you wanted to leave?  Well, would anyone be expected

25   to tell armed agents I'm not going to do what you want?  I ask

1    you to consider that.

2           They take him out to the car.  Crystal Rivas watches.

3    I asked, Did you tell him he could bring anybody with him?  No.

4    They tell you, well, he just walked out there on his own

5    consent.  Walked out there of his own consent and spilled his

6    guts about all these things about child pornography.  I even

7    asked Agent DePaola, so it's your position he just walks out

8    there and voluntarily tells you all these things.  And she said

9    yeah.  You, the jury, might want to ask yourself about whether

10   that's a voluntary statement, notwithstanding the clear

11   difference between what the defendant says and what the agents

12   say, but only the agents get to keep the notes.  We don't have

13   a recording which would have given us both sides of the story

14   and I submit we wouldn't be arguing about this.  I don't think

15   it's fair nor is it rational to say, well, we simply weren't

16   given body cams.  Their purpose, admitted to by Ms. DePaola, is

17   to isolate the defendant one on one, to get incriminating

18   evidence against him to build their case.  Is that voluntary?

19   I submit not.

20          Now, with regard to some of the details about the

21   laptop, if you'll remember, Agent Juarez said the deal, the

22   agreement to go and get the laptop, that all occurs in the

23   house.  Agent DePaola said it was in the car.  That's a pretty

24   important point.  When did this discussion and agreement to go

25   and get them a laptop that they acknowledged they had

1    absolutely no access to by the Search Warrant, when did that

2    occur?  Agent Juarez says it happened in the house.  DePaola

3    says no, it happened in the car.

4           Well, I would ask you to consider whether either Agent

5    DePaola or Agent Juarez -- only one of them can be right, but

6    they oppose each other in their statements.  What's another

7    thing that's kind of interesting and important?  Well, when was

8    this discussion about stopping at McDonald's?  Agent DePaola

9    told you it was when we were out driving, just came up while we

10   were driving.  Agent Juarez said no, that discussion occurred

11   before they ever left.  Kind of an important difference in

12   terms of your recollection.  Kind of an important difference,

13   one that trained agents, one for 27 years and one for 16, not

14   the kind of detail they would forget or confuse.  Nonetheless,

15   could the defendant have left?  That's an interesting thing.

16   Agent DePaola was asked twice, Why did you go back in the

17   house?  Well, we had to get the keys.  I said, Your car was

18   running, you had your keys.  Oh, yes.  They had to go in and

19   get the defendant's keys because they had the keys, so he

20   wasn't free to leave.  The only place he could have gone was

21   down the sidewalk or back in the house where the armed agents

22   were.  Let's keep in mind, what is the defendant perceiving

23   here?  My family is inside, hostages to armed agents.  Do you

24   think that would control an individual?  Did you think that

25   would undercut the voluntariness of all of this information

1    that they claim he said.

2           The defendant didn't fail to take the stand, he took

3    the stand.  The government asked him, he said I didn't say

4    that.  About the PTHC, he said no, they asked me if I knew what

5    pre-teen was.  I said, well, young ones.  Then they ask him

6    about PTHC and he said -- they ask him three times,

7    increasingly angry on the part of Agent DePaola.  She actually

8    calls him a liar.  And he says, ma'am, I actually don't know

9    what the acronym is.  Now, they now try to weave that back into

10   Exhibit Seven, I believe, which is that there is a search

11   involving PTHC.  Remember I ask Agent DePaola, you know all

12   these websites.  Oh, I know too many of them.

13          So when the government says, well, they didn't know

14   this, they know every single website, this is what they do

15   every day is probably a better recognition.  Why is that

16   important?  He says they keep peppering him with questions.

17   Even Agent DePaola says no, I controlled all the questions.

18   You've got to view the demeanor of all of these witnesses here

19   in the courtroom.  I submit Agent DePaola is quite forceful.

20   And certainly you're alone in a car with two agents with guns

21   while your family is being held hostage essentially from your

22   perspective by other armed agents.  Why do we know that the

23   government really isn't all that concerned about the

24   limitations of their Search Warrant?  Well, there's an

25   interesting thing.  The consent to search the car, the truck

1    that is supposedly signed by the defendant, he says they just

2    handed it to me and I signed it on my leg, but interestingly

3    enough, they had already asked Crystal Rivas for the keys to

4    the Tahoe, the other vehicle.  If they don't have a Search

5    Warrant for it, why didn't they get a consent from her?  It's

6    because they're going to search whatever they want to search.

7    And that's exactly what they did.  So they get a consent after

8    they've already searched outside the scope of the Warrant.

9    That is actually how they conduct themselves.  They just say,

10   oh, sign this.  They don't give him an opportunity to read it.

11   They don't give him an opportunity to question about it.

12   Interestingly enough, both Ms. Rivas and the defendant said --

13   were you allowed to talk to each other?  Answer, no.

14          Ms. Rivas made it very clear she wasn't free to move

15   around the house.  Remember, Agent DePaola said, oh, yeah, if

16   you need something, just ask.  Well, that's funny because

17   Ms. Rivas said, I had to have my daughter go to school.  And

18   what did she say?  At first the agents told her no.  Well, if

19   you're free to leave and free to go to school and that's really

20   what Agent DePaola or Agent Juarez said, that negotiation would

21   have never taken place.

22          Were you escorted throughout the house wherever you

23   went?  Ms. Rivas says escorted upstairs, downstairs, her

24   daughter is escorted to the bathroom, to the room to get her

25   clothes, back to the kitchen.  You're always having to ask.

1    That's not impeding the search.  That's controlling every

2    single movement.  There is no other logical conclusion about

3    that.  So if you're looking about the atmosphere, it's pretty

4    clear that the atmosphere is we've got the guns.  That's all

5    they need to do because there is, I would submit, no rational

6    human being that would defy them under those circumstances.  So

7    if you're looking at what were the circumstances, the

8    conditions under which these disputed statements are made, it's

9    pretty clear they weren't voluntary.

10            COURTROOM DEPUTY CLERK:  Ten minutes.

11            MR. RICHARD BARTOLOMEI:  Now, one other thing I want

12   to point out.  When you get to the business they said, oh,

13   well, he gets in the car, nobody accompanies him.  Well, his

14   family is still there.  He doesn't know.  They're still in the

15   house when he leaves and again he's escorted out by the agents.

16   He has to be given his keys because he doesn't have them.  They

17   drive.  Now, here is where it gets a little murky.  They said,

18   oh, well, we didn't get a consent because he could change his

19   mind.  Well, I'm not sure that that's a very logical reason for

20   not getting the consent before he left, but the point is they

21   get him out there, they go through the door.  And here is where

22   once again kind of critical facts that are very much different.

23   Remember, Agent Juarez said, I see the rifle leaning against

24   the wall.  Agent DePaola matches the defendant.  He tells them

25   voluntarily I have a loaded shotgun.  She remembers the same

 1   thing.  I submit Agent Juarez didn't see a gun or a rifle
 2   leaning up against the wall.  It's exactly as the defendant.
 3   You say, well, what does that give us or what does that tell
 4   us?  It tells you that the defendant is far more accurate in
 5   his account.  And wouldn't it be riveting in your mind and
 6   etched in your mind what happens the first time you ever face
 7   all those guns, all those agents.  And he says I didn't consent
 8   to go get it, they told me, We need to get that laptop.
 9          Now, when did they discover that the laptop wasn't
10   there?  They discovered the laptop that they were looking for
11   wasn't there when they went back in the house.  Why?  Because,
12   and you'll see it on the receipt, they already had a laptop
13   that was brand new, wasn't the right one.  So they realize,
14   oops, it's not within my Search Warrant, I've got to have that
15   laptop.  And why do they need to have that laptop?  That's
16   their purpose.  They don't want that laptop and the defendant
17   getting together, so they tell him, let's go get it.  But when
18   you look at the details at the business, what does he say?  And
19   remember this is very important, if he's agreed already to go
20   and give it to them, why would he ask them at the business,
21   Shouldn't you be showing me a Search Warrant?
22          Now, remember, Agent DePaola said -- because I asked,
23   Didn't he ask you that?  And she said, Possibly.
24          His testimony was they said, We could get a Search
25   Warrant, they held up a piece of paper and said we have a

1    Warrant for all your electronic devices that you use.

2         They didn't.  They had a Warrant for anything at the

3    residence.  And then they tell him, You could go to jail while

4    we get one, but that may take a while.  Then his testimony is,

5    I never read it, I was never offered it, she slaps it down, Ms.

6    Juarez, facedown with her hand over the text and says sign

7    here, which he dutifully does.  Does that sound like a

8    voluntary consent to give them the computer?  I leave that to

9    you.  And then they go off, laughing.  Oh, but one more thing.

10   He tells us, Don't go near your family until this investigation

11   is done.  And he never goes home for five days and since that

12   time he hasn't lived there.  They don't have a right to tell

13   him that.  It's not in any Warrant, but it suits their purpose,

14   just like the private interrogation in the car, it suits their

15   purpose.  And that renders all these statements -- even though

16   they're directly disputed by a defendant who took the stand to

17   face the cross-examination of the government, they're not

18   voluntary, notwithstanding that they're not accurate.  And even

19   they acknowledge, well, there's no independent proof of what

20   they said, just what we say he said.  But he denied and he

21   faced it.

22         Now, I'm going to step down and I won't be able to

23   argue with you again.  I won't be able to talk because the

24   government will finish, but here is what I will say to you, I

25   am pretty sure the prosecution in their 17 minutes will come up

1   and very carefully try to deconstruct everything I've said.  I

2   expect that.  That's their duty.  But as you're listening to

3   what she says and considering this evidence and talking amongst

4   yourself, ask yourself as she's speaking, If Rich could speak

5   one more time, what would he say?  You're going to hear it in

6   your head, and that, ladies and gentlemen, is the voice of

7   reasonable doubt.

8          MR. EDWARD BARTOLOMEI:  If it please the Court --

9          THE COURT:  Your time is expired, counsel.

10         COURTROOM DEPUTY CLERK:  He's got 4 minutes.

11         THE COURT:  You've got four minutes.

12         MR. EDWARD BARTOLOMEI:  If it please the Court,

13  Ms. Thompson, on behalf of my client, Mr. Jeffrey Michalik, on

14  behalf of my brother, on behalf of Mr. Perez, his defense team,

15  I'd like to start off by saying this, this has been a long

16  trial, it's been arduous, it's been highly contested and there

17  has certainly been an exchange between counsel on relevant

18  points of law.  And now we come down to the issue of relevant

19  points of fact.  If we have offended you in our representation

20  of Mr. Michalik, I would ask you this, please do not in your

21  verdict take into consideration or take it out against

22  Mr. Michalik.  We are here fighting for him.  Right here,

23  ladies and gentlemen, are the doors.  This case started through

24  a set of doors.  It really started in Switzerland on

25  photographs that allegedly came back to an IP address that were

 1   never recovered, never recovered.  And you remember I opened
 2   the door and I said the key to the door was Switzerland.  The
 3   police walked through with a Warrant fishing for photos they
 4   knew in advance weren't even on there, and in so doing,
 5   discovered the issues here.  Mr. Michalik told you from the
 6   stand, under cross-examination and has always contended and the
 7   instruction says it, a plea of not guilty is absolute statement
 8   of what?  Nonguilt.  That's on page two.  He said, I didn't
 9   know about it, I don't know it was there.
10          And now we come down to some very, very important
11   decisions in this jury instruction.  You're going to be asked
12   to describe what possession is.  Here we have a piece of paper.
13   I have it in my hand.  I don't know really what it is, but I
14   have it here.  Are you going to say, well, Mr. Bartolomei,
15   because you have it in your hand, do you know what's in it?
16   You possessed it.  Ironically it's a set of something else that
17   I haven't even read or seen.  But because I have it, the
18   government would like you to know that because I did have it
19   that I knew what was in it and, quite frankly, I therefore am,
20   closed quotes, guilty of possessing pornography.
21          It's unrebutted and undisputed in this case that on
22   two separate dates, 27 minutes on the 18th on the 1st, on the
23   19th, the images that she says all came to the computer.  And
24   ad nauseam everyone in this case has said but we cannot tell
25   you where it came from, who it came from and how it got there.

1  And there's no showing from any witness, the government's,

2  particularly, it's their case by the way, burden of proof, that

3  he ever opened it or knew it.

4          Now, the government will tell you, well, the entry

5  date, the access date, they all come at the same time if you

6  look at Six, but it doesn't really mean anything.  We only care

7  about access.  Well, it's all accessed on one day and that

8  confirms that they were dropped on the dates during the times

9  that they came.  By the way, when we talk about the way it's

10 reported, it's reported from a machine, it's reported in not

11 our time, it's reported in standard time, London time.  So if

12 it was October, it has to be daylight savings.  Take six hours

13 off of that.  And when does it all come in, most of it?  Gee,

14 it comes during --

15         MS. THOMPSON:  Your Honor, I'm going to object.

16 That's a misstatement of the testimony regarding the timing of

17 Exhibit Six.

18         MR. EDWARD BARTOLOMEI:  No, it's not.

19         THE COURT:  Well, okay, I'm going to let the jury make

20 their determination.

21         MR. EDWARD BARTOLOMEI:  Thank you.  When you look at

22 all of the images in there, different times, different places,

23 but six hours makes a huge difference because it comes in

24 during business hours.

25         COURTROOM DEPUTY CLERK:  One minute.

1            MR. EDWARD BARTOLOMEI:  Shortly after business hours.

2     And so, ladies and gentlemen, I'm going to ask you the

3     following, in the 45 seconds that I have left, do you see that

4     door right there?  In the management of your most personal

5     affairs and the critical decisions that you need to make in

6     your life, three letters separate Mr. Michalik from walking out

7     of this courtroom.  And I respectfully suggest that those three

8     letters "not" guilty are appropriate and should be applied in

9     this case.  That, ladies and gentlemen, is what reasonable

10    doubt is all about and that is what in the management of your

11    most personal affairs you should take out of this courtroom.

12    Thank you.

13            THE COURT:  Okay.  Ms. Thompson.

14            MS. THOMPSON:  Ladies and gentlemen, I'm going to try

15    and address this as quickly as I can, but this case comes down

16    to the testimony of the witnesses.  You saw everybody testify

17    and you heard them testify.  You need to determine for

18    yourselves who you believe because you either believe the

19    testimony of Special Agent Juarez and Special Agent DePaola or

20    you believe the testimony of the defendant.  When you look at

21    the credibility of witnesses, you are told did the witness have

22    a personal interest in the outcome of the case.

23            I do agree that this case started in Switzerland with

24    the five images that were downloaded from the defendant's house

25    on October --

1          MR. RICHARD BARTOLOMEI:  Objection, Your Honor.  That

2    is a misstatement.  It was to an IP address.  There is no

3    showing and they weren't even found in the computer after it

4    was seized.

5          THE COURT:  Now you're testifying here.

6          MR. RICHARD BARTOLOMEI:  I'm just objecting it's a

7    misstatement of the record.

8          THE COURT:  I will let the jury determine whether it's

9    a misstatement of the record.  They heard the evidence.

10         MS. THOMPSON:  You can look at the exhibits.  And the

11   representative from AT&T said that IP address was assigned only

12   to the defendant during the time in question.  They went to his

13   house.  Both forensic analyst and agent, they can tell you

14   what's on the computer, they can't tell you who did what to the

15   computer.  They can't tell you who was sitting behind the

16   keyboard.  They can only tell you what happened on the

17   computer.  And both of them told you the only operating system

18   on that computer is Windows 10.  And you'll see that in the

19   forensic report that we've reviewed in this case, on item

20   three.  If Windows 10 computers have two different operating

21   systems on it?  Yes.  And if there was another operating system

22   in another partition, it would have shown up in that report.

23         MR. RICHARD BARTOLOMEI:  Objection, Your Honor,

24   misstatement of the record.  They did not testify --

25         THE COURT:  All right.  I'm not going to put my

1    recollection in there.  I'm going to leave it to the jury.

2            MS. THOMPSON:  Look at the evidence in this case.  The

3    other thing Special Agent Nutt testified to was that there was

4    a design program run on the computer.  So a computer operating

5    in Windows 10 was able to operate the design program on a

6    number of different days.

7            With regard to the security ID, Special Agent Nutt

8    testified that there's only one security ID because there's

9    only one computer user.  I don't know if defense counsel is

10   referring to the security IDs of the accounts on the desktop,

11   but remember, there was a desktop computer and that information

12   is contained in section one and two.  And the desktop computer

13   at the house had a number of different accounts, including the

14   Log Me In account and Jeff, C. Rivas, Jeff admin, J. Michalik.

15   That had a number of different accounts, so it will have a

16   different security ID for each account.  That has absolutely

17   nothing to do with the laptop computer that had all the child

18   pornography on it.  That only has one user account and one

19   security ID.  That is a non-issue.

20           The five files that were downloaded from the website

21   in Zurich Switzerland were not found on the laptop computer.

22   We know that they were downloaded to Jeffrey Michalik's house

23   on August 4th of 2014 because they connected it to his IP

24   address which is a secure Internet connection.  We don't know

25   what computer was used to download those images and they were

1   not found on the Dell laptop computer.  Why wouldn't they have

2   been found?  That was a few months before the execution of the

3   Search Warrant.  And remember, the defendant was using C

4   Cleaner.  C Cleaner is a program that deletes what are

5   considered to be useless files to the user, all the background

6   files and stuff that you don't need on your computer is gone,

7   is deleted so that your computer can run faster.  The user has

8   to tell the program, the C Cleaner program what to delete and

9   what not to delete.  The fact that those files weren't found on

10  his computer doesn't mean anything.  The fact that they were

11  downloaded to his house where only somebody who knew the name

12  of the Internet router and the password to it would be able to

13  download those, that is significant to you.  It goes to

14  knowledge.  It goes to did he knowingly possess child

15  pornography on that laptop.  And that's really what you have to

16  decide.  I would suggest that the first three elements are very

17  simple.  It's the last one.  Did the defendant knowingly

18  possess the child pornography, did he know that there was child

19  pornography on the laptop.  If you look at all the evidence in

20  this case, including his testimony, I believe that you will

21  find he did.  Remember when I showed him Exhibit Five and he

22  testified he didn't -- that wasn't how he remembered seeing it.

23  He identified only the child's vagina, but he did acknowledge

24  he recognized both of those images.  There is somebody --

25          MR. RICHARD BARTOLOMEI:  That's a misstatement.

 1    Testimony was about legs.

 2         MS. THOMPSON:  You can look at the image and see how

 3    what part of legs are even on the file and what that looks

 4    like.  I realize I was standing in the way of most of you when

 5    that testimony happened, but you can review the image for

 6    yourself and determine what that shows.

 7         The grandmother and the child were allowed to leave

 8    the house.  They did leave the Search Warrant so that the child

 9    could go to school.  Really it comes down to do you believe the

10    defendant or do you believe the special agents.  How would

11    those special agents even know that that laptop existed if the

12    defendant didn't tell them?  How would they know that?  Where

13    would they get that information from?  The defendant took the

14    stand and he told you, I never said anything about it.  Agent

15    DePaola just miraculously figured it out.

16         And what motive did they have to not be honest in this

17    case?  You can tell who has a personal --

18         MR. RICHARD BARTOLOMEI:  Your Honor, that is

19    bolstering and is improper bolstering.  The motive is to make a

20    case which they testified to.

21         THE COURT:  The government does not stand behind any

22    witness and in terms of their truthfulness.  It is for you to

23    decide which witnesses are truthful and which witnesses are not

24    truthful, including the agents.  I don't think you meant to

25    vouch for the witness's honesty, did you?

 1              MS. THOMPSON:  No, I'm asking them to determine who is

 2       credible.

 3              THE COURT:  Because the government never vouches for

 4       witnesses, that's against the rules.  Go ahead.

 5              MS. THOMPSON:  It was argued that the defendant was

 6       upset that his family was being held hostage at the Search

 7       Warrant.  After he provided the laptop to law enforcement, he

 8       never went home to check on his family.  He didn't go home for

 9       five days, five days.  As he's leaving the house, his fiance

10       yells, What the F is going on?  If any of this is true, I'll

11       F'ing kill you!

12              That's what he heard right before he left the house.

13       And he knows what he said to law enforcement.  He knows what he

14       told them, even though he said he graded his honesty only an

15       eight out of ten, he knows what he told them.  He knows what

16       was on the computer.  He knows what happened.

17              Ladies and gentlemen, if you believe the defendant, if

18       you believe the testimony of the defendant, then he's not

19       guilty.  If you believe the testimony of the special agents in

20       this case, then I would suggest the evidence in this case has

21       proved well beyond a reasonable doubt that the defendant is the

22       one that knowingly possessed child pornography on that laptop

23       computer on October 22nd when he handed it over to law

24       enforcement and I would ask that you find him guilty of that

25       offense charged.  Thank you.

1         THE COURT:  All right.  Thank you.  All right, ladies

2    and gentlemen, you have now heard all of the evidence in this

3    case, you heard the Court's instructions and you've heard the

4    final argument.  We have one alternate left.  We can only

5    deliberate with 12 and we have 13 jurors, so at this time with

6    the thanks of the Court and with full appreciation for your

7    service, I'm going to excuse our alternate in the corner there

8    and you can go home.  I am going to keep you under the Court's

9    order, though, not to discuss this matter with anyone until we

10   get a verdict in this case.  And you will be notified what the

11   verdict is by Priscilla, she'll call you okay.  So you can step

12   out now and leave.  All right.  Thank you very much and you're

13   going to get full credit, so you shouldn't be seeing us for a

14   while.

15        Ladies and gentlemen, we're going to now send you --

16   where is the verdict form?  The verdict form is as simple as it

17   can be.  It just says, We, the jury, unanimously find the

18   defendant, it's got his name there, guilty, there's a line, or

19   not guilty.  And the foreperson who you're going to select

20   right away is going to mark that verdict, sign it and then let

21   the Court guard here know that you have reached a unanimous

22   verdict.  Remember, all 12 of you have to agree before you

23   reach a unanimous verdict.  In some State courts it can be ten

24   to two.  Not here, it has to be all 12.  Remember, here in

25   Federal Court, there is never a place for either sympathy or

1    prejudice.  You decide this case purely and only on the facts
2    as you find them and as the law that I have instructed you.
3    Now, time-wise here is what's going to happen.  You can
4    deliberate today only for about another half an hour and then
5    they're going to close the building.  If you don't reach a
6    verdict in half an hour, then you have to come back on Tuesday
7    because Monday is a holiday.  If you don't reach a verdict and
8    you have to come back on Tuesday, please remember over the
9    weekend, and it's a long weekend, it's just like when you were
10   off when we had to take Thursday and Friday off and we had the
11   two days of the weekend, same thing, okay?  All right.  Thank
12   you very much.  Good luck in your deliberations.
13           COURT SECURITY OFFICER:  Rise for the jury.
14           THE COURT:  One more thing, jurors often ask me Judge,
15   how long -- did we deliberate long enough?  And I can tell you
16   that I had a nine-month case once on and off it was a civil
17   case -- not nine months, I'm sorry, a four-month, a four-month
18   case and the jury came back in about an hour and ten minutes
19   with a verdict that was supported by the record.  I also had a
20   three-day trial and it took them two weeks to come back.  Was
21   one too long and one too short?  No.  It all depends upon how
22   you view the evidence.  You've heard all the evidence.  And as
23   long as you reach a unanimous verdict after properly
24   deliberating that you are comfortable with in accordance with
25   the standards under the law, then that's your verdict.  Okay.

1    Thank you.

2           *(Jury exits.)*

3                          *   *   *

4           THE COURT:  Counsel can be seated.  So I have a rule

5    -- you can be seated.

6           MR. EDWARD BARTOLOMEI:  Thank you, Your Honor.

7           THE COURT:  I have a rule in my court that counsel and

8    the defendant must be within 15 minutes of this courtroom at

9    any time when the jury is deliberating.  We can't have counsel

10   off somewhere way across town and we're waiting 30 minutes or

11   40 minutes in traffic for them to get here in case we have a

12   jury question.  It just doesn't work.  Obviously today we're

13   going to send them home at 4:30.  They may reach a verdict

14   before then, I don't know.  I had a case -- Priscilla would

15   remember, she's not here, but we sent the jury out, I got back

16   to my chambers, took my robe off, sat down and took one

17   telephone call and they came in and told me the jury's got a

18   verdict.  It took like six to ten minutes.  Who knows?  I also

19   remember that case, it was three days and we kept waiting,

20   waiting, waiting, waiting and it took them two weeks to reach a

21   verdict.  So I've given up on trying to figure that out.  I

22   think that's about it that we need to cover.  If you haven't

23   heard from us by 4:30, then you can just take off.  And then

24   just make sure that you're around on Tuesday.  I will be here

25   probably doing sentencings.  I don't know what's going on now.

1    They've had to move my calendar around.  I moved back my Austin

2    trip because I wanted to be sure I was here for as long as

3    possible.  Is there anything anybody would like to put on the

4    record?

5              MS. THOMPSON:  Nothing from the government.

6              MR. EDWARD BARTOLOMEI:  Happy Labor Day.

7              THE COURT:  I want to thank counsel.  I know that it's

8    been a hard fought case, both of you have very strong opinions

9    about this case and I understand that and I appreciate it.  And

10   I recognize that there have been some clashes between counsel

11   from time to time, but all in all I think that given the

12   subject matter in this case and actually very few of these

13   cases actually go to trial, probably 99 percent of them plead

14   probably.

15             MS. THOMPSON:  Probably 97.

16             THE COURT:  97, 99 percent are pled.  So these are

17   difficult cases when they go to trial because there's very

18   strong feelings, the subject matter is tough and, you know,

19   that's what our Constitution is all about.  I always like to

20   remind the jury that Abraham Lincoln who was one of the great

21   lawyers in our history, people forget about that, they think he

22   was just some kind of a backwoods lawyer, he still holds the

23   record for the most appearances before the Illinois Supreme

24   Court.  He tried cases left and right.  Somebody just wrote a

25   book about his last murder trial.  He was a defense lawyer, he

1    was a civil lawyer, he was a prosecutor, he was a great lawyer.

2    He called the Federal Court the ultimate temple of justice and

3    it is.  So we have to think of it that way and the lawyers here

4    are far more important than I am.  All of the lawyers here are

5    officers of this court, I'm an officer of the court.  But your

6    role here is much more important than mine.  Well, I will see

7    you at some point along the way and if I don't see you before

8    4:30, have a nice weekend.

9              COURT SECURITY OFFICER:  All rise.

10             *(4:03 p.m.)*

11                        *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JURY TRIAL PROCEEDINGS                    140

1                        *   *   *   *   *

2   UNITED STATES DISTRICT COURT

3   WESTERN DISTRICT OF TEXAS

4

5        I certify that the foregoing is a correct transcript from

6   the record of proceedings in the above-entitled matter.   I

7   further certify that the transcript fees and format comply with

8   those prescribed by the Court and the Judicial Conference of

9   the United States.

10

11  Date signed:  October 8, 2019

12

13  /s/ Angela M. Hailey

14  Angela M. Hailey, CSR, CRR, RPR, RMR
    Official Court Reporter
15  655 East Cesar E. Chavez Blvd., Third Floor
    San Antonio, Texas  78206
16  (210)244-5048

17

18

19

20

21

22

23

24

25